**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 10-cv-02868-MSK-KMT

L-3 COMMUNICATIONS CORPORATION; and
L-3 SERVICES, INC.,

        **Plaintiffs,**

v.

JAXON ENGINEERING & MAINTENANCE, INC.;
JONI ANN WHITE;
RANDALL K. WHITE;
SCOTT WHITE;
SUSAN RETTIG;
CHARLES RETTIG;
JAMES YOUNGMAN;
JERRY LUBELL;
KELLY RICE;
JOHN MCCLURE; and
JOHN DOES 1-25,

        **Defendants.**

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART**
**MOTION TO DISMISS**

---

      **THIS MATTER** comes before the Court pursuant to the Defendants' Motion to Dismiss

(**# 47**), the Plaintiffs' response (**# 50**), and the Defendants' reply (**# 55**); and the Defendants

Objections (**# 83**) to the Magistrate Judge's July 18, 2011 Minute Order (**# 70**) and ensuing

Protective Order (**# 82**) granting the Plaintiffs' Motion for Entry of a Protective Order (**# 62**), the

Plaintiffs' response (**# 84**), and the Defendants' reply (**# 88**).

1

## FACTS

Although the Amended Complaint (**# 33**) contains some 400 allegations spread over 87 pages, the underlying allegations can be simplified.  The Plaintiffs (collectively, "L3") are engaged in the business or providing machinery and services designed to test the protective measures found in electronic equipment against damage from electromagnetic pulses.  L3 alleges that, over the years, its employees – including some of the individual Defendants herein who were formerly employed by L3 – invented new testing equipment, improved on existing equipment, and otherwise devised new and more effective ways of conducting such testing.  L3 alleges that each of these inventions or improvements, along with other general business information such as customer lists and pricing data, constitute trade secrets belonging to L3.  It contends that each L3 employee, including the individual Defendants herein, contractually agree to maintain the confidentiality of L3's trade secret information.

L3 contends that in or about 2007, Defendant Randall White, an L3 employee, devised a plan to leave L3 and create a competing business entity.  While still employed by L3, Mr. White allegedly met with L3's major customers to convince them to support his new, competing business, and he began using L3's internal acquisitions systems to purchase equipment that would later be diverted to the new business.  In May 2008, Mr. White and his wife, Defendant Joni White (who was not an L3 employee), incorporated Defendant Jaxon Engineering and Maintenance, Inc. ("Jaxon").  Thereafter, Mr. White and certain L3 employees, named as Defendants here, continued to acquire equipment through L3 with the intention of later transferring it to Jaxon, and/or acquired other items of L3's trade secret information in order to give Jaxon access to that material.

In July 2009, although it was not yet operational, Jaxon succeeded in obtaining certain testing contracts from Serco, one of L3's major clients.  L3 contends that these contracts were awarded as the result of collusion between Mr. White and Donald Eich, a Serco representative with whom Mr. White had worked closely while employed at L3.  According to L3, Mr. White and Mr. Eich conspired to ensure that the contracts that were awarded to Jaxon were either drafted in such a way that L3 would be unable to meaningfully compete for them, or that L3 simply was not notified about the opportunity to bid.   Jaxon's bids were prepared by Mr. White and relied heavily on L3's trade secret information.  The Amended Complaint alleges that Jaxon continues to compete with L3 by improperly using L3's trade secret information.

Much like the answer to a law school examination, L3's 24-claim Amended Complaint asserts a wide variety of legal theories for recovery on these facts: (i) violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, in that Jaxon (and its participation with certain individual Defendants) constitutes an "enterprise," in furtherance of which the various Defendants have engaged in a pattern of predicate criminal offenses of mail and wire fraud; (ii) conspiracy to violate RICO, based on essentially the same facts; (iii) violation of the Colorado Organized Crime Control Act ("COCCA"), C.R.S. § 18-17-101 *et seq.*; and (iv) conspiracy to violate COCCA, all based on essentially the same facts as the RICO claim(s); (v) and (vi) patent infringement, apparently asserted only against Jaxon, on the grounds that Jaxon is infringing upon two patents owned by L3; (vii) violation of the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101 *et seq.*, against all Defendants; (viii)-(xi) common-law breach of contract claims against the individual Defendants, with each separate claim relating to different contracts that each individual Defendant entered into with L3; (xii) common-law

3

conversion against all Defendants, insofar as each Defendant allegedly converted non-trade secret physical property belonging to L3; (xiii) a claim sounding in false advertising, in violation of the Lanham Act, 15 U.S.C. § 1125(a), against all Defendants insofar as the Defendants solicited contracts from Serco and others by representing that Jaxon was capable of legally providing the testing services it was bidding for when, in fact, it was unable to do so without improperly employing L3's trade secrets; (xiv) a common-law claim for tortious interference with prospective business advantage against all Defendants, insofar as the Defendants improperly solicited contracts from Serco that would otherwise have been awarded to L3; (xv) a common-law claim for breach of fiduciary duty against those Defendants who were formerly employed by L3; (xvi) a replevin claim that L3 has since agreed to withdraw; (xvii) a common-law claim for unjust enrichment against all Defendants; (xviii) a claim for common-law conspiracy against all Defendants; (xix) a claim for civil theft in violation of C.R.S. § 18-4-405 against those Defendants who were formerly employed by L3, of somewhat uncertain provenance – it is not clear whether L3 is alleging that the material stolen are the physical goods and trade secret materials, or whether the stolen material is "compensation" that the Defendants received from L3 while they simultaneously conspired to develop and stock Jaxon, or whether the civil theft claim is premised on both theories; (xx) - (xxiv) common-law fraud claims against each of the former L3 employee Defendants, on the grounds that representations made by these Defendants to L3 in their employee timesheets and records showing work on L3's behalf were false; (xxv) violation of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, against Randall White, Joni White, Scott White, Susan Retting, and Jaxon, insofar as these Defendants conspired with Mr. Eich to rig bidding on Serco contracts such that Jaxon would receive the contracts even

4

where L3 submitted a lower-cost bid; and (xxvi) statutory unfair competition under C.R.S. § 18-4-405 against Jaxon, based on essentially the same facts as the Lanham Act claim previously described.

The Defendants move (# 47) to dismiss the Amended Complaint or, in the alternative, for a more definite statement. Rather than to summarize the arguments contained in the Defendants' 53-page motion and 34-page supporting brief in this portion of the Order, the Court will defer the discussion of the issues raised by the Defendants to the appropriate portions of the analysis.

Notwithstanding the pending Motion to Dismiss, the parties proceeded to commence discovery. On July 1, 2011, L3 moved (# 62) for a protective order, explaining that both sides were unwilling to produce business, technical, financial, and trade secret discovery, among other things, without the safety of a protective order that would prevent undue dissemination of such material. The motion recited that the parties had generally agreed upon a protective order containing two tiers of confidentiality – a tier for simple "confidential" information and a second tier that would be designated "attorneys' eyes only" – but the parties could not agree as to whether certain categories of individuals would be given access to one or both tiers. As relevant here, the parties agreed that each side would appoint one "Technical Advisor" that would be granted access to certain material for the purpose of providing interpretation and advice to counsel. However, the Defendants objected to two aspects of this proposal: (i) that the Technical Advisors would be granted access to material designated as "attorneys' eyes only," and (ii) the fact that L3 intended to designate Charles Crain, a current employee of L3, as its advisor, rather than a disinterested non-employee. L3's motion sought resolution of whether Mr. Crain could serve as L3's Technical Advisor and, if so, whether Mr. Crain would be given access to

5

"attorneys' eyes only" material.

The Court referred L3's motion to the Magistrate Judge and on July 18, 2011, following a hearing, the Magistrate Judge entered a Minute Order (**# 70**) granting, in part, L3's motion. Specifically, the Magistrate Judge ruled that Mr. Crain would be permitted, as L3's Technical Advisor, to view "attorneys' eyes only" material, but that his access to such material would be limited to "any successful bids made by Defendants prior to November 23, 2010, the date this matter was filed."  As directed by the Magistrate Judge, the parties drafted and submitted a proposed Protective Order embodying this and other rulings, and the Magistrate Judge issued that Protective Order (**# 82**) on August 8, 2011.

On August 11, 2011, the Defendants filed Objections (**# 83**) pursuant to Fed. R. Civ. P. 72(a) to the Magistrate Judge's ruling, arguing: (i) the Magistrate Judge erred in finding that L3 met its burden of showing that Mr. Crain, as a current L3 employee, was necessary as a Technical Advisor rather than available non-employees with sufficient knowledge; (ii) relatedly, that Mr. Crain's access to Jaxon's confidential information creates a risk of competitive harm to Jaxon; and (iii) that in the alternative to excluding Mr. Crain as an Advisor entirely, the Court should limit his access to technical information, and preclude him from having access to Jaxon's financial and pricing information.

## ANALYSIS

### A.  Motion to Dismiss

#### 1.  Standard of review

Most of the Defendants seek dismissal of the claims against them for failure to state a claim under Fed. R. Civ. P. 12(b)(6), among other grounds.   In reviewing a motion to dismiss

pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  The Court must limit its review to the four corners of the Complaint, but may also consider documents attached to the Complaint as exhibits, *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001), as well as unattached documents which are referred to in the Complaint and central to the plaintiff's claim, so long as the authenticity of such documents is undisputed.  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

With regard to what must be pled to avoid dismissal, the Supreme Court in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), described the standard that must be met as "facial plausibility."  In this context, "plausibility" refers to the scope and degree of specificity of the allegations in the complaint.  *Khalik v. United Air Lines*, ___ F.3d ___, 2012 WL 364058 (10th Cir. Feb. 6, 2012).  Although Fed. R. Civ. P. 8(a)(2) still requires the pleader to supply only "a short and plain statement of the claim," that statement must provide more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or generalized allegations of conduct that "encompass a wide swath of conduct, much of it innocent." *Id.*   In this regard, the plaintiff must do more than articulate a set of facts that could "conceivabl[y]" or "possibly" give rise to a claim; he must "nudge[ ] his claims across the line from conceivable to plausible." *Id.*  Of course, the degree of specificity that will be required will necessarily vary based on the context of the case. *Id.*

*Iqbal* suggests that one way for the Court to proceed when considering a Rule 12(b)(6) motion is for the Court to "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. 129 S.Ct. at 1950.  The Court's factual recitation set forth above is an attempt to do so.  Once the complaint has been winnowed down to only those sufficiently-specific, non-conclusory factual allegations, the Court treats those allegations as true and proceeds to examine whether, under the controlling law, those facts are sufficient to state a claim.

## 2. RICO and COCCA claims

The Court first turns to the Defendants' challenges to the sufficiency of the pleading of L3's RICO and COCCA claims.  The two statutes are similar and are generally construed according to similar principles.  *Tara Woods Ltd. Partnership v. Fannie Mae*, 731 F.Supp.2d 1103, 1125 (D.Colo. 2010).  In broad terms, a party asserting a garden-variety RICO or COCCA claim must plead four major elements: (i) conduct; (ii) of an enterprise; (iii) through a pattern of two or more instances; (iv) of racketeering activity.  *Bixler v. Foster*, 596 F.3d 751, 861 (10th Cir. 2010).

The Defendants first challenge the sufficiency of L3's allegations of predicate acts of "racketeering activity."  Under RICO, acts which would constitute criminal mail or wire fraud, in violation of 18 U.S.C. § 1341 or § 1343, can constitute "racketeering activity."  18 U.S.C. § 1961(1) (defining "racketeering activity").  To plead these predicate acts, L3 must plead facts showing: (i) Defendants engaged in a scheme to defraud by means of false pretenses; (ii) the Defendants acted with the requisite intent to defraud; and (iii) the scheme contemplated the use of mail or wire transactions.  *Burnett v. Amrein*, 243 Fed.Appx. 393, 395 (10th Cir. 2007)

(unpublished).  Under Fed. R. Civ. P. 9(b), allegations of fraud must be pled with particularity, and thus, in alleging the predicate acts of mail and wire fraud, L3 must "set forth the time, place, and contents of the false representation, the identity of the party making the false statement, and the consequences thereof."  *Id.*; *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006).

L3 attempts to itemize the specific allegations of mail and wire fraud in paragraph 183 of the Amended Complaint.  With regard to mail fraud allegations, L3 contends that, "by way of illustration and without limitation," the following acts by unspecified Defendants constituted acts of mail fraud: (i) "sending by mail equipment purchase orders and/or communications regarding such orders for equipment, using L-3's money, under L-3's contracts, for equipment that Defendants conspired to steal for themselves . . ."; and (ii) transmitting bids and/or communications associated with such bids by mail" for various contracts Jaxon received from Serco, "using and including stolen L-3 trade secrets but falsely representing that such proprietary information was owned by Jaxon."

The Court will assume, for the moment, that L3's general allegations concerning the object and means of the Defendants' scheme to obtain equipment and information from L3 to use for Jaxon is sufficient to plead the rough contours of the basic elements of a claim of mail fraud.  But the Court has some reservations that the Amended Complaint pleads the specific instances of fraud with the requisite level of particularity.  According to the Amended Complaint, the Defendants' acts of mail fraud fall into two categories: (i) ordering equipment through L3 with the intent to divert it to Jaxon, and (ii) transmitting bid to Serco.  When describing these events in the Amended Complaint, L3 fails to specifically identify "the time, place, and contents of the false representation, the identity of the party making the false statement, and the consequences

thereof."

For example, in paragraph 93(a), L3 alleges that, "on or about April 22, 2008," Defendant Randall White "began approving Purchase Requisitions spending L-3 funds on test equipment . . . for eventual transfer to Jaxon." This allegation is insufficient to plead an act of mail fraud with the requisite particularity for several reasons. First, it appears to describe a course of action by Mr. White over some period of time, but identifies only one date upon which Mr. White acted. Even assuming that a single submission of a purchase requisition by Mr. White on April 22, 2008 would be sufficient to state a claim for mail fraud, the allegation does not identify, with any specificity, the "contents of the false representation" contained in Mr. White's purchase requisition. Indeed, it is not clear whether the "false representation" in the purchase requisition was one of commission – *i.e.* Mr. White falsely attesting that the requested equipment would be used for L3's purposes – or one of omission – *i.e.* Mr. White failed to disclose his intent to use the equipment for Jaxon's benefit.

Similarly, paragraph 99 of the Amended Complaint, which alleges that over a period of time from April to December 2008, several Defendants "orchestrated the purchase of over 500 parts and pieces of equipment," presumably with the intent to divert it to Jaxon. But these generalized allegations are insufficient to identify the fraudulent representations or omissions made by the Defendants, much less the dates and specific makers of the fraudulent statements. The Court has canvassed the other allegations in the Amended Complaint that relate to the submission of purchase requisitions through L3, and finds no allegations therein with the necessary level of particularity that are sufficient to plead a mail fraud scheme.

Turning then to the second alleged form of mail fraud – the submission of bids by Jaxon

– the same issues are evident.  Although the Amended Complaint identifies the bids by the contract number for orders issued to Jaxon by Serco, the Amended Complaint gives no indication of the date of any alleged fraudulent bid, the identity of the person creating the bid, or the specific fraudulent statement contained in the bid.  At best, L3 pleads only that the bids "expressly or impliedly represented that trade secrets of L-3 were actually proprietary information owned by Jaxon," but L3 does not describe with any detail the particular content of the bids that "expressly or impliedly" constituted this representation.

Accordingly, the Court agrees with the Defendants that L3 has failed to allege the predicate acts of mail fraud with the degree of particularity required by Rule 9(b).

Turning then to L3's allegations of wire fraud, L3 again describes the alleged wire fraud schemes encompassing a few general categories of actions: (i) Randall White "signing L-3 Purchase Requisitions to purchase equipment" (and then "falsely representing the equipment as belonging to AFSPC," a different entity) and dispatching those requisitions by wire; (ii) transmitting bids to Serco by wire; and (iii) "making payments for equipment and/or receipt of payments" from Serco, again by wire.  The Court will not belabor the analysis by repeating its findings above: that the Amended Complaint fails to adequately identify the particulars of any fraudulent statement or omission by Mr. White with regard to any of the referenced categories of acts of wire fraud.  In no instance has L3 specifically identified the time and specific false contents of any wire communication made by Mr. White.

The Defendants argue that the Court should "relax" the particularity requirements of Rule 9(b) because "the facts are uniquely within the defendants' knowledge."  *Citing Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992).  *Scheidt* does not stand for the proposition that the Court can

"relax" Rule 9(b)'s particularity requirement; instead, it stands for the proposition that "allegations of fraud may be <u>based on information and belief</u> when the facts in question are peculiarly within the opposing party's knowledge," but even then, "the complaint [must] set[ ] forth the factual basis for the plaintiff's belief."  *Id.* (emphasis added).

Here, the Court has grave doubt that at least some of the facts underlying L3's allegations of mail and wire fraud are "peculiarly within" the Defendants' knowledge, such that L3 could instead plead the relevant particulars upon information and belief instead of actual knowledge. Because a major component of the fraudulent schemes involved the Defendants using L3 purchase requisitions to obtain the purloined equipment, it would reasonably follow that L3 would have copies of those requisitions or other records that would reveal what, if any, false statements or omissions were contained therein.  Assuming, without necessarily finding, that the contents of bids submitted by Jaxon to Serco would be unknown to L3, such that L3 could instead plead the fraudulent nature of such bids "upon information and belief," *Scheidt* nevertheless requires that L3 make clear the factual basis for L3's belief as to the contents of such bids.  L3 has not made any such showing regarding the basis of its belief that Jaxon's bids to Serco contained false representations or omissions.

L3 further argues that, under *U.S. v. Kennedy*, 64 F.3d 1465, 1475-76 (10th Cir. 1995), it is only required to allege the existence of a "scheme to defraud," rather than to specifically identify any particular false statements.  In *Kennedy*, a defendant convicted of mail fraud argued that the evidence against him was insufficient, insofar as the government failed to put on evidence that Kennedy made specific misrepresentations to each of the victims.  Finding that argument meritless, the 10th Circuit explained that the general prohibitory thrust of the mail fraud

statute was the devising of the scheme, not the making of particular misrepresentations to particular individuals, and thus, so long as there was sufficient evidence to establish the existence of a fraudulent scheme by Kennedy that used the mails, the question of whether a particular victim was the recipient of a particular misrepresentation was irrelevant. *Id.* at 1477-78.

*Kennedy* provides no real assistance to L3 in these circumstances. In *Kennedy*, the defendant's conviction was affirmed because there was evidence that he used the mails in furtherance of a scheme that involved him making false representations to <u>somebody</u>, even if that somebody was not one of the victims who testified. Here, L3 has not sufficiently alleged with sufficient particularity a false representation made by the Defendants to <u>anybody</u>. L3's reading of *Kennedy* to require only the pleading of a scheme, not any false representations, is equally unavailing. As explained there, the crime of mail fraud may exist where a defendant either formulates a "scheme to defraud"or a "scheme to obtain money or property by means of false statements." *Id.* at 1476, *discussing U.S. v. Cronic*, 900 F.2d 1511, 1513-14 (10th Cir. 1990). The latter intrinsically requires false statements to bring about the scheme, and thus, to the extent L3's mail fraud allegations depend on this type of scheme, it is necessary for L3 to plead the requisite false statement(s) that supported the scheme with the degree of particularity required by Rule 9(b).

To the extent L3 was instead relying on the "scheme to defraud" component of 18 U.S.C. § 1341, that theory raises more difficult questions. *Cronic* explained that, unlike schemes premised on false representations, a "scheme to defraud" was one in which a person defrauded another, yet did so without actually making any affirmative misrepresentation. 900 F.2d at 1514.

*Cronic* explained that the "scheme to defraud" theory "focuses on the intended end result, not on whether a false representation was necessary to effect the result." *Id.* at 1513. Assuming for the moment that the difference between a "scheme to defraud" and a scheme premised on false representations are differentiated by whether a defendant made affirmative false statements (thus giving rise to a false representation claim) or omitted material information (thus giving rise to a scheme to defraud), L3 presenting its mail fraud claims as the latter carries some complications. Once again, L3's mail fraud theories are premised on two types of conduct: defendants ordering equipment using L3's money with the intent to convert it to Jaxon's use, and defendants bidding for Serco contracts without disclosing their theft of L3's trade secrets. It is difficult to envision how either type of conduct falls within a "scheme to defraud" theory of mail fraud.

With regard to the equipment-based contentions, these are contentions that sound in the simple tort of conversion: L3 purchased and owned certain equipment, and the Defendants misappropriated that equipment for their own benefit. The means by which the Defendants caused L3 to acquire the equipment is largely irrelevant in such circumstances – whether they resorted to omissions to cause L3 to buy more equipment than it needed, or whether they simply pilfered existing stores of equipment in L3 stockrooms is largely immaterial, as the relevant conduct is the Defendants' theft, not L3's acquisition of the material. Perhaps a different analysis might be appropriate if the allegations were that the Defendants somehow convicted L3 that Jaxon was a subcontractor or corporate subdivision and induced L3 to purchase the equipment <u>for</u> Jaxon's benefit, but the facts alleged herein are far less subtle. Thus, when the focus is on the Defendants' alleged theft of L3's equipment, it is difficult to conceive of how a "scheme to defraud" exists, rather than a simple "scheme to convert." In such circumstances, the

requisite elements of mail fraud are not present, thus failing to provide a predicate act for a RICO/COCCA claim.

With regard to the bidding-based contentions, the analysis is slightly more abstract.  As the Court understands L3's theory, Jaxon defrauded Serco by failing to note in its bid documents that Jaxon would be performing the services it was proposing by using L3's trade secrets.  But the Amended Complaint gives no indication that such an omission would have been considered material by Serco, such that it was "defrauded" by the omission of such information.  The Amended Complaint appears to allege that Serco was merely contracting for testing of its electric equipment according to certain specifications, and there is no indication that Serco was at all concerned whether Jaxon performed that testing using its own proprietary methods or whether it did so using testing methods it improperly obtained from others, so long as the proper testing was done.  Thus, it is difficult to envision how, under the allegations contained here, the Defendants engaged in any "scheme to defraud" Serco.  This theory only becomes more troubling when one recognizes that, according to the Amended Complaint, Mr. Eich, one of Serco's representatives, was fully aware of the Defendants' intention to set up Jaxon by improperly using L3's trade secrets.  *Amended Complaint*, ¶ 92 (Mr. White "worked with Donald Eich . . . to obtain [his] assurances that if he were to create a competing entity and steal L-3's intellectual property . . . that he would be awarded contracts . . . through Serco."  Thus, the Court cannot find that L3 has adequately alleged mail or wire fraud claims under a "scheme to defraud" theory.

Accordingly, the Court finds that L3 has failed to adequately plead the RICO/COCCA predicate acts of mail or wire fraud, and this defect is fatal to all of their RICO/COCCA claims.

Those claims are thus dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(6).[1]  The

Court does not reach the Defendants' remaining arguments with regard to these claims.

### 3. Patent infringement claims

With regard to the two claims for patent infringement, the Defendants contend that L3

has failed to adequately plead the means by which the Defendants' products infringe upon L3's

patents.  To plead a claim for patent infringement, a plaintiff must allege facts showing that he

owns the patent in question; that the defendant "has been infringing the patent by making,

selling, and using the device embodying the patent"; and that the plaintiff has given the

defendant notice of its infringement.  *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357

(Fed.Cir. 2007).  The plaintiff is not required to specifically recite "each element of the claims of

the asserted patent" that are allegedly infringed.  *Id.*  All that is necessary is to "plead facts

sufficient to place the alleged infringer on notice as to what he must defend."  *Id.*

Here, the Court finds that L3 has sufficiently identified the patents allegedly infringed

and has specifically identified specific devices made or used by Jaxon that result in such

infringement (the "Automated EM Barrier Monitoring Systems Equipment" and "short pulse and

intermediate pulse transient pulse generators for Pulse Current Injection").  Certainly, L3's

Amended Complaint is no model of specificity and affords little more notice beyond simply

identifying the alleged infringing devices, but the Court finds that this is sufficient under the

---

[1]L3's response generically asserts an intention to "amend the Amended Complaint to cure
any deficiencies."  Given the contentiousness of this matter to date, and the fact that L3 has
already amended its complaint, both formally (**# 33**) and informally by stipulation (**# 61**), the
Court is not inclined to grant blanket leave to L3 to further amend its pleadings.  If L3 believes
that it can cure the defects in its pleadings, it may seek leave to amend according to Fed. R. Civ.
P. 15, accompanying such a request with a proposed amended pleading within 7 days of the date
of this Order.

circumstances to put the Defendants on notice.  Any further elucidation as to precisely how L3

contends that Jaxon's devices infringe upon L3's patents may be had through discovery.

       4.  <u>Uniform Trade Secret Act</u>

      The Defendants argue that L3's claim under the Colorado Uniform Trade Secrets Act

should be dismissed because the claim "fails to identify sufficiently any alleged trade secrets,

and fails to plead which Defendants allegedly misappropriated such alleged trade secrets."

      The Court finds that the Amended Complaint sufficiently discloses some of the trade

secrets involved here with specificity: information relating to "the selection and combination of

switches, capacitors, inductors and resistors in pulse forming networks" for various pulser

machines; information relating to "antenna selection, design, and assembly"; software programs

"for controlling, capturing, and compiling raw CWI test data"; customer lists of purchasers of

HEMP technology; pricing templates; vendor lists; and drawings and designs of electromagnetic

enclosures, among other things.  Although the Defendants would certainly prefer that L3 be even

more specific in identifying each particular allegedly misappropriated trade secret, and that it be

prohibited from referencing other alleged trade secrets in more general terms, the Court cannot

say that the Amended Complaint is so bereft of specifics regarding any of the trade secrets at

issue here that dismissal is warranted.

      Turning to the Defendants' contentions that the Amended Complaint fails to identify

which Defendants allegedly misappropriated the trade secrets, the Court disagrees.  The

Amended Complaint specifically lists each individual Defendant and describes, in some detail,

certain confidential or proprietary L3 materials that each Defendant improperly obtained, copied,

or otherwise disseminated.  The Court cannot say that these descriptions are so bereft of detail

that the Defendants are deprived of meaningful notice of the allegations against them.

### 5. Breach of contract claims

The Defendants contend that, with regard to each of the breach of contract claims against them, L3 fails to adequately allege that those contracts were supported by consideration.

The Colorado Supreme Court has rejected the notion that a complaint alleging breach of contract must necessarily recite the consideration securing that agreement or else face dismissal. *Smith v. Mills*, 225 P.2d 483, 485 (Colo. 1950). Rather, it holds that "alleging entrance into a contract is sufficient allegations of its validity, and it is not necessary to set out specifically the nature of existence of consideration to enable the complaint to withstand motion for dismissal." *Id.* Certainly, the Defendants may contend on summary judgment that there is no sufficient consideration securing their contractual promises, and L3 will then be obligated to come forward with sufficient proof of adequate consideration, but at this stage of the litigation, the failure of the Amended Complaint to recite the terms of consideration is not fatal.

Separately, the Defendants allege that L3's breach of contract claim against Defendant Lubell fails to state a claim because the agreement in question between Mr. Lubell and L3 does not preclude Mr. Lubell from offering consulting services to third parties outside the contractually-defined areas of exclusivity, and the Amended Complaint does not specifically allege that the services Mr. Lubell supplied to Jaxon were within those areas of exclusivity. Although the Defendants are, strictly-speaking, correct on this point, a reasonable inference to be drawn from the Amended Complaint is that L3 is asserting that Mr. Lubell's services to Jaxon are within the areas in which he promised exclusive loyalty to L3. Whether or not this inference

is ultimately supported by the record is a question that must await summary judgment, but for

pleading purposes, the Court finds that the breach of contract claim against Mr. Lubell is

sufficient.

6.   Conversion claim

To state a claim for conversion under Colorado law, L3 must allege that: (i) a defendant

exercised dominion or control over property; (ii) that property belonged to L3; (iii) the

defendant's exercise of control was unauthorized; (iv) L3 demanded return of the property; and

(v) the defendant refused to return it.  *See e.g. Glenn Arms Assocs. v. Century Mortg. and

Investment Corp.*, 680 P.2d 1315, 1317 (Colo.App. 1984).  The Defendants contend that L3's

pleading of this claim suffers from several deficiencies, which the Court will address in turn.

First, the Defendants contend that L3 has not specifically identified the allegedly

converted property, instead resorting to a contention that such property "includ[es] items such as:

computers, cameras, business forms, templates, images, illustrations, pictures, notes, notebooks,

and other organizational mechanisms, and analysis and comparison tools."  The Defendants take

issue with the "items such as" language as being insufficiently specific, but the Court finds that

L3's itemization of the various categories of items taken provides the Defendants with sufficient

notice of the claims against them to permit them to marshal a defense.  Specific itemization of

the property allegedly converted must await discovery.

Next, the Defendants contend that the Amended Complaint does not specify which

Defendant converted which items of property, nor does it plead facts sufficient to demonstrate

that each Defendant lacked any legal right to control the disposition of the property in question.

The Court finds that the Amended Complaint adequately alleges specific behavior on the part of

19

some Defendants, including Randall White, Scott White, and Susan Rettig as being involved with acts to obtain, sequester, and ultimately remove items of equipment belonging to L3. The Amended Complaint does not contain similar allegations against other individual Defendants, but at this point, the Court is not prepared to simply dismiss the conversion claim as against other Defendants. It appears that L3's conversion claim is intended to apply to materials other than those considered to be "trade secrets," and where some other Defendants are accused of obtaining or retaining other items of property, it is not always clear whether that property is alleged to be a "trade secret" or physical property subject to the conversion claim. This is an area in which discovery and the strictures of Rule 11 provide adequate protection to those Defendants against whom no cognizable conversion claim might exist. If, at the close of discovery, L3 is unable to make a plausible factual showing that a given Defendant converted any physical property belonging to L3 and L3 refuses to either stipulate or otherwise make clear that the conversion claim is not asserted against that Defendant, the appropriate Defendant may not only seek summary judgment on the conversion claim but may also request sanctions against L3 pursuant to Fed. R. Civ. P. 11.

As to the remaining elements that the Defendants challenge – the sufficiency of allegations as to L3's demand for return of the property and its suffering of damages as a result, the Court finds that to the extent no express allegation to these effects is present, such allegations are a permissible inference to be drawn from the facts alleged in the Amended Complaint. Accordingly, the Court denies the Defendants' motion to dismiss the conversion claim.

7. Lanham Act/false advertising claim

To state a claim for false advertising under the Lanham Act, L3 must allege: (i) that

Jaxon made a material false or misleading representation in connection with the promotion of its product or service; (ii) that statement was made in interstate commerce; (iii) the false statement was likely to cause confusion or mistake as to the characteristics of its goods or services; and (iv) the statement resulted in injury to L3. *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002).

The Defendants contend that this claim should be dismissed against certain individual Defendants – Charles Rettig, Scott White, James Youngman, Jerry Lubell, Kelly Rice, and John McClure – on the grounds that there are no allegations that these Defendants participated in any statements promoting Jaxon and that the Lanham Act does not recognize imputed or aiding/abetting liability for false advertising. *Citing Electronic Lab Supply Co. v. Cullen*, 977 F.2d 798, 805-06 (3d Cir. 1992). L3 responds that the Lanham Act does permit liability on an aiding or abetting theory. *Citing Proctor & Gamble Co. v. Haugen*, 317 F.3d 1121, 1128 (10th Cir. 2003).

Both citations are off-point. *Electronic Lab Supply* considered whether attorneys who sought an *ex parte* property seizure order in a Lanham Act case can be considered an "applicant" for a seizure order that is later found to be wrongful, thus subjecting them to liability under 15 U.S.C. § 1116(d)(1)(A). Finding that attorneys drafting seizure orders were not "applicants," the court then turned to the question of whether they could be liable for aiding or abetting an "applicant" for a wrongful seizure order. Relying primarily on a test that examined (i) whether the statutory language expressly limits liability to a specifically-defined group of perpetrators; and (ii) whether the statutory claim was analogous to criminal or tort claims (where aiding and abetting liability is common), the court concluded that although the statutory remedy for

21

wrongful seizure orders was tort-like, the statute's language imposing such liability only on "applicants" was sufficiently narrow that it would be inappropriate to broaden the statute's scope by incorporating aiding and abetting liability.  *Id.* at 806.

Because *Electronic Lab Supply* was specifically interpreting terms in a statutory section different from the one presented here, its outcome is not controlling.  This is particularly true where the narrowness of the wrongful seizure remedy contemplated by 15 U.S.C. § 1116 stands in sharp contrast to the relatively broad scope of a Lanham Act false advertising claim under 15 U.S.C. § 1125(a).  The former limits itself to the "applicant" for the seizure order, whereas the latter imposes liability on "any person who, on or in connection with any goods or services," uses misleading representations about a product.  Given the far broader reach of § 1125(a) than § 1116, this Court is not convinced that the outcome in *Electronic Lab Supply* is persuasive here.

At the same time, *Haugen* is also off-point.  The cited opinion is the end of that case's long journey through the court system, and is primarily concerned with questions of whether the trial court properly applied the 10th Circuit's orders on remand from a prior appeal.  To fully appreciate the import of that decision, the Court must first explain the proceedings that preceded it.  The plaintiff, a manufacturer of soap products, sued certain distributors of its competitor, Amway, for false advertising under the Lanham Act (along with certain tort claims under state law), alleging that the distributors had been spreading false rumors associating the plaintiff with Satanism.  The plaintiff also sought to hold Amway liable for that conduct under a aiding and abetting theory.  The trial court initially granted summary judgment to the defendants on the grounds that the rumors did not relate to the quality of the plaintiff's goods and services itself, but on appeal, the 10th Circuit reversed, finding that the Lanham Act also prohibited false

advertising relating to a competitor's "commercial activities," and the rumors arguably implicated that standard. *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273 (10th Cir. 2000). Thus, the 10th Circuit vacated the grant of summary judgment to the defendants on the Lanham Act claims and remanded that matter for further consideration. The 10th Circuit also considered whether the trial court's finding that Amway could not be held vicariously liable for the distributors' conduct under state law with regard to state tort claims was correct. *Id.* at 1277. Concluding that the question turned on whether the distributors were employees of Amway or independent contractors, or possibly whether the distributors were acting as Amway's agents when spreading the rumors, the 10th Circuit found that the record failed to support either theory of vicarious liability. *Id.* at 1277-78. Thus, the Court of Appeals affirmed that portion of the trial court's order that granted judgment to Amway on claims sounding in vicarious liability for state torts.

Upon the remand to reconsider the Lanham Act claims, the trial court noted that the plaintiff was now asserting that "the vicarious liability standards under the Lanham Act are less stringent than under Utah common law," such that the 10th Circuit's determination of vicarious liability under state law did not control the argument as to whether such liability existed with regard to the Lanham Act claim. *Proctor & Gamble Co. v. Haugen*, 158 F.Supp.2d 1286, 1292 (D.Ut. 2001). The trial court found that the plaintiff's position on this issue as the case proceeded was "muddled," but that in any event it found that "no vicarious liability claim [under the Lanham Act] exists against Amway in any event." *Id.* at 1294. It first noted that "[e]ven if there is a difference between the state and Lanham Act vicarious liability standards (which [the plaintiff] has wholly failed to explain), and assuming *arguendo* that the Lanham Act imposes a

more liberal standard than Utah state law . . . the differences are not such that [the plaintiff] could succeed on such a claim in light of the Tenth Circuit's ruling." *Id.* Reciting the 10th Circuit's factual findings as to Amway's lack of involvement with the rumors, the trial court concluded that "the Tenth Circuit's ruling necessarily forecloses a vicarious liability claim under the Lanham Act." *Id.* at 1296.

This, then, sets the stage for the *Haugen* opinion cited by the Defendants here. Proctor & Gamble appealed the trial court's decision again, arguing that the trial court erred in conforming its vicarious liability analysis under the Lanham Act to the analysis of vicarious liability under Utah state law, as affirmed by the Court of Appeals. The 10th Circuit observed that, even at that advanced stage, Proctor & Gamble "identifies no discrete distinctions between Utah's vicarious liability standards and those of the Lanham Act – apart from its vague insistence that the Third Circuit's holding in *AT&T v. Winback and Conserve [Program, Inc.,* 42 F.3d 1421, 1438 (3d Cir. 1994)] is evidence of a standard separate and apart from Utah common law." 317 F.3d at 1127. The 10th Circuit interpreted the *AT&T* case to hold that "it is proper to import into [15 U.S.C. § 1125(a)] common law concepts of agency, apparent authority, and vicarious liability." *Id.*, *citing* McCarthy on Trademarks and Unfair Competition, § 27:53 (4th Ed. 2002). It observed that *AT&T* had also remanded the matter to a trial court to assess "whether the sales representatives [sued in a vicarious capacity for trademark infringement] were agent independent contractors or non-agent independent contractors." *Id.*, *citing AT&T*, 42 F.3d at 1439. Concluding that the agency and independent contractor questions addressed in *AT&T* were identical to the same agency and independent contractor questions the 10th Circuit had previously examined under Utah law, the 10th Circuit found that Proctor & Gamble"has made an insufficient

showing that vicarious liability under the Lanham Act is substantially different than under Utah law." *Id.* at 1128.

Arguably, *Haugen* could be read to be an endorsement by the 10th Circuit of the concept of vicarious liability in Lanham Act cases, at least to the extent that *AT&T* recognized it to exist. But this then requires an examination of the scope of the *AT&T* case. There, AT&T sued the defendant, who purchased services from AT&T in bulk and resold them to smaller customers, alleging that the defendant falsely represented to customers that it was affiliated with AT&T. The defendant argued that any misrepresentations were made by independent sales representatives over whom the defendant exercised no control. The court thus sought to examine the extent to which <u>agency theory</u> existed under the Lanham Act; the court was careful to explain that it was not opining as to whether "aiding and abetting" liability existed under the Lanham Act, as aiding and abetting theory addresses "a "different act" (encouragement) than the substantive offense does, whereas agency liability addresses who should be held responsible for a substantive offense that has indisputably been committed. *Id.* at 1430. To the *AT&T* court, that distinction was essential, as it observed that aiding and abetting liability "largely has been confined [in the federal system] to securities fraud," whereas agency liability "has long been a part of the federal system." *Id.* at 1431. Thus, although *AT&T* ultimately concluded that agency liability could exist under the Lanham Act, the court was careful to stated that "aiding and abetting should not be transplanted into the more settled realm of agency law." *Id.* at 1432.

Accordingly, the Court finds that *Proctor & Gamble* does nothing more than adopt the contours of *AT&T*, and in so doing, approves only of the importation of agency theory into Lanham Act infringement clams, but it does not purport to approve of aiding/abetting liability

under the Act.   The Defendants here cite to no other authority for the proposition that vicarious liability for violations of 15 U.S.C. § 1125(a) extends beyond the boundaries of standard agency theory, and thus, the Court finds that on the record presented here, L3's Lanham Act claims against the various employees of Jaxon must stand or fall based on the extent to which the Amended Complaint alleges sufficient facts to show that these employees acted as agents of Jaxon in bringing about the alleged false advertising.

Expressed in these terms, it is apparent that L3's allegations are insufficient.  L3's Lanham Act claims against the employees of Jaxon does not allege, as an agency-based claim typically would, that an act of false advertising by a subordinate permits liability to be escalated up the chain to a person who allegedly authorized that act; rather, L3's theory of liability seeks to push liability downward, exposing low-level employees in Jaxon to liability for conduct engaged in by their superiors, for which they had no alleged ability to control or direct.  L3 argues that these Defendants transferred L3's trade secrets to Jaxon "with actual or constructive knowledge that Jaxon or others would misrepresent the technology as being owned by Jaxon," but such an argument addressing only an aiding/abetting theory, not an agency theory.  Because the Amended Complaint fails to allege facts sufficient to impose Lanham Act liability on these Defendants under an agency theory, the Lanham Act claims are dismissed as against Charles Rettig, Scott White, James Youngman, Jerry Lubell, Kelly Rice, and John McClure.

The Defendants also make a perfunctory argument that L3 has failed to adequately allege that it is likely to be injured by any misrepresentation made by Jaxon in connection with the sale of its products.  The Court finds that a reasonable inference to be drawn from the allegations in the Amended Complaint is that Jaxon is only able to compete with L3 for contracts by

unlawfully exploiting L3's trade secrets, and that if Jaxon were prevented from using such secrets, it would not be able to advertise and bid for the same contracts as L3.  This is sufficient, at this early stage of the litigation, to satisfy the injury element of the claim.

        8.   <u>Tortious interference claim</u>

To assert a claim for tortious interference with prospective economic advantage, L3 must allege: (i) that the Defendants either induced a third person not to enter into or continue a contractual relationship with L3, or prevented L3 from acquiring or continuing the prospective relation; (ii) that the Defendants did so intentionally; and (iii) that they used improper means to do so.  *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo.App. 2007), *citing* <u>Restatement (Second) of Torts</u>, § 766B (1979).

The Defendants contend that L3 has not alleged that L3 "does not allege that it would have obtained (or even that it submitted bids regarding) the business purportedly lost," and that it merely alleges that "it had a right to continued business with Serco and unspecified other third-party companies."  This is an overly-cramped reading of the Amended Complaint.  L3 alleges that it was the incumbent provider of services to Serco, and that the Defendants "rigged" the bidding on contracts to continue those services in such a way that L3 would either not be invited to bid on them or were given incomplete information upon which to submit a bid.  A reasonable reading of the Amended Complaint thus suggests that the contracts allegedly obtained by Jaxon were for services that L3 was currently providing to Serco and, presumably, would have continued to provide had the Defendants not induced Serco to manipulate the bidding on them.  This is sufficient to state a claim for tortious interference.

The Defendants argue that cases such as *Memorial Gardens, Inc. v. Olympian Sales &*

*Mgmt. Consultants, Inc.*, 690 P.2d 207, 210-12 (Colo. 1984), stand for the proposition that "a company has no legal right to future contracts with current or prospective customers" is misplaced. *Memorial Gardens* involved a claim for tortious interference with an <u>existing</u> contract, not a prospective economic advantage, and thus, is of little illustrative value here. Cases such as *MDM* make clear that expectations of receiving future contracts are protected against tortious interference so long as "there is a reasonable likelihood or reasonable probability that a contract would have resulted" absent the interference. 165 P.3d at 886.  L3's allegation that it was the incumbent provider of similar services to Serco on similar contracts is sufficient to allege a reasonable probability that L3 could have obtained the Jaxon contracts as well.

The Defendants also complain that L3 does not adequately allege which Defendants allegedly interfered with L3's prospective economic advantage.  This complaint is well-taken, insofar as the statement of the claim refers only generally to "Defendants."  In its response, L3 purports to itemize the particular conduct by each Defendant that allegedly gives rise to the claim.  There can be little dispute that, under the facts as alleged, Jaxon and Randall White were the primary architects of the "bid-rigging" scheme that underlies this claim.  There are also sufficient allegations in the Amended Complaint that Susan Retting was "involved with preparing [a] proposal" to Serco for the contracts at issue here, making the claim cognizable against her.  However, L3's allegations with regard to the remaining Defendants merely contend that these Defendants participated in stealing trade secret information for Jaxon, not in assisting in rigging the bidding process with Serco to Jaxon's benefit.  Accordingly, the tortious interference claim is dismissed against all Defendants other than Jaxon, Randall White, and Susan Rettig.

9.  Breach of fiduciary duty claim

To plead a common-law claim for breach of fiduciary duty,[2] L3 must allege that: (i) there

was a fiduciary duty that existed between the parties; (ii) the Defendants breached that duty; and

(iii) L3 was damages as a result.  *FDIC v. Refco Group, Inc.*, 989 F.Supp. 1052, 1080 (D.Colo.

1997).  Under Colorado law, a variety of relationships can create fiduciary responsibilities

among the parties, even where the relationships themselves are not *per se* fiduciary in nature.

*Atlantic Richfield Co v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1162 (10th Cir. 2000).  A

fiduciary duty arises when "one person is under a duty, created by his undertaking, to act

primarily for the benefit of another in matters connected with the undertaking."  *Id.*, *citing*

*Destefano v. Grabrian*, 763 P.2d 275, 284 (Colo. 1988).

The Defendants argue that, to the extent their alleged fiduciary duties to L3 arose out of

their signing of various contracts promising confidentiality and non-dissemination of L3's trade

secrets, the damages associated with the breach of such fiduciary duties are co-terminus with the

damages flowing from their breaches of those contracts, such that the economic loss rule

prohibits the fiduciary duty claim.  L3 responds that, wholly apart from their contractual

obligations, the Defendants owed common-law fiduciary duties arising from their employment

with L3 and their access to L3's confidential information.  Cases such as *Jet Courier* recognize

such a common-law duty of loyalty by employees arising independently from any contractual

---

[2]L3 contends that its claim is one for "breach of loyalty" as recognized in *Jet Courier Sev., Inc. v. Mulei*, 771 P.2d 486, 492 n. 10 (Colo. 1989), rather than for any alleged fiduciary duty.  For purposes of this analysis, the conceptual differences between these two types of claims are immaterial.

agreement between the parties, preventing the employees from making certain types of preparations to compete against their employer while remaining in that employ.  Those are precisely the sorts of allegations contained in the Amended Complaint, and thus, the Court finds that the economic loss rule does not preclude any breach of fiduciary duty or similar claim by L3.

>    10. Unjust enrichment claim

The Court need not specifically address the Defendants' objections to L3's unjust enrichment claim, as it is clear to the Court that the allegations state a cognizable unjust enrichment claim against each Defendant.  With regard to the Defendants' argument that C.R.S. § 7-74-108 preempts any tort claims of unjust enrichment premised upon claims of misappropriated trade secrets, the Court finds the reasoning in *Powell Products, Inc. v. Marks*, 948 F.Supp. 1469, 1474-75 (D.Colo. 1996), to persuasively explain why the preemptive reach of that statute is necessarily narrow.  The Court finds that L3 has alleged numerous ways in which the Defendants were unjustly enriched by events that do not involve any trade secrets of L3, including their misappropriation of physical equipment, misuse of L3's internal computer resources, and various other acts.

>    11. Civil conspiracy claim

The Court also summarily rejects L3's arguments regarding alleged defects in the pleading of L3's civil conspiracy claim against the Defendants.  Taken in the light most favorable to L3, with reasonable inferences drawn in its favor, the Amended Complaint adequately alleges that each Defendant knowingly entered into an agreement to form an entity to compete with L3 and to employ unlawful means – most significantly, the improper use of L3's confidential

information – to further that agreement.  The fact that not all Defendants are alleged to have

engaged in unlawful conduct in furtherance of the conspiracy – *e.g.* the allegation that Joni

White merely incorporated Jaxon and served as an officer of it – is irrelevant; it is axiomatic that

an individual member of a conspiracy is liable for all foreseeable unlawful acts of the

conspiracy.

### 12.   Civil theft claim

As with the conversion claim, the Court finds that the allegations in the Amended

Complaint, coupled with reasonable inferences to be drawn therefrom, are sufficient to allege the

necessary elements of this claim against all Defendants.  To the extent L3 is ultimately unable to

establish a colorable factual predicate to assert this claim against a given Defendant and refuses

to concede the claim against that Defendant, the Court will entertain a properly-supported

motion for sanctions.

### 13.   Fraud claims

L3 alleges claims of common-law fraud against each of the former employee Defendants,

allegedly arising from false claims on those employees' timesheets that they were performing

work for L3 when, in fact, they were performing work on behalf of Jaxon.  The Defendants

contend that L3 has not pled the requisite details of the alleged fraudulent statements with the

level of specificity required by Rule 9(b).

The Court finds that the Amended Complaint is sufficiently detailed on this point to meet

the rule's requirements.  The Amended Complaint adequately describes the substance, if not

necessarily the precise words, of the misrepresentation – namely, the contention that the

Defendants were performing work for L3 at a given time when, in reality, they were not.   The

failure of the Amended Complaint to supply the dates of these representations is unfortunate, but does not render the allegations so non-specific that the Defendants cannot reasonably respond to them.  The Court readily expects that, once L3 is able to ascertain through discovery the particular dates upon which the Defendants performed particular Jaxon-related acts on L3's time, it will be able to specifically point the Defendants to the corresponding time sheets.  Accordingly, the Court declines to dismiss the fraud claims.

### 14.  Sherman Act claim

To allege a violation of the Sherman Act, 15 U.S.C. § 1, L3 must allege: (i) a conspiracy or agreement among two or more independent actors; and (ii) that agreement unreasonably restrains trade in commerce.  *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992).  The Court turns first to the parties' dispute over whether the allegations sufficiently demonstrate an unreasonable restraint of trade.  Assuming, for the moment, that L3's allegations of collusion between Jaxon and Serco demonstrate a restraint of trade, the question becomes whether that restraint is "unreasonable."

There are some restraints of trade that have such pernicious effects or that so lack redeeming value that they are considered *per se* unreasonable; all other restraints are subject to a more complex "rule of reason."  *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 289-90 (1985).  L3 contends here that the restraint it alleges is a form of "bid rigging," widely understood to constitute a *per se* violation. *U.S. v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992).  But this Court finds that the allegations here do not fall within the definition of "bid rigging."  The crux of L3's Sherman Act claim is that Jaxon and Serco agreed that Serco would purposefully direct contracts to Jaxon, bypassing a competitive bidding

process in which L3 either would have participated but was not notified of the opportunity to

bid, or indeed did participate in and submitted the lowest-cost bid but was not selected. "Bid

rigging" arises from "an <u>agreement between competitors</u> pursuant to which contract offers are to

be <u>submitted to or withheld form a third party</u>." *U.S. v. Reicher*, 983 F.2d 168, 170 (10th Cir.

1992) (emphasis added). Thus, a scheme by which <u>L3</u> and <u>Jaxon</u> jointly agreed as to how they

would bid for Serco contracts, thus depriving Serco of the benefit of competitive bidding, would

constitute "bid rigging," but that is not what is alleged here.

The Court has carefully reviewed a wealth of antitrust cases for a more factually-similar

paradigm, and finds one described as "sham bidding" in *Sitkin Smelting & Refining Co. v. FMC

Corp.*, 575 F.2d 440 (3d Cir. 1978). There, the defendant announced that it would accept bids

for a contract to demolish its building and recover its scrap metal. Two bidders, plaintiff Sitkin

and an entity called Krentzman, submitted bids. The plaintiff contends that the defendant agreed

with Krentzman to share Sitkin's bid, to allow Krentzman to modify its bid accordingly, and to

ultimately accept Krentzman's higher bid for the project. The Third Circuit struggled to locate a

label that could be applied to such allegations. It rejected the characterization of the events as

"price fixing," noting that price fixing "is an agreement to fix the price to be charged in

transactions with third parties, not between the contracting parties themselves." *Id.* at 446. It

also rejected the notion that the agreement constituted a form of "vertical price fixing," noting

that in such cases, "the prices fixed are resale prices charged to third parties and not the price

between the conspiring parties themselves." *Id.* It considered whether the agreement was a

"concerted refusal to deal" or "group boycott," but noted that such labels "involve broad

combinations and rather pervasive refusals to deal by a group of suppliers covering many

transactions over an extended period of time." *Id.*

Ultimately accepting the plaintiff's label of the conduct as "sham bidding," the court then turned to the question of whether such conduct constituted an unreasonable restraint of trade. Finding that it did not, the court focused on the fact that "all but one of the bidders were destined to come up 'empty-handed' with or without the sham bidding," and the fact that the defendant elected to favor Krentzman over the plaintiff was of no antitrust significance, "so long as its conduct has no market control or monopolistic purpose or effect." *Id.* at 447. The court noted that "there was no evidence of an intent [by the defendant and Kretnzman] to affect the quantity or quality of any goods or services," nor any evidence that the agreement influenced "prices, quantity, or quality in the scrap metal market." *Id.* It acknowledged that sham bidding might be "reprehensible under some moral or ethical standard or even illegal under some other law," but that the Sherman Act "is neither a lowest-responsible-bidder statute nor a panacea for all business affronts which seem to fit nowhere else." *Id.* at 447-48.

A similar analysis applies here. L3's allegations simply describe an agreement between a purchaser and one of its suppliers to favor that supplier's bids over those of disfavored competitors. L3 does not allege that Jaxon was attempting via the agreement to manipulate the market price for the testing services; rather, it was convincing Serco to award contracts to Jaxon regardless of the fact that bidders like L3 (in those instances in which L3 submitted a bid) were already offering to provide the services at lower prices. In essence, Jaxon convinced Serco to act against its own best interests and select a higher-priced bidder, just as the defendant in *Sitkin* chose to ignore Sitkin's lower-priced bid and instead agreed to purchase the same service from the higher-priced Krentzman. As *Sitkin* notes, the Sherman Act is not a guarantee that contracts

34

will go to the lowest-priced responsible bidder.  (Whether L3 has a remedy available to it under other statutes that might apply to bidding on federally-related contracts is a question this Court does not consider.)

In any event, L3 has elected in both the Amended Complaint and in its response to argue that the alleged practices violate the Sherman Act because they constitute *per se* unlawful "bid rigging."  Because the Court finds that the allegations fail to amount to bid rigging, the Amended Complaint fails to state a Sherman Act claim.

Although the Court need not address the Sherman Act claim further, it also notes that the Defendants are correct in challenging the sufficiency of L3's allegations of "antitrust injury." To give rise to a cognizable antitrust claim, the injury claimed by the plaintiff must be an injury that poses an adverse effect to competition or consumers, not simply an injury to a competitor; that is, it must be an injury that flows from the "competition-reducing aspect or effect" of the Defendants' behavior.  *Elliott Industries, Ltd. Partnership v. BP America Production Co.*, 407 F.3d 1091, 1124-25 (10th Cir. 2005). Thus, the existence of an actionable injury must be examined "from the consumer's viewpoint," to ascertain whether the alleged conduct "affected the prices, quantity or quality of goods or services, not just [the plaintiff's] own welfare." *Vesom v. Atchison Hosp. Assn.*, 279 Fed.Appx. 624, 638 (10th Cir. 2008).  In short, the injury to the plaintiff and the injury to competition must be one and the same.

Here, the Amended Complaint alleges that the antitrust injury – the harm suffered by the "general public" is that "it resulted in the United States government having to pay more for services and product with regard to these Task Orders than otherwise would have occurred." *Amended Complaint,* ¶ 408.  But the alleged injury L3 claims it suffered itself is different, as the

35

conduct "resulted in Jaxon obtaining business opportunities, including but not limited to these Task Orders instead of L-3." *Id.*, ¶ 407.  In short, L3 alleges that its own injury was an injury to it <u>as a competitor</u> (it did not receive orders that it was entitled to), but that injury is different from the alleged injury to <u>consumers</u> (that they paid higher prices for services).  Because L3's own claimed injury is not the same as the alleged antitrust injury, this too requires dismissal of the Sherman Act claim.

### 15.   <u>Unfair competition claim</u>

Finally, the Defendants challenge several aspects of L3's common-law unfair competition claim.  They begin by noting that the statutory citation accompanying this claim (allowing civil suit by owner to recover stolen property) is apparently unconnected with the allegations in the body of the claim and in L3's defense of the claim in its response, and thus, the Court disregards that statutory citation.

The Defendants contend that this claim is preempted by the Colorado Uniform Trade Secrets Act, and L3 responds by arguing that the claim seeks relief for those instances in which the Defendants profited from misappropriating L3's non-trade secret, but still proprietary, business forms and information.  Although Colorado appears to contemplate the tort of unfair competition applying in such circumstances, *see Powell*, 948 F.Supp. at 1476, it appears to this Court that L3's unfair competition claim is effectively subsumed within its unjust enrichment claim.  Both claims essentially recite that the Defendants obtained a benefit by availing themselves of proprietary (but non-trade secret) information belonging to L3.  The Amended Complaint offers no clear distinction between the two types of claims, and L3 has not offered any articulation of one claim that would squarely place it outside the scope of the other.  Because

36

the Court has already found that the unjust enrichment claim may proceed, it dismisses the unfair competition claim as redundant.

16. Request for a more definite statement

The Court summarily rejects the Defendants' request that L3 be required to provide a more definite statement of its claims.  Without necessarily endorsing the quality of the pleading in the Amended Complaint, the Court finds that there are sufficient allegations contained therein to permit the Defendants to frame a meaningful response.  Moreover, it is fully evident to the Court that the Defendants will avail themselves (and indeed, have already) of the full range of discovery available to them to assess and delimit the scope of L3's claims.

**B.  Objections**

Finally, the Court turns to the Defendants' Objections to the Magistrate Judge's ruling that L3 may designate Mr. Crain as its Technical Advisor, and that Mr. Crain can be given access to "attorneys' eyes only" material.

Rulings on non-dispositive issues by a Magistrate Judge are reviewed by this Court pursuant to Fed. R. Civ. P. 72(a), and will be reversed only if they are "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996).  Accordingly, the Defendants' Objections will be overruled unless the Court finds that the Magistrate Judge abused her discretion or, if after viewing the record as a whole, the Court is left with a "definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

The Court begins by observing that the question of who L3 may designate as a Technical Advisor and what materials that person should be given access to are matters that are not governed by any strict rule or controlling precedent, but rather fall within the general requirement that the Court exercise its sound discretion in deciding what safeguards should apply to discovery concerning a party's trade secret information. *Centurion Indust., Inc. v. Warren Steurer and Assocs.*, 665 F.2d 323, 326 (10th Cir. 1981), *citing* Fed. R. Civ. P. 26(c)(1)(G) (court may direct that trade secrets or confidential information "not be revealed or be revealed only in a specified way"). This adds an additional layer of discretion to be exercised by the Magistrate Judge in this case, making it even more unlikely that this Court will find that she abused the considerable discretion afforded her with regard to the issues.

The Court has reviewed the parties written submissions with regard to the Motion for Protective Order, the materials that they have submitted in conjunction with the Objections herein, and the transcript of the July 18, 2011 hearing (**# 75-1**) and the Magistrate Judge's oral ruling. On that record, the Court cannot say that the Magistrate Judge abused her discretion in permitting L3 to designate Mr. Crain as Technical Advisor, nor in permitting Mr. Crain to have access to a portion of Jaxon's pricing information.

The Defendants argue that L3 did not carry its burden of showing that it was necessary to identify Mr. Crain, as opposed to a disinterested outsider, as its Technical Advisor. Assuming, without necessarily finding, that this is a correct statement of the relevant standard, the Court observes that the record before the Magistrate Judge on this question was contested. The Defendants proffered the affidavit of Randall White, who stated that "Numerous individuals in industry, academia, and within the government possess equal or superior knowledge of HEMP

testing technology to that of Mr. Crain," or that "any qualified electrical engineer could understand the technology at issue in this case and advise counsel."  By contrast, L3 proffered the affidavit of Mr. Crain himself, who stated that "there are very few HEMP testing technology experts with both theoretical and substantial field experience in the United States, nearly all of whom are in government positions or employed by L-3, Jaxon [or one of their competitors]."  He also rejected Mr. White's contention that "any electrical engineer" could provide technical advice, stating that "only extensive hands-on experience . . . can provide true expertise in the field [and] someone without this experience would require lengthy and expensive training . . . to understand and assist with the technical issues" in the case.

The Magistrate Judge elected to resolve this dispute by generally siding with Mr. Crain.  Among other things, she observed that he "is probably preeminent in this field, . . . and in fact is the co-inventor on the patents in suit, so obviously knows a lot about it. . . He knows things about what was going on [at L3 when the Defendants left] that no one else has, and he's a fact witness with a lot of expertise woven in."  As a result, she concluded that "he is essential to the ability of the plaintiff to prove their case."  Having reviewed the Defendants' Objections, the Court does not understand the Defendant to dispute any of these factual findings – that Mr. Cain is preeminent in the field and a co-inventor of the technology, nor that he was present at L3 with knowledge of its operations as of the time the Defendants left.  Thus, the Court cannot say that the Magistrate Judge's factual findings were clearly erroneous.  Nor can the Court say that the decision that Mr. Crain, given his unique possession of both expertise and factual knowledge, is "necessary" is contrary to law.  The Magistrate Judge expressly noted her concern that "there is a high risk of harm" to Jaxon from allowing Mr. Crain to serve in this capacity, but she

acknowledged that various restrictions would bus sufficient to ameliorate those risks.  The

Defendants have pointed the Court to no law that would suggest that Mr. Crain would <u>not</u> be

considered necessary under such circumstances.

The Court then turns to the question of whether the Magistrate Judge abused her

discretion in granting Mr. Crain access to Jaxon's pre-suit (but not post-suit) pricing information.

The Magistrate Judge heard extensive argument from both sides on this issue and concluded that

pricing information "is so intertwined with what they're looking at that I think they need Mr.

Crain to be able to see all of that, because in order to evaluate a proposal, at least in their minds,

to see if there is something the believe is stolen, they have to see the whole package."   This is

consistent with L3's argument, which the Magistrate Judge apparently credited, such that the

Court cannot say that her finding that technical and pricing data were "intertwined" is clearly

erroneous.  Nor have the Defendants pointed the Court to any law that would direct that, based

on the Magistrate Judge's findings, Mr. Crain should be <u>prohibited</u> from having access to the

pricing information.  The Magistrate Judge clearly took into consideration the risk of harm to

Jaxon that could result from Mr. Crain having unrestricted access, and crafted a ruling that gave

Mr. Crain access to only that information that was necessary to his function, exposing no more

of Jaxon's pricing and financial information than was necessary.  Under these circumstances, the

Court cannot say that this ruling was contrary to law.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Defendants' Motion to Dismiss **(# 47)** is **GRANTED IN**

**PART**, insofar as the Court dismisses the RICO/COCCA claims in their entirety; the Lanham

Act claim as against Defendants Charles Rettig, Scott White, James Youngman, Jerry Lubell,

Kelly Rice, and John McClure; the tortious interference with prospective economic advantage claim against all Defendants except Jaxon, Randall White, and Susan Rettig; and the Sherman Act claim in its entirety, each pursuant to Fed. R. Civ. P. 12(b)(6); and the common-law unfair competition claim as redundant; and **DENIED IN PART** in all other respects.  The Defendants' Objections (**# 83**) are **OVERRULED** and the Court **AFFIRMS** the Magistrate Judge's July 18, 2011 Minute Order (**# 70**) granting the Plaintiff's Motion for Protective Order.

Dated this 26th day of March, 2012

**BY THE COURT:**

Marcia S. Krieger
United States District Judge