IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10–cv–02868–MSK–KMT


L-3 COMMUNICATIONS CORPORATION, and
L-3 SERVICES, INC.,

     Plaintiffs,

v.

JAXON ENGINEERING & MAINTENANCE, INC.,
JONI ANN WHITE,
RANDALL K. WHITE,
SCOTT WHITE,
SUSAN RETTIG,
CHARLES RETTIG,
JAMES YOUNGMAN,
JERRY LUBELL,
KELLY RICE,
JOHN MCCLURE, and
JOHN DOES 1-25, said names being fictitious as such names are unknown at this time,

     Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Kathleen M. Tafoya**

     This case comes before the court on "Plaintiffs' Motion to Dismiss Defendant Jaxon

Engineering & Maintenance, Inc.'s Amended Counterclaims" [Doc. No. 317] filed June 21,

2012.  Jaxon Engineering & Maintenance, Inc., Counterclaim Plaintiff (hereinafter "Jaxon")

filed its "Response to Motion to Dismiss Amended Counterclaims" on July 16, 2012 [Doc. No.

338] and Counterclaim Defendants L-3 Communications Corporation and L-3 Services, Inc.

(hereinafter "L-3") filed a Reply on August 2, 2012 [Doc. No. 351].

Jaxon's Amended Counterclaims [Doc. No. 304] ("Am.CC") alleges three causes of

action: (1) that Plaintiffs tortiously interfered with Jaxon's prospective economic advantage

(Am.CC ¶¶ 10-27); (2) unfair competition (*id.* ¶¶ 28-35); and (3) declaratory judgment of non-

infringement due patent misuse as a result of Plaintiffs' bad faith in seeking to enforce the two

patents-in-suit.  (*Id.* ¶¶ 36-66.)  L-3 argues that each of the counterclaims fails to state a claim

pursuant to Fed. R. Civ. P. 12(b)(6) and therefore should be dismissed.

### *LEGAL STANDARDS*

#### A.    *Failure to State a Claim, Fed. R. Civ. P. 12(b)(6)*

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss

a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6)

(2007).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that

the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally

sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d

1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual

allegations are true and construes them in the light most favorable to the plaintiff."  *Hall v.*

*Bellmon*, 935 F.2d 1106, 1198 (10th Cir. 1991).  "To survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  The *Iqbal* evaluation requires two prongs of analysis.  First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory.  *Id*. at 1949–51.  Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief."  *Id*. at 1951.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss.  *Id*. at 1950.

Notwithstanding, the court need not accept conclusory allegations without supporting factual averments.  *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct. at 1940.  Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id*. at 1949 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*,129 S. Ct. at 1949 (citation omitted).

**B.**     *Fed. R. Civ. P. 8*

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Khalik v. United Air Lines,* 671 F.3d 1188, 1190 (10th Cir. 2012) (citing Fed. R. Civ. P. 8). "In examining a complaint under Rule 12(b)(6), we will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* The Tenth Circuit, analyzing pleading requirements subsequent to the Supreme Court's holding in *Twombly* and *Iqbal* held that plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (*quoting Twombly*, 550 U.S. at 570). Further, the Tenth Circuit has noted that "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011); *see also Iqbal*, 129 S.Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Thus, this circuit has concluded the "*Twombly/Iqbal* standard is 'a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do.'" *Khalik*, 671 F.3d at 1191 (quoting *Robbins*, 519 F.3d at 1247.) In other words, "[w]hile the 12(b)(6) standard does not require that [Counterclaim Plaintiff] establish a *prima*

4

*facie* case in [its] complaint, the elements of each alleged cause of action help to determine whether [Counterclaim Plaintiff] has set forth a plausible claim." *Id.*

### ANALYSIS

The court begins its analysis as instructed by the Supreme Court with stripping each claim of bare assertions, conclusory statements and legal conclusions which are not entitled to the assumption of truth.  The counterclaims herein contain a great deal of "unadorned, the-defendant-unlawfully-harmed-me accusation(s)." *Iqbal*, 129 S. Ct. at 1949 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  There are also a substantial number of bare assertions and legal or general conclusions, none of which contribute to whether Jaxon has stated a plausible claim against L-3. *Id.*  At many places in the counterclaims, Jaxon asserts that L-3 "knew or should have known" certain things, for instance in paragraph 14 where Jaxon asserts, "14. Counterclaim Defendants knew of these business relationships." *Iqbal* specifically holds that such statements about what was "known" are bare assertions "amount[ing] to nothing more than a 'formulaic recitation of the elements' of the claim asserted. *Id.* at 1951. *Iqbal* counsels that such assertions should not be rejected "on the ground that they are unrealistic or nonsensical" but rather that "[i]t is the conclusory nature of the [] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.*  A claim only attains facial plausibility when enough pure factual content is asserted to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

Giving the benefit of the doubt to the Counterclaim Plaintiff when an allegation contains mixed facts and conclusory assertions, the following are the facts supporting the Counterclaims:

First Counterclaim: Tortious Interference with Prospective Economic Advantage

11.     Jaxon has business relationships with customers and potential customers to provide services. Such customers include Customer A, Customer B, Customer C, Customer D, Agency A, and Agency B.[1]

12.     Jaxon also has business relationships with vendors and suppliers to purchase services. Such vendors and suppliers include Vendor A.[2]

13.     Jaxon has the prospect and a reasonable likelihood of entering into future relationships with customers, vendors, and suppliers, including Customer A, Customer B, Customer C, Customer D, Agency A, Agency B, and Vendor A.

16.     Among other acts, Counterclaim Defendants told Customer A, Customer B, Customer C, Customer D, Vendor A, Agency A, Agency B, and other customers, vendors, and suppliers that Jaxon and its employees and consultants were "criminals," had "stolen [L-3] blind", had infringed patents owned by Counterclaim Defendants, and had stolen equipment from Counterclaim Defendants and stolen Counterclaim Defendants' alleged trade secrets.  Jaxon has contracts and prospective relationships with Customers A, B, C, D, and Agencies A and B, and Jaxon submitted an order to Vendor A with the expectation to enter into a contract to purchase materials from Vendor A. Counterclaim Defendants' actions caused Vendor A to decline to do business with Jaxon, . . . .

19.     . . . Counterclaim Defendants intentionally solicited and obtained . . . the identity of Jaxon customers, and the form, amount, and details of confidential proposals and marketing materials submitted by Jaxon to a Jaxon customer. Among other acts, Counterclaim Defendants searched for, obtained, reviewed, and circulated within L3, Jaxon trade secrets and proprietary information from a computer taken from Defendants Susan and Charles Rettig's home.

---

[1] The designations herein do not represent unknown, but supposedly existing companies, such as when an allegation is made against "John Doe."  Both parties in this action are government contractors.  Given the sensitive nature of the services they perform under government contracts, the parties have protected the contracting agencies' identities pursuant to a Protective Order.  The parties are each aware of the true identities of the four "customers" and the two "agencies."

[2] See footnote 1, *supra*.

Second Counterclaim: Unfair Competition

The facts alleged in the First Counterclaim are incorporated into this claim.  (Am.CC ¶

28.)  Additionally, the following fact is alleged:

> 29.    One or both of the Counterclaim Defendants currently is/are competing
>        with Jaxon in the fields of HEMP testing and maintenance.

Third Counterclaim: Declaratory Judgment of Unenforceability Due to Patent Misuse

The facts alleged in the First and Second Counterclaim are incorporated into this claim.

(Am.CC ¶ 36.)  Additionally, the following facts are alleged:

> 38.    . . . each of the task orders that L3 identifies in Paragraph 110 of its
>        Amended Complaint as having been awarded to Jaxon includes an
>        "Authorization and Consent" provision . . .
> 42.    L3 has nevertheless asserted infringement against Jaxon . . . L3 and Jaxon
>        are competitors . . .
> 47.    Upon information and belief, L-3 first conceived of the purported
>        invention of the '989 patent, i.e. the pulsers, in late 1998 or early 1999
>        during the course of performing a subcontract for electromagnetic
>        hardening testing with Science and Technology Associates, Inc. ("STA"),
>        which later became SI International, Inc. and, eventually, Serco, under
>        prime Contract No. DACA-45-97-C-0059 with the Army Corps of
>        Engineers ("USACE").
> 48.    Upon information and belief, L-3 designed the Pulsers to meet this need
>        and completed development of the Pulsers in the Spring of 1999 and
>        confirmed that the Pulsers operated as intended . . . by testing the Pulsers
>        under its subcontract with STA in support of STA's prime contract with
>        USACE between Fall 1999 and Spring 2000.
> 49.    Upon information and belief, in 2006, L-3 updated the Pulsers during the
>        performance of Contract No. DTRA01-03-D-0003/12 with the Defense
>        Threat Reduction Agency ("DTRA") for electromagnetic hardening
>        testing.
> 50.    Upon information and belief, both of these L-3 contracts, as well as STA's
>        prime contract with USACE, contain a[] . . . patent rights clause.
> 51.    . . . the purported invention of the '916 patent, i.e., the ABITE technology,
> 52.    Upon information and belief, in the mid-2000's, L-3 began development
>        of remote testing technology. DTRA began funding L-3's efforts to

7

develop remote electromagnetic testing capabilities under Contract No.
DTRA01-03-D-0003/20.

53.     Upon information and belief, after L-3 and DTRA executed the funding
        agreement, L-3 first conceived of the ABITE technology. L-3 . . .
        demonstrated that the technology would work as intended on or about
        January 2008 under the same DTRA contract.

54.     Upon information and belief, the funding agreement between DTRA and
        L-3 contained the [] patent rights clause. . . .

55.     . . . The contracts under which L-3 conceived of and first actually reduced
        to practice the purported inventions all contained the [] patent rights
        clause – Federal Acquisition Regulation ("FAR") 52.227-11 for awards
        after 2007 and FAR 52.227-12 for awards prior to 2007 (collectively, the
        "Patents Clause"), . . . .

56.     The Patent Clause provides the Government with a "nonexclusive,
        nontransferable, irrevocable, paid-up license to practice or have practiced
        for or on behalf of the United States". . . FAR 52.227-12(b) and -11(d)(2).

57.     When the Government receives [ ] rights in an invention, . . . "This
        invention was made with Government support under [identify the
        contract] awarded by [identify the agency]. The Government has certain
        rights in this invention." FAR 52.227-12(f)(4) and -11(e)(4).

59.     L-3 did not provide a DD882 notice of the purported invention described in
        the '916 patent to its prime contractor or to the Government.

60.     L-3 did not provide a DD882 notice of the purported invention described
        in the '989 patent to its prime contractor or to the Government.

63.     The Government advised L-3 that the Government was appropriating title to the
        '916 and '989 patents.

## I.     *First Counterclaim: Tortious Interference with Prospective Economic Advantage*

Both L-3 and Jaxon adopt District Judge Marcia S. Krieger's elements of a claim for

tortious interference with prospective economic advantage as set forth in her Order in this case

dated March 26, 2012 [Doc. No. 214] when she considered the Defendants' Motion to Dismiss

L-3's similar claim.  (Order at 27.)  Therefore, Jaxon is required to allege facts supporting: (1)

that Plaintiffs induced a third person not to enter into or continue a contractual relationship with

Jaxon; (2) that Plaintiffs did so intentionally; and (3) that they used improper means to do so.

8

*See MDM Group Assoc., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. App. 2007);

*Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 622-23 (10th Cir. 1995).

This court considers Jaxon's claims that L-3 submitted unspecified and undated "false complaints" to the Defense Industrial Security Clearance Office that Jaxon was violating unarticulated "federal and state laws" to be an unsupported bare assertion not entitled to a presumption of truth.  (Am.CC ¶ 17.)  However, the assertion that L-3 communicated to Jaxon's customers, vendors and suppliers that Jaxon and its employees and consultants were "criminals," who had "stolen [L-3] blind" by stealing equipment and trade secrets from L-3 and also that Jaxon and its employees and consultants had infringed L-3's patents is particularized enough to satisfy Fed. R. Civ. P. 8's pleading requirements for this claim, particularly in light of the factual allegation that L-3 obtained this customer and vendor information by taking a computer from Defendants Susan and Charles Rettig's home, albeit without specifying or alleging any improper conduct by L-3 regarding the confiscation of the computer.  (*Id.* at ¶ 19.)

This court finds, however, that Jaxon has not met all three required elements to state a claim for tortious interference with prospective economic advantage.  Jaxon alleges that L-3 *intentionally* made the objectionable statements that Jaxon and its employees and consultants were criminals and that they had stolen trade secrets and equipment from L-3 and that Jaxon and its employees were infringing on L-3's patents which satisfies the pleading requirements of the first element.  Further, satisfying element two, Jaxon alleges that because of those statements made by L-3, when Jaxon submitted an order to Vendor A to purchase materials for a contract, Vendor A declined to do business with or enter into a contract with Jaxon and that this "damaged

Jaxon's reputation and interfered with Jaxon's business relationships with Customers A, B, C, D, Agencies A and B."  It is on the last element that Jaxon falls short.

For L-3, through its employees or officers, to express their offending opinions to Jaxon's current customers, vendors and suppliers without any adjudication of or proof of guilt plausibly could be considered improper.  *See Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1196 (Colo. App. 2009) ("There must also be proof that such interference was "improper.")  The parties here, however, are competitors and therefore they have a "privilege to engage in business and to compete" which "implies a privilege to induce third persons to do their business with [it] rather than with [its] competitors."  *Id.*  In a competitive situation, the interference alleged as part of the tort must be more than just "improper;" the actor must have actually employed "wrongful means."  *Id.* at 1197.

The Colorado Supreme Court recognized that the definition of "wrongful means" is not open-ended in *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 502 (Colo. 1995), by citing in footnote 6 cases from other jurisdictions recognizing the limited nature of "wrongful means."  Drawing from *Amoco Oil*, the *Harris* court stated

> For example, "wrongful means" are those that are "intrinsically wrongful-that is, conduct which is itself capable of forming the basis for liability of the actor," *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1507 (8th Cir. 1992)(quoting *Conoco, Inc. v. Inman Oil Co.*, 774 F.2d 895, 907 (8th Cir. 1985)); "illegal," *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 543 (7th Cir. 1986); or "wrongful by reason of a statute or other regulation, . . . a recognized rule of common law, . . . an established standard of a trade or profession," "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation or disparaging falsehood," *Downey Chiropractic Clinic v. Nampa Rest. Corp.*, 127 Idaho 283, 286, 900 P.2d 191, 194 (1995).  *See also Occusafe, Inc. v. EG & G Rocky Flats, Inc.*, 54 F.3d 618, 622 (10th Cir. 1995)

> (interpreting Colorado law and applying section 768 comment e [Restatement (Second) of Torts (1979)], stating that "in the context of a claim for tortious interference with prospective economic advantage, 'wrongful means' refers to conduct such as 'physical violence, fraud, civil suits, and criminal prosecutions'" (quoting *R-G Denver, Ltd. v. First City Holdings*, 789 F.2d 1469, 1476 (10th Cir. 1986))).

*Harris Group, Inc*., 209 P.3d at 1197-1198.  In this case, Jaxon fails to state who made the alleged statements, in what context the statements were made, when the statements were made and to whom the statements were made.  As a factual allegation, then, the upshot is that Jaxon claims that at some point someone at L-3 allegedly made accusations to some third party that someone at Jaxon had stolen trade secrets or other information and was violating L-3's patents.  These statements of opinion by an unnamed person or persons are not defamatory nor are they necessarily "falsehoods" as this is exactly the behavior to which L-3 directs its claims against Jaxon.  (See First Am. Compl., [Doc. No. 33]) (alleging patent infringement and trade secret misappropriation among other claims.)

Jaxon attempts to bolster this claim by apparently alleging that L-3 came by the identity of Jaxon's customers and vendors "from a computer taken from Defendants Susan and Charles Rettig's home."  There is no allegation that the taking of the computer from the Rettigs was wrongful in any manner, much less that it was wrongful in a manner consistent with the definitions outlined in *Harris*.[3]  Even if the court were to consider the bald assertion(s) that are

---

[3] The seizure by L-3 of the computer at the Rettig home has been the subject of considerable dispute during discovery.  It is uncontested that the computer at issue belonged to L-3 and was rightfully L-3 property.  Nonetheless, this court, looking only at the allegations in the counterclaims without benefit of this additional knowledge sees no allegation of L-3 wrongful conduct concerning the <u>seizure</u> of the computer as opposed to the use of information

unsupported by factual allegations following paragraph 19 of the Amended counterclaims,

including, "Counterclaim Defendants obtained that information from persons who were not

authorized to release such information to Counterclaim Defendants" (Am.CC ¶ 20), there is still

no conduct alleged that would satisfy the element that L-3, the <u>recipient</u> of the information, used

"wrongful means" to interfere with a Jaxon business relationship.  Therefore, Jaxon has failed to

set forth factual allegations in support of each element of a tortious interference claim between

competitors, and therefore has failed to state a claim pursuant to Rule 12(b)(6).

        This court recommends that Plaintiff's Motion to Dismiss be granted with respect to the

First Counterclaim.

        **II.      *Second Counterclaim: Unfair Competition***

        The parties are in disagreement about the elements of a claim for unfair competition.  L-3

alleges that Jaxon must allege facts showing that (1) Plaintiffs have copied Jaxon's products or

services or misappropriated Jaxon's name or operations in some regard, and (2) that this conduct

is likely to deceive or confuse the public because of the difficulties in distinguishing between

Jaxon's and L-3's products and services, relying on *Netquote, Inc. v. Byrd*, 504 F. Supp. 2d

1126, 1131 (D. Colo. 2007), a district court case authored by David M. Ebel, Tenth Circuit

Judge.  Jaxon asserts that under Colorado common law, an unfair competition claimant must

plead that either: (i) defendant has misappropriated plaintiff's proprietary and valuable business

assets; or that (ii) defendant's conduct confuses or deceives the public as to the source or origin

---

later discovered by L-3 on the computer.

of goods citing *Powell Prods. Inc. v. Marks*, 948 F. Supp. 1469, 1476 (D. Colo. 1996) and

*Adolph Coors, Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131, 136 (D. Colo. 1980). (Resp.

at 8.) Jaxon asserts that its counterclaim rests on its first allegation, that L-3 has misappropriated

Jaxon's proprietary and valuable business assets and has taken actions to harm Jaxon through

deceitful statements to the public. (*Id.*) It appears to this court that Jaxon has simply fabricated

the elements of a claim for unfair competition from bits and pieces of fabric ripped at random

from the whole cloth of miscellaneous thirty-year old cases.

In Judge Ebel's more recent *NetQuote* case, he examined in detail numerous cases

involving claims of unfair competition and specifically held that

> state and federal courts applying Colorado law have consistently held that the tort
> of unfair competition requires, first, that the defendant has copied the plaintiff's
> products or services <u>or</u> misappropriated plaintiff's name or operations in some
> regard, <u>and</u> second, that this conduct is likely to deceive or confuse the public
> because of the difficulties in distinguishing between the plaintiff's and
> defendant's products and services.

*NetQuote, Inc*., 504 F. Supp. 2d at 1131 (emphasis added). Recent District of Colorado cases

have held the same. *See, e.g., Predator Intern., Inc. v. Gamo Outdoor USA, Inc*., Case No. 09-

cv-00970-PAB-KMT, 2011 WL 3799030, at *5 (D. Colo. Aug. 26, 2011); *Gates Corp. v.*

*Dorman Products, Inc*., Case No. 09-cv-02058-CMA-KLM, 2009 WL 5126556, at *5 (D. Colo.

Dec. 18, 2009).

To be sure, the tort of unfair competition is not limited to cases "in which one competitor

engaged in 'palming off,' i.e., misrepresenting work of another as his own, but instead includes

unfair misappropriation and the exploitation of a competitor's business values." *NetQuote*, 504

F. Supp. 2d at 1130 (internal quotation marks and citation omitted).  As to what constitutes misappropriation of business values, Judge Ebel held that the court "envisions a wrongful appropriation by one competitor of the skill or labor of another," but reiterated that "the most important consideration remain[s] whether defendant's conduct will confuse or deceive the public."  *Id.* at 1131 (internal citations omitted.)

Therefore, this court finds that for Jaxon to state a viable claim for unfair competition against L-3, it must allege sufficient facts to show that (1) L-3 either copied Jaxon's products or services or misappropriated Jaxon's name or operations in some regard, and (2) that L-3's conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between Jaxon's and L-3's products and services.

As noted previously, in paragraph 19 of the Amended Complaint, Jaxon alleges that L-3 "intentionally solicited and obtained Jaxon's trade secrets and proprietary information [a conclusory statement provided for context], including the identity of Jaxon customers, and the form, amount, and details of confidential proposals and marketing materials . . . from a computer taken from Defendants Susan and Charles Rettig's home."  (Am.CC at ¶ 19.)  Additionally, Jaxon alleges in paragraph 29,  that "one or both of the Counterclaim Defendants currently is/are competing with Jaxon in the fields of HEMP testing and maintenance."  Therefore, Jaxon has satisfied the hurdle of adequate pleading to plausibly support its claim of misappropriation of Jaxon's operations.  That said, however, Jaxon completely and totally fails to plead any facts to plausibly support the element that L-3's conduct was likely to deceive or confuse the public.

14

For this reason, this Court finds that Plaintiff has failed to plead facts sufficient to state a claim for unfair competition against L-3 pursuant to Rule 12(b)(6) and recommends that L-3's motion to dismiss be granted with respect to the Second Counterclaim.

### III.    Third Counterclaim: Declaratory Judgment of Unenforceability Due to Patent Misuse

"Patent misuse occurs where the patent owner attempts to extend the impact of his patent beyond its proper scope." *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005). "The key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." *Shire LLC v. Sandoz, Inc*., Case No. 07-cv-00197-EWN-CBS, 2008 WL 4402251, at *13 (D. Colo. Sept. 24, 2008) (quoting *C.R. Bard, Inc. v. M3 Sys., Inc*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) (citations omitted).  The patent misuse doctrine, born from the equitable doctrine of unclean hands, is a method of limiting abuse of patent rights separate from the antitrust laws.  *B. Braun Medical, Inc. v. Abbott Laboratories*  124 F.3d 1419, 1426 (Fed. Cir. 1997)  The key inquiry under this fact-intensive doctrine is whether, by imposing the condition, the patentee has "impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect."  *Id.* (quoting *Windsurfing Int'l, Inc. v. AMF, Inc*., 782 F.2d 995, 1001-02 (Fed. Cir. 1986)).  When used successfully, this defense results in rendering the patent unenforceable until the misuse is purged.  It does not, however, result in an affirmative award of damages to the accused infringer.  *Id.* at 1427.

Jaxon has brought its claim of patent misuse via declaratory judgment seeking to negate the ability of L-3 to enforce infringement claims against Jaxon.  The Declaratory Judgment Act neither expands a court's jurisdiction nor creates new substantive rights.  See 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 57.02[1] (3d ed.1997).  Instead, the Act is a procedural device that provides a new, noncoercive remedy (a declaratory judgment) in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy (such as an injunction or damages award) and in cases in which a party who could sue for coercive relief has not yet done so.  See 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §§ 2766, 2751 (2d ed.1983).

A claimant can allege patent misuse as a bar to infringement claims to the extent that it asserts that a holder of one or more patents have engaged in sham litigation.  *Moore U.S.A., Inc. v. Standard Register Co.,* 139 F. Supp. 2d 348, 362 (W.D.N.Y. 2001).  *See also McCullough Tool Co. v. Well Surveys, Inc.,* 395 F.2d 230, 238 - 239 (10th Cir. 1968).  "The bringing of a lawsuit to enforce legal rights does not of itself constitute . . . patent misuse; there must be bad faith and improper purpose in bringing the suit . . . ."  *Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.,* 45 F.3d 1550, 1558 (Fed. Cir. 1995).  The same facts that could support a finding of sham litigation could also support a finding of patent misuse.

The Supreme Court has established a two-part test for determining if litigation is a "sham."

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized . . . and an antitrust claim premised on the sham exception must fail.  Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.  Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," through the "use [of] the governmental process-as opposed to the outcome of that process-as an anticompetitive weapon[.]"  This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc*., 508 U.S. 49, 60-61(1993).

*See also Shire LLC,* 2008 WL 4402251, at *13; *In re Indep. Serv. Org. Antitrust Litig*., 85 F. Supp. 2d 1130, 1169-70 (D. Kan. 2000) (citing *Columbia Pictures Indus., Inc*., 508 U.S. at 60 (the filing of an infringement claim does not constitute misuse "unless the claim is (1) objectively meritless and (2) brought in an attempt to interfere directly with the business of a competitor.").

Jaxon states that it has successfully pleaded the elements to support its declaratory judgment claim because it has factually alleged, (1) "L3 is attempting to enforce the Asserted Patents when L3 has no right to do so" and (2) L-3 "is enforcing rights in bad faith that it does not have because the Government owns and is licensed to have the purported inventions of the '916 and '989 patents practiced for or on its behalf."  (Resp. at 12.)  L-3 counters that "Jaxon has not alleged facts sufficient to state a cause of action that L-3 leveraged its patents beyond the scope granted by the United States Patent Act" and therefore has not stated a cognizable claim. (Reply at 5.)

17

This court finds that in order to state a claim for patent misuse sufficient to support declaratory judgment of non-infringement, Jaxon must plead facts sufficient to support the following:  (1) that L-3, as patent owner, is attempting to extend the impact of its patents beyond their proper scope by failing to acknowledge governmental interests and rights; (2) that L-3's claims of infringement are objectively meritless in that no reasonable litigant could expect success on the merits of L-3's patent infringement claims, and; (3) that L-3's alleged baseless infringement claims are brought against Jaxon in an attempt to interfere directly with the business of Jaxon, its direct competitor.  Important at this stage of the proceedings is the reaffirmation that Jaxon need not offer expansive proof of its claims, but rather must state sufficient factual allegations, which if accepted as true, plausibly state a claim for relief with support for each of the elements therein.[4]  *Iqbal,* 129 S.Ct. at 1949.

Jaxon's counterclaim first alleges that Jaxon has statutory immunity under 28 U.S.C. § 1498(a) and therefore any litigation L-3 brings against it must be in bad faith.  (Am.CC ¶ 41.) Jaxon makes this allegation on the basis of its contracts with the government that supposedly contain an "Authorization and Consent" provision whereby Jaxon claims the government

---

[4] Both parties in their filings have argued the merits of the allegations contained in this counterclaim; although tempting, the court will not veer from the course set for it by *Iqbal* while rendering its conclusions on L-3's Motion to Dismiss.  It has, however, not gone unnoticed by this court that several of the factual allegations which the court has duly recorded as falling within the parameters of factual averments to be considered under an *Iqbal* analysis, lack complete verity given the court's knowledge of the case through numerous proceedings, some of which have been evidentiary.  This is an issue which will, however, necessarily inform any summary judgment analysis and be adjudicated at that time, perhaps in light of the strictures contained in Fed. R. Civ. P. 11(b).

immunized Jaxon against patent infringement suits by approving or authorizing it to engage in infringing activity.  (*Id.* at ¶ 38.)  "To take advantage of the immunity offered by § 1498, the statute provides that a private contractor has the burden to demonstrate that the infringing conduct was undertaken with the 'authorization and consent' of the government."  *Sevenson Environmental Services, Inc. v. Shaw Environmental, Inc.,* 2005 WL 3890640, at *3 (W.D.N.Y. September 16, 2005) (internal citations omitted).  Where such Authorization and Consent clauses are used, the language must be narrowly construed to determine the scope of the authorization and consent.  *Auerbach v. Sverdrup Corp.*, 829 F.2d 175, 179 (D.C. Cir. 1987); *Leesona Corp. v. United States*, 599 F.2d 958, 968 (Ct. Cl. 1979) (Statutory waivers of governmental immunity, such as are embodied in § 1498(a), must be narrowly construed.)

Jaxon does not set forth the actual contract provision or language in its counterclaims, much less set forth a factual showing that the government specifically authorized Jaxon to infringe upon L-3's '916 and '989 patents.  Courts look to the exact contract specifications and other written instructions to determine what is authorized.  *See Hutchinson Indus. Inc. v. Accuride Corp.*, No. 09-1489 (FLW), 2010 WL 1379720, at *5 (D.N.J. Mar. 30, 2010); *Sevenson Envtl. Servs., Inc.,* 2005 WL 3890640*,* at *3 (relying on the language of the Army Corps of Engineers Work Plan to find authorization and consent where the allegedly infringing process was specified.)  Jaxon's interpretive opinion regarding the meaning of the absent contractual provision is conclusory and may not be utilized by this court to determine whether Jaxon has sufficiently stated a claim pursuant to Fed. R. Civ. P. 12(b)(6).  Consequently, Jaxon has not set forth sufficient facts to support its allegation that L-3 knew that Jaxon had immunity from a

patent infringement suit by L-3.  Therefore, this patent misuse allegation fails to satisfy the elements of this allegation.

As another form of patent misuse, Jaxon also alleges that L-3 developed its patents under particularized government contracts and alleges, therefore, that L-3 knew the government has certain rights in the patents which would render L-3's infringement claims against Jaxon void. (*Id.* at ¶ 56.)  Jaxon further alleges that because L-3 did not "provide a DD882 notice of the purported inventions," the government could, and did, begin to appropriate title to the '916 and '989 patents.  (*Id.* at ¶¶ 59 - 63.)  As a result, Jaxon alleges that L-3's filing an infringement suit against Jaxon, when it knew the government "owns and is licensed to have the purported inventions of the '916 and '989 patents practiced for or on its behalf" is pursued in bad faith. Jaxon has further asserted that it and L-3 are competitors (*id.* at ¶¶ 29, 42), that L-3 developed its patents under specified government contracts during specific time frames (*id.* at ¶¶ 47-49, 52-56), and that the government had the right to, and took steps to, own or practice the patents.  (*Id.* at ¶¶ 59-63).  These facts are sufficient to set forth a plausible claim that L-3 brought the litigation knowing that the government either owned or was licensed to use the patents-in-suit through any agent of its choice, including Jaxon, and that by bringing the claims for infringement against another government contractor, L-3 was attempting to broaden its rights in the patents by ignoring or excluding the existing government license or ownership rights. Further, under the factual allegations as they must be construed at this stage, Jaxon has set forth a factual basis for its allegation that L-3's claims of infringement against Jaxon, a government contractor working on government projects, are objectively meritless, and that the infringement

claims are brought against Jaxon in an attempt to interfere directly with the business of Jaxon, its direct competitor.

Therefore, this court recommends that L-3's Motion to Dismiss be denied as to the Third Counterclaim for Declaratory Judgment of Unenforceability Due to Patent Misuse (and correlating Affirmative Defense) be allowed to go forward.

WHEREFORE, for the foregoing reasons, I respectfully

**RECOMMEND** that "Plaintiffs' Motion to Dismiss Defendant Jaxon Engineering & Maintenance, Inc.'s Amended Counterclaims" [Doc. No. 317] be **GRANTED in part** and **DENIED in part**, as follows: (1) Plaintiffs' Motion to Dismiss be granted and Jaxon's first and second counterclaims be **dismissed** and, (2) Plaintiffs' Motion to Dismiss be denied as to the third counterclaim and that the third counterclaim and correlating affirmative defense be allowed to proceed.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop.*

*Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 25th day of February, 2013.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge

22