**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 10-cv-02868-MSK-KMT

L-3 COMMUNICATIONS CORPORATION; and
L-3 SERVICES, INC.,

      Plaintiffs,

v.

JAXON ENGINEERING & MAINTENANCE, INC.;
JONI ANN WHITE;
RANDALL K. WHITE;
SCOTT WHITE;
SUSAN RETTIG;
CHARLES RETTIG;
JAMES YOUNGMAN;
JERRY LUBELL;
KELLY RICE; and
JOHN MCCLURE,

      Defendants.

_____

**OPINION AND ORDER OVERRULING OBJECTIONS, ADOPTING**
**RECOMMENDATION AND GRANTING, IN PART, MOTION TO DISMISS**
_____

**THIS MATTER** comes before the Court pursuant to the Defendant Jaxon Engineering &

Maintenance's ("Jaxon") Objections (**# 580**) to the Magistrate Judge's Recommendation (**# 559**)

that Plaintiffs' (collectively, "L3") Motion to Dismiss (**# 317**) Jaxon's counterclaims be granted

in part and denied in part.  L3 has not filed any responsive papers to date, but the Court finds

itself fully apprised of the matter and requires no further briefing to resolve it.  D.C. Colo.L. Civ.

R. 7.1(C).

1

**FACTS**

The parties have litigated this case aggressively (perhaps overly so), and it is neither

practical nor helpful for the Court to attempt to address the full scope of the proceedings to date.

It is sufficient to note that L3 initiated this action against its business competitor, Jaxon, alleging

various claims sounding in patent infringement and breach of contract, among others.  In

response, Jaxon filed counterclaims **(# 304)** against L3, as follows: (i) a claim for tortious

interference with prospective economic advantage, arising out of L3's alleged statements to

Jaxon's actual and potential customers that Jaxon and its employees were "criminals" and had

"stolen L3 blind," etc., causing those actual and potential customers to refuse to do business with

Jaxon; (ii) a claim for "unfair competition," under unspecified authority, apparently arising out

of the same set of facts; and (iii) a claim for a declaratory judgment that "L3 has engaged in

patent misuse through its bad faith attempts to enforce" the patents at issue in this case.

L3 moved **(# 317)** to dismiss Jaxon's counterclaims, alleging that they failed to state

cognizable claims under Fed. R. Civ. P. 12(b)(6).  The Court referred that motion to the

Magistrate Judge for a recommendation, and on February 25, 2013, the Magistrate Judge

recommended **(# 559)** that L3's motion be granted in part, insofar as the tortious interference and

unfair competition counterclaims should be dismissed for failure to state a claim, and denied in

part insofar as its claim for a declaratory judgment on the issue of patent misuse should be

limited to the contention that L3 knew the government owned or was licensed to use the patents

in question.

Jaxon filed timely Objections **(# 580)** to the Recommendation, arguing: (i) the Magistrate

Judge erred in concluding that Jaxon had not adequately alleged that L3 availed itself of

"wrongful means" to compete, and thus, erred in concluding that Jaxon had not stated a claim for

tortious interference; (ii) alternatively, that the Court should grant Jaxon leave to amend its

tortious interference counterclaim to allege additional facts; (iii) that the Magistrate Judge erred

in finding that Jaxon's patent misuse counterclaim failed to adequately allege the alternative

theory that Jaxon is immune from patent claims by L3 pursuant to 28 U.S.C. § 1498; and (iv)

alternatively, that the Court should grant Jaxon leave to amend its patent misuse counterclaim to

allege additional facts.

<u>**ANALYSIS**</u>

**A. Standard of review**

The Court reviews the objected-to portions of the Recommendation *de novo*. Fed. R.

Civ. P. 72(b).

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all

well-plead allegations in the Complaint as true and view those allegations in the light most

favorable to the nonmoving party. *Stidham v. Peace Officer Standards and Training*, 265 F.3d

1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d

1226, 1236 (10th Cir. 1999). The Court must limit its consideration to the four corners of the

Amended Complaint, any documents attached thereto, and any external documents that are

referenced in the Amended Complaint and whose accuracy is not in dispute. *Oxendine v.

Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941

(10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

A claim is subject to dismissal if it fails to state a claim for relief that is "plausible on its

face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). To make such an assessment, the Court

first discards those averments in the Complaint that are merely legal conclusions or "threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at

1949-50.  The Court takes the remaining, well-pled factual contentions, treats them as true, and

ascertains whether those facts (coupled, of course, with the law establishing the requisite

elements of the claim) support a claim that is "plausible" or whether the claim being asserted is

merely "conceivable" or "possible" under the facts alleged.  *Id.* at 1950-51.  What is required to

reach the level of "plausibility" varies from context to context, but generally, allegations that are

"so general that they encompass a wide swath of conduct, much of it innocent," will not be

sufficient.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

### B.  Tortious interference claim

Jaxon does not object to the Magistrate Judge's determination that the elements of a

claim for tortious interference are: (i) that L3 induced a third-party to refuse to enter into or

refuse to continue a contractual relationship with Jaxon; (ii) that L3 did so intentionally; and (iii)

that it used improper means to do so.  *MDM Group Assoc. Inc. v. CX Reinsurance Co.*, 165 P.2d

882, 886 (Colo. App. 2007).  The Magistrate Judge found that Jaxon had adequately alleged the

first two elements, but failed to sufficiently plead the third – "improper means."

When, as here, the parties are engaged in business competition, the "improper means"

element is satisfied by allegations showing that the interference took the form of conduct that is

"intrinsically wrongful – that is, conduct which is itself capable of forming the basis for liability

of the actor," as well as conduct that is illegal, in violation of professional standards, achieved

through violence or threats, arising from misrepresentation or unfounded litigation, or via

defamation.  *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1197-98 (Colo.App. 2009).

The Recommendation expressly lists the particular factual allegations in Jaxon's

Amended Counterclaims that the Magistrate Judge accepted as sufficiently specific to warrant

consideration under *Iqbal* (and, by inference, rejected the remaining factual contentions as

insufficiently conclusory).  Jaxon's Objections do not specifically contend that the Magistrate Judge erred in making such findings.  Jaxon addresses the *Iqbal* pleading standard in general terms, and contends, without elaboration, that the Magistrate Judge erred by holding Jaxon to a "heightened pleading standard."  Jaxon also cites to certain paragraphs from the Amended Counterclaims -- paragraphs that the Magistrate Judge did <u>not</u> list – as support for its arguments.  But Jaxon does not offer any particularized argument as to why the Magistrate Judge's decision to reject a certain factual averment as conclusory was somehow in error.

A party wishing to raise an objection to a recommendation must be "specific" in the identification of the legal and factual issue(s) being raised, as a generalized objection does not "focus attention on those issues" that require resolution.  *U.S. v. One Parcel of Real Property*, 73 F.3d 1057, 1059 (10th Cir. 1996).  Without a meaningful argument by Jaxon as to why the Magistrate Judge erred in finding specific paragraphs of factual averments to be conclusory, the burden would fall to this Court to make those arguments for Jaxon, a task the Court refuses to undertake.

The facts pertinent to the "improper means" element of Jaxon's tortious interference claim are found in paragraphs 16 and 19 of the Amended Counterclaims.  Paragraph 16 contends that L3 communicated to Jaxon's potential customers that Jaxon and its employees "were 'criminals,' had "stolen L3 blind,' had infringed patents [and] stolen equipment [and] trade secrets."  Paragraph 19 contends that L3 "intentionally solicited and obtained the identity of Jaxon customers and the form, amount, and details of confidential proposals and marketing materials submitted by Jaxon to a Jaxon customer" and had "searched for, obtained, reviewed and circulated within L3 Jaxon trade secrets and proprietary information from a computer" used by Defendants Susan and Charles Rettig.

With regard to the allegations in Paragraph 16, the only contention is that L3 "told . . . customers, vendors, and suppliers" certain things about Jaxon.  The Magistrate Judge found that such statements do not constitute "improper means" because the statements "are not defamatory nor are they necessarily 'falsehoods' as this is exactly the behavior to which L3 directs its claims against Jaxon."  The Court does not read Jaxon's Objections to specifically take issue with the Magistrate Judge's finding on this point.

With regard to Paragraph 19, the Magistrate Judge read Jaxon's contention that L3 "intentionally solicited and obtained Jaxon's trade secrets and proprietary information" in the first sentence of that paragraph with the contention in the second sentence that such information was obtained by L3 from a computer taken by L3 from the Rettigs' home.  The Magistrate Judge found that Jaxon made no allegation that L3's acquisition of that computer was unlawful or improper and thus, concluded that Jaxon had not alleged facts showing that L3, as "the recipient of the information," engaged in an improper act by subsequently using it.

In its Objections, Jaxon takes issue with the Magistrate Judge construing the two sentences of Paragraph 19 together.  It contends that the first sentence's description of L3 "solicit[ing] and obtain[ing] Jaxon's trade secrets" constitutes "conduct which is distinct from the allegations discussed in the Recommendation" [*i.e.* the review of information from the Rettigs' computer].  But if the Court were to do as Jaxon suggests and divorce the first sentence of the paragraph from the second, it would be forced to conclude that the first sentence, on its own, is too conclusory to permit consideration under *Iqbal*.  A contention that a party "solicited and obtained" information is nothing more than a "label [or] conclusion. . . devoid of further factual enhancement."  556 U.S. at 678.  It provides no information as to what particular acts Jaxon contends constituted the "solicitation" or "obtaining," leaving open the possibility that

what Jaxon labels as improper "solicitation" is conduct that is, in actuality, perfectly permissible competition (such as reviewing information that the Rettigs saved on a computer belonging to L3). *Id.* at 680, *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 (2007). Because Jaxon provides no factual detail to illuminate the mere conclusory labels contained in the first sentence of Paragraph 19, the Magistrate Judge properly turned to the second sentence to supply the missing information, and properly concluded that the full text of that paragraph did not sufficiently allege "improper means."[1]

Jaxon also argues that it has adequately alleged "improper means" in the form of L3 making abusive misuse of its patent, as set forth in its third counterclaim. Although *Harris* contemplates that "unfounded litigation" can constitute a type of "improper means" sufficient to support a tortious interference claim, Jaxon never contended in its underlying response to L3's motion to dismiss that "unfounded litigation" was a type of "improper means" supporting the tortious interference claim. *See* Docket # 338 at 3-7. Issues raised for the first time in objections to a recommendation are deemed waived, as a party cannot obtain "*de novo* review of an argument never seasonably raised before the magistrate." *Marshall v. Chater*, 75 F.3d 1421, 1426-27 (10th Cir. 1996).

Accordingly, the Court overrules Jaxon's Objections and adopts the Magistrate Judge's recommendation that Jaxon's tortious interference counterclaim be dismissed.

---

[1]     Jaxon points to C.R.S. § 7-74-102(2), which is part of a Colorado statute providing remedies where one "misappropriat[es]" a trade secret. This Court simply notes that all of the statutory definitions of "misappropriation" include the concept of acquisition of a trade secret through "improper means." The term "improper means" is also statutorily-defined, C.R.S. § 7-74-102(1), and the Court finds nothing in Paragraphs 16 or 19 of the Amended Counterclaims that would clearly fit within that statutory definition.

### C.  Patent misuse claim

Jaxon's third counterclaim invokes the doctrine of "patent misuse." Patent misuse is an equitable doctrine, related to the doctrine of "unclean hands," and allows a court to equitably refuse to enforce a patent (*i.e.* by refusing granting a judgment of infringement in favor of the patent holder) where the patent holder has misused it.  *B. Braun Medical, Inc. v. Abbot Laboratories*, 124 F.3d 1419, 1427 (Fed. Cir. 1997).  The "misuse" in question occurs when the patent holder engages in conduct that does not, in and of itself, violate any law, but which exploits the monopoly power granted by the patent itself to impose some additional anticompetitive injury.  *Id.*

The Federal Circuit in *Princo Corp. v. Intl. Trade Commission*, 616 F.3d 1318, 1326-28 (Fed Cir. 2010), gives examples of the types of conduct that gave rise to and shaped the doctrine: (i) the inventor of a film projector requiring licensees of the projector technology to agree to show only certain kinds of films; (ii) the inventor of a dry ice packaging material requiring licensees to purchase the dry ice that they packaged in the material from him (and the inventor of a device for adding salt to canned foods requiring licensees to buy salt tablets from him); and (iii) inventors who required licensees to continue to pay licensing fees beyond the date on which the patent would expire.  *See also  Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed. Cir. 1992) (agreements wherein patent holder requires licensee to sell its product above a set minimum price constitute misuse, as the patent gives the holder the right to sell or not sell the technology, but not the right to directly control the market price).  The doctrine is an extremely narrow one, confined to "a handful of specific practices" that have been found to constitute misuse, such as "tying or enforced package licensing or price restraints or extended royalty terms." *C.R. Bard*, 157 F.3d at 1373; *Princo*, 616 F.3d at 1322 ("Because patent misuse is a

8

judge-made doctrine that is in derogation of statutory patent rights against infringement, this court has not applied the doctrine of patent misuse expansively").

As can be seen from the examples above, the doctrine is properly described as applying where a patent holder, "by imposing conditions that derive their force from the patent, . . . impermissibly broaden[s] the scope of the patent grant with anticompetitive effect." *C.R. Bard Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1373 (Fed. Cir. 1998).  A successful invocation of the doctrine of patent misuse results in the patent being rendered unenforceable until the misuse is purged (*i.e.* the abusive licensing term or contract condition is withdrawn), but does not give rise to an award of damages to the accused infringer.[2]  *Braun*, 124 F.3d at 1427.

Jaxon's conception of the counterclaim does not fit within the established contours of the doctrine.  Jaxon does not contend that L3 refused to license its patented technology to Jaxon unless Jaxon also agreed to buy certain additional goods or services from it, or that L3 attached some other anticompetitive condition upon Jaxon's licensing of the patents; indeed, the crux of Jaxon's misuse counterclaim is that it was not obligated to license L3's patents at all.  Thus, Jaxon's stated counterclaim for patent misuse does not appear to be the proper invocation of that doctrine.

Jaxon contends that the misuse doctrine also applies in a separate set of circumstances: one in which the patent holder's "infringement suit was a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a

---

[2]     An infringer who successfully demonstrates misuse might be entitled to a declaratory judgment that patent misuse has occurred, but any subsequent relief (such as damages incurred by the infringer pursuant to such misuse) must be sought through a separate substantive claim. *Braun*, 124 F.3d at 1428.   Because Jaxon states only a counterclaim for declaratory relief sounding in patent misuse, but does not allege any further substantive counterclaim that would entitle it to damages if indeed L3 has misused its patent, it is unclear to this Court how Jaxon's counterclaim will operate any differently than a simple assertion of patent misuse as an affirmative defense to L3's infringement claim.

competitor," *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998).  The Magistrate Judge agreed, finding that a cognizable counterclaim for misuse arises where a patent holder's infringement claims are both "objectively meritless" and brought in bad faith.  Although this Court has profound doubts that this is a correct application of the precedent at issue,[3] it notes that L3 has not objected to the Magistrate Judge's recommendation that Jaxon's misuse counterclaim proceed in part, and thus, the Court will not *sua sponte* address the broader question of whether the general proposition as stated above is correct.

Jaxon's patent misuse counterclaim contends that L3's patent infringement claims here are "objectively meritless" for two separate reasons.  First, it contends that that L3 knew that its patent claims were unfounded because "Jaxon is immune from individual liability for the alleged infringement pursuant to 28 U.S.C. § 1498(a)."  That statute provides that "[w]henever [a patented invention] is used or manufactured by or for the United States without license of the owner thereof , . . . the owner's remedy shall be by action against the United States."  In other words, the statute immunizes government contractors against claims of patent infringement if: (i) the contractor's use of the patent was "for the Government," and (ii) the use is "with the

---

[3]      This conception of "misuse" is essentially a finding that the patent holder has engaged in frivolous and vexatious litigation, for which a variety of remedies already exist.  *See e.g.* Fed. R. Civ. P. 11(b)(1) and (2); 28 U.S.C. § 1927; 35 U.S.C. § 285 ("the court in exceptional [patent] cases may award reasonable attorney fees to the prevailing party").

Without going into extensive detail, it appears to this Court that cases seeming to articulate a doctrine of patent misuse arising solely from the fact that the patent holder's infringement claim is "sham litigation" are actually addressing the question of whether such litigation entitles the party bringing it to enjoy the antitrust immunity that would normally attach to such litigation under the *Noerr-Pennington* doctrine.  *See generally Coll v. First American Title Ins. Co.*, 642 F.3d 876, 896-97 (10th Cir. 2011) (describing *Noerr-Pennington*); *see also Glaverbel Societe Anonyme v. Northlake Marketing & Supply Inc.*, 45 F.3d 1550, 1558 (Fed. Cir. 1995) (discussing "sham litigation" in both a patent misuse and antitrust context, but citing only to antitrust cases as authorities).  Because Jaxon does not assert any antitrust counterclaims against L3, the "sham litigation" exception to *Noerr-Pennington* immunity is not relevant here.

It also appears that such a holding would be contrary to 35 U.S.C. § 271(d)(3), which appears to suggest that asserting claims of patent infringement cannot constitute patent misuse.

authorization or consent of the Government." *TDM America, LLC v. U.S.*, 85 Fed.Cl. 774, 781 (Fed. Cl. 2009).  Second, Jaxon contends that L3 has engaged in patent misuse because "L3 first conceived of and actually reduced to practice the purported inventions of the [patents in question] under Government-funded contracts or subcontracts, thereby granting the Government rights in the technology" under Federal Acquisition Regulations.  In other words, Jaxon contends that the Government retains the right to grant a license to Jaxon to use the patented technology over L3's objection, notwithstanding the grant of patents in the technology to L3.

The Magistrate Judge found that Jaxon's second theory was sufficiently pled to permit the patent misuse counterclaim to proceed, but found that Jaxon's allegations of its own statutory immunity against infringement claims were insufficient to support the counterclaim.  Jaxon objects to the latter finding.  The Court need not address the Magistrate Judge's particular findings supporting that conclusion, nor Jaxon's arguments as to why the counterclaim can properly be premised on that statutory immunity, as there is authority -- interpreting facts essentially identical to this case[4] -- concluding that the doctrine of patent misuse is inapplicable where a patent holder asserts infringement against a government contractor, heedless of 28 U.S.C. § 1498.

In *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868-70 (Fed. Cir. 1997), the plaintiff held a patent on technology used to construct certain electronics testing equipment.  It began contacting the defendant's (its competitor) customers ("including a number of government contractors and agencies"), informing them that the defendant's product infringed the plaintiff's patents and ordered them to cease and desist using those products.  The plaintiff then brought

---

[4]     Indeed, the *Virginia Panel* case discussed below is so squarely on-point with regard to Jaxon's Objections that the Court is somewhat surprised that Jaxon did not even cite it, much less attempt to distinguish its holding.

patent infringement claims against the defendant, and the defendant counterclaimed asserting, among other things, patent misuse (and antitrust violations), arising from the plaintiff "sen[ding] infringement notices, including requests to cease and desist infringing activities, to government contractors without informing those contractors of the affirmative defense provided by 28 U.S.C. § 1498." 133 F.3d at 868.  A jury found in favor of the plaintiff on the infringement claims, but a second jury, hearing the defendant's counterclaims, found in favor of the defendant on its patent misuse and antitrust claims.  On appeal, the Federal Circuit addressed the second jury's finding of patent misuse, and agreed with the plaintiff that "none of the conduct on which [the defendant] relied can constitute patent misuse as a matter of law." *Id.*

The court began by stating that the plaintiff's actions in "sen[ding] infringement notices to various government contractors, even notices that threatened suit and injunctions," did not amount to patent misuse "because they did not broaden the scope of its patent, either in terms of covered subject or temporally." *Id.* at 869.  Citing *Mallinckrodt*, it observed that "a patentee that has a good faith belief that its patents are being infringed violated no protected right when it so notifies infringers." *Id.*, *citing* 976 F.2d at 709.  Thus, the plaintiff was "allowed to make its rights known to a potential infringe so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability." *Id.*  "That applies," the court explained, "even to warning a company like [the defendant] that, at least in its role as a supplier to the United States, could not be subject to liability or enjoined from practicing the claimed invention." *Id.*  The statutory immunity, it pointed out, "restricts a patentee's remedies against government contractors' infringing acts [but] does not make those acts non-infringing and it certainly does not prohibit the sending of infringement notices to

government contractors."[5]  *Id.*  Accordingly, the court held, the plaintiff's "threats to seek injunctions against [the defendant's] customers, whether in the form of an infringement notice or in direct negotiations, did not constitute patent misuse because [the plaintiff] had a good faith belief that those it notified were using a device that infringed [its] patent."  *Id.* at 870.

The application of *Virginia Panel* to Jaxon's contention that L3's asserting of infringement claims without acknowledging 28 U.S.C. § 1498 constitutes patent misuse is largely self-evident, requiring little additional comment from this Court.  The Court will proceed to address only the final aspect of the Court's holding, that the plaintiff there "had a good faith belief" that the defendant was infringing its patent.  Jaxon might contend that this renders *Virigina Panel* distinguishable, because here, Jaxon is alleging that L3 is acting in <u>bad</u> faith in asserting its infringement claims.  But this argument would misread *Virginia Panel*: the "good faith" at issue there was the plaintiff's belief that the defendant's product infringed the plaintiff's patent, not a good faith belief that the plaintiff would ultimately recover damages from the defendant.  *Id.* at 869 (statutory immunity "restricts a patentee's remedies . . . [but] does not make those acts non-infringing").  Nothing in Jaxon's counterclaims appears to contend L3 lacks that same good-faith belief that Jaxon is infringing on L3's patents.  The counterclaim makes a conclusory assertion that L3 is making a "bad faith attempt to enforce" its patents against Jaxon, but the "bad faith" in question appears to be L3's failure to acknowledge that "Jaxon is immune from individual liability" pursuant to 28 U.S.C. § 1498, not "bad faith" in the sense that L3 allegedly knows that Jaxon's products do not actually infringe upon L3's patents.  *Docket* # 304 at ¶ 37-40.

---

[5]      It further noted that the statutory provision "only provides an affirmative defense" that the infringing contractor must establish.  *Id.*

Thus, *Virginia Panel* unambiguously establishes that Jaxon's invocation of the doctrine of patent misuse is inappropriate to the extent it is based upon a contention that L3 misused its patent by alleging infringement despite the operation of 28 U.S.C. § 1498. Jaxon's objections to the Recommendation on this ground are therefore overruled.

### D.  Leave to replead

With respect to both of its counterclaims, Jaxon requests that, if the Court finds no error in the Recommendation, it nevertheless be permitted leave to amend its counterclaims in an effort to salvage the claims.

Fed. R. Civ. P. 15(a) provides that leave to amend shall be "freely given."  However, such leave is not appropriate if the proposed amendment is the result of undue delay, would cause undue prejudice to the opponent, arises from bad faith, results from failure to cure deficiencies via previous amendments, or would be futile. *Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009). Here, the Court finds that Jaxon's request to amend its counterclaims at this stage of the litigation is the result of undue delay, a failure to cure any deficiencies via previous amendments, and, that such amendment would be futile.

The deadline in the Scheduling Order for amendment of pleadings has long since passed, and the parties have already engaged in extensive discovery, such that reopening the pleadings at this stage poses the risk of prolonging an already strained discovery process. Moreover, the Court notes that Jaxon has already amended its counterclaims once, in response to a motion to dismiss from L3 (**# 272**). When faced with the instant motion to dismiss, Jaxon did not again seek to promptly amend to cure the cited defects, but instead argued that the Amended Counterclaims were facially sufficient (and notably, did not request leave to amend if any counterclaim was found deficient). Jaxon's Objections do not suggest that the facts it now

14

would seek to allege in order to rescue its claims were unknown to it at the time it responded to L3's motion to dismiss, and thus, the record indicates that Jaxon could have (arguably) cured the defects in its pleading more promptly, but instead chose to take its chances and defend the Amended Counterclaims as written. Granting leave to replead to rescue Jaxon from the consequences of this strategic decision would amount to rewarding what has otherwise been undue delay.

Moreover, the Court has reviewed the additional facts Jaxon proposes to plead and finds that those facts would be insufficient to rescue either counterclaim. With regard to the tortious interference claim, the facts Jaxon proposes to add make clear that the "improper means" Jaxon seeks to allege derive primarily from the fact that L3 exploited information it obtained from the Rettigs' computer. However, those facts also make clear that L3 obtained the information through entirely lawful means, insofar as it provided to computer to its employee, Mrs. Rettig, and that Mrs. Rettig allowed Mr. Rettig to put confidential information belonging to Jaxon on it despite the fact that he was not affiliated with L3. Colorado law imposes on the owner of a trade secret the obligation to take reasonable efforts to maintain its secrecy. *Gates Rubber Co. v. Bando Chemical Industries*, 9 F.3d 823, 849 (10th Cir. 1993). Here, the decision by Mr. Rettig to place Jaxon's trade secrets on a computer that belonged to L3 would not amount to "reasonable efforts" to maintain the secrecy of such information, and thus, the Court cannot say that L3's subsequent use of that information would amount to "improper means" sufficient to support a claim for tortious interference.

As to Jaxon's proposed amendments to cure the defect in its patent misuse claim, the Court simply notes that nothing in the proposed amendment cures the inability of Jaxon to allege that L3 lacked a good faith belief that Jaxon's products infringed on L3's patents.

Accordingly, the Court denies Jaxon's request for leave to amend its counterclaims.

## **CONCLUSION**

For the foregoing reasons, Jaxon's Objections **(# 580)** are **OVERRULED**.  The Court **ADOPTS** the Recommendation **(# 559)**, and **GRANTS IN PART** L3's Motion to Dismiss **(# 317)**.  Jaxon's tortious interference and unfair competition counterclaims are **DISMISSED** in their entirety, and its patent misuse claim is **DISMISSED** in part, to the extent predicated on L3's alleged bad faith in alleging infringement heedless of 28 U.S.C. § 1498.

Dated this 27th day of March, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge