IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

No. 10-cv-2868-MSK-KMT

L-3 COMMUNICATIONS CORPORATION,
et al.,

       Plaintiffs,

v.

JAXON ENGINEERING &
MAINTENANCE, INC., et al.,

       Defendants.

---

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFFS' TRADE SECRET AND BREACH OF CONTRACT CLAIMS**

---

       **COME NOW** Defendants Jaxon Engineering & Maintenance, Inc. ("Jaxon"), Joni

White, Randall White, Scott White, Susan Rettig, Charles Rettig, James Youngman, Jerry

Lubell, Kelly Rice, and John McClure (collectively, "Defendants"), who move pursuant to

Federal Rule of Civil Procedure 56 for partial summary judgment on Counts VII through XI of

the First Amended Complaint (ECF 33) filed by Plaintiffs L-3 Communications Corporation and

L-3 Services, Inc. (collectively, "L3").  Granting this Motion will sharply narrow the issues in

this case and reduce significantly the scope of evidence to be presented at trial.  Defendants have

conferred with L3 in an attempt to resolve the matters raised in this Motion, without success.

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION .......................................................................................................... 1

II.    CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT ....................... 1

    A.    Defendants Are Entitled to Partial Summary Judgment on Count VII:
        Trade Secret Misappropriation Pursuant to the Colorado Uniform Trade
        Secret Act Against All Defendants ........................................................................ 1

        1.    Burden of Proof and Elements .................................................................... 1

        2.    Element That Cannot Be Proven By L3 ..................................................... 3

                a.    L3 Did Not Treat Its HEMP Technology or Vendor List as
                     Confidential ....................................................................................... 4

                     (1)    HEMP Testing Equipment ................................................. 6

                     (2)    HEMP Testing Methods .................................................... 7

                     (3)    HEMP Testing Software ..................................................... 7

                     (4)    Vendor List ........................................................................ 7

                b.    L3 Sold and Revealed the HEMP Technology Without Any
                     Restriction on Use, Copying, or Distribution ............................... 8

                     (1)    L3 Transferred Copies of the HEMP Testing
                              Equipment and Software With No Restrictions on
                              Use .................................................................................... 9

                     (2)    L3 Agreed That Boeing and the Government Have
                              Unlimited Rights To Use and Distribute the HEMP
                              Technology ...................................................................... 10

                     (3)    L3 Disclosed Its HEMP Testing Methods and Lists
                              of Testing Equipment and Software to Others
                            Without Any Assurance of Confidentiality ..................... 13

                     (4)    As a Matter of Law, L3's Disclosures Destroyed
                            Any Trade Secret Rights ................................................. 14

    B.    Defendants Are Entitled to Partial Summary Judgment on Counts VIII
        through X (Breaches of Contract Against Former L3 Defendants) and
        Count XI (Breach of Contract Against Defendant Jerry Lubell) ......................... 17

        1.    Burden of Proof and Elements .................................................................. 17

        2.    Element That Cannot Be Proven By L3 ................................................... 18

III.   CONCLUSION ............................................................................................................ 19

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atmel Corp. v. Vitesse Semiconductor Corp.*,
  30 P.3d 789 (Colo. App. 2001), *overruled on other grounds by*
  *Ingold v. AIMCO/Bluffs, LLC*, 159 P.3d 116 (Colo. 2007) ..................................................2, 5

*Colo. Supply Co. v. Stewart*,
  797 P.2d 1303 (Colo. App. 1991) ....................................................................................2, 5, 8

*HiRel Connectors, Inc. v. United States*,
  No. CV01-11069, 2005 WL 4958589 (C.D. Cal. Jan. 4, 2005) ........................................16, 17

*L-3 Commc'ns Westwood Corp. v. Robichaux*,
  No. 06-279, 2008 WL 577560 (E.D. La. Feb. 29, 2008)......................................14, 15, 16, 17

*Plainville Elec. Prods. Co. v. Bechtel Bettis, Inc.*,
  No. 3:06cv920, 2009 WL 801639 (D. Conn. Mar. 26, 2009)...........................................16, 17

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984)....................................................................................................................14

*Secure Servs. Tech., Inc. v. Time & Space Processing Inc.*,
  722 F. Supp. 1354 (E.D. Va. 1989) .......................................................................8, 15, 16, 17

*Shell v. Am. Family Rights Ass'n*,
  --- F. Supp. 2d ---, 2012 WL 4476641 (D. Colo. 2012) (Krieger, J.) ........................................2

*Sw. Stainless, LP v. Sappington*,
  582 F.3d 1176 (10th Cir. 2009) ........................................................................................2, 5, 8

*Young Design, Inc. v. Teletronics Int'l, Inc.*,
  No. Civ. A. 00-970-A, 2001 WL 35804500 (E.D. Va. July 31, 2001).......................................8

STATUTES

Code, L3.............................................................................................................................................15

Colo. Rev. Stat. § 7-74-102(4)....................................................................................................2, 8

OTHER AUTHORITIES

48 C.F.R. § 252.227-7013..............................................................................................11, 12, 13

48 C.F.R. § 252.227-7014..............................................................................................................12

I.      **<u>INTRODUCTION</u>**

L3 contends that this case centers on its allegations that Defendants "stole" alleged "trade secret" information of L3.  The real L3 "secret" in this case, however, is the one L3 would like to conceal from the Court:  L3 never considered or treated the vast majority of the data as confidential.  This includes at least 101 of the 117 alleged trade secrets.  L3's own employees have testified that L3 did not treat the information as confidential.  Moreover, before the events alleged in this action, L3 gave and revealed the information to third parties, including the United States Government, without *any* restriction on use, copying or distribution.  Thus, L3 has failed to take reasonable measures to protect its alleged trade secret and confidential information, so the information cannot be trade secret or confidential.

L3's failure is fatal to a substantial portion of its case.  The simple and straight-forward consequence is that, for 101 of the 117 alleged trade secrets, L3 cannot meet its burden of proving that: (1) it possesses a valid trade secret (Count VII); or, (2) Defendants breached the asserted contracts (Counts VIII-XI).  In light of L3's failure of proof, Defendants are entitled to partial summary judgment as to Counts VII though XI of the First Amended Complaint on those alleged trade secrets, which will significantly reduce the scope of discovery and evidence to be presented at trial.  Other courts have granted summary judgment in remarkably similar circumstances.

II.     **<u>CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT</u>**

     A.      **<u>Defendants Are Entitled to Partial Summary Judgment on Count VII: Trade Secret Misappropriation Pursuant to the Colorado Uniform Trade Secret Act Against All Defendants</u>**

          1.      **Burden of Proof and Elements**

L3's claim of trade secret misappropriation under the Colorado Uniform Trade Secrets Act ("CUTSA") requires L3 to establish, by a preponderance of the evidence: "(i) that [it]

possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and

(iii) that the defendant knew, or should have known, that the trade secret was acquired by

improper means."  *Shell v. Am. Family Rights Ass'n*, --- F. Supp. 2d ---, 2012 WL 4476641, at

*12 (D. Colo. 2012) (Krieger, J.); *see also* Colo. Rev. Stat. § 7-74-102(4).

To prove the first element (possession of a valid trade secret), L3 must prove, among

other things, that it took "measures to prevent the secret from becoming available to persons

other than those selected by the owner to have access thereto for limited purposes."  Colo. Rev.

Stat. § 7-74-102(4).  This inquiry includes:

> 1) the extent to which the information is known outside the business; 2) the extent
> to which it is known to those inside the business, i.e., by the employees; [and] 3)
> the precautions taken by the holder of the trade secret to guard the secrecy of the
> information . . . ;

*Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1991) (internal quotation marks

omitted).

"Normal business precautions" are insufficient and do not constitute "precautions . . .

taken to protect trade secrets."  *Id.*; *see also Sw. Stainless, LP v. Sappington*, 582 F.3d 1176,

1189-90 (10th Cir. 2009) (finding "general measures to keep its company information private"

insufficient for trade secret protection); *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d

789, 795 (Colo. App. 2001), *overruled on other grounds by Ingold v. AIMCO/Bluffs, LLC*, 159

P.3d 116 (Colo. 2007).  Trade secret protection has also been rejected where, for example,

"dissemination of [the] information was not limited to certain employees" and "[e]ven

independent contractors, who were hired [by the party claiming protection], were provided the

information."  *Colo. Supply Co.*, 797 P.2d at 1306; *see also Sw. Stainless*, 582 F.3d at 1189-90

(finding pricing information not a trade secret regardless of measures taken where, *inter alia*,

pricing was known to customers and the plaintiff "[did] not prevent its customers and vendors from disclosing pricing information to others").

### 2.      Element That Cannot Be Proven By L3

Defendants challenge only the first element in this Motion.  Defendants expressly reserve the right to challenge the other elements of L3's claim at a later time.

Element 1:  L3 cannot demonstrate a triable issue of fact that it possesses a valid trade secret with respect to any of its alleged "HEMP Technology Trade Secrets" or Vendor List information, as identified by L3 in its response to Defendants' Interrogatory No. 1 (attached hereto as Exhibit 1), specifically the items numbered 1-100 and 103 therein.  Defendants have numbered each of the alleged trade secrets on Exhibit 1 for ease of reference.[1]

In its First Amended Complaint ("Complaint") and opposition to Defendants' motion to dismiss that pleading, L3 alleges that Defendants misappropriated L3's trade secrets in 2008 and 2009.  (ECF 33 ¶¶ 99, 116; ECF 50 at 12-13.)  (The Court subsequently dismissed certain Counts of that Complaint.  (ECF 214.))

The Complaint does not describe the trade secrets, so Defendant's Interrogatory No. 1 required L3 to "[d]escribe in detail each trade secret and item of confidential information that [L3] contend[s] any Defendant misused."  (Ex. 1 at 4.)  L3 refused, so Defendants were forced to file a motion to compel L3 to provide an adequate response to Interrogatory No. 1.  (ECF 94.)  Following a hearing on October 3, 2011, the Court reviewed the applicable case law and ordered L3 to do so.  (ECF 119 at 6.)

On October 24, 2011, L3 supplemented its response to Interrogatory No. 1.  (ECF 122.)  In that response, and again in its most recent October 26, 2012 response (Ex. 1), L3 identified

---

[1] The attached Declaration of Daniel E. Johnson (Ex. 25) authenticates the exhibits referenced in this Motion.

alleged "HEMP Technology Trade Secrets" ("HEMP Technology") consisting of certain equipment ("HEMP Testing Equipment," numbered 1-15, 37-41, and 75 on Exhibit 1), methods ("HEMP Testing Methods," numbered 16-25, 42-65, and 76-88 on Exhibit 1), and software ("HEMP Testing Software," numbered 26-36, 66-74, and 89-100 on Exhibit 1).  L3 also identified its "vendor list including recent quotes and details on terms and conditions" ("Vendor List").  (Ex. 1 at 24 (numbered 103).)  L3 also identified very generally sixteen (16) other alleged trade secrets.  (Ex. 1 at 24-25 (numbered 101-02 and 104-17).)

As shown below, L3 did not treat the alleged trade secrets as confidential and gave to outsiders without any restrictions on use or copying.  Thus, as a matter of law, they are not trade secrets.

a.   <u>L3 Did Not Treat Its HEMP Technology or Vendor List as Confidential</u>

L3's interrogatory responses, as well as the testimony of its own witnesses, show that L3 never took necessary measures to protect the secrecy of its alleged trade secrets.  L3 never required all of its employees to sign confidentiality agreements, did not tell its employees that the data was confidential, and did not limit the disclosure of information to L3 personnel on a need-to-know-basis.

Defendants' Interrogatory No. 1 specifically asked L3 to describe, for each "trade secret and item of confidential information that [L3] contend[s] any Defendant misused," "(a) all steps L-3 took to prevent the trade secret or item of confidential information from becoming available to Persons other than those selected by the owner to have access thereto for limited purposes." (Ex. 1 at 4.)  L3 has responded that it had a "data protection program . . . based upon principles" set forth in the response.  (Ex. 2 at 6.)  The "principles" consisted of steps commonly undertaken by companies like L3 that deal with Government-sensitive data or are Government contractors:

-4-

"keyed locks"; requiring personnel to obtain security clearances; requiring visitors "to sign in and be escorted"; unspecified "internal segregated portions" within the L3 office suite; "periodic computer-based training"; "strict access control for individual computers, office servers and storage devices"; and confidentiality agreements.  (Ex. 2 at 6-7.)   None of the "principles" that L3 sets forth are specific to the HEMP Technology or Vendor List in particular, or show that those items were treated as confidential or trade secret.  (Ex. 2 at 6-7.)

Even if L3 had taken the steps identified in its response to Interrogatory No. 1(a) regarding the HEMP Technology and Vendor List (which L3 did not do), those steps would be no more than "normal business precautions," and would therefore be insufficient as a matter of law under the CUTSA to protect the HEMP Technology or Vendor List as alleged trade secrets. *See Colo. Supply Co.*, 797 P.2d at 1306; *see also Sw. Stainless*, 582 F.3d at 1189-90; *Atmel Corp.*, 30 P.3d at 795.

In fact, L3 did not take those steps regarding the HEMP Technology and Vendor List. First of all, L3's own documents and witness show that L3 did not even obtain confidentiality agreements from many L3 employees.  As of October 20, 2010, L3's Applied Technologies Group -- the L3 group involved in this litigation -- "had 14 employees that had not yet provided the confidential and innovation document[, a]nd 41 employees had not yet provided the confidential innovation and nonsolicitation document."  (Ex. 3 (Dep. of S. Appleby) at 190:18-195:15.)  Thus, no fewer than 41 of the approximately 275 employees in the Applied Technologies Group had not even signed one or more L3 confidentiality agreements.  (Ex. 3 (Dep. of S. Appleby) at 190:18-195:15.)

Second, L3 never told its workforce to keep the HEMP Technology and Vendor List confidential.  L3's written policy required that all information and media "having business,

technical, or trade secret value" be *identified* by the L3 managers and *labeled* "in 16 pt. Font capital letters" as "L-3 COMMUNICATIONS PROPRIETARY" or "L-3/ATD PROPRIETARY." (Ex. 4 at L3-1317857, -859, -861.)  L3 implemented this policy to "[e]nsure that information is properly classified and is neither over-classified nor under-classified."  (Ex. 4 at L3-1317862.)  As shown below, regarding each category of alleged trade secrets (HEMP Testing Equipment, HEMP Testing Software, HEMP Testing Methods and Vendor List), L3 neither advised its employees that the data was confidential nor labeled it as such.  Thus, the data cannot be trade secret.

(1)    HEMP Testing Equipment

L3 witnesses and others have testified that the HEMP Testing Equipment was not marked as L3 proprietary information, and that they were not told that the equipment was proprietary. (Ex. 5 (Dep. of D. Kizner) at 29:16-29:20, 31:14-32:19; Ex. 6 (Dep. of K. Moore) at 217:01-218:18; Ex. 7 (Dep. of L. Linn) at 148:16-148:24, 157:24-158:02; *see also* Ex. 8 (Dep. of D. Kleeberg) at 180:01-181:02.)  Repair kits that contained a spare part for each part in the testing equipment also were not marked as L3 proprietary information.  (Ex. 5 (Dep. of D. Kizner) at 12:18-13:15, 30:23-31:05.)  One of L3's witnesses whose job was to work with the parts lists could not recall ever seeing any parts list marked or otherwise designated as L3 proprietary information.  (Ex. 5 (Dep. of D. Kizner) at 11:22-12:17, 31:14-31:17, 40:12-41:09.)

L3 witnesses also testified that L3 often left its HEMP testing equipment on job sites where non-L3 personnel, including government employees and employees of other contractors, could access the equipment.  (Ex. 7 (Dep. of L. Linn) at 156:22-158:02; Ex. 8 (Dep. of D. Kleeberg) at 180:15-181:02.)

(2)     HEMP Testing Methods

Witnesses from both L3 and third parties testified that they were not told that the L3 HEMP Testing Methods were confidential or proprietary.  (Ex. 5 (Dep. of D. Kizner) at 27:06-29:20, 31:22-32:19, 40:12-41:13, 44:24-46:01.)  Indeed, L3 allowed non-L3 personnel to observe L3's HEMP Testing Methods and did not tell those outsiders that the HEMP Testing Methods were proprietary or confidential to L3.  (Ex. 5 (Dep. of D. Kizner) at 46:08-46:25, 48:04-48:14; Ex. 6 (Dep. of K. Moore) at 217:01-218:18; Ex. 7 (Dep. of L. Linn) at 155:12-155:21; Ex. 8 (Dep. of D. Kleeberg) at 176:20-179:19.)

(3)     HEMP Testing Software

L3 did not tell its employees to mark or treat its HEMP Testing Software as confidential, proprietary or a trade secret, and L3 employees often showed customers how it worked and operated.  (Ex. 9 ¶¶ 11-14; *see also* Ex. 9 ¶¶ 17-20.)  L3 made its HEMP Testing Software readily available and accessible within L3, including to those L3 employees who did not have a need to have access to it.  (Ex. 9 ¶ 9.)  L3 also loaded the software on L3's lab and testing computers that did not require access passwords.  (Ex. 9 ¶ 9.)  L3 did not control access to the software source code, and those with access could and did alter the code, resulting in multiple variations of the software, which L3 did not track.  (Ex. 9 ¶ 10.)

(4)     Vendor List

L3 witnesses testified that they did not recall seeing vendor prices and parts lists marked proprietary to L3, and did not otherwise consider vendor pricing to be proprietary.  (Ex. 5 (Dep. of D. Kizner) at 40:12-41:09; Ex. 7 (Dep. of L. Linn) 148:25-149:10.)  Prices for parts were available on vendor's websites, and no one from L3 ever indicated that the identity of the vendor, the prices of such parts, or the invoices, were proprietary to L3.  (Ex. 5 (Dep. of D. Kizner) at 38:03-40:11; *see also* Ex. 5 (Dep. of D. Kizner) at 48:15-49:23.)  Not surprisingly, L3 has

produced no evidence of any agreement with each of the vendors that restricted the vendors from disclosing their own identity and prices charged to L3 or other terms.

L3 did not have all of its employees sign confidentiality agreements and did not advise its employees that the information was confidential and did not label it as such. Disclosure of the HEMP Technology and Vendor List also was not limited to L3 personnel on a need-to-know basis and were in fact disclosed to non-L3 personnel without any confidentiality agreement. Thus, as a matter of law, they are not trade secrets. *See* Colo. Rev. Stat. § 7-74-102(4); *see also Young Design, Inc. v. Teletronics Int'l, Inc.*, No. Civ. A. 00-970-A, 2001 WL 35804500 (E.D. Va. July 31, 2001) (concluding that the plaintiff failed to take reasonable measures to protect its alleged trade secrets where, *inter alia*, its product containing the alleged trade secrets was sold to others who could then open the product and examine the alleged trade secrets, even where part numbers had been "erased" from certain components "to reduce the likelihood of copying"); *Secure Servs. Tech., Inc. v. Time & Space Processing Inc.*, 722 F. Supp. 1354, 1360 (E.D. Va. 1989); *Colo. Supply Co.*, 797 P.2d at 1306; *Sw. Stainless*, 582 F.3d at 1189-90.

L3 therefore cannot demonstrate a triable issue of fact that it possesses a valid trade secret with respect to the HEMP Technology or Vendor List on which its misappropriation claim is based, specifically items numbered 1-100 and 103 on Exhibit 1, and Defendants are entitled to summary judgment on Count VII as to those items.

b.      L3 Sold and Revealed the HEMP Technology Without Any Restriction on Use, Copying, or Distribution

Even if L3 had taken internal steps to treat the alleged trade secrets as confidential, L3 waived any trade secret protection by selling and/or disclosing the HEMP Testing Equipment, Software and Methods to third parties without any restriction on use. For example, in 2007, L3 offered and sold a complete set of its HEMP Testing Equipment and HEMP Testing Software to

-8-

the Boeing Company and the Government with no promise of confidentially by Boeing or the Government and with no other restriction on use, copying or distribution.  L3 even went further and actually agreed that Boeing and the Government had unlimited rights to use and distribute the information.  L3 also repeatedly disclosed lists of its HEMP Testing Equipment and Software, and described its Testing Methods, in numerous reports to the Government that the Government was free to use and distribute.  Therefore, under established law, L3 cannot claim that the HEMP Technology is a trade secret or confidential.

> (1)  L3 Transferred Copies of the HEMP Testing Equipment and Software With No Restrictions on Use

In July 2007, before the events alleged in this case, L3 submitted a written proposal to Boeing for the Government's ███████████████████████████████████████████.  (Ex. 10.)  Boeing was the prime contractor for that program.  (Ex. 10 at L3-1128994.)  L3 proposed to prepare and deliver to Boeing and the Government, among other things, "a dedicated set of equipment used to perform all required [HEMP] testing . . . which would also be available to support [HEMP] testing of other ██████ facilities and assets . . . as may be required in the future."  (Ex. 11 at L3-1129004.)  L3 promised to deliver "a complete HEMP testing capability at ████████████████."  (Ex. 11 at L3-1129004, -020.)  The complete set of equipment that L3 offered to deliver included "DAS PCs," on which L3's HEMP Testing Software was loaded.  (Ex. 11 at L3-1129005; Ex. 12 at L3-1129064.)[2]  The proposal resulted in a Purchase Contract between L3 and Boeing dated December 12, 2007.  (Ex. 15.)

---

[2] L3 describes its "BADDAS," "BUTTER" and "DATAVIEWER" software (alleged trade secrets 29, 32, 66, 92, 95, and 99) as part of its "data analysis system" (*see, e.g.*, Ex. 13 at L3-1338803).  L3 also told Boeing that its "CUCO" software (part of the HEMP Testing Software (Ex. 1, numbered 35, 73, and 98)) is the data reduction software in the DAS PC (Ex. 14 at L3-081568).  L3 described the "EasyPlot" software  (part of the HEMP Testing Software (Ex. 1, numbered 33, 71, and 96)) as "a commercially available plotting package . . . used to generate reduced data plots" (Ex. 14 at L3-081568).

L3 completed the transfer of the HEMP Testing Equipment and Software to Boeing.  (Ex. 16 at L3-1321793).  The HEMP Testing Equipment (and Software as part of the "DAS PC's") was turned over to Boeing with "government property tag[s]" under the control of the Government/Boeing.  (Ex. 16 at L3-1321793).  None of the equipment was marked with any restriction on use. (Ex. 5 (Dep. of D. Kizner) at 27:06-29:20.)  L3 therefore conveyed and delivered to Boeing and the Government the actual HEMP Testing Equipment and Software that L3 now claims is a trade secret, without any restriction on use, copying or distribution.

L3 also provided to Boeing a Form DD1149 (Ex. 17 at L3-955703) that attaches a list entitled "Boeing Contract Purchases" (Ex. 17 at L3-955704-11).  This list sets forth the L3 equipment, including the DAS PCs, sold and delivered to Boeing/Government.  (Ex. 17.)  The list is not marked with any restriction on use, copying or distribution.  (Ex. 17.)[3]

Having sold and delivered the HEMP Testing Equipment and Software to Boeing and the Government without any restriction on use, L3 cannot seriously claim that they are trade secrets.

> (2)     L3 Agreed That Boeing and the Government Have Unlimited Rights To Use and Distribute the HEMP Technology

Not only did L3 *not* restrict Boeing and the Government from using or distributing the HEMP Testing Equipment and Software, but L3 affirmatively agreed that Boeing and the Government would have unlimited rights to do whatever they pleased with it.

In its proposal to Boeing, L3 expressly certified that all of the data and software would be furnished without any restrictions on use, release or disclosure.  (Ex. 12 at 1129039-41.)  The ensuing L3/Boeing Purchase Contract contained the same representation.  (Ex. 15 at L3-062935.)

---

[3] Further evidence that there was no restriction on use of the HEMP Testing Equipment and Software is that, in April 2010, Boeing sent the same Form DD1149 and list of equipment to Jaxon, telling Jaxon that "anyone" could use the equipment for HEMP testing at Fort Greely.  (Ex. 18.)

It also incorporated by reference "Customer contract flow downs" "with the same force and effect as if they were set forth in full text." (Ex. 15 at L3-062936.) One of these incorporated clauses states, "Except for data and software specifically identified in this contract as being delivered with less than unlimited rights, all technical data, computer software, and software documentation required to be delivered under this contract will be provided with unlimited rights." (Ex. 19 at page 12 of 22 § E.; *see also* Ex. 15 at L3-062941.) The Purchase Contract did not identify any restrictions on use of the information, so L3 agreed that it was giving the Government "unlimited rights" to do whatever it wished with it. (*Id.*; Ex. 15 at L3-062935, § H.8.)

Other clauses incorporated into the Purchase Contract also gave Boeing and the Government unlimited rights to do whatever they wished with the HEMP Technology. These clauses included the 1995 versions of the contract clauses found at Defense Federal Acquisition Regulation Supplement ("DFARS") 252.227-7013 and 252.227-7014. (*See* Ex. 19 at page 6 of 22; *see also* Ex. 15 at L3-062941.) DFARS 252.227-7013 defines "unlimited rights" to include the rights to "use . . . release, or disclose technical data . . . . for any purpose whatsoever . . . ." 48 C.F.R. § 252.227-7013(a)(15) (1995). DFARS 252.227-7013 provides that "[t]he Government shall have unlimited rights in technical data that are – (i) Data pertaining to an item, component, or process which has been or will be developed exclusively with Government funds; (ii) Studies, analyses, test data . . . when the study, analysis, test or similar work was specified as an element of performance; [or] (iii) Created exclusively with Government funds in the performance of a contract that does not require the development, manufacture, construction, or production of items, components, or processes . . . ." 48 C.F.R. § 252.227-7013(b)(1)(i), (iii).

DFARS 252.227-7014 contains nearly the same provisions for computer software.  *See* 48 C.F.R.

§ 252.227-7014(a)(15), (b)(1)(i) (1995).[4]

      As noted above, L3 expressly certified that none of the data or software was developed

with private funds (in other words, it was all developed exclusively with Government funds), and

that all of it would be furnished to Boeing and the Government without any restrictions on use,

release or disclosure.  (Ex. 10 at L3-1128999; Ex. 12 at 1129039-41; Ex. 15 at L3-069235.)

Thus, under the DFARS clauses incorporated into Purchase Contract, Boeing and the

Government obtained unlimited rights in the data and software.  48 C.F.R. § 252.227-

7013(b)(1)(i), (iii), 48 C.F.R. § 252.227-7014(b)(1)(i).

      The data that L3 provided to Boeing and the Government included reports of tests that

were specified as an element of performance in the Purchase Contract.  (*E.g.*, Ex. 15 at L3-

062912-914.)  These reports disclosed L3's HEMP Testing Equipment, Software and Methods.

(*E.g.*, Ex. 20 at L3-1346943, L3-1346977-6978, L3-1346995, L3-1347009-7011, L3-1347027.)

Boeing and the Government therefore obtained unlimited rights in those alleged trade secrets.  48

C.F.R. § 252.227-7013(b)(1)(ii).

---

[4] These DFARS clauses also required L3 to maintain documentation supporting any claim of development at private expense.  48 C.F.R. § 252.227-7013(g)(2) (requiring the contractor to "[m]aintain records sufficient to justify the validity of any restrictive markings on technical data delivered under this contract"); 48 C.F.R. § 252.227-7014(g)(2) (requiring the contractor to "[m]aintain records sufficient to justify the validity of any restrictive markings on computer software").  L3 has not produced any records showing, and therefore cannot meet its burden of proving, that it developed the HEMP Testing Equipment, Software or Methods with private funds.

(3)     L3 Disclosed Its HEMP Testing Methods and Lists of
        Testing Equipment and Software to Others Without Any
        Assurance of Confidentiality

L3 also disclosed its HEMP Technology Trade Secrets in plans and reports given to Boeing and others without any restriction on distribution.  This also waived any trade secret protection.

L3 submitted -- without any restriction on distribution -- test plans and test reports to Boeing and other companies that described in detail the HEMP Testing Equipment, Software and Methods.  For example, in its April 2008 report to Boeing, L3 listed each piece of its PCI and CWI HEMP Testing Equipment and described in detail the HEMP Testing Software and Testing Methods used.  (Ex. 20 at L3-1346943, L3-1346977-6978, L3-1346995, L3-1347009-7011, L3-1347027.)  In that report, L3 noted that the dedicated pulser to be used for the PCI testing "[was] identical to the current version of the L-3 / Jaycor 1 kA pulser" (Ex. 20 at L3-1347012), which L3 claims is trade secret 39 (Ex. 1 at 13).

As another example, in an August 2006 test report to the Government's MILSTAR organization, L3 disclosed all of the components of its SE and PCI HEMP Testing Equipment and Methods.  (Ex. 21 at L3-1339070 – 1339092.)  L3 also disclosed its HEMP Testing Software in other documents in 2006.  (Ex. 13; Ex. 21.)  None of these disclosures have any indication that they were provided under any confidentiality arrangement with Boeing or the Government.[5]

---

[5] The "For Official Use Only" statement on the reports is a Government designation of Government-sensitive data, not a limitation on the Government's rights to use or disclose the data.  To assert a restriction on the Government's right to disclose or use the information, a defense contractor like L3 must use a specific legend:  "GOVERNMENT PURPOSE RIGHTS" or "LIMITED RIGHTS," with further details.  48 C.F.R. § 252.227-7013(f).

-13-

(4)     As a Matter of Law, L3's Disclosures Destroyed Any Trade
        Secret Rights

As the Supreme Court has stated,

> Because of the intangible nature of a trade secret, the extent of the property right
> therein is defined by the extent to which the owner of the secret protects his
> interest from disclosure to others.  Information that is public knowledge or that is
> generally known in an industry cannot be a trade secret.  If an individual discloses
> his trade secret to others who are under no obligation to protect the confidentiality
> of the information, or otherwise publicly discloses the secret, his property right is
> extinguished.

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (internal citations omitted).  As shown

above, L3 disclosed its HEMP Technology to others who were "under no obligation to protect

the confidentiality of the information," and "otherwise publicly disclosed the secret[s]," which

"extinguishes" L3's trade secret rights.  *See id.*

Indeed, courts have granted summary judgment for the defendant in trade secret cases —

including in another case involving an L3 entity — where the party asserting trade secret

protection had given the Government unlimited rights in the alleged trade secret, because

providing such rights waives any trade secret protection for that information.  *See, e.g.*, *L-3

Commc'ns Westwood Corp. v. Robichaux*, No. 06-279, 2008 WL 577560, at *7 (E.D. La. Feb.

29, 2008).  In *L-3 Communications*, L3 alleged misappropriation of trade secrets in, *inter alia*,

certain source codes and manuals.  *Id.* at *5.  The defendant "pointed to evidence that all of the

source codes at issue . . . were developed exclusively with government funding."  *Id.* at *6.

(Here, it is indisputable that L3 *certified* to Boeing and the Government that *none* of the data or

software was developed with private funds.  (Ex. 10 at L3-1128999; Ex. 12 at L3-1129039-

-14-

9041.))  The court therefore concluded that L3 presented no evidence showing "a genuine issue of fact regarding the funding" of the software.  *L-3 Commc'ns*, 2008 WL 577560, at *7.[6]

The *L-3 Communications* court then granted summary judgment in favor of the defendant, holding that "because [the L3 entity] provided the government with unlimited rights," there could be no trade secret claim.  *Id.*  The court explained:

> At issue is whether the source codes were the subject of efforts, reasonable under the circumstances, to maintain their secrecy.  The Court finds that as a matter of law, they were not.  Granting the government unlimited rights to data without any restrictive legend or markings constitutes a failure to maintain secrecy.

*Id.* at *8.  Citing DFARS 252.227-7013(e)(2), the court further explained that, as is the case here, "[t]he DFARS contemplate a way for contractors to protect their trade secrets, [but L3] did not take advantage of any of those protections."  *Id.*  The court also noted that, even if L3 retained "ownership" of the source code, L3 had waived any trade secret protection for the code.  *Id.* at *7 & n.7.

Decisions of other courts are in accord.  For example, in the *Secure Services Technology* case cited *supra*, the plaintiff delivered to the Government a machine that used particular protocol variations, which the plaintiff later asserted to be trade secret.  722 F. Supp. at 1358-59. In granting summary judgment for the defendant, the court concluded that the plaintiff "failed to take reasonable steps to maintain the secrecy of the protocol variations."  *Id.* at 1360.  The court noted that, like here, "[n]o notification was given, as required by regulation, that the . . . machine included any proprietary information," and "[n]o markings were placed on the machine or in the related instructional material to indicate the presence of proprietary information," particularly

---

[6] The court also rejected L3's argument that the software source code had to be "delivered" before the government obtained unlimited rights, noting that delivery was neither defined nor a condition precedent under the DFARS "when the government has funded the development of the computer software."  *Id.* at *7.  Here, there is no genuine issue of the material fact that the HEMP Testing Equipment and Software was in fact delivered to Boeing and the Government.  (*See, e.g.*, Ex. 17.)

where the contract referenced a regulation that permitted a "claim [of] protection for proprietary information." *Id.* Citing DFARS 252.227-7013, the court concluded that the Government "acquired unlimited rights" in the machine, and the plaintiff "waived trade secret protection in the protocol variations." *Id.*; *see also Plainville Elec. Prods. Co. v. Bechtel Bettis, Inc.*, No. 3:06cv920, 2009 WL 801639, at *17 (D. Conn. Mar. 26, 2009) (granting summary judgment for defendant because plaintiff provided data under government subcontract incorporating DFARS 252.227-7013, so there could be "no trade secret claim" for the data); *HiRel Connectors, Inc. v. United States*, No. CV01-11069, 2005 WL 4958589, at *4 (C.D. Cal. Jan. 4, 2005) (granting summary judgment for the defendant, noting, "The Government's unlimited right to use form, fit, and function data in any way it wished establishes that as a matter of law, such information cannot be protected as a trade secret." (citing *Ruckelshaus*, 467 U.S. at 1002)).

Because L3 certified that none of the HEMP Testing Equipment and Software was developed with any private funds (Ex. 12 at 1129039-41)—*i.e.*, it was developed exclusively with Government funds—the DFARS clauses in the Purchase Contract gave Boeing and the Government "unlimited rights" in the HEMP Testing Equipment and Software, and the HEMP Testing Equipment and Software cannot be a trade secret. *L-3 Commc'ns*, 2008 WL 577560, at *7; *see also Plainville Elec. Prods.*, 2009 WL 801639, at *17; *HiRel Connectors*, 2005 WL 4958589, at *4; *Secure Servs. Tech.*, 722 F. Supp. at 1360.

Moreover, regardless of the source of funding of the alleged trade secrets, the Government obtained unlimited rights in the HEMP Testing Equipment and Software because L3 confirmed that it was delivering the HEMP Testing Equipment and Software to Boeing and the Government and was providing the data:  1) with unlimited rights (Ex. 19 at page 12 of 22, ¶ E.); and 2) without any restrictive markings or any assurance of confidentiality.  (Ex. 10 at L3-

1128999; Ex. 12 at L3-1129039-41).  Each of those actions destroyed any trade secret protection and entitles Defendants to summary judgment.  *L-3 Commc'ns*, 2008 WL 577560, at *7-8; *see also Plainville Elec. Prods.*, 2009 WL 801639, at *17; *HiRel Connectors*, 2005 WL 4958589; *Secure Servs. Tech.*, 722 F. Supp. at 1360.

L3 therefore cannot demonstrate a triable issue of fact that it possesses a valid trade secret with respect to any of the HEMP Testing Equipment or Software on which its misappropriation claim is based, specifically items numbered 1-15, 37-41, and 75 (equipment) and 26-36, 66-74, and 89-100 (software) on Exhibit 1, and Defendants are entitled to a summary judgment on those claims as a matter of law.

**B.**  **Defendants Are Entitled to Partial Summary Judgment on Counts VIII through X (Breaches of Contract Against Former L3 Defendants) and Count XI (Breach of Contract Against Defendant Jerry Lubell)**

**1.**  **Burden of Proof and Elements**

In Counts VIII through X, L3 alleges breach of contract against each of the "Former L3 Defendants" (defined as Defendants Randall White, Scott White, Susan Rettig, James Youngman, Jerry Lubell, Kelly Rice, and John McClure, collectively (ECF 33 ¶ 6)) with respect to the "Standard Contract," "Confidentiality Contract," and "Ethics Contract," respectively (ECF 33 ¶¶ 252-70).  In Count XI, L3 also alleges breach of contract against Defendant Lubell with respect to the "Exclusive Services Agreement."  (ECF 33 ¶¶ 271-78.)

The Standard Contract is expressly governed by California law (*see, e.g.*, Ex. 22), and the Confidentiality Contract and Exclusive Services Agreement are expressly governed by New York law (*see, e.g.*, Ex. 23; Ex. 24).

L3 has previously asserted that the elements for breach of contract are the same under the laws of California, New York, and Colorado, *i.e.*, L3 has the burden of proving by a preponderance of the evidence that:  (1) an enforceable contract existed; (2) L3 performed under

-17-

the contract, or its performance was excused; (3) the Defendant breached the contract; and (4) L3 was damaged thereby.  (ECF 431 at 24 n.9 (citing *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (Cal. 2011); *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992); *Harris v Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (N.Y. App. Div. 1st Dep't 2010)).)

## 2.      Element That Cannot Be Proven By L3

Defendants challenge only the third element in this Motion.  Defendants reserve the right to challenge all elements of L3's breach of contract claims, including but not limited to challenging that the alleged contracts were not supported by consideration and therefore are not enforceable.

Element 3:  L3 cannot demonstrate a triable issue of fact that the Former L3 Defendants breached the Standard Contract, Confidentiality Contract, or Ethics Contract, or that Defendant Jerry Lubell breached the Exclusive Services Agreement (collectively, the "Alleged Contracts") with respect to items 1-100 and 103 because L3 cannot demonstrate that any of those items are covered by any of the Alleged Contracts.

In Counts VIII through XI, L3 alleges breach by "improper use or disclosure of L-3" "trade secrets," "proprietary" or "confidential" information "  (ECF 33 ¶¶ 256, 264, 269, 274.)[7]

Defendant's Interrogatory No. 1 specifically asked L3 to "[d]escribe in detail each trade secret and item of confidential information that [L3] contend[s] any Defendant misused."  (Ex. 1 at 4.)  In its August 2011 response to Interrogatory No. 1, L3 specifically did not identify any trade secrets or confidential information allegedly misused.  (Ex. 2 at 5-8.)  In its October 2011 supplemental response pursuant to Court Order, and again in its most recent October 2012 response, L3 identified its HEMP Technology as well as its Vendor List.  (ECF 122 at 4-24; Ex.

---

[7] Counts VIII through XI also claim breach by "participation in the [RICO] enterprise," but the allegations of RICO enterprise were dismissed by the Court.  (ECF 214.)

1 at 6-25 (numbered 1-100 and 103.)  L3 also identified generally 16 other alleged trade secrets. (Ex. 1.)

By their terms, the Alleged Contracts do not apply to information that is not confidential or is "generally available to the public" or "generally known in the trade."  (Ex. 22; Ex. 23; Ex. 24; Compl. ¶¶ 66, 67.)

As noted above at Part II.A, the HEMP Technology and Vendor List were not treated by L3 as confidential or proprietary.  L3 also made them publicly and generally available by selling and displaying them to outsiders without restriction on use, and gave the Government unlimited rights to use and distribute them.  L3 therefore cannot demonstrate that the Alleged Contracts apply to the HEMP Technology or the Vendor List.

Thus, as a matter of law, L3 cannot demonstrate that the Defendants breached any of the Alleged Contracts with respect to the HEMP Technology or the Vendor List.

## III.    CONCLUSION

For the reasons stated herein, the Court should grant partial summary judgment in Defendants' favor on Counts VII-XI regarding alleged trade secret items 1-100 and 103 on Exhibit 1.

Respectfully submitted this 14th day of December, 2012.

/s/ Jennette C. Roberts
Steven M. Masiello
Jennette C. Roberts
Timothy R. Odil
Charles E. Swanson
Kathleen M. Kramer
MCKENNA LONG & ALDRIDGE LLP
1400 Wewatta Street, Suite 700
Denver, CO 80202
Telephone: 303-634-4000
Facsimile: 303-634-4400
E-mail:   smasiello@mckennalong.com
          jroberts@mckennalong.com
          todil@mckennalong.com
          cswanson@mckennalong.com

Daniel E. Johnson
Lora A. Brzezynski
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: 202-496-7786
Facsimile: 202-496-7756
E-mail: djohnson@mckennalong.com
        lbrzezynski@mckennalong.com

*Counsel for Defendants Jaxon Engineering &
Maintenance, Inc., Joni Ann White, Randall K.
White, Scott White, Susan Rettig, Charles
Rettig, James Youngman, Jerry Lubell,
Kelly Rice, and John McClure*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December, 2012:

- I electronically filed a restricted Level 3 version of the foregoing and Exhibits 1-25 thereto with the Clerk of Court using the CM/ECF system;

- The Clerk of the Court will send notifications of such filings to the individuals listed below; and

- I caused a complete and unredacted version of the foregoing and Exhibit 1-25 thereto to be served by electronic mail upon the following:

> Benjamin G. Chew
> Nigel Wilkinson
> Rory E. Adams
> PATTON BOGGS, LLP
> 2550 M Street, NW
> Washington, DC  20037
> Email:  bchew@pattonboggs.com
>        nwilkinson@pattonboggs.com
>        radams@pattonboggs.com

> Steven L. Levitt
> Karen Lisa Solomon Weiss
> STEVEN L. LEVITT & ASSOCIATES, P.C.
> Two Hillside Avenue, Building F
> Williston Park, New York 11596
> Email:  slevitt@sllpc.com
>        kweiss@sllpc.com

> Suzanne M. Parker
> PARKER INTELLECTUAL PROPERTY LAW, PC
> 1610 West Street, Suite 105
> Annapolis, MD 21401
> Email:  sparker@parkeriplaw.com

*Counsel for Plaintiffs*

                                                */s/ Jennette C. Roberts*

DC:50973692.6