IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10–cv–02868–MSK–KMT

L-3 COMMUNICATIONS CORPORATION, and
L-3 SERVICES, INC.,

      Plaintiffs,

v.

JAXON ENGINEERING & MAINTENANCE, INC.,
JONI ANN WHITE,
RANDALL K. WHITE,
SCOTT WHITE,
SUSAN RETTIG,
CHARLES RETTIG,
JAMES YOUNGMAN,
JERRY LUBELL,
KELLY RICE,
JOHN MCCLURE, and
JOHN DOES 1-25, said names being fictitious as such names are unknown at this time,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Kathleen M. Tafoya**

      This case comes before the court on "Plaintiffs' Motion for Preliminary Injunction" [Doc.

No. 383] ("Mot.") filed October 19, 2012.  Plaintiffs seek an injunction against Jaxon

Engineering & Maintenance, Inc. ("Jaxon") and the other defendants requiring that Defendants

immediately

> (a) return all copies of L-3's proprietary and trade secret BADDAS data
> acquisition software, including any copies provided by any Defendant to any third
> party and any documents, software or other information constituting, containing
> or derived from L-3's proprietary and trade secret BADDAS data acquisition
> software; (b) refrain from using L-3's proprietary and trade secret BADDAS data
> acquisition software or any data acquisition software that is based, in whole or in
> part, on L-3's proprietary and trade secret BADDAS data acquisition software; (c)
> provide a sworn declaration setting forth in detail Defendants' efforts to comply
> with (a) and (b); and (d) escrow all revenue received from any task order for
> which Defendants used any data acquisition software based in whole or in part on
> L-3's proprietary and trade secret BADDAS data acquisition software.

(Mot. at 1-2.)  "Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary

Injunction" [Doc. No. 414] was filed on November 16, 2012 and a Reply [Doc. No. 430] was

filed on November 26, 2012.  The hearing originally scheduled for November 29, 2012 was

vacated due to the unavailability of a critical witness and rescheduled to begin on January 15,

2013.  Plaintiffs and Defendants filed closing argument briefs on February 15, 2013 [Doc. Nos.

550 and 551] and closing reply briefs on February 22, 2013 [Doc. Nos. 555 and 556].  The

matter is ripe for review and recommendation.

### A.      Standard

The Court applies "federal standards to [] preliminary injunctive relief" pursuant to

Federal Rule of Civil Procedure 65.  *Lyons v. Jefferson Bank & Trust*, 781 F. Supp. 1525, 1530

(D. Colo. 1992) (citing *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990)); 19

CHARLES WRIGHT, ARTHUR MILLER & EDWARD COOPER, FEDERAL PRACTICE AND PROCEDURE

§ 4513 (2009) (federal standards apply to preliminary injunctions and temporary restraining

orders because they are "neither final determinations of the parties' rights nor final relief."

To obtain a preliminary injunction, L-3 has the burden of proving: (1) a substantial likelihood of success on the merits of its claims; (2) irreparable harm to L-3 if the injunction is denied; (3) the threatened injury to L-3 outweighs the harm that the preliminary injunction may cause Jaxon; and (4) the injunction, if issued, will not adversely affect the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008); *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). As the Tenth Circuit has long recognized, "a preliminary injunction is an extraordinary remedy; it is the exception rather than the rule." *Gen. Motors Corp.,* 500 F.3d at 1226 (internal quotation marks omitted). Thus, "the movant's right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001) (hereinafter "*Dominion Video Satellite I*"); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

Because the limited purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, (1981), the Tenth Circuit has identified three types of specifically disfavored preliminary injunctions including (1) preliminary injunctions that alter the *status quo*; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) ( en banc). Such disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Schrier v. University of Colo.*, 427 F.3d 1253, 1258-1259 (10th Cir. 2005).

"[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.R.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998). This is because a "failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979)). This case was filed November 19, 2010 and the Motion for Preliminary Injunction was not filed until October 19, 2012, almost two **years** later. L-3 argues that the delay was occasioned by its failure to learn that its BADDAS data acquisition software had been physically stolen by one or more of the defendants until after it took their depositions. While the court acknowledges there was a substantial delay in production of documents caused by Defendants' contractual obligation to obtain approvals from the United States to release discovery materials, the delay still undercuts the sense of urgency attributed to a preliminary injunction request especially now that the case is postured for trial, with the attendant possibility of a permanent injunction.

## B.    *Disfavored Motion*

The primary purpose of a preliminary injunction is to preserve the *status quo* pending a final determination of the parties' rights. *Otero Savings and Loan Ass'n v. Federal Reserve Bank*, 665 F.2d 275, 277 (10th Cir. 1981). "[T]he *status quo* is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Dominion Video Satellite I*, 269 F.3d at 1155. "In determining the *status quo* for preliminary

injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' rights." *Id.*

Randall White, the co-founder of Defendant Jaxon, terminated his employment with L-3 on January 2, 2008.  (Testimony of Randall White, Transcript January 15, 2013 [Doc. No. 526] ("R. White Test.") at 143:19-21.)  Jaxon was set up and began operations in the middle of 2008. (Testimony of Joni White, Transcript January 15, 2013 ("J. White Test.") at 66:17-19.)  As of May 4, 2009, however, Jaxon had no task orders awarded and was bidding on its first project. (R. White Test. at 124-125.)  Further, Jaxon had no HEMP testing or data acquisition software of its own at the time it was making its first bid.  (*Id.*)  Additionally, testimony revealed that during the preparation of Jaxon's first proposal to Serco, the prime contractor for the government, active and current L-3 employees were helping Mr. White create the proposal, in spite of the fact that Jaxon was a direct competitor of L-3.  (Testimony of James Youngman, Transcript January 15, 2013 ("Youngman Test.") at 175.)  *See DoubleClick, Inc. v. Paikin*, 402 F. Supp.2d 1251, 1256 (D. Colo. 2005) ("Under *O Centro*[1] [Defendants are] not allowed to establish the *status quo* through secretive or clandestine activity").  Under the standard, the *status quo* for purposes of a preliminary injunction would therefore be the point immediately preceding Jaxon's entry into its first bidding process in early 2009.

There is no evidence that Mr. or Mrs. White had the BADDAS software in their possession in early 2009.  The testimony from Mr. Youngman was that Defendant McClure brought the allegedly pilfered copy of the BADDAS software to the new company when

---

[1] 389 F.3d 973.

McClure joined Jaxon in the fall of 2009.  (Youngman Test. at 212:16-20.)  Therefore, if L-3's

injunctive request were to be allowed, the *status quo* would not be altered.

However, this court finds that the request for injunctive relief in the motion, is a

disfavored mandatory preliminary injunction because it would require Jaxon to take mandatory

affirmative action as opposed to simply refraining from some act, in order to be in compliance.

*The Independence Institute v. Buescher,* 718 F. Supp. 2d 1257, 1266 (D. Colo. 2010).

Given that the motion is one of disfavored status and that it was filed late in the case

suggesting a lack of exigency, the court must view this request with a high degree of scrutiny.

### C.      *Preliminary Discussion of L-3's Claims*

In both the briefing and the evidentiary presentation, the parties devoted substantial

resources in presenting whether L-3 is likely to prevail on the merits of its Colorado Uniform

Trade Secrets Act ("CUTSA") and breach of contract claims.  Ultimately, however, as outlined

below, the court finds that L-3's Motion fails because it cannot establish that it will be

irreparably harmed if a preliminary injunction is not issued.  Nevertheless, the court finds that a

threshold discussion of the merits of L-3's claims is warranted to demonstrate this lack of

irreparable harm.

To establish a claim under CUTSA for trade secret misappropriation, L-3 must

demonstrate that Defendants (1) disclosed or used L-3's trade secret without consent while (2)

knowing such trade secret was acquired improperly or under circumstances giving rise to a duty

to either keep it secret or limit its use.  *See* Colo. Rev. Stat. § 7-74-102(2); *Gognat v. Ellsworth,*

259 P.3d 497, 500-501 (Colo. 2011).  Further, under the facts herein, L-3 must also demonstrate

that its BADDAS software constitutes a trade secret, requiring that L-3 demonstrate it took

"measures to prevent the secret from becoming available to persons other than those selected by

the owner to have access thereto for limited purposes."  Colo. Rev. Stat. § 7-74-102(4); *Colo.*

*Supply Co., Inc. v. Stewart,* 797 P.2d 1303, 1305-06 (Colo. App. 1990).

Although the parties vigorously dispute whether the BADDAS software constitutes a

trade secret for purposes of the CUTSA, the court will assume, for purposes of this analysis,

although it explicitly does not so conclude, that the BADDAS software constitutes a trade secret.

Under that assumption, L-3 may well be able to establish a substantial likelihood of success on

the merits of its CUTSA claim.  After helping Randall White with Jaxon's proposal to Serco,

once Jaxon had been awarded its first contract in early- to mid-2009, on August 18, 2009,

Defendant Youngman resigned from L-3 in order to join Jaxon.  (Youngman Test. at 168:3-4.)

Defendant John McClure, also a former L-3 employee, had left L-3 earlier to join SARA before

becoming associated with Jaxon, like Youngman, after the award of the initial Serco contract.

(R. White Test. at 149:9.)  In October 2009, both Defendants McClure and Youngman, then both

employees of Jaxon, participated in sending L-3 alleged proprietary data acquisition software,[2]

including the source code for the same, to an independent software designer, Tim Farajian.[3]  The

---

[2] The data acquisition software at issue is named BADDAS; however it appears that versions of L-3 software named BUTTER and COCO were also in the possession of McClure and/or Youngman and were also transmitted to Farajian.

[3] Defendant McClure and Mr. Farajian worked together at SARA subsequent to McClure's employment at L-3 and McClure initially contacted Farajian on behalf of Jaxon in mid to late 2009.  (Testimony of Timothy Farajian, Transcript January 22, 2013 [Doc. No. 528] ("Farajian Test.") at 15-16).

L-3 software was sent to Mr. Farajian to assist him in creating the same or similar data

acquisition software for the newly formed Jaxon so that Jaxon could fulfill its contract with

Serco.  (*Id*. at 170:15-16 and 193:3-17; Testimony of Timothy Farajian, Transcript January 22,

2013 [Doc. No. 528] ("Farajian Test.") at 22:18-20, 119:8-13, 162:2-4.)  Mr. Youngman

admitted under oath that the software source codes he and Mr. McClure were providing to Mr.

Farajian came directly from L-3, had been developed by L-3 employees, (Youngman Test.

210:24), and that he and Mr. McClure had access to the software at the time they were L-3

employees.  (*Id*. at 211:3).  Mr. McClure's instruction to Mr. Farajian with respect to L-3's

BADDAS program was for Mr. Farajian to "look at it [BADDAS] and build, use it, or create it

from scratch on my own." (Farajian Test. at 19:7-8.)  Mr. Youngman further testified that it was

his belief that it was not appropriate for he or Mr. McClure to have sent L-3's BADDAS

software to Mr. Farajian for the purposes of creating Jaxon software.  (Youngman Test. at

211:10-15 and 215:11-25.)  Given this testimony, and having assumed that the BADDAS

software constitutes a trade secret, the court might well find that Mr. Youngman and Mr.

McClure, on behalf of Jaxon, disclosed or used L-3's trade secrets without consent while

knowing it was acquired improperly or under circumstances giving rise to a duty to either keep it

secret or limit its use, and that therefore L-3 is likely to prevail on its CUTSA claim for

misappropriation.

   For similar reasons, L-3 may arguably be successful on the merits of its contract claims.

By way of separately signed  "Termination Certifications," both Defendants Youngman and

McClure (1) certified that they did "not have in [their] possession, nor [had they] failed to return,

any . . . software programs . . . that fall within the definition of 'Confidential Company

Information' in the Standard Confidentiality Agreement" or reproductions thereof, belonging to

L-3; and (2) agreed to "preserve as confidential all trade secrets, confidential knowledge, or

other proprietary information."  (Mot., Ex. 5 at L3-002898, L3-002900.)  As detailed above,

however, both Defendants Youngman and McClure provided L-3's BADDAS data acquisition

software to Mr. Farajian, with the intent that the latter use it to develop data acquisition software

for Jaxon.  Thus, assuming, without deciding, the BADDAS software constitutes either

"Confidential Information," as defined by the "Standard Confidentiality Agreement" signed by

Defendants Youngman and McClure, or a trade secret, Defendants Youngman and McClure may

well have violated their contractual duties under the Termination Certifications.

Notwithstanding these apparent violations, the CUTSA directs that "[t]emporary and

final injunctions . . . may be granted . . .*to prevent or restrain actual or threatened*

*misappropriation* of a trade secret."  Colo. Rev. Stat. § 7-74-103 (emphasis added).  This court

finds that L-3 has ultimately failed to demonstrate circumstances that would warrant the

imposition of a preliminary injunction under this directive.  First, to the extent that L-3 seeks to

have Defendants "return all copies of L-3's proprietary and trade secret BADDAS data

acquisition software, including any copies provided by any Defendant to any third party . . . and

refrain from using L-3's proprietary and trade secret BADDAS data software," Defendants have

averred that they do not have any copies of BADDAS in their possession.  (Resp. at 9.)  Further,

L-3 did not present any evidence, in its briefs or at the hearing, suggesting that Defendants or

any third parties currently have operable copies of the BADDAS software in their possession, much less that they are presently using the BADDAS software for any purpose.[4]

Perhaps even more importantly, L-3 has failed to present compelling evidence that Defendants' possess "data acquisition software that is based, in whole or in part, on L-3's . . . BADDAS data acquisition software" to support terms (b) and (d) of its proposed preliminary injunction.  At the evidentiary hearing, Mr. Farajian gave credible and repeated testimony that he did not use the BADDAS software provided to him by Defendants Youngman and McClure, that he never actually fully opened or ran the BADDAS program, and that he instead developed Jaxon's data acquisition software in a completely different computer language and without any copying or pilfering from the BADDAS program.  (*e.g.*, Farajian Test. at 23:1-14 and 24:3-4.) Under these circumstances, while L-3 may be likely to prevail on its allegation that the BADDAS software was taken or copied with the *intent* that it be used to provide Jaxon with "pirated" software, the evidence from Mr. Farajian establishes for the purposes herein that the software developed for Jaxon and used by Jaxon to perform under its Serco contracts was and is not a pirated version of BADDAS, but was instead legitimate, privately created software developed specifically for Jaxon by Mr. Farajian.  (Farajian Test. 29:16-19.)  Given that testimony, there is no basis to support injunctive relief including escrowing "all revenue received from any task order for which Defendants used any data acquisition software based in whole or

---

[4] No testimony was elicited from Mr. Farajian as to his ultimate disposition of the BADDAS software sent to him by Defendants Youngman and McClure but given his testimony that he was never able to, nor did he want to, open or use the software, it is unlikely he kept the copy provided.

in part on L-3's proprietary and trade secret BADDAS data acquisition software" since the evidence supports a finding that Jaxon has only used JEMDAQ when performing its contracted work.  Further, the court finds, based on the evidence presented at the motion hearing, that L-3 is not likely to prevail on any request that Jaxon "refrain from using . . . any data acquisition software that is based, in whole or in part, on L-3's proprietary and trade secret BADDAS data acquisition software" as the evidence presented established that the JEMDAQ software used by Jaxon is not based on BADDAS.

Therefore, ultimately, even assuming that L-3 may be able to succeed on the merits of its CUTSA claim, the court does not find any basis to enter a preliminary injunction that would be "reasonable to prevent or restrain *actual* or *threatened* misappropriation of a trade secret."  Colo. Rev. Stat. § 7-74-103 (emphasis added).

### D.  *Irreparable Harm*

The court finds that the Plaintiff has likewise failed to show irreparable harm to support its request for injunctive relief.  Irreparable harm is the single most important factor in determining whether a preliminary injunction should issue.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Xantrex Tech. Inc. v. Advanced Energy Indus., Inc*., No. 07-cv-2324, 2008 WL 2185882, at *15 (D. Colo. May 23, 2008) ("[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.")

"[T]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).  "It is [] well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages."  *Id*. at 1189; *Schrier*, 427 F.3d at 1267.  *See also* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2948.1, at 152–53 (2d. ed.1995)); *Port City Properties v. Union Pacific R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008).

### 1.    Competitive Advantage

L-3 maintains it is irreparably harmed because it has lost and may continue to lose contracts to Jaxon as a result of misappropriation of its trade secrets and because of the lost value of its BADDAS software.  (Mot. at 11.)  Plaintiffs argue that at the time an actual or threatened misappropriation occurs that would provide the defendants with a head start in the marketplace, irreparable harm exists regardless of whether the plaintiffs point to a specific lost customer, lost sale, or loss of position in marketplace.  L-3 argues that as long as it demonstrates that the misappropriation provided a head start to Jaxon, it is entitled to equitable relief.  *Id*. (citing *Xantrex* at 16.)  As evidence of its potential harm, L-3 claims

> Defendants continue to have access to L-3's proprietary and trade secret
> BADDAS data acquisition software. And they continue to engaging [sic] in
> HEMP Testing activities using data acquisition software that is either L-3's
> BADDAS software or based in whole or in part on L-3's BADDAS software.

(Mot. at 10-11.)  The evidence adduced at the hearing, as noted *infra* however, does not bear out this claim.

Randall and Joni White both admitted that Jaxon represented to the government in both emails and proposals that Jaxon would have testing capability should they be awarded the contract but did not, in fact, have its own testing software or the capability to perform the testing at the time these representations were made.  (J. White Test. at 72, 95; R. White Test. at 125).  L-3 asserts that Jaxon could not have performed the testing without Jaxon's unlawful usurpation of L-3's software, including BADDAS.  However, the Jaxon principals both testified that they could have hired third parties to run the software tests and were considering having their own software developed.  *Id*.  L-3 relies on testimony from Charles Crain to support their claim that possessing BADDAS data acquisition software at the time of the first contract implementation gave Jaxon an unfair competitive advantage, which damaged L-3's relationships with its closest customers and forced it to lay off employees.  (Testimony of Charles Crain, Transcript January 16, 2013 ("Crain Test.") at 263.)

The testimony is not clear when exactly Jaxon came into possession of BADDAS software through former L-3 employee John McClure.  Mr. Youngman stated that he obtained a copy of the software and source code from Mr. McClure sometime between August 18, 2009, subsequent to his departure from L-3, and October 29, 2009.  (Youngman Test. at 212:16-20.) There is no evidentiary support before the court suggesting that Jaxon had the software prior to its proposal to Serco, except for the assertion in the March 2009 proposal that Jaxon could perform the testing required by the contract, if awarded.  (J. White Test. at 71 (agreeing that the

13

proposal stated, "JEM personnel and its subcontractors, welders, etcetera, will be responsible for installing hardware and testing it."))

As set forth in more detail in Section C, *infra*, Defendants Youngman and McClure attempted to benefit Jaxon by providing the source code for BADDAS, part of the software suite necessary to perform testing under the Serco contract, to Mr. Farajian. However, Mr. Farajian's testimony was that the BADDAS software was unworkable and that he created JEMDAQ, the Jaxon data acquisition software, completely from scratch in a completely different computer language without reference to BADDAS. Therefore, this court finds there was no competitive advantage or head start given to Jaxon as a result of its allegedly wrongful possession and/or distribution of the L-3 BADDAS software.

### 2.      Economic Value of Loss of Government Contracts

Jaxon argues that to the extent L-3 is able to prove any damages related to misappropriation of the BADDAS data acquisition software, such harm is quantifiable. Charles Crain, L-3's Technical Advisor in this case, admitted that he had already calculated L-3's damages from losing various contracts from the government to Jaxon after the bidding process.[5] (Crain Test. at 245:9-12.) Mr. Crain's testimony establishes that if L-3 proves its claims at trial, L-3's lost profits are calculable real dollar terms. (*Id*. at 253 - 254.) If L-3's claimed business losses are measurable as Mr. Crain testified that they were, irreparable harm has not been

---

[5] The information concerning how the economic damages from lost business were calculated by Mr. Crain was limited on the basis of asserted attorney-client privilege. Nonetheless, Mr. Crain testified that he did actually do a numerical calculation for L-3's in-house counsel on the damages associated with business lost to Jaxon.

established.  *See Dominion Video Satellite v. Echostar Satellite Corp*, 356 F.3d 1256, 1264 (10th Cir. 2004) (hereinafter "*Dominion Video II*").

Further, L-3 has previously quantified the value of BADDAS, including the source code, when, in 2002, L-3 offered to sell the BADDAS source code to Neat Tech for $19,504.00. (Crain Test. at 251:14-24.).  Of course, the current actual value of the BADDAS software is likely different than it was in 2002, but the point is taken that there is or was a numerical value at which L-3 would sell the code.  The contemplated sale to Neat Tech, which never occurred, was for an earlier version of BADDAS, and an upgraded version of BADDAS might be very different if sold to an L-3 direct competitor today.[6]  Nonetheless a dollar value can be affixed to the software itself like any other marketable product.

Given that the lost profits, if any, which L-3 claims to have lost as a result of Jaxon's illegal misappropriation of the BADDAS software can be easily calculated in money damages, there has not been a sufficient showing of irreparable harm to justify a preliminary injunction at this time.  *See Heideman*, 348 at 1189.

### 3.    *Presumption of Irreparable Harm*

L-3 argues that the nature of its claims obviates the requirement that it make a specific showing of irreparable harm.  L-3 claims that irreparable harm to L-3 should be presumed, including a presumption that money damages are insufficient recompense.  (Mot. at 10-11.)

---

[6] The testimony from Mr. Farajian indicated that one reason why he did not attempt to use the BADDAS software was that it appeared to be out of date and he could not get it to open, much less function.  (Farajian Test. at 23:6-8 and 24:7-16.)

15

### a.      Statutory Presumption

In 2004, in a case involving the Oklahoma Unfair Sales Act ("OUSA"), the Tenth Circuit held that "[w]hen the evidence shows that the defendants *are engaged in, or about to be engaged in,* the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown."[7]  *Star Fuel Marts, LLC v. Sam's East, Inc*., 362 F.3d 639, 651 - 52 (10th Cir. 2004) (emphasis added).  *See also Burlington N. R.R. Co. v. Bair*, 957 F.2d 599, 601 (8th Cir. 1992) ("[I]t is not the role of the courts to balance the equities between the parties [where] Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in . . . any activity which the statute prohibits.").  The Tenth Circuit concluded in *Star Fuel Marts* that because the OUSA itself provided for injunctive relief, that case fit the public policy encouraging an injunction. *See* Okla. Stat., tit. 15, § 598.5(a).  L-3 argues that since it has brought at least one claim under the CUTSA, which specifically provides for the possibility of injunctive relief, it is entitled to the presumption of irreparable harm without further need to so demonstrate.  *See* Colo. Rev. Stat. § 7-7-103 ("[t]emporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or refrain actual or threatened misappropriation of a trade secret.").

---

[7] Given the court's findings that Defendants are not engaged in any current or future violation of CUTSA involving L-3's BADDAS software, this part of the statute is simply inapplicable and no further findings are strictly necessary.  However, given the litigiousness of the case to this point, a more fulsome analysis is presented as an aid to complete review by the District Court.

Two years after *Star Fuel Marts*, however, the Supreme Court examined a case involving a lower court's presumption of irreparable harm in *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 392-93 (2006).  The high court examined the proof required to grant a permanent – as opposed to preliminary – injunction under either the Patent Act or the Copyright Act, both of which provide that a court "may" grant injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement."  *See*, *e.g.*, 17 U.S.C. § 502(a).  The Supreme Court categorically rejected the lower courts' adoption of a rule to replace traditional equitable considerations, such as a rule that an injunction automatically "must" follow a determination that a copyright has been infringed, based on a statutory provision that an injunction "may" be a remedy for ongoing prohibited activity.[8]  The Supreme Court stated that "the creation of a right is distinct from the provision of remedies for violations of that right," and held that traditional equitable considerations are still required from a court when analyzing whether injunctive relief is appropriate in a given case.  547 U.S. at 392.  The court stated "a major departure from the long tradition of equity practice should not be lightly implied."  *Id*. at 391, 395; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982); *Lorillard Tobacco Co. v. Engida,* 213 Fed. App'x. 654, 657 (10th Cir. 2007).  In light of *eBay*, this court concludes that *Star Fuel Marts'* presumption of irreparable harm without the need for further evidentiary support when a

---

[8] *But see Colorado Cross-Disability Coal. v. Abercrombie & Fitch Co.,* No. 09-cv-02757-WYD-KMT, 2013 WL 856510, at *9 (D. Colo. March 7, 2013) (Since the *only* remedy for violation of Title III of the ADA is injunctive – the statute having no damages remedy for private plaintiffs – and where [Defendant] has been found to be in violation of section 12183(a) requesting permanent injunctive relief, plaintiffs are not required to show irreparable harm or engage in a balance-of-harms test because an injunction is mandatory to remedy the violation.).

claim is predicated on a statute providing for the possibility of injunctive relief, to be on less than firm ground.

Post *eBay*, *Star Fuel Marts* has been criticized in the commentary[9] and an analysis of cases in this District shows a somewhat frenetic application.  In *Xantrex Technology Inc.*, the court cited with approval *Star Fuel Marts'* application to claims under CUTSA, holding that "a showing of irreparable harm is unnecessary in the instant case if plaintiff meets its burden as to the CUTSA claim."  2008 WL 2185882, at *14.  Nevertheless, the court went on to discuss the standards for finding irreparable harm in the context of a preliminary injunction and found, under the evidence presented in support of its motion, that "Xantrex has demonstrated both current irreparable injury as well as shown the substantial likelihood and threat of further immediate irreparable harm."  *Id.* at 15.

Following suit in another matter arising under CUTSA, a magistrate judge stated

As the court noted in *Xantrex*, . . . I must consider the irreparable harm factor independently of the [CUTSA] because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction

---

[9] *See e.g.*, WILLIAM PATRY, PATRY ON COPYRIGHT, REMEDIES § 22.33 (database updated March 2013) characterizing *Star Fuel Marts* as holding "that where a federal statute provides for injunctive relief, no irreparable harm need be shown."  Patry stated, "[t]he basis for this unique approach is the belief that merely by providing for injunctive relief, Congress 'has already balanced the equities and has determined that as a matter of public policy, an injunction should issue where the defendant is engaged in … any activity which the statute prohibits,' 652 F.3d at 652.  This approach makes no sense. . . .  Congress legislates against the background of general equitable principles and assumes that courts will utilize the traditional factors in determining whether to grant interim relief in the case sub judice.  If Congress wishes to take away courts' discretion, it knows how to do so: it uses the word "shall" instead of "may,". . . .

and the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.

*SBM Site Services, LLC v. Garrett*, 10-cv-00385-WJM-BNB, 2011 WL 7563785, *5 (D. Colo. June 13, 2011) (internal citations omitted).  *See also Mentor Worldwide LLC v. Craigo*, No. 12-cv-00776-REB-MJW, 2012 WL 1439498, at *4 (D. Colo. April 26, 2012) (District Judge Blackburn stating, "if a threatened or actual misappropriation of a trade secret is shown, irreparable harm properly is presumed," but nevertheless finding in that CUTSA case "the evidence in the record does not demonstrate a substantial likelihood that [Plaintiff] can prove a threatened or actual misappropriation of a [Plaintiff's] trade secret by [Defendant]."  *Id.*

Additionally, the Colorado Court of Appeals has examined its own statute in the context of preliminary injunctive relief in *Bishop & Co. v. Cuomo*, 799 P.2d 444, 445-47 (Colo. Ct. App. 1990).  The Colorado Court of Appeals recognized that

§ 7–74–103, simply provides that the trial court has the discretion to grant injunctions to "prevent or restrain actual or threatened misappropriation of a trade secret."  This provision neither conflicts with C.R.C.P. 65 nor is sufficiently detailed to suggest that the General Assembly intended to displace the rule.

*Id.*at 446.  To obtain a preliminary injunction pursuant to Colo. R. Civ. P. 65, a party must show "a reasonable probability of success on the merits, the lack of an adequate remedy of law, and irreparable harm from the refusal to grant the injunction."  *Id.*  The Colorado court found no reason to conclude that the Colorado General Assembly intended to displace the requirement to show irreparable harm arising from a threatened violation of CUTSA and determined that an injunction may not issue under CUTSA without a showing of irreparable harm, stating, "[a] showing of irreparable harm, considered by some courts as 'perhaps the single most important

prerequisite for the issuance of a preliminary injunction' has been consistently required." *Id*. at

447 (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp*., 719 F.2d 42 (2d Cir.

1983)).

It is likely that this District's application of *Star Fuel Marts* in *SMB Site Services* and

*Xantrex Technology* was informed by the long held admonition,

> We are dealing here with the requirements of equity practice with a background
> of several hundred years of history. . . .  The historic injunctive process was
> designed to deter, not to punish.  The essence of equity jurisdiction has been the
> power of the Chancellor to do equity and to mould [sic] each decree to the
> necessities of the particular case. Flexibility rather than rigidity has distinguished
> it.

*Rondeau v. Mosinee Paper Corp*., 422 U.S. 49, 61 (1975) (*quoting Hecht Co. v. Bowles*, 321

U.S. 321, 329 (1944).)  In other words, injunctive relief must be individually crafted to fit the

specific requirements of the case.  Seldom is there a case where a simple "stop it" will suffice; in

most cases, the response of "stop what?" requires a detailed and specific inquiry into the harms,

if any, associated with the alleged misappropriation.  L-3's injunctive requests are far reaching

but this court's obligation is to fashion relief that fits the harm.

In order to reconcile both *Star Fuel Marts* and *eBay*, and to comply with its duty to

fashion only appropriate and necessary injunctive relief on a case-by-case basis, this court

concludes that while a presumption of irreparable harm may, under some circumstances, apply in

CUTSA cases, the court should still undergo an equitable analysis for the existence of

irreparable harm to the movant.  *Dominion Video Satellite I,* 269 F.3d at 1154.  And, as

established above, L-3 has failed to establish that it will be irreparably harmed if an injunction is

not granted.

### b.      *Contractual Provisions*

L-3 also argues that each of the individual Defendants, all of whom were former L-3

employees except Joni White, signed contracts with L-3 which provide for presumptive

injunctive relief.   (Mot. at 6.)  Paragraph 12, of the General Release cited by L-3, titled

"Remedies," provides

> Employee and [L-3] acknowledge and stipulate that the covenants and agreements
> contained in this [Standard Contract] are of a special nature and that any breach,
> violation or evasion by Employee of the terms of this [Standard Contract] will
> result in immediate and irreparable injury and harm to [L-3], and will cause
> damage to [L-3] in amounts difficult to ascertain.  Accordingly, [L-3] shall be
> entitled to the remedies of injunction and specific performance, or either of such
> remedies, as well as to all other legal or equitable remedies to which [L-3] may be
> entitled, . . . .

(Mot., Ex. 3.)

As noted, Defendant McClure and Defendant Youngman are the only two defendants as

to whom L-3 presented credible evidence of breach by their possession of the BADDAS

software and its transmission to Tim Farajian.  Both Defendants, at the time of the alleged

breach, were employees of Jaxon.  The court, of course, is not bound by the private agreements

of the parties with respect to its decision on the propriety of a preliminary injunction.  *Dominion*

*Video Satellite II*, 356 F.3d at 1261 (court declined to bind itself to the parties' private

determination regarding irreparable harm, however did adopt the agreement's provision finding

it to be "a clear and unavoidable concession.").  While courts have given weight to parties'

21

contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief. *See, e.g.*, *Dominion Video Satellite II* at 1261; *Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop."); *Baker's Aid v. Hussman Foodservice Co.*, 830 F.2d 13, 16 (2d Cir.1987) ("contractual language declaring money damages inadequate in the event of a breach does not control the question of whether preliminary injunctive relief is appropriate"); *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001) (provision in contract providing that breach would cause irreparable damage is merely one factor to be examined in making irreparable harm determination); *Dice v. Clinicorp, Inc.*, 887 F. Supp. 803, 810 (W.D. Pa. 1995) (contractual provision cannot act as substitute for finding by court regarding injunctive relief); *Int'l Ass'n of Plumbing and Mechanical Officials v. Int'l Conference of Bldg. Officials*, Case No. 95-55944, 1996 WL 117447 at *2 (9th Cir. 1996) (district court committed error where it based its conclusion that irreparable harm existed solely on a contractual provision in which the parties conceded irreparable injury would exist in the event of a contract breach).  In light of this authority, the court finds that the parties' contractual stipulation of irreparable harm is insufficient, standing alone, to establish the irreparable harm necessary for issuing a preliminary injunction.

22

### *Conclusion*

Plaintiff has identified nothing about the balance of the equities or the public interest that would alter the conclusion reached here. *Big O Tires, LLC v. Felix Bros., Inc*., 724 F. Supp. 2d 1107, 1121 -1122 (D. Colo. 2010). The Court declines to address the remaining preliminary injunction elements, as the resolution of them will have no bearing on the outcome of the motion. *See In re Qwest Comm'ns Int'l, Inc. Sec. Litig.*, 241 F. Supp. 2d 1119, 1123 (D. Colo. 2002) (declining to enter temporary restraining order, even "assum [ing], without deciding, that the plaintiffs have a substantial likelihood of success on the merits," because plaintiffs failed to establish irreparable harm and that the balance of equities was in their favor); *Russell v. Dep't of Air Force*, 915 F. Supp. 1108, 1122 (D. Colo. 1996) ("Having decided that [plaintiff] has not shown clearly that he has a substantial likelihood of success on the merits, I need not address the remaining factors . . . ."); *see also Dominion Video Satellite II*, 356 F.3d at 1266 n.8 (declining to address other preliminary injunction factors after deciding that the district court's finding of irreparable harm was in error)*; Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999) (noting that if a plaintiff fails to meet the "threshold requirements" of showing "likelihood of success and irreparable injury," "the court's inquiry is at an end and the injunction must be denied"). Nothing is gained by wading into an analysis that will have no effect at this pre-trial juncture with discovery almost complete.

The District Court's ability to render a trial judgment that is meaningful to both sides is advanced by avoiding interim decisions made on less than all the facts. Commentators have opined that avoidance of costly errors in order to preserve a meaningful trial on the merits, – and

not merely preserving the *status quo* – should be the key objective in interim relief decisions. Patry, PRELIMINARY INJUNCTIONS § 22:10; John Leubsdorf, *The Standard for Preliminary Injunctions*, 91 Harv. L. Rev. 525, 541 (1978).  Further elaboration on the evidence at this stage would only serve to impinge on the District Court's findings and conclusions which may be different after a trial on the merits.  *See Hartford House Ltd. v. Hallmark Cards Inc.*, 647 F. Supp. 1533, 1536 (D. Colo. 1986).

WHEREFORE, on this disfavored motion brought late in the case without an adequate showing of continuing misappropriation or irreparable injury for which injunctive relief would be the remedy, I respectfully

**RECOMMEND** that "Plaintiffs' Motion for Preliminary Injunction" [Doc. No. 383] be **DENIED**.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Prop.*

*Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review);  *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 10th day of June, 2013.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge

25