**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 10-cv-02868-MSK-KMT

L-3 COMMUNICATIONS CORPORATION; and
L-3 SERVICES, INC.,

      Plaintiffs,

v.

JAXON ENGINEERING & MAINTENANCE, INC.;
JONI ANN WHITE;
RANDALL K. WHITE;
SCOTT WHITE;
SUSAN RETTIG;
CHARLES RETTIG;
JAMES YOUNGMAN;
JERRY LUBELL;
KELLY RICE; and
JOHN MCCLURE,

      Defendants.

_____

**OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT,**
**GRANTING MOTION TO CLARIFY, AND GRANTING IN PART AND**
**DENYING IN PART MOTIONS TO RESTRICT ACCESS**

_____

      **THIS MATTER** comes before the Court pursuant to the Defendants' Motion for Partial

Summary Judgment (**# 463, 464, 465, 466, 468, 469, 470, 599**)[1] on the Plaintiffs' (collectively,

_____

[1]      Docket # 463 is the unredacted version of the motion, filed under restriction, and Docket # 468 is the public entry for that restricted document.  Docket # 466 is the publicly-filed version of the motion containing some redactions.

      The Court confesses that it is unable to ascertain why an apparently identical version of the unredacted motion is filed at Docket # 464 (with a public entry for that document at # 469) or another seemingly identical version of the motion was filed at Docket # 465 (with a public entry at # 470), other than to note that Docket # 463 contains some of Exhibits 1-11, Docket # 464 contains some of Exhibits 12-25, and Docket # 464 contains the remaining exhibits.  In the

"L3") counterclaims for misappropriation of trade secrets and breach of contract, L3's response (**# 537, 538, 540**), and the Defendants' reply (**# 557, 562**).  In addition, L3 moved (**# 564**) for leave to file a surreply with regard to the Defendants' partial summary judgment motion, but did not include the text of the proposed surreply or identify with particular specificity the issues it sought to address.[2]  Also pending are several (**# 539, 549, 566, 568, 662**) motions by the parties seeking to file certain documents under restriction; and the Defendants' Emergency Motion to Clarify (**# 582**) a prior ruling, L3's response (**# 597**), and the Defendants' reply (**# 619**).

## FACTS

The Court will address the basic facts here, and elaborate as necessary in its analysis. This lengthy and extremely contentious litigation involves L3, a company that contracts with the U.S. Government to test electronic components, and Defendant Jaxon Engineering & Maintenance, Inc. ("Jaxon"), a company that was created by some of the named Defendants (themselves former employees of L3) to compete with L3 in the electronic testing market.

L3's Amended Complaint (**# 33**) alleged twenty-six claims against the various Defendants (some were subsequently dismissed (**# 214**) by the Court), presenting  patent infringement, breach of contract, and various common-law tort claims, among others.  Jaxon asserted certain counterclaims, although the only such counterclaim remaining (**# 589**) is a claim for patent misuse.

---

future, the Defendants are instructed to contact the CM/ECF help desk before filing to ensure that redundant motions are not included in attempts to simply file additional exhibits.

In addition, Docket # 599 is another copy of the motion with certain redactions, filed in response to an Order (**# 592**) by the Magistrate Judge.

[2]     Given the disposition of the Defendants' substantive motion, L3's motion for leave to file a surreply is denied as moot.

The instant substantive motion by the Defendants seeks summary judgment on L3's 7th-11[th] claims for relief.  Claim 7 alleges that Defendants Randall White, Scott White, Susan Rettig, James Youngman, Jerry Lubell, Kelly Rice, and John McClure (collectively, the "former L3 Defendants") violated the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101 *et seq.*, by misappropriating certain trade secrets of L3.  Claims 8 through 10 each allege that the former L3 Defendants breached various contracts with L3 by, among other things, misappropriating the trade secrets.  Claim 11 alleges that Mr. Lubell further breached another contract he had with L3, again by misappropriating the trade secrets.  The Defendants' motion contends that of the 117 specific trade secrets identified by L3 as being misappropriated, at least 101 of them were not treated by L3 as secret and confidential, thus entitling the Defendants to summary judgment on these claims.

## ANALYSIS

### A.  Summary judgment motion

#### 1.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2. Trade secrets

L3's statutory misappropriation of trade secrets and its breach of contract claims all turn on the question of whether certain material misappropriated by the former L3 Defendants

4

constituted a "trade secret" under Colorado law.  Under Colorado law, a "trade secret" is "any

scientific or technical information, design, process, procedure, formula, [or] confidential

business or financial information . . .  which is secret and of value."  C.R.S. § 7-74-102(4).  The

owner of such information "must have taken measures to prevent the secret from becoming

available to persons other than those selected by the owner to have access thereto for limited

purposes."  *Id.*  To adequately demonstrate that it has taken sufficient measures to prevent the

dissemination of the information, the owner must take steps that are "reasonable under the

circumstances" to preserve the information's secrecy, but "extreme and unduly expensive

procedures need not be taken."  *Saturn Systems, Inc. v. Militare,* 252 P.3d 516, 521-22

(Colo.App. 2011).  Whether a secret's owner has sufficiently attempted to protect the secrecy of

that information is typically a question of fact to be resolved by the factfinder.  *Id.*

To identify the trade secrets that are involved, the parties point to a disclosure made by

L3 that identifies 117 separate items that are its alleged "trade secrets" at issue in this case.[3]  The

parties do not typically address and analyze each item separately; rather, most frequently, they

refer to general categories of trade secrets, identifying specific items within that category only as

examples.  Practically speaking, there are two general categories of trade secrets asserted here:

(i) those used by L3 to actually conduct its "HEMP [high-altitude electromagnetic pulse] testing"

services – that is, testing equipment designs and components, testing protocols, software for

controlling tests and analyzing results, etc.; and (ii) those used by L3 in the general operation of

its business – that is, customer and supplier lists, pricing information, marketing plans, etc.

Although both categories are implicated here, most of the parties' discussion concerns the HEMP

---

[3]     The Court does not understand the Defendants to be asserting that such material has no
proprietary value or is commonly-known in the industry, such that it would not be considered a
"trade secret" regardless of how L3 handled such information.

testing category.  Greatly summarized, the Defendants' argument is that L3 failed to take reasonable steps to secure the secrecy of the HEMP testing information in two primary ways: (i) it failed to secure such information within its own offices; and (ii) it distributed such information to customers without taking steps to insure that the customers continued to preserve the secrecy of the information.

The first argument – that L3's own internal controls over the information were unreasonably lax – can be readily disposed of.   Courts have found that sufficiently reasonable measures to secure the secrecy of confidential information include "advising employees of the existence of a trade secret, limiting access to a trade secret on a 'need to know' basis, and controlling plant access."  *Saturn Systems*, 252 P.3d at 522, *citing Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo.App. 1990) *and Network Telecommunications Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo.App. 1990).  Here, the record, taken in the light most favorable to L3, establishes that L3 primarily maintains the HEMP testing equipment in its office in Colorado Springs, and that L3 grants access to that equipment only to "those who are acquiring parts for and/or building, repairing or need to use" it.  Physical equipment is kept in a locked laboratory controlled by electronic keypads that limit access to certain employees, and visitors to the facility must be escorted.  Witnesses testified that when the equipment was being used off-premises, it was kept locked up and/or guarded when not in use.  Software used in the HEMP testing process is kept on L3's servers and requires a password to access, with passwords being distributed only to personnel in the Colorado Springs office.  L3 required its employees to sign confidentiality agreements, promising not to disseminate L3's confidential information (including "customer lists and computer programs and software").  There is evidence that L3 specifically labeled certain paperwork as "confidential" or "proprietary."  All of these actions are

consistent with L3 engaging in reasonable efforts to secure the secrecy of its trade secret information.  *See Hertz. v. Luzenac Group*, 576 F.3d 1103, 1112-13 (10th Cir. 2009) (summary judgment against trade secret owner denied where owner posted warning signs regarding confidentiality, required employees to sign confidentiality agreements, barred visitors viewing the production process, and marked certain documents are confidential).

The Defendants offer various contentions suggesting that L3's precautions were less than complete – *e.g.* that not all individuals with access to HEMP testing information were required to sign confidentiality agreements, that not all alleged trade secret items were marked as "proprietary" or "confidential," that third parties were sometimes able to observe testing equipment or protocols during on-site work, etc.  To some extent, these arguments derive from a strained reading of the record (or, at the very least, a reading that does not draw all reasonable inferences in favor of L3, as the Court must do).  For example, the Defendants contend that "L3 often left its HEMP testing equipment on job sites where non-L3 personnel, including government employees and employees of other contractors, could access the equipment."  The deposition testimony cited in support of this contention does not support such a contention in all respects.  Mr. Linn testified affirmatively that "there [are] times when [he had] seen L-3 store its pulsers overnight at a job site where non L-3 people could access the pulsers," but he never used the word "often" and was not asked to elaborate on the frequency of such situations.  Moreover, Mr. Linn's testimony was also that there were occasions where L3 would lock the equipment into trucks overnight or leave them in locations overseen by guards.  Mr. Kleeburg gave similar testimony, acknowledging that "sometimes," L3 would leave equipment in a location where "government employees were" or even "possibly" where "other contractor employees from other companies" might be, but Mr. Kleeburg indicated that L3's equipment was left "in a secured

7

area."  At best, many of the "facts" the Defendants point to are disputed in the record, requiring the denial of summary judgment.

In other respects, the Court considers the Defendants' arguments to be an attempt to hold L3 to the type of "extreme and unduly expensive procedures" that courts do not require.  The Defendants take issue with L3's failure to mark each piece its testing equipment – down to "repair kids that contained a spare part" – as "proprietary," the fact that not necessarily every document was so marked, and that not every employee in L3's "Applied Technologies Group" (of which the HEMP testing employees are a subset) signed a confidentiality agreement.  Moreover, although it may be that L3 could have undertaken even more stringent and comprehensive measures to protect its information,  the Court's focus must be on the steps that L3 did take, rather than on the steps that it did not.  *Hertz*, 576 F.3d at 1112-13 ("there are always more security precautions that can be taken.  Just because there is something else that Luzenac could have done does not mean that their efforts were unreasonable under the circumstances") (emphasis in original).

Finally, the Defendants argue that the steps taken by L3 to secure the information amount to nothing more than "normal business precautions," not specific efforts to protect secret information.  *See e.g. Colorado Supply*, 797 P.2d at 1306.  Although cases such as *Colorado Supply* and *Network Telecommunications* mention that "normal business precautions" are not sufficient to show a trade secret owner's reasonable efforts to protect that secret, neither of those cases – nor any others cited by the Defendants – elaborate or explain how to distinguish between "normal business precautions" and reasonable efforts to protect secrecy.[4]  Some cases suggest

---

[4]     The Defendants point to *Southwest Stainles, LP v. Sappington*, 582 F.3d 1176, 1189-90 (10th Cir. 2009), a case decided under Oklahoma's essentially identical trade secret act.  There, the court considered whether a company's "pricing information" constituted a trade secret that

that "it is not enough simply to restrict access to the facility and require passwords," as such actions might be common in all businesses, but steps such as limiting the dissemination of the information to selected employees or requiring confidentiality agreements could be sufficient to show reasonable protection of the secret information. *See Centrifugal Acquisition Corp. v. Moon*, 849 F.Supp.2d 814, 831 (E.D.Wi. 2012); *Harvey Barnett, Inc. v. Schidler*, 143 F.Supp.2d 1247, 1252 (D.Colo. 2001).

Because there is evidence in the record that L3 took significant steps to secure its trade secret information, such as limiting access to it and requiring employees to sign confidentiality agreements, the Court finds that the Defendants are not entitled to summary judgment on the claims premised on the existence of such trade secrets.

The Defendants' second major argument is that L3 failed to adequately protect its trade secrets because it freely disclosed those secrets to its customers without restricting the customer's ability to use and disseminate the secret information. The bulk of the Defendants'

---

was misapprehended by two employees who defected to join a competitor. The trial court found that the plaintiff company took various steps to secure its confidential information, including requiring confidentiality agreements, password-protecting the information on company computers, and reminding employees of the confidential nature of the information. The 10th Circuit acknowledged that "each of these facts weigh in favor of finding a trade secret." *Id.* at 1189. However, it concluded that these facts were "*general* measures to keep its company information private," and reversed the trial court's verdict in favor of the plaintiff company. *Id.* (emphasis in original).

A close reading of *Southwest Stainless* indicates that it does not stand for the proposition that the types of security measures mentioned above are legally-insufficient as "general" or "normal business practices." Although *Soutnwest Stainless* emphasized the word "general" in the quote above, it did so to highlight that the plaintiff company's security measures applied generally to all of its confidential information, not to disparage the security measures as being merely common or ordinary security practices. The court went on to find that, despite the plaintiff's general practice of keeping company information confidential, "this is not always the case," as pricing information was readily disclosed to customers and competitors. *Id.* at 1190. Thus, the court found, "regardless of the [security measures] noted by the district court, . . . not every piece of [the plaintiffs'] 'confidential' information constitutes a trade secret." *Id.*

argument focuses on a contract that L3 entered into in or about 2007 to provide HEMP testing services to the Boeing Corporation.

The Court begins with the observation that both sides support their arguments on this point almost exclusively through citation to various contracting and implementation documents, rather than through witness testimony.  It should come as no surprise to anyone familiar with the byzantine complexity of government contracting or technical matters that such documents are rarely self-explanatory or even particularly comprehensible to the layperson.  Without a witness' testimony explaining the purpose of a particular document or offering a plain-language interpretation of what a given document is purporting to represent, the Court is reluctant to draw inferences that a particular statement, rendered in the peculiar argot of governmental contracting terminology, necessarily means what an outsider attempting to parse that language might understand it to mean.  For this reason alone, the Court is inclined to deny the Defendants' motion.

Nevertheless, to the extent that the contracting and other documents can be coherently parsed without additional guidance, the Court notes as follows.  L3 apparently entered into a contract with Boeing to perform HEMP testing and "hardness upgrades" for Boeing at a specific facility.  L3 apparently agreed to provide Boeing with testing equipment and laptop computers, on which certain L3 software necessary for conducting HEMP testing and analyzing the results was loaded.[5]  It appears to be undisputed that L3 did not require Boeing to agree to keep

---

[5]      It is not clear to the Court whether L3 was providing Boeing with all of the equipment and software necessary to conduct the HEMP testing on its own – in other words, that L3 was conveying all of the knowledge and materials necessary for Boeing to perform the testing without any further assistance by L3 -- or whether the equipment and software was being sold to Boeing in conjunction with retaining L3 to actually perform the testing.

confidential any details about the equipment or the software, although the record does not reflect what implicit understandings the parties may have shared about the issue.

The Defendants argue that the dissemination of the software to Boeing without any restrictions is an act inconsistent with L3's claim that it sought to preserve the secrecy of that software, but the Court is not persuaded.  Courts recognize that "the necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another" – such as a licensee or customer -- 'in confidence, and under an implied obligation not to use or disclose it.'" *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974).  Various documents reflecting the Boeing contract indicate that L3's submissions and materials are not for "public disclosure or authoriz[ed] for disclosure to other parties" and that data supplied by L3 "shall not be disclosed outside the Boeing Company."  Thus, there is some evidence in the record, taken in the light most favorable to L3, to suggest that at a minimum, Boeing was under an implicit obligation to preserve the confidentiality of any trade secret information that L3 disseminated to it.

Moreover, L3 persuasively points out that providing a customer with a usable version of software program is not the same as selling the customer the right to freely reproduce and redistribute that software to others. The record does not clearly and unambiguously demonstrate that L3 and Boeing intended or understood that it was obtaining an unfettered right to distribute the L3 software to others and that L3 was intending to surrender any right to control the distribution of the software.  L3 points out that providing an executable software program to a customer is not the equivalent of providing the underlying source code that would reveal the inner workings of the program or allow it to be freely modified.  In other words, the record reflects that L3 was delivering to Boeing the ability to <u>use</u> the software, but not the right to claim

ownership of, to modify, or to redistribute the software to others.  This is consistent with the testimony of one of the former L3 Defendants, Mr. Youngblood, who stated that "we [L3] do not market or sell this [software], it is purely for our use."  This, too, suggests that Boeing's use of the software was accompanied by an implicit license or understanding that Boeing was not free to disseminate the software (and the trade secrets it embodied) to L3's other customers, competitors, or to the public generally.

The Defendants offer a somewhat opaque argument that L3 cannot claim any trade secret protection in its software because the software was developed at government expense.  This argument appears to spring from *L3 Communications Westwood Corp. v. Robichaux*, 2008 WL 577560 (E.D.La. Feb. 29, 2008).  There, the court cited to provisions of the Defense Federal Acquisition Regulation Supplements ("DFARS"), 42 C.F.R. § 252 *et seq.*, which provide that a government contractor grants "the government unlimited rights in computer software developed exclusively with government funds."  Relying entirely on the description of the regulations in *Robichaux* (rather than attempting to parse the application of the regulations themselves as they might apply in this case), the Defendants argue that L3 certified here that all of the software it provided under the Boeing contract was developed at government expense.  Thus, the Defendants contend, L3 gave unlimited rights in the software to Boeing, which, in turn, defeats any claim by L3 of trade secret rights in the software.  *See Robichaux*, *id.*

The Court need not delve into the particular logic of this argument, as it finds that the factual predicate of the Defendants' argument – that "L3 certified to Boeing and the Government that none of the data or software was developed with private funds" – is not adequately demonstrated by the record evidence to which the Defendants cite.  The citations in support of this contention direct the Court to a page of Exhibit 10, part of L3's proposal document for the

Boeing contract, but that page merely includes a heading entitled "Representation of Private Development" and whose accompanying text merely reads "refer to Attachment 3." There is no "Attachment 3" that is included in Exhibit 10. The Defendants also refer to Exhibit 12, which is a portion of what appears to be the "Attachment 3" referenced in Exhibit 10, but that document does not appear to be an affirmative "certification" by L3 of anything. Rather, the document appears to require L3 to "Identif[y] and Assert[ ] Restrictions on the Government's Use, Release, or Disclosure of Technical Data" (another portion of the document addresses "Use, Release, or Disclosure of Computer Software"). The document explains that "Generally, the development of an item, component, or process at private expense, either exclusively or partially, is the only basis for asserting restrictions on the Government's rights . . ." and seems to suggest that, if the contractor is proposing restrictions, it must "indicate whether development was exclusively or partially at public expense" or otherwise "enter the specific reason for asserting that the Government's rights should be restricted." However, L3 did not make any assertion of restrictions, and thus, was not required to (and did not) make any certification as to whether its software was developed at private expense or not. Thus, the Court finds that the record does not factually support the Defendants' contention.[6]

Accordingly, the Court finds that the record does not unambiguously reflect that, as a matter of law, L3 failed to reasonably protect the secrecy of its trade secrets. The Defendants' motion for summary judgment is denied.

---

[6] The Court does not proceed to the next logical step of the argument: if L3 did not purport to restrict the Government's rights in the use of the software in its proposal, it cannot claim that the Government is restricted in its right to disseminate the software, thus destroying any trade secret character of the software. To the extent that argument is not addressed by the preceding discussion (recognizing the possibility of an inferred obligation on Boeing's part to maintain the confidentiality of L3's software), the Court finds it to be inadequately developed in the Defendants' briefing.

### B.  Motion for Clarification

During discovery, the Magistrate Judge authorized L3 to review the hard disk drives of certain computers used by some of the former L3 Defendants.  The Defendants filed Objections to the Magistrate Judge's ruling under Fed. R. Civ. P. 72(a) on various grounds, including a contention that unfettered disclosure of the hard drives might reveal certain privileged information.  The Court partially sustained **(# 416)** the Defendants' Objections on this ground, finding that the appropriate procedure to be used to protect privileged information would be for the Defendants to create a privilege log identifying every document for which a privilege was claimed, and that a Special Master would review and adjudicate each claim of privilege.  If the Special Master agreed that a given document was indeed privileged, that document would be removed from the hard drives before they were produced to L3.

Several months later, the Defendants filed the instant Emergency Motion to Confirm the Scope of [the prior order] **(# 582)**.  The Defendants pointed out that although their initial Objections to producing the hard drives identified three types of privileges potentially implicated – attorney-client privilege, attorney work product privilege, and a "privilege" in avoiding disclosure of intensely personal information – this Court's Order addressing those objections mentioned only the attorney-client and intensely personal privileges; the Court's Order never mentioned the attorney work product privilege at all.  When it came time to produce the privilege log called for by the Court's Order, the Defendants nevertheless included their claims of attorney work product privilege as well.[7]  This prompted L3 to move to strike the Defendants' privilege log, and in an Order **(# 573)** addressing a collateral issue, the Magistrate Judge stated her belief

---

[7]      It appears from the record that the Defendants' log also included designations of documents claimed to enjoy other privileges never asserted in the Objections, including the spousal privilege and accountant-client privileges.

that the Special Master was "proceeding according to [this Court's Order . . . only reviewing those documents" designated as attorney-client or intensely personal privileged, and that "documents which have been designated as subject to other privileges are irrelevant to the Special Master's review."  The Defendants' instant Motion to Confirm seeks to clarify whether this Court intended to limit the scope of the Special Master's review to the two types of privilege specifically stated in the Court's Order, or whether the Court intended the Special Master to address the Defendants' claims of all types of privilege.

Within a few days of L3 filing its response to the Defendants' Motion to Confirm (and before the deadline for the Defendants to file a reply had passed), the Special Master issued his final report (**# 601**) on the privilege claims.  That report confirms that the Special Master reviewed only the claims of attorney-client and personal privileges shown in the Defendants' privilege log.[8]

Upon review of the prior proceedings, this Court agrees with the Defendants that their initial Objections did indeed refer to concerns about disclosure of attorney work product privileged documents, as well as attorney-client and personal privileged documents.  (The Court is compelled to observe, however, that the Objections made no reference whatsoever to the Defendants intending to assert spousal, accountant-client, or other privileges that the Defendants subsequently proceeded to assert.)  Moreover, the Court agrees with the Defendants that, in general, its intention was to expedite the proceedings by ensuring that <u>all</u> claims of privilege

---

[8]  Subsequent to that report, the parties reached an agreement by which the hard drives would be partially redacted, removing all documents identified on the Defendants' privilege log. The redacted hard drives would be produced to L3 for review while the Defendants' objections to the Special Master's findings (and the remaining claims of privilege) were considered.  This resolution removed the "emergency" character of the Defendants' Motion to Confirm, as there was no immediate risk that documents subject to unadjudicated claims of privilege might be disclosed.

would be promptly asserted and adjudicated, whether by the Magistrate Judge or the Special

Master.  In this respect, then, this Court's Order's failure to mention claims of attorney work

product privilege was an inadvertent oversight, rather than a deliberate (and peculiarly

unexplained) exception.

Regardless, there remain unadjudicated claims of privilege in the Defendants' privilege

log – sounding in attorney work product privilege, spousal privilege, etc. -- and those claims of

privilege from production in discovery[9] will have to be addressed and resolved in some way.

The Court leaves the manner and substance of such resolution to the Magistrate Judge and her

discretion.  She may choose, for example, to re-retain the services of the Special Master to

consider the additional claims of privilege, or she may choose to resolve those claims herself.

She may, if she believes the record supports it, conclude that some or all of the unadjudicated

claims of privilege were untimely made or are deficient in some other respect, and dispose of

them in that regard.  (This Court emphasizes that it speaks entirely hypothetically, and is making

no suggestion as to how any of the claims should be addressed, only that they must be addressed

somehow.)[10]

---

[9]      The Court understands the Defendants to oppose any production to L3 of the documents
they claim as privileged.  It does not understand the Defendants to be asserting claims of
privilege solely to preserve the objection to admission of the documents at trial.   If that
understanding is misplaced – that is, if the Defendants consent to producing the privileged
documents to L3 in discovery without waiving the right to object to the admissibility of those
documents on privilege grounds at the time of trial -- the Magistrate Judge is free to find as much
and direct the Defendants to produce the documents to L3.

[10]      It may also be that the Defendants choose to revisit their claims of privilege in light of the
Special Master's report and the parties' agreement to produce the redacted hard drives.  For
example, documents for which the Defendants asserted both attorney-client and work product
privileges and which the Special Master agreed should be withheld on attorney-client grounds,
need not be adjudicated again.  Similarly, if the Special Master rejected the attorney-client
privilege claim, the Defendants may conclude that a work product privilege claim for the same
document might fail for the same or similar reasons.  Thus, the Court strongly encourages the

Accordingly, the Defendants' Motion to Confirm is granted in part as set forth herein.

**C. Motions to Restrict Access**

Various parties move to restrict public access to certain filings under D.C. Colo. L Civ. R. 7.2. Specifically:

• L3 moves **(# 539)** to restrict access to its summary judgment response **(# 537)** and certain exhibits in support. It has filed a redacted version **(# 540)** of that response for public access.

• The Defendants move **(# 549)** to further restrict L3's summary judgment response to restrict access to an additional exhibit and a portion of the substantive response that discusses that exhibit. It appears that the requested redactions/restrictions are already in effect with regard to L3's publicly-filed redacted version of that response.

• The Defendants move **(# 566)** to restrict access to four exhibits to L3's response **(# 544)** to a motion for sanctions. This motion is partially opposed by L3 **(# 578)**.

• L3 moves **(# 568)** to restrict access to that same response to the sanctions motion and to certain supporting exhibits. The motion includes as attachments a redacted version of the response brief and redacted exhibits to be made available for public access.

• L3 moves **(# 662)** to restrict access to two exhibits to its response **(# 652)** to a motion to compel.

The Supreme Court acknowledged a common-law right of access to judicial records in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978). This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system. *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002). Judges have a

---

Defendants to aggressively review and refine the list of unadjudicated claims of privilege in light of the course of proceedings to date.

responsibility to avoid secrecy in court proceedings because "secret court proceedings are anathema to a free society." *M.M. v. Zavaras*, 939 F. Supp. 799, 801 (D. Colo. 1996). There is a presumption that documents essential to the judicial process are to be available to the public, but access to them may be restricted when the public's right of access is outweighed by interests which favor nondisclosure. *See United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997).

Documents filed with the Court are presumptively available to the public, and the burden is on the party seeking restriction to justify such relief. D.C.Colo. L. Civ. R. 7.2(A). A showing of compelling reasons for restriction of public access is necessary, as it critical that the public be able to review the factual basis of this Court's decisions and evaluate the Court's rationale so that it may be confident that the Court is functioning as a neutral arbiter. *Cf. McVeigh*, 119 F.3d at 814. A party seeking to restrict access must make a multi-part showing. It must: (1) identify the specific document for which restriction is sought; (2) it must identify the interest to be protected and the reasons why that interest outweighs the presumption of public access; (3) it must identify a clear injury that would result if access is not restricted; and (4) it must explain why alternatives to restricted access – such as redaction, summarization, stipulation, or partial restriction – are not adequate. Local Rule 7.2(B)(1)-(4).

The Court commends the parties on their adherence to both the letter and spirit of Local Rule 7.2. Too often, attorneys succumb to the temptation to seek restricted access to the whole of a motion and it exhibits, even though only a small aspect of that filing is of a sensitive nature. Here, however, the parties appear to have facilitated the public interest significantly. As often as possible, they have filed redacted versions of documents and exhibits for public review and ensuring that such redactions are applied sparingly.

That being said, the Court finds that the parties could certainly have narrowed and refined many of their arguments and briefs even further, entirely ameliorating the need to present some of the exhibits and facts for which restriction is sought.  For example, Docket # 539 seeks to restrict access to various exhibits filed by L3 supporting its opposition to Jaxon's summary judgment motion.  Among the exhibits sought to be restricted is Exhibit 54, which L3 moves to restrict because it provides "detailed information regarding the layout and construction of a military facility, including the locations of penetrations in the electromagnetic shielding of the facility," and Exhibit 43, which L3 states "report[s] the HEMP vulnerabilities or lack of vulnerabilities of proprietary vendor equipment and facilities."

 Exhibit 54 is referenced only twice in L3's summary judgment response, both times in footnote 19.  The document is cited in support of the proposition that there was "a test plan [involving certain former L3 Defendants] which describes the software as 'L3/Jaycor CW Immersion Software. . . .'"  Exhibit 43 is mentioned only once, at page 19 of L3's response, for the proposition that "documents . . . drafted by Defendant [ ] Kelly Rice, specifically identified L3's HEMP testing software programs . . . as L3 proprietary."

There is no reason why L3 could not propose a stipulation, to which the Defendants apparently would have had no choice but to agree, *see* Fed. R. Civ. P. 11(b)(4), that the documents in question contained the quoted text.  Such a stipulation would have eliminated the need to file the Exhibits at all.  Even assuming that no such stipulation could be reached, there is no reason why L3's filing of the Exhibits could not have been redacted to include only the relevant text, omitting the irrelevant "detailed information regarding the layout and construction of a military facility" and "vulnerabilities or lack of vulnerabilities."  Had such steps been taken, there would be no need to restrict access to these exhibits at all.

19

With these observations in mind, and in order to avoid squandering limited judicial resources on collateral issues of this sort, the Court grants and denies the above-mentioned motions as follows:

• **Docket # 539**: Granted with respect to L3's brief, insofar as a redacted version is publicly available.  Denied with regard to Exhibits 27, 34, 39, and 71, insofar as the only justification offered for restriction is a designation pursuant to a protective order.  *See* Local Rule 7.2(b)(2).  Denied in part with regard to Exhibits 43-44, 47, 51-52, 54-58, and 64, 65, and 67 subject to L3 publicly re-filing redacted versions of these exhibits that omit the irrelevant sensitive material and reflect only that material pertinent to the purposes for which the exhibit is cited in L3's brief.[11]  Such re-filing (of these and all other exhibits, discussed below, for which re-filing is directed) shall occur within 14 days of the date of this Order.  Upon such re-filing, the exhibits as originally submitted shall be retained under restricted access, and deemed replaced by the publicly-filed redacted versions. Granted as to Exhibits 35, 45, and 60.

• **Docket # 549**: Granted in all respects.

• **Docket # 566**: Denied in part, with leave to publicly re-file redacted versions of Exhibit 1 (redacting only the list and map of testing locations), 2  (redacting all but the "fly under the radar" paragraph), 8 (redacting Randall White's original message).  Granted as to Exhibit 15.

• **Docket # 568:**  Granted in all respects.

---

[11]      For example, Exhibit 47 could readily be redacted to omit the pricing data, and perhaps even the specifications for the item in question and payment terms, etc., without diminishing the document's probative effect, given the limited purpose for which L3 submits it – that Scott White e-mailed an L3 quote document to Corey White, along with certain commentary.

Exhibit 64 could be redacted to include only Mr. Hudnall's message to Mr. Youngman, omitting the sensitive information in Mr. Youngman's response and the attachments, as the only purpose for which L3 cites this document is to indicate that Mr. Hudnall was unaware of what equipment Boeing possessed that L3 could make use of.

• **Docket # 662:**  Denied as to Exhibit D, and the Clerk of the Court shall lift restrictions on Docket # 654.  Granted as to Exhibit A.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Partial Summary Judgment **(# 463, 464, 465, 466, 468, 469, 470, 599)** is **DENIED**.   L3's motion **(# 564)** for leave to file a surreply is **DENIED AS MOOT**.   The parties' Motions to Restrict Access **(# 539, 549, 566, 568, 662)** are **GRANTED IN PART** and **DENIED IN PART** as set forth herein. The Clerk of the Court shall remove all restrictions on public access to Docket # 654.   The Defendants' Emergency Motion to Clarify **(# 582)** is **GRANTED**, insofar as the Court has clarified its prior Order.

Dated this 27th day of September, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge