**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

**Civil Action No. 10-cv-02868-MSK-KMT**

**L-3 COMMUNICATIONS CORPORATION; and**
**L-3 SERVICES, INC.,**

**Plaintiffs,**

**v.**

**JAXON ENGINEERING & MAINTENANCE, INC.;**
**JONI ANN WHITE;**
**RANDALL K. WHITE;**
**SUSAN RETTIG;**
**CHARLES RETTIG;**
**JAMES YOUNGMAN;**
**JERRY LUBELL;**
**KELLY RICE; and**
**JOHN MCCLURE,**

**Defendants.**

---

**OPINION AND ORDER GRANTING, IN PART, MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to the Plaintiffs' Motion for Partial Summary Judgment **(# 897)**, the Defendants' response **(# 941)**, and the Plaintiff's reply **(# 966)**. Also pending are several motions seeking to restrict public access to certain filings **(# 914, 959, 960, 1000)**, some of which are opposed; a Joint Motion **(# 981)** by the parties requesting a claim construction hearing; and two motions to withdraw as counsel **(# 995, 996)**.

## FACTS

The Court briefly recites the salient facts here, and elaborates as necessary in its analysis. The Plaintiffs (collectively, "L-3") are engaged in the business of testing electronic components

for various clients, including the United States Government and military agencies. In or about 2008, several L-3 employees, including some of the individual Defendants here, left L-3 to create and/or join a competing business, Defendant Jaxon Engineering & Maintenance, Inc. ("Jaxon"). L-3 alleges that these employees took various L-3 trade secrets and other proprietary materials to use for Jaxon's benefit, and that Jaxon is infringing on certain patents held by L-3.

The parties bring numerous claims and counterclaims against each other, most of which fall outside the scope of this Order. In the instant motion, L-3 seeks summary judgment on certain affirmative defenses and counterclaims by Jaxon: (i) the Defendants' affirmative defense that "the asserted patents are invalid and/or unenforceable under 35 U.S.C. § 102, 103, and/or 112," with L-3 arguing that certain individual Defendants are named inventors on the patents and thus estopped from asserting invalidity, and the remaining Defendants are in privity therewith; (ii) the affirmative defense that "L-3 is precluded from asserting patent infringement . . . under 28 U.S.C. § 1498(a)," in that the Court has already dismissed Jaxon's counterclaim premised on that statute; and (iii) Jaxon's counterclaim for a declaratory judgment that "L-3 has engaged in patent misuse through its bad faith attempt to enforce [certain patents]," because Jaxon cannot show the necessary elements of such a counterclaim.

Separately, the parties have filed several motions seeking to restrict public access to various filings, requested the setting of a claim construction hearing, and certain of L-3's counsel have moved to withdraw.

# ANALYSIS

## A. Summary judgment motion

### 1. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine

dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2. Inventor estoppel

L-3 brings several claims sounding in patent infringement; the Defendants have asserted the affirmative defense that the patents in question are invalid or unenforceable by operation of 35 U.S.C. § 102 (invalidity due to lack of novelty), § 103 (invalidity due to obviousness), and/or § 112 (invalidity due to differences between specification and claim language).

L-3 argues that certain individual Defendants were named inventors on the patents in question, and thus, are barred from asserting invalidity or unenforceability under the doctrine of "assignor estoppel." Assignor estoppel is an equitable doctrine that prohibits an inventor/assignor of a patent, or persons in privity with him or her, from attacking the validity of the patent when he or she is subsequently sued for infringement by the assignee. *Semiconductor Energy Laboratory Co. v. Nagata*, 706 F.3d 1365, 1269 (Fed. Cir. 2013). When, as in this case, an assignor (certain named Defendants) is sued for infringement, the assignor may not defend or counterclaim that the patent he or she assigned is invalid or unenforceable. *Id.* at 1370. The doctrine is premised upon the "implicit representation by the assignor that the patent rights he is

assigning (presumably for value) are not worthless." *Diamond Scientific v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988). Among other things, the doctrine operates to prevent unfairness and injustice and to prevent an inventor from benefitting from his own alleged wrong. *Pandrol USA, LP v. Airboss Railway Products, Inc.*, 424 F.3d 1161, 1166 (Fed. Cir. 2005).

Two patents are at issue in this case, the '916 and '989 patents. Among the listed inventors on the '916 patent are Defendants Youngman and Rice. They assigned their interests in the '916 patent to L-3 in 2006. The listed inventors of the '989 patent include Defendants Youngman and McClure, and they similarly assigned their interests in the patent to L-3 in 2006. Thus, by operation of the assignor estoppel doctrine, they cannot now assert the affirmative defense of invalidity in response to L-3's infringement claims.

The more difficult question is whether the remaining Defendants are, or were, in privity with Defendants Youngman, Rice, and McClure. The question of privity examines the nature of the relationship between the assignor and the person sought to be estopped, in light of the alleged infringement. *Mentor Graphics Corp. v. Quickturn Design Sys.,Inc.*, 150 F.3d 1374, 1379 (Fed. Cir. 1998). The closer that relationship, the more the equities will favor application of the doctrine. *Id.* In making a privity determination, the central question is whether the other Defendants "availed [themselves] of the inventor's knowledge and assistance to conduct the infringement." *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839 (Fed. Cir. 1991). Privity may exist in a corporation that is founded by the assignor. *Shamrock Technologies, Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990). However, the assignor's mere status as an employee of a competitor does not necessarily warrant a finding of privity. *Id.* at 795.

With these principles in mind, the Court turns to the specific facts allegedly demonstrating privity between Defendants Youngman, Rice, and McClure and the remaining Defendants.

**Jaxon**: Jaxon was formed by Defendants Randall, Scott, and Joni White in July 2008. Mr. Youngman resigned from L-3 in mid-2009, and immediately began working for Jaxon. A June 2009 Jaxon business plan includes an organizational chart showing Mr. Youngman holding the title of "Chief Scientist," reporting directly to CEO Randy White. Corporate records reflect that Mr. Youngman holds Jaxon's stock (Mr. Youngman holds the same number of shares as Kelly Rice, Jaxon's Vice President of Engineering and Robert Smith, the company's Chief Financial Officer). Among other things, Mr. Youngman built pulsers for Jaxon, presumably based off the same knowledge and experience Mr. Youngman used when designing the pulser that is the subject of the '989 patent while at L-3.

Mr. McClure left L-3 in 2008 and joined Jaxon as Engineering Director in August 2009. He also holds Jaxon stock. Mr. McClure is also involved in building pulsers for Jaxon, just as he had been for L-3 at the time of the '989 patent. When asked to testify about the differences between the pulsers he built for L-3 and those he built for Jaxon, Mr. McClure identified Jaxon's pulser as using a different kind of switch, although he later conceded that he had been "experimenting" with that same kind of switch while working at L-3.

Mr. Rice left L-3's employ in October 2009 and immediately joined Jaxon as its Vice President of Engineering. He also holds stock in Jaxon, in similar amount as do Mr. Youngman and Mr. McClure. Mr. Rice wrote software for "portable SE [shielding effectiveness] test equipment" at Jaxon, having done the same task at L-3, and having embodied some of that work in the '916 patent. Mr. Rice testified that the device he designed at Jaxon used many of the same

parts as the one he designed at L-3, although he states that he has improved the software in various respects.

In the face of fairly clear evidence of privity between Jaxon and Mr. McClure, Mr. Youngman, and Mr. Rice, the Defendants offer several observations (not all of which are favorable to them). They point out that the majority of Jaxon's business operations consist of "maintenance and repair work," for which Mr. Youngman, Mr. McClure, and Mr. Rice's talents are not required and which does not involve the allegedly infringing devices. They argue that "testing" – the work Mr. Youngman, Mr. McClure, and Mr. Rice assist in and that uses the devices in question – constitutes only 10% of Jaxon's operations and that Jaxon initially "considered outsourcing the testing component to a third party." (The Court thus infers that it was the hiring of personnel such as Mr. Youngman, Mr. McClure, and Mr. Rice that allowed Jaxon the ability to perform testing services in-house, which they could not have otherwise done.) They argue that the assignors do not hold positions as directors or officers of Jaxon, do not control any financial or strategic decisions, and are merely "minority shareholders."

The Court finds that there is ample evidence in the record to warrant the conclusion that Jaxon is in privity with the assignors with regard to the allegedly infringing devices. They perform the same functions at Jaxon that they did at L-3, where the patented devices were invented, sometimes using the same parts, design, and techniques that they used at L-3. The fact that Jaxon originally lacked the ability to perform testing work, and was only able to develop that branch of its business by hiring people like the assignors, strongly suggests that Jaxon retained them precisely because of their knowledge and experience in designing and building pulsers at L-3. In this regard, the Court finds the instant case quite similar to *Shamrock*. There, the court found an inventor to be in privity with his employer for purposes of his former employer's

infringement suit, where, among other things, the defendant employer had not been active in a particular business sector and had hired the inventor specifically to manage its new operations in that sector. 903 F.2d at 795.

The Defendants rely heavily on *Accushnet Co. v. Dunlop Maxfli Sports Corp.*, 2000 WL 987979 (D.Del. Jun. 29, 2000) (slip op.), for the proposition that privity should only be found where the inventor/assignor "either controlled the [defendant] corporation . . . or had a significant financial stake in the corporation's success." *Accushnet* essentially posits a test for privity that examines whether the assignor is his or her employer's "corporate disguise." *Id.* This Court finds *Accushnet*'s reading of other cases to be needlessly cramped. For example, it reads *Shamrock* to have based its privity determination on the fact that the assignor was hired as Vice President of Operations for the defendant corporation, and that he held 50,000 shares of stock. *Id.* However, beyond reciting the assignor's job title and the number of shares he owned in the defendant company, *Shamrock* makes no mention of the scope of the assignor's control of the company. 903 F.2d at 794. Indeed, even when the *Shamrock* court responds to the defendants' argument that the assignor was a "mere employee," it points to the company's "direct involvement of [the assignor] in [the company's] infringing operations," not the assignor's corporate title or status. *Id.* It is clear from *Shamrock* that the court's determination turns in large part on the fact that the assignor's joining the defendant company allowed that company to embark upon a new field of business by infringing upon the patents assigned to the plaintiff. *Id.* Thus, this Court finds *Accushnet* to be unpersuasive and *Shamrock* to clearly suggest that a finding of privity between Jaxon and the assignors is warranted. Accordingly, Jaxon is also estopped from asserting the invalidity of the patents at issue here.

**Randy White, Scott White, and Joni White**: The Whites are the founders, majority shareholders, and officers of Jaxon. Randy White and Scott White were former employees of L-3, and Randy White in particular was involved in L-3's testing division, where he was in contact with the assignors. In October 2008, after Jaxon had been incorporated but while still employed at L-3, Scott White prepared a list of future Jaxon employees (and their anticipated salaries), including fellow L-3 employees such as Mr. Youngman, Mr. Rice, and Mr. McClure. As noted above, none of the Whites themselves appear to be sufficiently knowledgeable and capable of performing testing services for Jaxon without the assistance of the assignors. Given the considerable privity that the Court finds between Jaxon and the assignors, and the direct ownership and management that the Whites have in Jaxon, it is appropriate to conclude that the Whites are estopped to challenge invalidity to the same extent that Jaxon is. It would hardly be logical to preclude Jaxon from contesting invalidity, but to allow its officers to do so as individuals.

**Susan Rettig, Charles Rettig, Jerry Lubell**: The situation is somewhat different with these Defendants. The record reflects that Charles Rettig and Mr. Lubell perform services for Jaxon as consultants pursuant to a contractual "Professional Services Agreement"; it is entirely unclear from L-3's motion how Ms. Rettig is involved with Jaxon. (L-3's motion merely states that Ms. Rettig "worked as a Contracts Administrator for L-3 before joining Jaxon.")

Mr. Rettig's contract recites that he is being retained by Jaxon to provide "preparation of customer proposals, negotiation of terms and conditions and the negotiation of any resultant contracts," and "such services as may be requested . . . in support of [Jaxon's] pricing and other business issues." There is no indication that Mr. Rettig is involved in any technical aspects of testing activities or otherwise dependent upon the technologies invented by the assignors or the

assignors' knowledge and experience when preparing customer proposals or negotiating contracts. L-3 makes a passing contention that Mr. Rettig was among certain Defendants who physically misappropriated materials from L-3 and delivered them to Jaxon, but it is unclear how such conduct bears on the question of assignor estoppel.

The Court finds that L-3 has failed to show facts that would suggest that the Rettigs have any connection, much less a substantial one, to any of the assignors relating to the alleged infringement. (Indeed, it is somewhat unclear to the Court precisely what acts of patent infringement the Rettigs are alleged to have committed.) The record does not reflect that the Rettigs' work with Jaxon even brings them into contact with the assignors, much less the infringing devices. Although the Rettigs may enjoy some degree of financial or professional success if Jaxon itself succeeds, this connection is far too tenuous to deem the Rettigs in privity with the assignors for purposes of estoppel. To the extent the Rettigs are themselves accused of infringing upon the patents at issue, the record lacks sufficient facts to warrant equitably preventing the Rettigs from challenging the validity of those patents.[1]

Mr. Lubell's contract suggests a more technical focus. He is retained to "provide technical support to . . . Mr. Jim Youngman and work closely with . . . Mr. Kelly Rice to plan, coordinate, and orchestrate technically sound and expedient [testing]." Given that Mr. Lubell's contract specifically designates him to support the testing activities of Mr. Youngman and Mr. Rice, in the particular fields that those individuals obtained the patents at issue here, it is

---

[1] This presents an interesting hypothetical procedural dilemma that the parties are encouraged to consider and, if appropriate, address. At trial, the Rettigs may put on an invalidity defense, and may even succeed in convincing the jury that the patents are invalid. However, because the remaining Defendants are estopped from challenging the patents' validity, the jury will be instructed to enter judgment on the patent infringement claims with regard to the Rettigs, but to assume the validity of the patents with regard to the remaining Defendants.

appropriate to conclude that any infringing activities Mr. Lubell may have engaged in at Jaxon were done in consultation with or at the direction of Mr. Youngman or Mr. Rice. As such, Mr. Lubell is in privity with Mr. Youngman and Mr. Rice, and thus, subject to the same assignor estoppel that they are.

Accordingly, the Court finds that L-3 is entitled to summary judgment on all of the Defendants' affirmative defenses of invalidity on the grounds of assignor estoppel, with the exception of Defendants Charles and Susan Rettigs; the Rettigs may continue to assert affirmative defenses to patent infringement sounding in invalidity.

3. 28 U.S.C. § 1498(a)

All Defendants assert as an affirmative defense to L-3's patent infringement claims, that "L-3 is precluded from asserting patent infringement against Jaxon under 28 U.S.C. § 1498(a)." Separately, Jaxon asserted a counterclaim for "Declaratory Judgment of Unenforceability Due to Patent Misuse" that also invoked that statute. The statute provides that where an alleged patent infringer was producing the infringing item "for the United States," the patent-holder's exclusive remedy for the infringement is a suit against the United States in the Court of Federal Claims, not an action against the infringer. L-3 seeks summary judgment on the Defendants' invocation of 28 U.S.C. § 1498(a) as an affirmative defense, arguing that the Court has already dismissed Jaxon's counterclaim under that statute, and thus, the affirmative defense should follow.

A full understanding of this issue requires a brief summary of prior proceedings in this case. Jaxon's counterclaim for "patent misuse" is a somewhat jumbled collection of discrete, seemingly standalone assertions such as: (i) that, by operation of 28 U.S.C. § 1498(a), Jaxon is immune from infringement claims for work it performs for the Government; (ii) L-3 improperly contacted Jaxon's customers, advising them that Jaxon was infringing L-3's patents; (iii) because

L-3 developed the patented technology pursuant to a contract with the Government, the Government is administratively entitled to a license to use the patented technology, directly or by commissioning others to use it on the Government's behalf; and (iv) the Government has already exercised a right it has to "appropriate title" to the patented technology. The Defendants' counterclaim lumps these (and others) discrete arguments together under the general umbrella of "patent misuse," contending that the totality of these acts constitute unclean hands on L-3's part, preventing it from asserting infringement claims against Jaxon and the other Defendants.

L-3 moved to dismiss **(# 317)** Jaxon's "patent misuse" counterclaim, mostly arguing: (i) that the doctrine of "patent misuse" generally requires allegations of antitrust-like behavior, which Jaxon failed to plead; (ii) Jaxon failed to plead facts showing that the Government necessarily exercised its administratively-granted license to use L-3's patented technology when entering into contracts with Jaxon; and (iii) that the Government never appropriated title to L-3's patents. Notably, 28 U.S.C. § 1498(a) was mentioned only once in L-3's motion, and only when reciting the counterclaim's assertions.

The Court referred L-3's motion to the Magistrate Judge who recommended **(# 559)** that the motion to dismiss the patent misuse claim be denied, at least in part. Specifically, the Magistrate Judge found that Jaxon "allege[d that it] has statutory immunity under 28 U.S.C. §1498(a)," but concluded that Jaxon had not adequately alleged facts showing that the Government had given its authorization and consent to Jaxon making use of the patented technology as part of its contract. However, the Magistrate Judge found that Jaxon had adequately pled a counterclaim for patent misuse insofar as it alleged that L-3 knew that the Government had either appropriated the L-3 patents itself or had retained a license to the

patented technology, and thus, L-3's infringement claims against Jaxon were arguably frivolous (and thus, "patent misuse") on that ground.

Jaxon filed Objections **(# 580)** to that recommendation, taking issue with the Magistrate Judge's conclusion that it had not sufficiently alleged facts showing that that L-3's infringement claims were barred by 28 U.S.C. § 1498(a). Jaxon argued that the inclusion of "an express Authorization and Consent clause" in its contract with the Government was sufficient to demonstrate the Government's intention to permit Jaxon to infringe on the L-3 patents. Jaxon then pointed to particular allegations in its counterclaim that asserted the presence of such clauses in its contracts with the Government.

Acting before L-3 submitted papers in response, this Court overruled **(# 589)** Jaxon's Objections and adopted the Recommendation. In doing so, the Court strayed somewhat from the arguments that Jaxon had presented. Understanding Jaxon's counterclaim to focus primarily on L-3's acts of contacting Jaxon's customers and informing them that Jaxon was infringing on patents, this Court observed that the Federal Circuit has clearly rejected the notion that a patent-holder's contacting of a competitor's customers, threating to bring infringement claims that were theoretically barred by 28 U.S.C. § 1498(a), constituted "patent misuse." *Citing Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868-70 (Fed. Cir. 1997). This Court apparently overlooked Jaxon's contention that L-3's assertion of patent infringement claims against Jaxon itself, the immunity conferred by 28 U.S.C. § 1498(a) notwithstanding, constituted a distinct form of patent misuse.

Before turning to the substance of L-3's instant motion, the Court pauses to *sua sponte* address an apparent error in its prior ruling. With the benefit of hindsight and further development of this case, the Court concedes that its prior order overruling Jaxon's Objections

was too narrowly focused and failed to address the issues Jaxon specifically raised. However, the Court also notes that, regardless of that error, the outcome was correct: dismissal of Jaxon's "counterclaim" for patent misuse, to the extent it is based on the provisions of 28 U.S.C. §1498(a), remains appropriate for several reasons.

First, as this Court noted in a footnote to its prior order, the *Virginia Panel* case states that "patent misuse is an affirmative defense." 133 F.3d at 868. Jaxon, along with the other Defendants, have preserved that affirmative defense in their Answer. This Court is aware of no authority that allows parties to assert an affirmative counterclaim for declaratory relief sounding in § 1498(a), while simultaneously asserting an affirmative defense on precisely the same grounds. (Indeed, Jaxon's counterclaim sought only declaratory relief, making it essentially indistinguishable from an affirmative defense.)

Moreover, as the Magistrate Judge noted in the earlier Recommendation, a claim seeking a declaratory judgment is appropriate only where the party lacks another vehicle that would provide a meaningful remedy. Here, Jaxon has an appropriate remedy for its contention that L-3's infringement claims are precluded by 28 U.S.C. § 1498(a): it may seek summary judgment on its affirmative defense. Thus, a counterclaim for declaratory judgment regarding 28 U.S.C. §1498(a) is duplicative of the Defendants' pending affirmative defense and properly dismissed.

This brings us back to L-3's instant motion. L-3 argues that the Court should grant it summary judgment on the Defendants' affirmative defense under § 1498(a) simply because the Court has dismissed Jaxon's § 1498(a) counterclaim. The preceding discussion should make clear why that argument lacks merit, but to the extent it does not, the Court expressly rejects L-3's argument that this Court "f[ound] that Jaxon did not have [section] 1498 Statute (sic) immunity." The Court made no such finding, having never reached Jaxon's argument that its

contracts with the Government contained the necessary language. L-3 does not offer any substantive argument as to the Defendants' affirmative defense under § 1498(a), and thus, the Court denies L-3's motion seeking its dismissal.

4. Patent misuse

The Court turns to the remaining portion of L-3's motion, directed at the residual portion of Jaxon's counterclaim for patent misuse and the Defendants' affirmative defense on the same grounds. L-3 argues that the claim of patent misuse is limited to cases involving antitrust-like behavior by the patent holder, such as "tying" a patent license to some other concession that the licensee must give. In its response, Jaxon characterizes that a counterclaim of patent misuse is also cognizable when the patent holder is engaged in "sham litigation," lacking any reasonable basis to believe that its patent claims are colorable[2] and simply attempting to interfere with a competitor's operations.

This Court's March 23, 2013 Order **(# 589)** partially granting L-3's motion to dismiss discussed the general principles governing patent misuse claims, finding the doctrine to generally be limited to the antitrust context and expressing "profound doubts" that a misuse counterclaim could be predicated solely on allegations that L-3 was engaging in "sham litigation."[3] Jaxon argues here that, contrary to the Court's prior pessimism, the Federal Circuit has recognized the doctrine of patent misuse in "sham litigation" cases. For example, Jaxon cites to *Monsanto Co.*

---

2 Greatly summarizing a lengthy and factually-intensive argument, Jaxon contends that L-3's patent infringement claims are frivolous "sham litigation" because the federal government exercised its right to appropriate title to the patented technology, which was invented by L-3 in furtherance of a federal contract, thus depriving L-3 of the exclusive right to practice the patent.

3 Among other things, the Court noted that Jaxon's counterclaim, which seeks only a declaratory judgment of misuse and no other relief, is thus indistinguishable from the Defendants' affirmative defense that "the claims of the asserted patents are unenforceable for patent misuse." *Docket* # 252 at 37, ¶ 8.

*v. Scruggs*, 459 F.3d 1328, 1339 (Fed. Cir. 2006), for the proposition that "patent misuse may be found even where there is no antitrust violation . . . ."

Jaxon is correct that the quoted language is present in *Monsanto*, but it does not carry the weight Jaxon ascribes to it. *Monsanto* goes on to explain that patent misuse arises only where the patent holder "impermissibly broaden[s] the scope of the patent grant with anticompetitive effect," and that actions by the patent holder that are "reasonably within the patent grant" preclude the success of a patent misuse defense. *Id.* In *Monsanto*, the patent holder refused to license its patented seeds unless the licensee also agreed to various other provisions, including an agreement not to replant seeds. The defendant purchased some of the patented seeds, but managed to avoid signing the required licensing agreement and replanted the seeds, drawing a patent infringement suit. The defendant asserted defenses sounding an antitrust violations and patent misuse. Following a trial, the District Court granted judgment to the patent holder on the defenses, and on appeal, the Federal Circuit affirmed. It found the alleged behavior did not constitute an antitrust violation, and that the various additional licensing restrictions were "a valid exercise of its rights under the patent laws." 459 F.3d at 1340. *Monsanto* does not endorse Jaxon's "sham litigation" theory of patent misuse; it merely recognizes that although an actual antitrust violation is not necessary in order for patent misuse to arise, some form of "anticompetitive" behavior beyond seeking to enforce rights inherent in the patent must be present. Here, L-3's infringement claims, regardless of their ultimate merit, are clearly invoking rights that purport to arise from the scope of the patent grant itself.

This Court has reviewed the various authorities cited by Jaxon in support of its contention that a patent misuse counterclaim can be premised solely on the assertion that the patent holder is asserting frivolous infringement claims, and finds that none of those authorities persuasive on

this point. Indeed, the very notion is paradoxical: there is no need for a defense of patent misuse – which precludes the patent holder from enforcing the patent against the successful defendant until such misuse ceases – in situations where the infringement claims themselves are frivolous. Put differently, where there is no colorable assertion of infringement, no defense to the non-existent infringement is necessary. Accordingly, the Court grants summary judgment to L-3 on Jaxon's counterclaim sounding in patent misuse, as well as the Defendants' affirmative defense to that effect.[4]

**B. Motions to Restrict Access**

The parties filed motions seeking to restrict access to portions of each other's summary judgment briefing **(# 914, 959, 960, and 1000)**. Thereafter, the Magistrate Judge convened a hearing to discuss the proliferation of motions to restrict access and had some success in narrowing the scope of such motions. The Magistrate Judge issued a Minute Order **(# 1047)** directing the lifting of provisional restrictions on certain documents. Thereafter, the parties conferred and filed "supplements" **(# 1053, 1058, 1061)**, partially resolving aspects of the pending motions to restrict, and occasionally suggesting that the parties "will be filing a supplemental motion" with regard to other documents.

This Court confesses that it is unable, with reasonable effort, to ascertain precisely what matters remain in dispute with regard to the Motions to Restrict Access identified above. Accordingly, the Court denies these motions without prejudice. The parties shall confer in an

---

[4] The dismissal of these defenses does not, however, compromise the Defendants' ability to argue that L-3 lacks the authority to assert patent infringement pursuant to 28 U.S.C. § 1498(a) or contend that the Government has appropriated title to the patented inventions; it merely dismisses the entirely redundant assertion that these standalone defenses can be aggregated together to constitute an additional defense of "patent misuse." Nor does it preclude the Defendants from seeking sanctions, including attorney fees, against L-3 should the Court ultimately conclude that L-3's patent infringement counterclaims were indeed objectively unreasonable or frivolous. 35 U.S.C. § 285.

attempt to identify which documents found at Docket # 898, 942, 943, and 967 both: (i) remain under restricted access following the Magistrate Judge's Minute Order, and (ii) may properly have such restrictions lifted based on the parties' supplemental submissions. Within 30 days of this Order, the parties shall jointly identify those documents for which remaining restrictions on access should be lifted (or expressly withdraw a document from the Court's consideration), and the Clerk of the Court shall lift such restrictions. As to the remaining documents from Docket # 898, 942, 943, and 967, each party may file a single Motion to Restrict Access, specifically identifying the documents for which restricted access should continue to be maintained and supplying the requisite supporting argument. To the extent possible, the moving party should also propose redacted versions of these exhibits that could be publicly-filed.

**C. Claim construction**

The parties have filed claim construction briefs and now request that the Court schedule a claim construction hearing. Given the possibility that the Defendants could defeat L-3's patent infringement claims (in part or whole) on the collateral grounds discussed above, the Court finds it improvident to attempt to construe the claim language unless and until the Court concludes that the patent infringement claims will require resolution on their merits.

To expedite resolution of these issues, the Court will direct that, within 30 days of this Order, the Defendants shall move for summary judgment on L-3's patent infringement claims on the grounds that: (i) the claims against the Defendants themselves are preempted by 28 U.S.C. §1498(a); and (ii) that the Government exercised its right to appropriate title to the patented technology. The motion and response shall further address the extent to which L-3's patent infringement claims would remain viable should the Court find merit in one or both of these

contentions (*i.e.* the extent to which Jaxon has allegedly infringed the patent in services performed for non-governmental clients).

**D. Withdrawal of counsel**

Two of L-3's counsel seek to withdraw from representation. Because L-3 continues to enjoy the services of its remaining counsel, these motions are granted.

**CONCLUSION**

For the foregoing reasons, L-3's Motion for Partial Summary Judgment **(# 897)** is **GRANTED IN PART** and **DENIED IN PART** as set forth herein. The parties' Motions to Restrict Access **(# 914, 959, 960, and 1000)** are **DENIED** without prejudice to additional filings as set forth above. The parties' Joint Motion for Claim Construction Hearing **(# 981)** is **DENIED** without prejudice, pending the filing of a motion for summary judgment by the Defendant within 30 days as set forth above. The Motions to Withdraw as Counsel **(# 995, 996)** are **GRANTED**, and the Clerk of the Court shall terminate electronic service on Lacy Kolo and Scott A.M. Chambers with regard to this case.

Dated this 22nd day of September, 2014.

**BY THE COURT:**

Marcia S. Krieger

Marcia S. Krieger
Chief United States District Judge