IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-CV-02868-MSK-KMT

L-3 COMMUNICATIONS CORPORATION,
and L-3 SERVICES, INC.,

        Plaintiffs,

        v.

JAXON ENGINEERING & MAINTENANCE, INC.,
JONI ANN WHITE,
RANDALL K. WHITE,
SCOTT WHITE
SUSAN RETTIG,
CHARLES RETTIG,
JAMES YOUNGMAN,
JERRY LUBELL,
KELLY RICE,
JOHN MCCLURE,

        Defendants

---

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

## Table of Contents

INTRODUCTION.................................................................................................1

STATEMENT OF UNDISPUTED FACTS...............................................................3

A.   Each Of The Former L-3 Employee Defendants Signed Multiple Agreements Through Which They Promised To Protect And Not To Disclose L-3's Information While Employed By L-3 And Beyond ...............................3

B.   L-3 Took Other Measures To Protect Its Information...............................9

C.   The HEMP-Testing Trade Secrets And Confidential Information At Issue In This Litigation................................................................................13

D.   The Administrative Trade Secrets And Confidential Information At Issue In This Litigation................................................................................25

E.   Randy White, Joni White, And Others Form Jaxon In 2008 To Directly Compete With L-3 In 2009 And Beyond ...............................................27

F.   Randy White, Scott White And Others Create A Turn-Key HEMP-Testing And Maintenance Operation Using L-3 Materials And Information ..........................31

G.   Jaxon And Its Employees Use L-3's HEMP-Testing Software As A Guide For Jaxon's Software, Then Youngman (Unsuccessfully) And McClure (Successfully) Try To Erase The Most Incriminating Evidence ..............................44

H.   Other L-3 Documents Defendants Refused To Produce In Discovery, But Were Subsequently Found On Defendants' Computers ................................51

ARGUMENT.................................................................................................53

1.   **Because the Undisputed Facts Show that the Former Employee Defendants Stole L-3's Confidential, Proprietary, and Business Information to Set Up a Turn-Key HEMP-Testing Organization and Directly Compete with L-3, L-3 Is Entitled to Summary Judgment on Its Breach of Contract Claims (Counts 8-11)**......................53

   A.   Burden of Proof and Elements................................................53

   B.   The Undisputed Facts Show that the Employee Defendants Breached Their Con-

**fidentiality Obligations Under Multiple Contracts** ................................................ **55**

**Element 1: Each Defendant Entered into Multiple Confidentiality Contracts with L-3** ................................................................................ **55**

    a. <u>L-3's Valid Contracts with the Employee Defendants</u> ............................. 55

    b. <u>L-3's Valid Contract with Defendant Jerry Lubell</u> .................... 59

**Element 2: L-3 Performed Its Obligations to the Employee Defendants, Including Mr. Lubell** ................................................................... **60**

**Element 3: The Employee Defendants Failed to Perform by Breaching their Confidentiality Obligations and Retaining L-3 Documents After They Left L-3** ....... **60**

    a. <u>Defendant James Youngman</u> ........................................ 61

    b. <u>Defendant John McClure</u> ........................................... 64

    c. <u>Defendant Randy White</u> ............................................ 65

    d. <u>Defendant Scott White</u> ............................................. 67

    e. <u>Defendant Susan Rettig</u> ............................................ 68

    f. <u>Defendant Kelly Rice</u> .............................................. 70

    g. <u>Defendant Jerry Lubell</u> ............................................ 70

**Element 4: L-3 Suffered Damages as a Result of Defendants' Breaches** .................... **71**

2. <u>**The Court Should Grant Summary Judgment in Favor of L-3 Against the Employee Defendants for Breach of Their Duty of Loyalty (Count 15)**</u> ....................... **72**

    A.    **Burden of Proof and Elements** ............................................. **72**

    B.    **The Undisputed Facts Show that the Employee Defendants Breached their Fiduciary Duties to L-3 by Retaining Confidential L-3 Documents and Forming Jaxon (Count 15)** ................................................. **72**

**Element 1: As an employee, each of the Employee Defendants owed a duty of loyalty to L-3** ................................................................. **72**

**Element 2: Each of the Employee Defendants breached the fiduciary duty of loyalty**

owed to L-3 ................................................................................................... **74**

      a.  <u>Defendant Randy White</u> ........................................................... 74

      b.  <u>Defendant Scott White</u> ............................................................ 76

      c.  <u>Defendant James Youngman</u> .................................................. 78

      d.  <u>Defendant Susan Rettig</u> ........................................................... 79

      e.  <u>Defendant John McClure</u> ........................................................ 82

      f.  <u>Defendant Kelly Rice</u> .............................................................. 82

      g.  <u>Defendant Jerry Lubell</u> ........................................................... 83

**<u>Element 3</u>: L-3 Suffered Damages as a Result of Defendants' Breaches** .................... **83**

**3.** **<u>L-3 Is Entitled to Summary Judgment on Its Claim that by Stealing L-3's Confidential and Proprietary Information, All Defendants Violated the Colorado Uniform Trade Secrets Act (Count 7)</u>** ........................................................................... **84**

  **A.** **Burden of Proof and Elements** ................................................................. **84**

  **B.** **The Undisputed Facts Show that Defendants Misappropriated L-3's Trade Secrets** ............................................................................................................ **93**

    **<u>Element 1</u>: The Undisputed Facts Show that L-3 Possessed Valid Trade Secrets 93**

    **I.** **Having Taken Years and Millions of Dollars to Develop, L-3's Trade Secrets are Incredibly Valuable to L-3 and Could Not be Duplicated or Acquired by Others without Tremendous Expense** ................................................ **93**

    **II.** **L-3's Precautions To Guard the Secrecy of Its Information and the Containment of its Trade Secrets to Only Those Who Need to Know** ........................ **100**

    **<u>Element 2</u>: The Undisputed Facts Show that Defendants Acquired, Disclosed, or Used L-3's Trade Secrets** ........................................................................ **108**

      a.  <u>Defendant Jaxon</u> .................................................................. 108

      b.  <u>Defendant Randy White</u> ...................................................... 111

      c.  <u>Defendant James Youngman</u> .............................................. 113

  d. Defendant John McClure ....................................................... 115

  e. Defendant Scott White ......................................................... 116

  f. Defendant Joni White .......................................................... 117

  g. Defendant Susan Rettig ....................................................... 118

  h. Defendants Charles and Susan Rettig ..................................... 119

  i. Defendant Jerry Lubell ........................................................ 122

  j. Defendant Kelly Rice .......................................................... 122

**Element 3**: Defendants All Knew or Should Have Known that L-3's Trade Secrets Were Acquired by Improper Means ............................................................... 124

**4.** **Unjust Enrichment (Count 17)** ............................................................ 125

 **A.** **Burden of Proof and Elements** ............................................... 125

 **B.** **By using L-3's materials to set up a turn-key competitive operation to obtain HEMP-testing task Orders, the Defendants have been unjustly enriched at L-3's expense** ....................................................... 126

 **Element 1**: Defendants all obtained a benefit from their efforts to misappropriate L-3 materials to create Jaxon ............................................................ 126

 **Elements 2 and 3**: Defendants obtained these benefits at L-3's expense under circumstances that would make it unjust for Defendants to retain the benefit without commensurate compensation ............................................................ 127

**5.** **L-3 Is Entitled to Summary Judgment on its Conversion Claim Against Jaxon (Count 12)** ............................................................................... 128

 **A.** **Burden of Proof and Elements** ............................................... 128

 **B.** **The Undisputed Evidence Shows that Defendant Jaxon Converted L-3's Capacitors for its 5K and 1K Pulsers** ........................................... 129

**Elements 1 and 2**: Jaxon exercised dominion or control over ▮▮▮▮▮ belonging to L-3. 129

 **Elements 3, 4, and 5**: Jaxon's exercise of L-3's control was unauthorized and Wrongful ............................................................................... 131

**6.**     **<u>L-3 is entitled to summary judgment as to its Lanham Act claim (Count 13)</u>**..........131

    **A.**     **Burden of Proof and Elements**................................................................**131**

    **B.**     **The undisputed facts Show that Jaxon's False and Misleading Advertisements and Proposals Violated the Lanham Act** ...........................................**133**

**<u>Element 1</u>: Each of the affected Defendants made materially false or misleading representations in connection with promoting Jaxon's products or services** ...............**133**

**<u>Element 2</u>: Jaxon made its false representations in commerce** ...................................**137**

**<u>Element 3</u>: Jaxon's false representations were likely to cause confusion or mistake as to the origin or characteristics of Jaxon's products or services** ................................**138**

**<u>Element 4</u>: The false statements caused L-3 harm** .......................................................**139**

**CONCLUSION** ..................................................................................................................**140**

Plaintiffs L-3 Communications Corporation and L-3 Services, Inc. (collectively, "L-3" or "Plaintiffs"), by and through their undersigned counsel, hereby move for partial summary judgment against:[1]

1.      All of the former L-3 employee Defendants Randy White, Scott White, Susan Rettig, James Youngman, Kelly Rice, John McClure, and Jerry Lubell (the "Employee Defendants") for breach of contract (Counts 8 through 11) and breach of fiduciary duty (Count 15);

2.      All of the Defendants for violating the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. § 7-74-101, *et seq*. ("CUTSA") (Count 7) and for unjust enrichment for benefiting from their stealing or wrongfully retaining and using L-3's proprietary and business information to set up and maintain a competing HEMP-testing company (Count 17);

3.      Defendant Jaxon Engineering & Maintenance, Inc. ("Jaxon") for conversion (Count 12); and

4.      Defendants Jaxon, Randy White, Joni White and Susan Rettig for Lanham Act violations (Count 13).

## **INTRODUCTION**

Getting to the truth in this case has been no easy feat.  Defendants' destruction of relevant documents and hiding the ball in discovery delayed the process and prompted the Court to order

---

[1] Defendants move for summary judgment on each of the counts listed below with respect to liability only.  Defendants agree that the amount of damages owed to L-3 is a contested fact, and therefore should be resolved at trial.  Nonetheless, for all of the reasons stated herein, as there are no contested issues of material fact with respect to Defendants' liability on the counts at issue, partial summary judgment on liability is warranted.  *See, e.g.*, *Am. Express Financial Advisors, Inc. v. Topel*, 38 F. Supp. 2d 1233, 1248 (D. Colo. 1999) (granting plaintiff's partial motion for summary judgment with respect to liability and reserving the issue of damages for trial).

all but one Employee Defendant to produce his and her hard drives.  But now, after more than three years, the truth is out, and Defendants' liability on certain counts is clear as a matter of law.

Granting summary judgment on these counts—where no genuine issue of material fact exists—would simplify, streamline, and shorten the trial and thereby enable the jury to focus on those counts where disputed facts remain and on the contested issue of damages.  As set forth below, it is undisputed that each of the Employee Defendants stole multiple L-3 documents which they and Defendant Jaxon used to set up a turn-key HEMP-testing operation, violating multiple contracts with L-3 and establishing their liability as to Counts 8 through 11.

Those same thefts and wrongful acts, which enabled Jaxon to receive tens of millions in task order awards that otherwise would have gone to L-3, establish the Employee Defendants' liability as to Count 15, for breach of their duties of loyalty.  Similarly, the Employee Defendants' theft and misuses of L-3's HEMP-testing equipment and software, pricing and templates, vendor lists and other administrative documents make them liable under the CUTSA, Count 7, and for unjust enrichment, Count 17, and establish Jaxon's liability for conversion, with respect to Jaxon's theft of physical L-3 property, Count 12.

Finally, Jaxon's indisputably false statements and those of Defendants Randy White, Joni White and Susan Rettig, about Jaxon's capabilities make L-3's claims of Lanham Act violations, Count 13, ripe for summary judgment on liability.

## STATEMENT OF UNDISPUTED FACTS[2]

**A.   Each Of The Former L-3 Employee Defendants Signed Multiple Agreements Through Which They Promised To Protect And Not To Disclose L-3's Information While Employed By L-3 And Beyond**

**1.**      Each of the former L-3 employee Defendants (Randy White, Scott White, Jim Youngman, John McClure, Jerry Lubell, and Susie Rettig) signed a Standard Confidentiality Agreement and Assignment of Inventions contract ("Standard Contract"). Exhibit 53, L3-002776 (R. White), L3-002786 (S. White), L3-002812 (Youngman), L3-002796 (Rice), L3-002831 (Lubell), L3-002822 (McClure), L3-002804 (S. Rettig).

**2.**      The Standard Contract states in relevant part (emphasis added):

> c. "Confidential Information" – All information whether or not reduced to writing, possessed by the Company or relating to the business or any actual or demonstrably anticipated research and development of the Company or its Customers <u>and which gives the Company or any of its Customers an advantage over competitors who do not know or use it or is otherwise not generally known in the trade</u>, including, but not limited to, trade secrets, proprietary information, customer lists and computer programs and software, and including information conceived, originated or developed by Employee.

> ***
> 3. Purpose. The purpose of this agreement is to protect the trade secrets and other proprietary and confidential information of the Company and the Company's rights to certain inventions by Employees, in order to assure the Company's ability to continue its business and furnish employment to its employees and to preserve and protect the secrets of the United States Government, Customers and others which are entrusted to the Company.

> 4. Confidentiality. The Employee agrees to maintain the confidentiality of all Confidential Information, both during and subsequent to any periods of employment with the Company, and Employee will not, without express written authorization by the Company, directly or indirectly reveal or cause to be revealed any such Confidential Information to any person other than to Company employees who are authorized to receive such Confidential

---

[2] Because the following undisputed facts are relevant to multiple claims against multiple Defendants, L-3 is providing this list here rather than repeat the relevant facts in each of the argument sections below. Citations in the relevant argument sections to "SOF _____" refer to the numbered paragraphs contained in this list.

Information in order to perform their duties for the Company, nor will Employee use such Confidential Information to the detriment of the Company or its Customers or other than in the course of his employment with the Company.[3]

      ***

15. Successors and Assigns. This Agreement shall be binding upon Employee's heirs, administrators and other legal representatives, and is for the benefit of the Company, its successors and assigns.

**3.**     Each of the former L-3 employee Defendants signed an Employee Confidentiality and Innovation Agreement contract ("Confidentiality Contract"). Exhibit 53, L3-002835 (Lubell), L3-002826 (McClure), L3-002816 (Youngman), L3-002800 (Rice), L3-002780 (R. White), L3-002790 (S. White), L3-002808 (S. Rettig).

**4.**     The Confidentiality Contract states in relevant part (emphasis added):

1. Non-Disclosure. I understand that during my employment with L-3 (including, for purposes of this Agreement, any predecessor companies or business units that have been acquired by L-3), I may have had or will have access to Proprietary Information (as defined in Paragraph 4 below) and L-3 Materials (as defined in paragraph 2 below). I agree to hold all Proprietary Information and L-3 Materials in strict confidence and in compliance with L-3's corporate policies concerning the protection of Proprietary Information and L-3 Materials. I will not take, use, copy, disclose, publish or summarize any Proprietary Information or L-3 Materials except to the extent necessary to carry out my duties and responsibilities as an employee of L-3.

2. L-3 Materials. All files, records, proposals, specifications or other documents, and all computer software, software applications, files, databases and the like relating to L-3's business or which contain Proprietary Information, whether prepared by me or otherwise coming into my possession ("L-3 materials"), shall remain the exclusive property of L-3. Upon the termination of my employment for any reason, or upon the request of L-3 if sooner, I will promptly deliver to L-3 all L-3 Materials in my possession, custody or control, and shall not retain any copies of the L-3 Materials in any form or medium whatsoever.

      ***

---

[3] Paragraph 4 of the Titan (one of L-3's predecessor companies) Standard Contract (signed by Defendant Susan Rettig) has slightly different language in that it drops the use of the "his" possessive pronoun in the last sentence and adds "and in no case will the employee use this data for the employee's own personal gain" at the end of that sentence.

4. Proprietary Information Definition. For purposes of this Agreement, the term "Proprietary Information" <u>shall include all trade secrets, know-how and other information that relates to the business of L-3 and is not generally available to the public or generally known in the industries in which L-3 does business or may become engaged</u>, including, without limitation, any formulas, devices, inventions, methods, techniques or processes, compilations of information, records and specifications that are owned or licensed by L-3 and used in the operation of L-3's business and any other information of L-3 relating to its services and products (offered or to be offered), research, development, marketing, pricing, clients and prospective clients, business methods, strategies, financial condition, plans, personnel information and capabilities, polices or prospects.

**5.** Each of the former L-3 employee Defendants signed an acknowledgment form agreeing to abide by Titan's Code of Ethics & Standards of Conduct. Exhibit 53, L3-1410664 (Youngman), L3-1410333 (R. White), L3-1410635 (S. White), L3-002838 (Lubell).

**6.** The Titan Ethics Agreement states in relevant part:

Confidential or "Inside Information"
***
Any employee having access to confidential or "inside information" not available to the general public, or special knowledge acquired in the course of business in Titan, must not disclose such information to other s or use the information for private gain for themselves or others. (Page 10).
***
Property
Unauthorized use of company or customer property for other than official company (or customer) business is prohibited. Property includes but is not limited to assets such as equipment, cash, buildings, technology, software and data. (Page 12).
***
Proprietary Information, Copyrights and Inventions
All employees are obligated to:
• Not remove from their former place of employment any information that is or might be considered private or proprietary by that employer, such as books, computer printouts, notes and trade secrets, unless authorized in writing to do so by official representatives of the employer.
• Not disclose or use Titan or customer private or proprietary information except as required by the normal business activity of Titan.
• Not disclose or use Titan or customer private or proprietary information except as required by the normal business activity of Titan. (Page 13).

**7.** Each of the former L-3 employee Defendants also signed an acknowledgment form agree-

ing to abide by L-3's Code of Ethics and Business Conduct. Exhibit 53, L3-1410006 (S. Rettig), L3-1410551 (S. White), L3-002818 (J. Youngman).

**8.** The L-3 Ethics Agreement states in relevant part:

> Safeguarding Confidential Information
> At L-3, we own, create or have access to a significant amount of "sensitive information" (e.g., confidential or proprietary information) in the course of conducting our business. We must protect the confidentiality of all sensitive information whether obtained from or relating to L-3 and/or suppliers, customers or other third parties. You should not disclose (even to family) or use any sensitive information for any purpose other than on a "need-to-know" basis within L-3. This obligation lasts during your entire employment and at all times thereafter. (Page 17).

**9.** Each of the former L-3 employee Defendants were "at-will" employees (Exhibit 32 Crain Decl. ¶ 4, and Confidentiality Contract ¶ 9) and affirmed at the end of their respective employment with L-3 that they would abide by the various contracts they signed during their employment with L-3. Exhibit 53, L3-002898 (Youngman), L3-002899 (Lubell), L3-002900 (McClure), L3-002901 (Rice), L3-002902 (R. White), L3-002903 (S. White), L3-002904 (S. Rettig).

**10.** The Termination Certifications state:

> This is to certify that I do not have in my possession, nor have I failed to return, any customer lists, marketing materials, mark-up guidelines, software programs, financial information or any other documents or property that fall within the definition of "Confidential Company Information" in the Standard Confidentiality Agreement and Assignment of Inventions Agreement signed by me, or reproductions of any aforementioned items, belonging to L-3.

> I further certify that I have complied with all the terms of the Confidentiality Agreement signed by me, including the provisions regarding the return of Confidential Company Information covered by that Agreement.

> I further agree that, in compliance with the Confidentiality Agreement, I will preserve as confidential all trade secrets, confidential knowledge, or other proprietary information relating to the Company's services, customers, business plans, financial information or other information about the Company's business or the business of its customers.

**11.** Randy White acknowledged that "these [employment] agreements bound [him] every day

of the week, 24 hours a day, while [he was] an employee of JAYCOR, Titan or L-3." Exhibit 62 Randy White Depo. Tr. 3/25/14 at 41:13-19.

12.     Randy White also agreed that the obligations under the Standard Contract continued even after employment with L-3 ended. Exhibit 58 1/15/2014 PI Hearing Tr. 108-09.

13.     Randy White agreed to the terms contained in his various employment agreements, including the ethics agreements, the Termination Certification, and the provisions contained in the employee handbook . Exhibit 58 1/15/2013 PI Hearing Tr. 110-122.

14.     John McClure understood that when he signed the Confidentiality Contract he was agreeing to keeping L-3's proprietary and other business information confidential. Exhibit 64 McClure Dep. Tr. 81-82.

15.     When Susie Rettig signed the Confidentiality Contract she understood it required her to recognize and respect L-3's corporate policies regarding L-3's proprietary information and that she was not to use any L-3 information for any purpose other than to carry out her duties at L-3. Exhibit 63, 4/18/2012 S. Rettig Dep. Tr. 66-68.

16.     Defendants Kelly Rice, Jerry Lubell, Randy White, Scott White, Susie Rettig, John McClure and Jim Youngman all had access to L-3 trade secret and confidential information while working for L-3. Exhibit 89 Defendants' Supplemental Response to Interrogatory No. 13, dated 12/22/2011.

17.     Not one of Defendants Kelly Rice, Jerry Lubell, Randy White, Scott White, Susie Rettig, John McClure and Jim Youngman dispute that the agreements identified above exist or the terms contained therein.  Doc. No. 252 (Answer) at ¶¶ 60, 64, 69, and 70 (noting that the agreements, "speak for themselves.").

18.     In addition to the various contracts referenced above, Defendant Jerry Lubell signed an Exclusive Services Agreement ("ESA") with L-3 in November 2009 (after ending his period of employment by L-3), through which he agreed to perform certain HEMP-related work on an exclusive basis for L-3. Exhibit 53, L3-002840.

19.     Part of the work Mr. Lubell was supposed to be performing for L-3 on an exclusive basis was working with the Defense Threat Reduction Agency ("DTRA") to support its Balanced Hardening and EMP Testing and Technology Assistance programs. *Id.* at L3-002861. Mr. Lubell's main contact at DTRA while working for L-3 was Mike Rooney. Exhibit 53, L3-1318127.

20.     Unbeknownst to L-3, Mr. Lubell was also performing similar services for Jaxon, in direct violation of the ESA. Exhibit 53, L3-947633-34 (Lubell November 2009 invoice for Jaxon with native file printout); Exhibit 79, JAXHD-CH3-E007-00942, Nov. 11, 2009 email from Youngman noting that Lubell is a contractor for Jaxon and that no one should be discussing his role with Jaxon outside of Jaxon, "███████████████████████████████████ ████."

21.     On December 31, 2009, Mr. Lubell submitted his 30-days' notice to end his consulting services under the ESA, which ended the term of his consultancy on January 30, 2010. Exhibit 53, L3-099487. Despite still being under an exclusive agreement with L-3, in early January 2010, Defendants set up a meeting with Mike Rooney at DTRA to discuss Jaxon's approach to HEMP-hardening and testing projects for DTRA. Defendant Kelly Rice noted that Mr. Lubell would also attend and described Mr. Lubell's role with Jaxon as "██████████████████████████████ ████████" Exhibit 54, JAX-0043493.

**B.     L-3 Took Other Measures To Protect Its Information**

**22.**     L-3's Employee Handbook applicable to the former L-3 employee Defendants (Exhibit

54, JAX-0026541), states at page 21 (JAX-0026565):

> **Proprietary or Restricted Information:** Proprietary information is information devel-oped and owned by ATD. Its disclosure to others could impair the Company's ability to compete fairly in the marketplace. Documents should be appropriately marked "Company Private" or "Proprietary." Every ATD employee is bound to honor the Confidentiality Agreement signed at the beginning of employment. According to its terms, an employee may not use or disclose to an outside party Confidential or Proprietary information in the employee's possession, except when specifically authorized to do so. This includes, but is not limited to contract and rate information, salary and benefit data, and ATD's intellectu-al property such as patents, trade secrets, trademarks, or copyrights. Said Property of ATD shall not be published or disclosed in any fashion, including on the Internet, without ex-press written permission and appropriate measures to safeguard it from improper disclo-sure.

> Upon termination of employment, or at any time upon ATD's request, an employee must return, without retaining any copies, summaries, excerpts or reproductions of any kind, all documents containing proprietary or restricted information. This prohibition extends in-definitely beyond the period of employment. An employee's agreement to protect the con-fidentiality of such information in perpetuity is considered an important condition of em-ployment at ATD.

**23.**     In March 2008, L-3's Applied Technologies Division ("ATD") (which included the Colo-

rado Springs Office) published an Information Protection Desktop Guidebook and Proprietary

Protection Plan; both of which L-3 sent to all of ATD, including Defendants Randy White, Scott

White, John McClure, Jim Youngman, and Jerry Lubell. Exhibit 53, L3-1319841-56.

**24.**     The Proprietary Protection Plan notes that:

> **Proprietary Information,** as defined by L-3 Communications Corporate Policy 307 is "information that may cause damage to the corporation, subsidiaries, ven-dors, directors, officers, employees, or shareholders if disclosed to unauthorized individuals." Proprietary Information includes all financial, personnel, technical or business information owned or possessed in any format or media by ATD which has not been authorized for public release. Examples include, but are not limited to, data such as technical information and computer software for which in-tellectual property rights, such as patents, trade secrets, trademarks or copyrights,

9

may or may not be claimed, wage and salary data, cost proposals, components, contract pricing data, department/corporate planning reports, employee information (including the company phone book), corporate financial records/reports, supplier lists, customer or business contact lists and/or any other information determined to be sensitive and which might reveal company operating methods, processes and/or procedures. Such information is frequently referred to as Proprietary Data, Confidential Information, Privileged Information, Proprietary Data, Company Sensitive and Company Private.

***

It is the responsibility of each employee, supervisor, manager and division authority to determine whether information, either generated or received, in their departments is in nature defined as proprietary information. Any information, regardless of its character or form, the release of which by itself or when added to other information could jeopardize the competitive position of L-3 Communications, ATD, or information requiring limited distribution on a "need-to-know" basis by individuals within ATD, shall be designated "L-3 COMMUNICATIONS PROPRIETARY". Any failure to designate any information or material as proprietary shall not constitute an admission that such information is not or proprietary information. *Id.* at L3-1319854-55. (Emphasis added).

25.     In addition to taking a very broad view of what it considers Proprietary Information to be, L-3 Communications Corporate Policy 307 also requires that "Upon initial employment all L-3 employees will sigh the "L-3 Communications Confidentiality and Innovation Agreement" (Appendix 2) acknowledging their acceptance of non-disclosure of L-3 Proprietary Information, assigning all inventions and improvements to L-3, and the return of all L-3 property upon termination." Exhibit 53, L3-001419, 1422.

26.     L-3 requires employees to undergo online computer-based training several times a year regarding security, which includes ongoing alerts regarding security awareness, and reminders that L-3 takes a broad view of the information it considers to be proprietary.  Exhibit 59, 1/16/2013 PI Hearing Tr. 148:24-150:18 (Crain); Exhibit 53, L3-1266879 (Randy White training report).

27.     Former ATD employee Peter Coakley testified that his division did not deal with public information as it was mostly classified or subject to ITAR restrictions; thus, the general consensus among employees was that they treated all company information as proprietary. Exhibit 65 Coakley Dep. Tr. 33-37. Employees were instructed (at least annually) to err on the side of caution and treat everything as proprietary. *Id.* at 48-49.

28.     L-3's Colorado Springs Office is a Department of Defense-cleared facility. Exhibit 59 1/16/2013 PI Hearing Tr. 149 (Crain). This means that, from a national security standpoint, the facility is eligible for access to and generation of classified information. Exhibit 32, Crain Decl. ¶ 3. All visitors had to sign in, and be escorted if no Department of Defense Official visit request was on file. Exhibit 67, L-3 12/03/13 Rule 30(b)(6) Dep. Tr. 208:4-8 (Barr).

29.     L-3's Colorado Springs Office employs about 20 people. Exhibit 59, 1/16/2013 PI Hearing Tr. 151 (Crain).

30.     L-3's HEMP-testing technology (equipment, software, methodologies) is primarily utilized out of the Colorado Springs office. Exhibit 90, Feb. 1, 2013 Crain Decl. ¶¶ 2, 13.

31.     L-3 keeps its HEMP-testing equipment (for SE, PCI and CWI testing) secured in its laboratory at the Colorado Springs office when it is not being used at a particular job site. Exhibit 90, Feb. 1, 2013 Crain Decl. ¶ 12.

32.     Only individual employees who are building, repairing, acquiring, or using the HEMP-testing equipment have access to that equipment. Exhibit 90, Feb. 1, 2013 Crain Decl. ¶ 14; Exhibit 67, L-3 12/03/13 Rule 30(b)(6) Dep. Tr. 207:3 - 208:3 (Barr) (noting that L-3 limits physical access to only authorized personnel, requiring DoD background investigation and maintaining a secret clearance).

33.    L-3's Colorado Springs office is alarmed; access cards are required to gain access to the building and to various parts of the building depending on whether an employee has a need for such access; all of the computers are password-protected (changed every 60 days); and the computer system is firewalled, which prevents outsiders from coming into the building and accessing the computer network. Exhibit 59 1/16/2013 PI Hearing Tr. 151-53 (Crain). Passwords are not disseminated beyond the Colorado Springs office. Exhibit 60, 1/18/2013 PI Hearing Tr. 76:5-7 (Anderson).

34.    David Kizner, an L-3 field technician, testified that although he did not recall seeing pulsers or spare parts lists marked with the words "proprietary" on them, he fully understood that he had a contractual obligation not to share any technical information with anybody that did not have a need to know. Exhibit 70, Kizner Dep. Tr. 32:24-33:2.

35.    L-3's Larry Linn testified that for jobs taking multiple days, he observed pulsers being locked up in large rental trucks overnight, or stored in secured government facilities that had round-the-clock guards. Exhibit 71, Linn Dep. Tr. 160:12-15; 157:4-16.

36.    L-3's David Kleeberg testified that L-3 conducts its testing on secured government facilities and when testing equipment is left overnight, it was stored in secured areas that could not be accessed by anyone that did not need to have access.  Exhibit 72 Kleeberg Dep. Tr. 106:6-8; 180:15-19.

37.    Serco's Don Eich, who has aligned with Defendants in this case, testified that on occasion when he was able to observe L-3 conducting HEMP-testing, merely looking inside of a pulser or observing a test taking place did not inform him of any of the details required to determine how the pulser was made or how to conduct such a test. Exhibit 69 Eich Dep. Tr. 638:22 - 642:17.

12

38.     L-3 maintains its HEMP-testing software (including applicable source code) on its servers in the Colorado Springs office, on individual computers within the office, and on encrypted laptop computers for use outside the office; and people outside of the Colorado Springs office (including others within L-3) do not receive access to L-3's HEMP-testing software. Exhibit 59 1/16/2013 PI Hearing Tr. 151-53 (Crain); Exhibit 90 Feb. 1, 2013 Crain Decl. ¶ 15.

C.     **The HEMP-Testing Trade Secrets And Confidential Information At Issue In This Litigation**

Shielding Effectiveness ("SE") Trade Secrets

39.     L-3 compilation of parts and equipment L-3 uses to conduct SE testing in accordance with the parameters set forth in Mil-Std-188-125 Appendix A, including L-3's selection of vendors to supply those parts and equipment, are a trade secret. Exhibit 84 L-3 Second Supplemental Objections and Responses to Defendants' Interrogatory No. 1 ("Trade Secret List") pp. 5-7. [4] Exhibit 90 Feb. 1, 2013 Crain Decl. ¶¶ 17-19, 25, 28-36, 38-40, 42.

40.     The methods of assembling the SE test equipment, including the training provided to L-3 employees to assemble the equipment, and any photographs or drawings of L-3's SE testing equipment as assembled for use are also a trade secret. Exhibit 84 Trade Secret List at p. 7.

41.     The methods by which L-3 uses its SE test equipment to generate the raw data necessary

---

[4] The Trade Secret List was designed to put the Defendants on notice as to what L-3 was claiming as a trade secret, and provided part numbers to facilitate Defendants' understanding of the types of materials, the compilation of which, amounts to L-3 trade secret. L-3 never intended to relinquish its trade secret claim in the event the Defendants used a different part number (or piece of equipment) that performed the same function as the part or piece of equipment identified on the Trade Secret List. Jaxon's proffered expert on the trade secret issues, Davidson Scott, acknowledged that merely replacing a part in a compilation trade secret would not vitiate the compilation's trade secret status: "okay, you have something that is a trade secret and somebody else comes and replaces parts from it, I can see how you might be able to conclude that there's a violation there." Exhibit 73 D. Scott Dep. Tr. 246:23-247:2.

to assess whether a given enclosure meets the requirements of Mil-Std-188-125 Appendix A are a trade secret. Exhibit 84 Trade Secret List at pp. 7-8.

**42.**    Jaxon's SE test equipment is substantially similar to L-3's SE test equipment, and the components in both L-3's set and Jaxon's set perform the exact same function. Exhibit 32 Crain Decl. ¶ 54, referencing his Table 1) and ¶ 52 (identifying the comparisons of Jaxon's and L-3's SE test equipment below):





**43.** Jaxon's methods for conducting SE testing in accordance with Mil-Std-188-125 Appendix A are substantially similar to L-3's methods because both Jaxon and L-3 use essentially the same equipment, including antennas that are non-compliant with Mil-Std-188-125. Exhibit 32 Crain Declaration ¶ 54, referencing Crain's Table 2).

**44.** Other companies that perform Mil-Std-188-125 Appendix A testing use different equipment than L-3 and Jaxon. For example, SARA uses a signal generator for its SE testing. Jaxon 5/13/2014 Rule 30(b)(6) Dep. Tr. 104:14-20 (McClure); a company called ATSI uses a vector signal analyzer. Crain Decl. ¶ 53 citing D. Scott Dep. Ex. 19.

**45.** L-3 also claims as a trade secret its physical ABITE system, which is a spectrum analyzer-based automated SE testing system that can be operated in person or remotely. Crain Decl. ¶ 55 (noting that L-3's ABITE system is proprietary, confidential, and is considered an L-3 trade secret); Exhibit 84 (Trade Secret List) p. 11. The components that make up L-3's ABITE system are below:



**46.** Kelly Rice also designed and possibly built a portable SE test system while he was at L-3. In June 2009, Randy White directed Kelly Rice to build two such portable SE test systems, and Kelly Rice, in turn, worked with Shane Meredith to order the parts to do so. Exhibit 53, L3-1270005, 1270006, 1270075. The chart above also shows a comparison of the L-3 Kelly Rice-designed portable SE tester with Jaxon's KR2 system. Under Kelly Rice's contracts with L-3, an-

ything he invents or designs at L-3 belongs to L-3. Exhibit 53, L3-002796 at ¶ d.; L3-002800 ¶ 3.

Pulse Current Injection ("PCI") Trade Secrets

**47.**    The compilation of parts and equipment L-3 uses to conduct PCI testing in accordance with the parameters set forth in Mil-Std-188-125 Appendix B, including the designing and building of L-3's E1 1k and 5k pulsers, the E2 pulsers, and the controller to run the 5k pulsers, and including L-3's selection of vendors to supply those parts and equipment, are a trade secret. Exhibit 84 (Trade Secret List) pp. 10-15; Exhibit 67 30(b)(6) Dep. Tr. 249-250 (Crain).

**48.**    L-3's methods of constructing the pulsers and the assembly, layout and hook-up of the pulsers and other equipment used to conduct PCI testing are also trade secrets. New pulsers are built using existing pulsers as templates and employees are provided specific training to do so. Drawings and photographs of the pulsers (which are also considered to be L-3 trade secrets) are also sometimes used. Exhibit 84 (Trade Secret List) pp. 15-16; Exhibit 90 Feb. 1, 2013 Crain Decl. ¶¶ 17-19

**49.**    The processes and procedures L-3 uses to conduct PCI testing to generate the raw data necessary to assess whether the products being tested meet the requirements of Mil-Std-188-125 are L-3's trade secrets. L-3's PCI equipment must be used in a certain way or the pulsers might explode, damage the equipment under test, damage nearby equipment, or cause harm to the operator. Exhibit 84 (Trade Secret List) pp. 16-17.

**50.**    Jaxon's PCI test equipment is substantially similar to L-3's PCI test equipment (including the initial pulsers Jaxon built in November 2009), and the components in both L-3's set and Jaxon's set perform the exact same function. Exhibit 32 Crain Decl. ¶ 56-60 referencing his Tables 3, 4, 5, 6, and 7) and ¶ 52 (referencing the photographic comparison between Jaxon's and L-3's PCI

test equipment listed below):

capability, Exhibit 53, L3-973365. L-3 had also already created a ████████████

████████ before Jaxon. Exhibit 32 Crain Decl. ¶ 52 (referencing photograph of ████████

████████ (photo comparison 5K-H, above)); Exhibit 64 McClure Tr. 42:4-14, 281:17-24, and

Dep. Ex. 2 (JAX-0003528), agreeing that he had designed and experimented with a ████████

████████████ ); Exhibit 53 (L3-726555, May 2009 email from Youngman while at

L-3 in which he notes that "The good thing here is that we build/own/repair the pulsers. We are

currently in the middle of a change to our ████████████████████

████████████████████████████ ██ ████████ ) but I

need to spend some quality time with the pulsers & controllers to nail down these improve-

ments."). And of course, all of ideas that John McClure or Jim Youngman came up with while an

L-3 employee that relates to HEMP-testing or maintenance belong to L-3 by virtue of Young-

man's and McClure's contracts with L-3. Exhibit 53 (L3-002822 and 2826 (McClure); L3-002812

and 2816 (Youngman)).

52.    Jaxon's methods for conducting PCI testing in accordance with Mil-Std-188-125 Appen-

dix B are substantially similar to L-3's methods, in part because the testing equipment is virtually

identical (████████████████████████████████

████████████ ) and performs the exact same function. Exhibit 32, Crain Decl. ¶ 62 (ref-

erencing his Table 8).

53.    Other companies that perform Mil-Std-188-125 Appendix B testing use different equip-

ment than L-3 and Jaxon. For example, SARA's E2 pulser looks nothing like Jaxon's and L-3's

E2 pulser. Exhibit 32, Crain Decl. ¶ 63 citing D. Scott Dep. Ex. 20 (SARA website).████████

████████████████████████ . Exhibit 32 Crain Decl. ¶ 63 citing D. Scot Dep.

Ex. 21. And Fischer Custom Communications, Inc. and Montena have pulsers designed for conducting Mil-Std-188-125 Appendix B PCI testing that are completely different than those used by both L-3 and Jaxon. Crain Decl. ¶ 63, citing D. Scott Dep. Exs. 22 and 23.

**54.** The Defendants were well aware of other commercially-available pulsers. Exhibit 53 (L3-973365, 2008 email from Youngman to McClure, Rice and others attaching specification sheet from Fisher Custom Communications, Inc.).

Continuous Wave Immersion ("CWI") Trade Secrets

**55.** L-3 compilation of parts and equipment L-3 uses to conduct CWI testing in accordance with the parameters set forth in Mil-Std-188-125 Appendix C, including L-3's custom-made parts and its selection of vendors to supply those parts and equipment, are a trade secret. Exhibit 84 (Trade Secret List) at pp. 19-21.

**56.** L-3's assembly, layout, and hook-up of its CWI equipment is a trade secret. New CWI test sets are built using existing CWI test sets as templates, and employees who build the CWI test sets undergo specific training to be able to do so. Drawings and photographs may also be used to help guide the assembly. Such drawing and photographs relating to the assembly of and/or assembled equipment are also part of the CWI trade secret. Exhibit 84 (Trade Secret List) at p. 21.

**57.** The processes and procedures L-3 uses to conduct CWI testing to generate the raw data necessary to assess whether the facilities being tested meet the requirements of Mil-Std-188-125 are L-3's trade secrets. To generate the necessary CWI data, L-3's equipment must be used a certain way, including careful and methodical calibration of all components in the CWI test system, overall calibration of the CWI test setup, continuous quality checks and evaluations of the raw data as it is being collected and processed, and by various status checks conducted during the test,

which L-3 developed over time. Exhibit 84 (Trade Secret List) p. 22.

58.    Jaxon's CWI test equipment is substantially similar to L-3's CWI test equipment, includ-

ing the use of ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████. The components in both L-3's set and Jaxon's set perform the exact same func-

tion. Exhibit 32 Crain Declaration ¶ 64 (referencing his Table 9) and ¶ 52 (referencing the photo-

graphic comparison between Jaxon's and L-3's CWI test equipment). Indeed, John McClure, tes-

tifying as Jaxon's Rule 30(b)(6) witness, conceded that Jaxon's CAMS was similar to L-3's, but

that it was his idea to add distinguishing "feet" to the Jaxon CAMS (Exhibit 68 Jaxon Rule

30(b)(6) Dep. Tr. 202:11-204:7) – despite the clear fact that L-3's CAMS already had the "feet"

Mr. McClure took credit for implementing on Jaxon's system. Exhibit 32 (Crain Decl. ¶ 52 (ref-

erencing the photographs below).

---

[5] Although John McClure testified at Jaxon's 30(b)(6) deposition that Jaxon does not ███████
███████ (5/13/2014 Jaxon 30(b)(6) Dep. Tr. 204:8-10), photographs found on Jim
Youngman's computer from a CWI test Jaxon performed at ██████ AFB in 2012 show the ██
████████ Mr. McClure too had a photographs of Jaxon's CWI test system
with ███████████. Exhibit 99 DF4-E004 108 CANON.



**59.**     Jaxon's methods for assembling and using its CWI test equipment is substantially similar to the assembly and use methods L-3 uses in conducting CWI testing because both Jaxon and L-3 use essentially the same equipment, which is █████████████████████████████████████ █ Exhibit 32 Crain Declaration ¶¶ 66-67 (referencing Crain's Table 10 and 11)

**60.**     Other companies that perform Mil-Std-188-125 Appendix C testing use different equipment than L-3 and Jaxon. For example, SARA's CWI antenna uses a large loop rather ████████ ██████████████████████████████████Exhibit 32  Crain Decl. ¶ 68, citing D. Scott Dep. Exs. 27 and 21.

L-3's Proprietary HEMP-testing Software

**61.**     L-3 has created its own proprietary and trade secret software to control, capture, compile, and process the raw data collected by its HEMP-testing equipment. These software programs include BADDAS, Butter, CUCO, Butterfly, Reducktionator, Appendix Builder, Dataviewer, Pulsedat, Pre-Pulsedat, and Post-Pulsedat. Exhibit 84 (Trade Secret List) pp. 8-9, 18, 23-24; Exhibit 59 (1/16/2013 PI Hearing Tr. 135:2-10 (Crain)).

**62.**     L-3 created its HEMP-testing software internally at its own expense. Exhibit 59 (1/16/2013 PI Hearing Tr. 145:17-146:2 (Crain)).

**63.**     L-3 informed customers that its HEMP-testing software was proprietary to it. For example, former L-3 employee Bruce Anderson drafted test plans that identified the HEMP-testing software system as including three specifically-designed coded software packages written internally by L-3. Exhibit 60 (1/18/2013 PI Hearing Tr. 94:10-97:9 (Anderson)). Defendant Kelly Rice authored customer documents in which he identified L-3's BADDAS, CUCO and Butter programs as L-3 proprietary. Exhibit 53 (L3-1344045 at 046, 060); Exhibit 53 (L3-081546 at 47, 68).

**64.**     In July 2007, Jim Youngman acknowledged that L-3's HEMP-testing software was for L-3's own internal use only. In an email to L-3's Sandi Quintero regarding a contract for ███ Mr. Youngman stated, in part:

> We also use some "proprietary" SW packages for data acquisition and processing. By "proprietary" I mean that these SW codes have been developed internally for our use. … We do not market or sell this SW, it is purely for our use in data acquisition, processing, formatting and display purposes. These are : BadAss (Data acquisition) Butter (Data processing) Reductionator (Data Processing) DataViewer (Data Processing) CuCo (Data Processing.

> … All of this SW was also generated, modified and maintained without consideration of "restrictive rights" (or so I believe). None of it was a deliverable on a previous contract. And none of it will be a deliverable on this current contract, un-

less we develop new SW for these purposes – which I am anticipating.
\*\*\*
In summary, I don't think there is anything to report with regard to restrictive rights. … The SW we use to acquire and process this data is NOT a deliverable. The briefings, reports, and so forth will be generated in commercially available SW, and it is these documents which will be are primary deliverables.

Exhibit 53 (L3-001025 at 026-27). *See also* Exhibit 59 (1/16/2013 PI Hearing Tr. 53:23-

57:14) (Youngman) (discussing this same document)

**65.**    Jim Youngman testified at the PI hearing that while he was at L-3, he never gave the

BADDAS, Butter, or CUCO source code to anyone, nor did he have any personal knowledge of

anyone at L-3 ever distributing the software outside of L-3. Exhibit 59 (1/16/2013 PI Hearing Tr.

48:9-49:16) (Youngman). When he was involved in government programs at L-3, Mr. Youngman

never intended to give away any of L-3's proprietary information. Exhibit 60 (1/18/2014 PI Hear-

ing Tr. 61:16-19) (Youngman).

**66.**    All of L-3's HEMP-testing technologies (its SE, PCI, and CWI testing equipment, its

HEMP-testing software, its equipment assemblies, and its methodologies used to conduct HEMP-

testing) were developed over a period of years to arrive at the optimal selection of parts, the ven-

dors to supply those parts, and processes and procedures used to construct the equipment and per-

form HEMP-testing. Exhibit 84 (Trade Secret List) at pp. 5-24; Exhibit 90 (Feb. 1, 2013 Crain

Decl. ¶¶ 17-19, 25, 28-36, 38-40, 42 . L-3's HEMP-technologies were developed at private ex-

pense, are not generally known outside of L-3's Colorado Springs office (that is, they are provid-

ed to employees on a need to know basis), and have value as they give L-3 a competitive ad-

vantage in performing HEMP-testing for its customers. *Id.*  Exhibit 67 L-3 Rule 30(b)(6) Dep. Tr.

249-250. Indeed, until Jaxon formed, L-3 was the preeminent provider of HEMP-testing services

because of the technologies it had developed over the preceding decade, and had won a majority

of all HEMP-testing task orders awarded in the United States. Exhibit 32 Crain Decl. ¶¶ 9-10.

**D.   The Administrative Trade Secrets And Confidential Information At Issue In This Litigation**

67.    L-3 also asserts as trade secrets and business confidential information its technical strategies developed over time that have allowed L-3 to develop an expertise in efficiently assessing, bidding on, and conducting HEMP-testing in accordance with MIL-STD-188-125. The strategies include and can be derived from, solely or in any combination of: test plans, test reports, site surveys, customer briefings, HEMP hardness testing data, technical manuals, export lists of test equipment, customer lists; vendor lists; pricing spreadsheets and templates; L-3 technical and cost proposal bidding templates, labor rate spreadsheets and templates, L-3 designed labor categories; documents containing L-3's profit margins L-3-created briefings; L-3 marketing strategy and plan briefings; technical proposals; recommended work approaches; and site surveys. Exhibit 84 (Trade Secret List) pp. 24-25.

68.    In accordance with the L-3's policies and the various confidentiality agreements referenced above, L-3 considers all materials generated by L-3 in the course of its business to be "confidential" information not to be disclosed outside of L-3, including the items listed at Exhibit 1 to the Trade Secret List, which identifies some of the materials the former L-3 employee Defendants sent to themselves from an L-3 email address, and materials wrongfully retained after their employment with L-3 ended. Exhibit 84 (Trade Secret List) at Ex. 1. The items identified on the exhibit to the Trade Secret List came from the former L-3 employee Defendants' computers at L-3 (those items having an "L3" Bates number), and from materials Defendants produced to L-3 (those items having a "JAX" Bates number).

69.    The Defendants' computer hard drives, produced in 2013, contain thousands of other L-3

materials (including materials from both Jaycor and Titan, L-3's predecessor companies) that permitted Defendants to set up a turn-key HEMP-testing and maintenance operation without having to go through the time and expense of starting such a business from scratch. Examples of such materials are set forth in Exhibit 1 and 92 (Declarations from FTI and Advanced Discovery identifying materials found on Defendants' hard drives). All of these materials fall within the protection of the Confidentiality Contract, which protects all "information that relates to the business of L-3 and is not generally available to the public or generally known in the industries in which L-3 does business or may become engaged…." The materials found on the Defendants' hard drives were sufficient to save Defendants the years of research and development L-3 incurred in creating its HEMP-testing and maintenance operations. Exhibit 32 Crain Decl. ¶¶ 11-13.

**70.**    Even non-defendant Corey White, son of Defendants Randy and Joni White, and brother of Defendant Scott White, had multiple spreadsheets and other documents created long before Jaxon ever came into existence; documents that came directly from L-3. Exhibit 91 (C. White Dep. Ex. 3 (showing multiple documents with creation dates in 2008 and earlier)); Exhibit 92 Advanced Discovery Decl. attachment. When asked as to how he obtained these documents, Corey White confessed that he had received them from his father, Randy White, sometime in late 2008. Exhibit 75 C. White Dep. Tr. 31:18-35:11; 67:7- 70:1. Corey White further admitted that when he received cost spreadsheets from his father, they contained various rates and formulas, and referenced L-3 Communications in them. *Id.* at 67:12- 70:6. For L-3 to have appeared in any spreadsheet Corey White received from his father, that spreadsheet must have contained rates and formulas created after 2005 when L-3 acquired Titan Systems.

**E.** **Randy White, Joni White, And Others Form Jaxon In 2008 To Directly Compete With L-3 In 2009 And Beyond =**

**71.** Randy and Joni White incorporated Jaxon in June 2008. Exhibit 54, JAX-0000004.

**72.** On August 10, 2008, Scott White informed John McClure (who had left L-3 earlier that year) that things with Jaxon were moving forward: "The company – we are still working on it next to having these damn real jobs to maintain. We are tracking along just fine with continued motivation to leave from the bastards at L-3." Exhibit 53 (L3-910822). He then goes on to discuss how they anticipated getting Jim Youngman and Kelly Rice to join them; expecting a "large chunk of money to come in" around November 2008, at which time they would start staffing up Jaxon. *Id.*

**73.** In late August or early September 2008, Jim Youngman prepared an L-3 site survey for an Air Force base in North Dakota, which randy White sent to his Air Force contact on October 13, 2008. Exhibit 53 (L3-1321561). In that site survey, Youngman suggested a number of items that needed to be addressed. These included "███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████." *Id.* at L3-1321562. Youngman then goes on to identify other areas that need attention, provides an explanation as to why some of this work is needed (noting, for example, that ████████████████████████████████████████ ████████████████████████████████), and offers suggestions for addition-al work, including testing. *Id.* at L3-1321562-63. *See also* Exhibit 62 (R. White dep. Tr. 158-161, acknowledging that this trip report addresses issues discovered during this site survey and that Jaxon later analyzed this site and made suggestions on how to deal with those issues).

**74.**     Charles and Susie Rettig's company, CLR Associates, entered into a formal consulting agreement with Jaxon effective October 1, 2008. Exhibit 80 (PJAX-00762312).

**75.**     On October 3, 2008, Scott White, using an L-3 template, created a list of "Start Up People (08)(V2)" for Jaxon. Exhibit 53 (L3-036954). The majority of the people identified on that list were current L-3 employees that Scott and Randy believed they could get to leave L-3 and come work for Jaxon. *Id. Compare with* Exhibit 53 at L3-1270956, with attachment (R. White sending S. White a list of L-3 personnel on December 23, 2008, titled "Division People (08)").

**76.**     On October 13, 2008, John McClure (while working at SARA) sent to Scott White's home email address a number of purchase orders (including past L-3 purchase orders that McClure had kept from L-3) for equipment needed for HEMP-testing, noting that "If the delivery time is to long we will just have to wing it at the JAXON." Exhibit 83 (SARA-001179-1215). McClure followed up with more purchase orders (and more from L-3) over the next few days. *Id.* at 1211-1215. Indeed, on October 15, 2009, Scott White let McClure know that he had gone ahead and ordered a number of the suggested products for potential use at Jaxon. *Id.* at 1216.

**77.**     In fact, what Scott White had been doing is ordering parts on various L-3 contracts under the guise of putting together a collection of those parts that later he and others at Jaxon would claim were "Government Furnished Equipment" or "GFE" that Jaxon wanted Serco to commandeer for Jaxon's use on the initial task orders. Exhibit 53 L3-035126 and L3-1273411. Exhibit 53 (L3-035126, with native attachment). Randy White eventually Scott's completed list to his contact at the Air Force. Exhibit 53, L3-023830). This version of the list ended up at Jaxon in October 2009 through Serco's Don Eich, who directed his subordinate to seek (unsuccessfully) the materials directly from L-3 for Jaxon's use. Exhibit 54 (JAX-0056975).

**78.**     On October 19, 2008, Randy White sent Robert Smith (Jaxon's future CFO) a list of bid rates and estimated overhead in L-3 spreadsheets that he modified for use in Jaxon proposals. Exhibit 54 (JAX-0059637, with attached native files). Each of the attached spreadsheets were authored by L-3's Mike Bell. Exhibit 92 Advanced Discovery Decl. attachment.

**79.**     Also on October 19, 2008, Chuck Rettig emails Randy White, but sends it to Joni White's email address for cover, and inquires about Randy's meeting with Don Eich of Serco (L-3's customer) before Chuck reaches out to Ginny Cook, also of Serco, to seek an advanced private copy of what would become the contract vehicle between Jaxon and Serco for HEMP-testing task orders. Exhibit 54 (JAX-0058021). Significantly, Randy White and Chuck Rettig are actively soliciting L-3's customer on behalf of a competitor, almost three months before Randy White leaves L-3's employ, and long before Randy.  *See* Exhibit 53 (L3-002902, R. White termination certification).

**80.**     On December 11, 2008, Susie Rettig sent to Chuck Rettig then-current and pending L-3 proposals that included detailed and proprietary labor rates and categories with calculations and formulas for doing and calculating profit, various direct costs, materials and costs. The subject of her email to her husband was "███████████████████████████." Exhibit 54 (JAX-0057774, with attachments, Charles Rettig custodian), Exhibit 92 Advanced Discovery Decl. attachment. These materials were specifically marked as containing L-3 proprietary data submitted to Serco in strict confidence, which specifically (and legally) prevented Serco from sharing this information with an L-3 competitor. *See, e.g. id.* at JAX-0057807.

**81.**     Between October 19 and December 4, 2008, Randy White had Chuck Rettig negotiate Jaxon's contract with L-3's then-customer Serco. Exhibit 79 (JAXHD-DF4-E008-00301-35).

While Randy White remained an L-3 employee, he continued to engage in these negotiations with Serco on Jaxon's behalf, assuming responsibility along with Scott White (who was also still an L-3 employee and would remain for another 8 months) for "████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██" *Id.* at JAXHD-DF4-E008-00336.  There was no question that Jaxon was a HEMP-testing and maintenance company: Randy White had to acknowledge that in order to put together proposals that required labor, services, and materials "████████████████████████." Exhibit 62 R. White Dep. Tr. 234-36. Indeed, by early December 2008, Randy White had already been talking with his Air Force contact and new that new business was on the horizon, and Randy had already begun crafting responses to proposals even before they had been officially released. Exhibit 79 (JAXHD-CF4-E008-00336-37); Exhibit 62 (R. White Dep. Tr. 250-51).

**82.**     On November 15, 2008 (a Saturday), Randy White held a secret meeting among himself, Robert Smith (Jaxon's future CFO), Charles Rettig, Corey White, and Scott White at L-3's North Lab to discus Jaxon – Jim Youngman and Kelly Rice were also invited but did not attend. Exhibit 53 (L3-002866); Exhibit 62 R. White Dep. Tr. 205-216.

**83.**     Randy White and Scott White met with Serco in early December (while both were still L-3 employees) to discuss what Jaxon could do for Serco in the HEMP-testing and maintenance arena in general and for sites at ████████████████████. Exhibit 62 (R. White Dep. Tr. 232, 241-47.

**84.**     Chuck Rettig acknowledged that L-3's cost and pricing information is proprietary to L-3. Exhibit 74 3/17/2014 C. Rettig Dep. Tr. 38:8-39:18.

**85.**     When Randy White left L-3's employ, he did not destroy any L-3 information or documents (including confidential matters) he kept on his home computer, nor did he tell anyone at L-3 he was retaining such materials. Exhibit 62 (R. White Dep. Tr. 61-64).

**86.**     The materials Randy White retained from L-3 included funding information starting in 2008 for ████████████████████████████ (Exhibit 62 (R. White dep. Tr. 85-86); Exhibit 79 (JAXD-CH3-E007-00112, R. White Dep. Ex. 12); Exhibit 1, FTI Decl.); and a collection of site surveys with estimated costs, which provided specific information as to what work was both needed and completed, and provided valuable lessons learned. Exhibit 62 R. White Dep. Tr. 91-93 and Dep. Ex. 14 (JAXHD-CH3-E010-00002).

**87.**     Indeed, Randy White arranged to attend a site survey in August 2008 for ████████████ (after Randy has already formed Jaxon and had so informed Serco's Don Eich) under the guise of assessing work for L-3 that would materialize in 2009 – and L-3 paid for that trip. Exhibit 62 R. White Dep. Tr. 136-142; Exhibit 53 (L-3 -1321543, R. White Dep. Ex. 19).

**88.**

**F.     Randy White, Scott White And Others Create A Turn-Key HEMP-Testing And Maintenance Operation Using L-3 Materials And Information**

**89.**     As of January 4, 2009, Scott White was an officer for Jaxon, an L-3 competitor, while he simultaneously worked for L-3 performing HEMP-related work. Exhibit 79 (JAXH-CH3—E007-00122); Exhibit 54 (JAX-0054807-08); Exhibit 62 (Randy White Dep. Tr. 269, 273-280).

**90.**     By early January 2009, Jaxon had completed what it called its "Initial Talking Papers." Exhibit 79 (JAXHD-CH3-E007-00185-214, R. White Dep. Ex. 41). That document took and used photographs of L-3 employees (including Scott White) performing work at government facilities directly from an earlier L-3 presentation. *See* Exhibit 79 (JAXHD-CH3-E006-00044 L-3 briefing

31

on repairs done at ████ AFB, which was one of the sites Jaxon referenced in its Initial Talking

Papers)   These talking papers were designed for Serco, Inc., a government contractor headquar-

tered in Virginia. In these Talking Papers, Jaxon advertised experience and capabilities it did not

have at the time. Rather, Jaxon was exploiting L-3's experience when they discussed "we" being

Serco's first task order, being with Serco from the beginning in 1996, and being the only team in

the world authorized to perform certain repairs. Exhibit 62 (R. White Dep. Tr. 290-296). Moreo-

ver, Randy White obtained the information contained in these Talking Papers while he was acting

as an L-3 employee. *Id.* at 297.

91.     On January 15, 2009, Scott White compiled a list of materials needed to build a complete

set of L-3 HEMP-testing equipment, complete with manufacturer, part number, and price, and

send that list to L-3's Debra Bailey, copying both Rice and Youngman. Exhibit 53 L3-034412.

The list also contains an itemized description of parts for L-3's custom pieces of equipment, such

as the pulsers, controllers, and CWI components under the title "Parts list for 'L-3 Custom' Piec-

es." *Id.* Scott White sent a completed L-3 DSP-73 export license to his home email address on

April 1, 2009, which contained a copy of the materials he sent to Debra Bailey a few months be-

fore. Exhibit 53 (L3-041921). Scott White had a comparable list while he was at Jaxon in Decem-

ber 2009, but changed part of it to read "'Jaxon Custom' Pieces." Exhibit 79 (JAXHD-CH3-

E001-00005). Scott sent this "revised" list to Kelly Rice, Randy White, and Jim Youngman not-

ing that he wanted Rice and McClure to review but warned them "████████████████████

████" *Id.* Kelly Rice readily admitted that the only difference between the two lists was that Scott

White added Jaxon's name to it. Exhibit 66 (K. Rice Dep. Tr. 280:16-281:19). Rice also recog-

nized that it would be wrong for Jaxon to use L-3 materials as a template, and it was not some-

thing he would have done. *Id.* at 282:1-21.

**92.**     At the end of January 2009, Randy White arranged to have Scott White leave his post on an L-3 job site on a government facility (and while being paid an L-3 salary) to escort Randy and others to conduct a site survey for a project on which Jaxon planned to bid, because Scott White had the appropriate security clearance. Exhibit 54 (JAX-0059530); Exhibit 62 (R. White Dep. Tr. 315-321).

**93.**

**94.**     On February 13, 2009, Susie Rettig sends Corey White a cost proposal for Jaxon's proposal 09-001. Exhibit 54 (JAX-0014091-2, with attachment). Exhibit D of the attached spreadsheet still bears "L-3 Services, Inc." in the top left cell – which Susie Rettig forgot to remove. *Id.* That the L-3 name appears in this spreadsheet is not surprising since the metadata shows it was authored by L-3's David Merewether, but last modified by Susie Rettig. *See* Exhibit 92 (Advanced Discovery Decl. attachment). Core Rettig also forgot to remove the "L-3 Services, Inc." reference when he sent a similar version to the Air Force on June 26, 2009. Exhibit 54 (JAX-0017195-6, with attachment), Exhibit 92 (Advanced Discovery Decl. attachment).

**95.**     On March 2, 2009, Scott White sent Randy White by email a number of technical responses L-3 prepared for earlier task orders on which L-3 bid. Exhibit 54 (JAX-0029778, with attachments).

**96.**     A number of spreadsheets Jaxon used in its proposals for the initial task orders all started out as L-3 documents. For example, a cost proposal for Jaxon project 09-001 (L3-494198), was authored by L-3's David Merewether, as were the cost proposals for Jaxon project 09-002 (L3-579982) and Jaxon project 09-004 (L3-554306). *See* Exhibit 92 Advanced Discovery Decl. at-

tachment. Jaxon's Bid Rates Form #1 (L3-554316), and Jaxon Estimated Overhead V1 (2) (L3-554317) were authored by L-3's Mike Bell. *See id.*[6]

97.     On March 11, 2009, Scott White sends an email received at L-3 regarding the status of various sites needing testing – specifically, the Air Force was informing that a particular site was closing so there would be no need to include that site on future proposals. Exhibit 54 (JAX-0014617). Scott then forwards that email from his home email to Randy White and Corey White, exclaiming " ███████████████████████████████████ " *Id.*

98.     On March 11, 2009, Joni White submitted Jaxon proposal 09-001 to Serco for its Task Order 9030. Exhibit 85 (JAX-0000493-529).[7] Although Jaxon at the time had only Joni White, Corey White and Randy White as employees, the Technical Proposal on page 1 (JAX-0000508) nevertheless states that:



99.     Under the "Experience" section, the Technical Proposal continued:

---

[6] These documents bear an L-3 Bates prefix because were on the L-3 computer Susie Rettig used and not discovered until after L-3 terminated her employment and retrieved that computer from her at the end of 2009.

[7] This Jaxon proposal and its corresponding statement of work, and the other proposals with their statements of work, are set forth in their own exhibits rather than being part of the larger exhibit that contains all of the JAX documents. Defendants did not produce the final versions of each proposal and statement of work in a complete or coherent manner, and thus L-3 had to cobble complete proposals form documents produced by Jaxon, the Air Force, and Serco.



**100.**     Throughout the proposal, Jaxon references various positions such as Chief Scientific Advisor, VP Engineering another positions, and specifically references John McClure as one of the Senior Test Engineers and Scott White as the VP of Maintenance, despite Jaxon not having any of these positions and the individuals referenced were actually working for someone else. *Id.* at JAX-0000508-09. The proposal throughout also references Jaxon's "experience" with the particular site and the tasks at hand, even though at the time Jaxon wrote and submitted this proposal, "Jaxon" had no such experience.  *Id.*

**101.**     The technical proposal at page 21 (JAX-0000528) states that in order to perform the work required in the task order "

." The GFE referenced here are the materials Scott White had obtained and stashed at L-3's North Lab facility.

**102.**     The Jaxon proposals also contained a significant amount of detail about the particular sites that was not included in the statement of work submitted with the requests for proposal. *See, e.g.,* Exhibit 54 (JAX-0014324-30, providing statement of work for Task Order 9030, responded to in Jaxon proposal 9-001), and compare with JAX-0000509-23, describing in detail of the work that Jaxon planned to do , based on past test results and inspections – information that Jaxon did not get through performing its own site survey at all of the sites referenced in the statement of work.

Exhibit 62 (R. White dep. Tr. 489-533). For example, the statements of work for site 5 provides

no detail at all about that site.  JAX-0014328. Yet Jaxon's proposal identifies that the facility had

been ████████████████████████████████████████, thee are descrip-

tions of the buildings at the site, how many hardened doors were at the site, and the types of cabi-

nets that were in the buildings. JAX-0000516. Randy White testified that he had committed all

that knowledge to memory and did not rely on any materials about the sites that he had retained

from L-3. Exhibit 62 (R. White Dep. Tr. 512-513, 544-551). Elsewhere in his deposition Randy

White admitted that he did have some reference materials that had been created while he was at

L-3 and that he kept when he left L-3. *Id.* 539-542. Randy White also admitted that his plan was

to bid work that exceeded the scope of work in the statement of work. *Id.* at 533.

**103.**     Other proposals Jaxon submitted contained similar language regarding "Jaxon's" experi-

ence, its needs to complete the task orders on which it was bidding, and extensive detail obtained

without an official site survey.  For example, for proposal 09-002 (Exhibit 86 the experience and

organization sections are at JAX-0000671-74 (including references to work JEM personnel had

performed at this site nine years earlier and how earlier designs by a "JEM Program Manager"

had proven to be very effective), and the specific site detail is at JAX-0000676. The statement of

work, which contains no detail about the site, is at Serco.L-31:003280-83. For Proposal 09-003

(Exhibit 87 the experience and organization section is at AF-002534-35, site detail is at AF-

002538-544, and a request for technical data about the site is at AF-002548. The statement of

work, which contains no detail about the site, is at Serco.L-31:001286-89. For Proposal 09-004

(Exhibit 88), the experience and organization sections are at JAX-0000627-28, site detail is at

JAX-000629-30, and a request for the North Lab stash materials is at JAX-0000637-38. The

statement of work, which contains no detail about the site, is at Serco.L-31:002182-85.

**104.**    Susie Rettig admitted to working for L-3 and Jaxon at the same time throughout 2009, doing the same work for each. Exhibit 63 (S. Rettig 3/18/14 Dep. Tr. 318); Exhibit 62 (R. White Dep. Tr. 372-374).

**105.**    Between December 2008 and June 2009 when Jaxon was preparing and submitting proposals to Serco for the initial task orders, Scott White emailed from his L-3 email account to his personal email account or to his brother Corey White several hundred scanned and electronic L-3 proprietary business documents for Jaxon's use, which included forms, vendor quotes, invoices, and purchase orders for materials Jaxon would need to use for testing and maintenance projects – all of which saved Jaxon enormous time and effort in having to research all of this information to include in proposals for the initial task orders. Scott sent some of these materials within days of receiving them at L-3. Exhibit 53, L3-046417, L3-046417, L3-036473, L3-036468, L3-036460, L3-036463, L3-044064, L3-034196, L3-034046, L3-033115, L3-032623, L3-032555, L3-032861, L3-032362, L3-032145, L3-032052, L3-030929, L3-030711, L3-030550; L3-035156 , L3-034422, L3-044064, L3-034196, L3-034087, L3-034046, L3-033305, L3-033154, L3-033055, L3-032623, L3-032591, L3-032555, L3-032861, L3-032145, L3-032052, L3-030929, L3-030711, L3-024823, L3-042268, L3-041921, L3-002933, L3-039756; Exhibit 54 (JAX-0057345, JAX-0000332, JAX-0057345, JAX-0057350, JAX-0057389).

**106.**    On May 15, 2009, Scott White sent to his personal email address multiple pictures of work being done at various government facilities Exhibit 53 (L3-040626, L3-040621, L3-040617, L3-040609, L3-040591).

**107.**    In early May 2009, Randy White was communicating directly with an Air Force repre-

sentative discussing what might be an appropriate amount for an upcoming testing project. In that

email, Randy White says that "███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████" Exhibit 54 (JAX-0056096). The "boys" were Jim Youngman and John

McClure, even though neither one of them worked at Jaxon. Exhibit 62 (Randy White 3/25/14

Dep. Tr. 399:25-401:2). Randy White acknowledged that he was incapable of performing HEMP-

testing himself – he needed others in order for Jaxon to actually do any testing.  *Id.* at 404.

**108.**    On May 8, 2009, Randy White sent to the other two Jaxon employees and Scott White

(who was still working for L-3 at the time) a list of 13 proposals that Jaxon had either completed

or was currently working on, but had not yet been awarded, with an approximate value of $38.22

million. Exhibit 79 (JAXHD-DF4-E008-00005); Exhibit 68 (Jaxon Rule 30(b)(6) Dep. Tr.

5/13/2014 361:23-362:9).

**109.**    In the beginning of June 2009, Randy White reached out to Mike Stella at Serco with in-

formation Jaxon had gathered about some of the products Jaxon was to use on upcoming projects.

The information had actually been gathered by Scott White in February 2009 while he was at L-3,

and under the guise of seeking special L-3 pricing for L-3. Exhibit 54 (JAX-0045439 at 440).  Af-

ter obtaining the L-3 price for these products, Scott White sent this information on to his father at

Jaxon. *Id.*  When sending this information on to Serco, Randy White tried to cover his tracks by

telling Stella "Mike. Please burn this message once you download the PDFs. It's from my son to

me." *Id.* at 45439. Stella readily agreed: "Will do." *Id. See also* Exhibit 76 (S. White Dep. Tr.

332-33, 338, acknowledging that the Cortec coating materials were used by Jaxon support of its

proposal to Serco, and that he gathered these materials while he still an L-3 employee).

**110.**     On June 10, 2009, Jaxon updated its "Executive Summary Business Plan." Exhibit 54 (JAX-0045182). The second page of this presentation shows a series of photographs of work being done on government facilities. The photograph in the bottom left corner is of Scott White, but the photo has been manipulated to remove the Jaycor logo that appeared on his shirt because this is a photo of him doing work for L-3 and not Jaxon, as the photo array suggests. *Id.*  at JAX-0045183; Exhibit 62 (R. White Dep. Tr. 290-291, admitting he "airbrushed" the logo off of Scott White's shirt). (This photo collage also appears in Jaxon's January 2009 "Initial Talking Papers, Exhibit 79 JAXHD-CH3-E007-00185 at 186). The fourth page has two photographs of men on ropes working on a radar face, one with "2001" on it and the other with a "2009" on it. *Id.*  at JAX-0045185. The text implies that these too are photographs of Jaxon employees currently doing Jaxon work. But Jaxon as of June 2009 had no such employees and had performed no testing or maintenance work. Indeed, Jaxon employee Shane Meredith recognized himself in the "2009" photo, acknowledging that in June 2009, both he and John Janish, the person on the radar face with him, were both L-3 employees. Exhibit 78 Meredith Dep. Tr. 208:20-209:22.

**111.**     The second page of the Business Plan, and photos on pages 4 and 24 come directly from an L-3 presentation authored and retained by Randy White. *See* Exhibit 54 (L3-790566 at pp. 1, 9, and 34). Indeed, on page 1, the Jaycor logo on Scott White's shirt is clearly visible.

**112.**     On June 26, 2009, Randy White needed Jim Youngman's help in preparing a proposal for a test of ███████████████████████, and forwarded the RFP paperwork from Serco to Youngman's wife's email address (directing her to give it to her husband), as Youngman was still working for L-3 at the time. Exhibit 54 (JAX-0030477). For example, Randy wanted

Youngman's input on the number of people to propose, the number of trips, and what kind of materials Jaxon would need. *Id.*; Exhibit 58 (1/15/13 PI Hearing Tr. 175 (Youngman noting that Randy White was asking for his recommendations as to what to put in the proposal). Youngman responded and provided L-3's competitor with over 11 pages of detail interpreting the proposal, including the statement of work, and what should include in Jaxon's response. Exhibit 54 (JAX-0020625, with attachments, Youngman Dep. Ex. 33).

**113.** In the beginning of July 2009, Serco sent Susie Rettig at her L-3 email address a request a rough order of magnitude for HEMP testing at ███████████ . Ms. Rettig then immediately forwarded that email and its attachments to Randy and Corey White at Jaxon, stating "███████ ████████████████████████████████████████████████████████ Exhibit 54 (JAX-0036279, S. Rettig Dep. Ex. 45). Ms. Rettig also worked on an L-3 proposal for the same project. Exhibit 53 (L3-624877, S. Rettig Dep. Ex. 52) Once caught, Ms. Rettig later confessed at her deposition that she should not have sent these materials to Jaxon, but she never told anyone at L3 that she had sent the materials to a direct competitor on the same project. Exhibit 63 (S. Rettig Dep. Tr. 287:7-289:22, 297:3-298:16).

**114.** Two weeks after Susie Rettig sent Randy White the L-3 email from Serco, Randy White directed Chuck Rettig to delete the email communication from his end, as Randy had done from his end. Exhibit 79 (JAXHD-DF4-E008-00447, S. Rettig Dep. Ex. 47). Chuck Rettig commented that his wife was concerned that L-3 could tracking their actions since they were using an L-3 computer. *Id.*

**115.** Prior to July 2009, when Jaxon received its first award from Serco, Jaxon had only two or three employees: Randy White, Corey White, and possibly Joni White. Exhibit 75 (C. White Dep.

Tr. 110:17-111:8).

**116.**   On September 9, 2009, Randy White sends various Jaxon personnel a number of L-3 cor-

porate plans and directs their use for creating similar Jaxon corporate plans. Exhibit 54 (JAX-

0030295, with attachments). Randy White testified that he simply renamed them "JEM" plans;

and had kept these from L-3 and never asked permission to either retain them or use them for any

purpose. Exhibit 62 3/26/2014 R. White dep. Tr. 627:24-629:17.

**117.**   On September 11, 2009, Jim Youngman warned John McClure "Try not to make any of

the pulsers look like what is claimed in the attachment," which was a copy of the '989 patent. Ex-

hibit 80 (PJAX-01196927-0001).

**118.**   On October 21, 2009, Youngman sends an email to other Jaxon employees, including

Randy and Scott White, citing a "wealth of information" from "our old employer" warning the

recipients to "please hold the later close and do not distribute further." Exhibit 54 (JAX-

0060349).  The materials Youngman wanted his co-conspirators to "hold close" were emails

Youngman received while he was at L-3 (and which he must have retained) that explained certain

types of work that had performed, and which Youngman thought would be helpful in formulating

Jaxon's maintenance plan. *Id.*; Exhibit 54 (JAX-0060389, 0060402, 0060445).

**119.**   At the end of November 2009, Jaxon had put together two full sets of PCI testing equip-

ment, which included 1K, 5K, and E2 pulsers, and corresponding controllers. Exhibit 79

(JAXHD-CH3-E001-00036, with attachments). The Red 5K pulser was substantially similar to

one of L-3's designs, and used ███████████████████████████████

██████████████████████████████████ L-3. Exhibit 32 Crain Decl. ¶ 47. ████

████████████████████████████████ just like L-3's. *Id.* And the pulser

container appears to be a large metal cabinet, similar to the one L-3 uses. *Id.* Jaxon's black 5K

pulser appears to be in a cabinet that is a bit smaller than the one L-3 uses. *Id.*

**120.**   The Red 1K pulser ███████████████████████████████, just like

L-3's 1K pulser.  Exhibit 32 Crain Decl. ¶ 46 The Red E2 pulser was identical to L-3's except that

Jaxon used ████████████████████████████████████████████████

███████████. *Id.* Each of L-3's and Jaxon's controllers ████████████████████

████████████████████████████. *Id.*

**121.**   On December 8, 2009, John McClure passed on to Scott White an update on what they

had spent thus far on building HEMP-testing equipment. Exhibit 54 (JAX-0031260, 31261). The

attached "Test Purchases Matrix" contained no entries indicating that they had purchased and re-

ceived any ██████████████. *Id.* Indeed, there were no entries indicating that they were even

using any ███████████████████. The only entry for ██████████████████████,

of which they were not even expecting delivery until the end of January 2010. *Id.* Ultimately,

Jaxon did order ██████████████████████ which were shipped on Dec. 7, 2009, after

Jaxon had already built its two 1k pulsers. Exhibit 82 (CSI 000027).

**122.**   Jaxon, through one or more of its employees, actually stole from L-3 the ████████████

in the 1K pulser. Photograph DSC00024 from one of the hard drive shows a ██████████████

██████ built and shipped in January 2002. This manufacturing and delivery date match an or-

der that L-3 had placed. Exhibit 32 Crain Decl. ¶ 46. The ██████████ shown in the red 5K pulser

are the same ones that L-3 uses in its 5K pulser ██████████████████ and cost approximately

██████ in 2010.  These ██████████ are manufactured to order, CSI has no record of making or deliv-

ering these types of ██████████ to Jaxon, and Jaxon has no record or financial entry corresponding

to purchasing any of these ███████. Exhibit 32 Crain Decl. ¶ 44 (explaining manufacture to or-

der); Exhibit 82 CSI 000001 (noting that CSI sold Jaxon only a ███████ capacitors), CSI

000017 (noting that the particular part number was "especially made for our customer [L-3]");

Exhibit 100 (Jaxon financials from 8/09 through 11/09, showing no entry for purchasing ███████

███ for the 1K or 5K pulsers). L-3 purchases its ███████ with the intent that they will be used

by L-3 and L-3 did not give Defendants permission to take any of its materials; nor has L-3 sold

any surplus ███████ into the secondary market.

**123.**    On December 9, 2009, John McClure bragged to Scott White that "███████████

████████████████████████████████████████

███████████." Exhibit 79 (JAXHD-DF4-E005-0001). McClure explained that

they could do a PCI test as of that day; they had two 5K pulsers, two 1K pulsers, an E2 pulser,

and all the cabling, probes and software they would need. He makes mention that any of the puls-

ers are merely non-working or non-useable prototypes. *Id.*

**124.**    Between October and December 2009, while he was an L-3 VP and CTO, an L-3 consult-

ant, and a concurrent Jaxon consultant, Jerry Lubell sent to his personal email address: an October

2009 proposal to ███████ for HEMP-testing and technical assistance management (Exhibit 54 (L3-

969783)); December test data and test locations for a ███████ (*id.* at L3-1319062); and a De-

cember internal L-3 proprietary briefing excerpt (*id.* at L3-935528, with attachment).

**125.**    In early 2010, Jaxon launched its website, www.jaxon-em.com. Exhibit 54 (JAX-

0044589). On that website, Jaxon makes false representations, such as "JAXON maintenance per-

sonnel have years of experience in the following areas…" *Id.*  Additionally, the website includes

a photo of "face walking" in the course of performance of work on an L-3 contract task. *Id.* Fi-

nally, Jaxon's website indicated "Patents are pending on our pulsers and STE components." Exhibit 54 (JAX-0044592).

**G.      Jaxon And Its Employees Use L-3's HEMP-Testing Software As A Guide For Jaxon's Software, Then Youngman (Unsuccessfully) And Mcclure (Successfully) Try To Erase The Most Incriminating Evidence**

**126.**      On October 9, 2009, John McClure sent Tim Farajian a version of L-3's BADDAS source code and other files, telling Farajian "Here is the BADDAS source code in VB, check it out this is similar to how I want the code to function. I will send the data reduction next week for PCI and some requirements." Exhibit 81 (Farajian-00003, with attached zip file). Included in this zip file McClure provided Farajian were various versions of BADDAS executable and source codes (*e.g.*, BADDAS30.exe, baddas30.vbp, BADDAS90.exe, baddas.vbp); instruction documents identifying the changes between various versions of BADDAS (*e.g.*, Changes for BADDASv30.doc); and various other related documents. *Id.*

**127.**      About a week later, John McClure sent Farajian more L-3 proprietary software, and instructions on how to use it: "Here is the PCI data reduction source code and CUCU executable with explanation how to set up". Exhibit 81 (Farajian-0052, with attachments).  The attachments to this email included a detailed explanation how to set up and use L-3's CUCO software, and multiple versions of both executable and source code for CUCO (*e.g.* CUCO-v1.31.exe, CUCO-1.36.vbw); a text file noting a computer folder pathname with a subfolder titled "Docs-JaycorSourceCode-LatestOnly ("CUCO-v1.36.vbproj.FileListAbsolute.txt" ); a version of the easyplot software L-3 used (*e.g.*, epw32.exe, epw32.inn); a version of L-3's PulseDat software (pulsedat2G.exe), and instructions on how to use this upgraded version (readme.doc); various data files (*e.g.*, C1001.403; B2041.A07); and input files for PulseDat (filelist.csv). *Id.*

**128.** On October 22, 2009, John McClure sent Farajian various versions of L-3's BADDAS software. Exhibit 81 (Farajian-00210, with attachments); Exhibit 81 (Farajian-00212, with attachments).

**129.** Also on October 22, 2009, Jim Youngman had a conversation with Tim Farajian to discuss how he (Youngman) wanted out of Jaxon's data acquisition code (to be called JEMDAQ) that Jaxon would need to conduct various forms of HEMP-testing. In an effort provide Mr. Farajian with a bit more detail, Mr. Youngman created a "specs" document for the yet-created code, and sent it to Farajian and John McClure the next day. Exhibit 81 (Farajian-00215, with attached zip file and metadata showing that the file titled "JEMDAQ description ver1.docx" was created on 10/22/2009).

**130.** In that "specs" document, Youngman states that "JEMDAQ is based on other DAQ codes, but must be unique to JEM. Remove any evidence of pedigree. … Again, make it unique to JEM and avoid any resemblance to other codes." *Id.* at Farajian- 222, p. 1. Throughout the "specs" document, Youngman directs Farajian to "Run BADDAS to see what I mean," (*id.*); and instructs Farajian as to other characteristics of BADDAS, which could only have come from running the program: "there should be no need to have a block to type in a new directory nor a 'Make a New Folder' as in BADDAS" (*id.* p. 4); "That is, the user does not have to enter a suffix (as with BADDAS)" (*id.* p. 5); and "PLOT OPTIONS (called PRINT OPTIONS in BADDAS)" (*id.* p. 6).

**131.** By telling Farajian to "remove any evidence of pedigree," he was referring to using L-3's code. Exhibit 58 (1/15/2013 PI Hearing Tr. 218:6-11) (Youngman).

**132.** In his October 23, 2009 email to Farajian enclosing the "specs" document, Mr. Youngman clearly contemplated using L-3's proprietary codes as the bases for Jaxon's code (hence the direc-

tions to remove any evidence of pedigree and avoid any resemblance to other codes). Exhibit 81 (Farajain-00215). He tells Farajian that he could "run BADDAS20k," and try to import into an updated version of visual basic. He also tells Farajian that "the BADDAS source codes John provided are older than the 20k version," yet while he had trouble getting the BADDAS code to upgrade, Youngman was successful in upgrading another L-3 code, BUTTER. He directs Farajian to "steal this part of the code [frequency-domain plotting] from BUTTER if you can't get BADDAS to upgrade. *Id.* at Farajian-00216. Finally, Youngman directs notes that even if Farajian determines it is easier to "start fresh" than to modify BADDAS, they all could "us[e] the existing BADDAS code to provide examples to guide implementation" and "Of course, the BADDAS code would be used to provide code examples on how to communicate with the instruments (via GPIB) and some of the other functions, like plotting data." *Id.*

133.   Attached to Youngman's Oct. 23, 2009 email to Farajian was a zip file with a plethora of L-3 software and executable codes, instructions, and data files acquired using L-3 software. Exhibit 81 (Farajian-00215 with zipfile list). For example, the zip file contained various data files taken with BADDAS (*e.g.*, A2074.407; B1067.407; S023.814);[8] an executable version of BADDAS (BADDAS20k.exe); an executable version of BUTTER (butter.exe); various versions of BUTTER source code (*e.g.*, Butter.vbp, Butter1b.vbw); and various log and form files relate to BUTTER. *Id.*

134.   Two weeks after Youngman's comprehensive email to Farajian, McClure sent Farajian yet

---

[8] The suffixes for these files (which can be opened in Notepad) indicate the date on which the data was collected. Thus, for example, A2074.407 indicates the data was collected on April 7, and for this particular file, it was 2009. Crain Decl. ¶ 15 (explaining the suffix for BADDAS data files); Exhibit 91 Advanced Discovery Decl. attachment (explaining that the date on the file listing for Farajian-00215 shows the date of this file to be 4/7/2009).

another version of BADDAS. Exhibit 81 (Farajian-00304, with attachments). The enclosed zip file contained multiple additional versions of BADDAS executable and source codes (*e.g.*, BADDAS31.exe, BADDAS40.vbp, BADDASv20.vbp, baddas31.vbp); various instructions on how to use some of the software (*e.g.*, Data Reduction CWMS.doc, Operating Instructions for Baddas.doc); and other related files. *Id.*[9]

135.    John McClure admitted to taking L-3's software and multiple other files when he left L-3 in April 2008, moving those files over to his Jaxon laptop over a year and half later, and then giving L-3 software files to Mr. Youngman. Exhibit 64 (McClure Dep. Tr.) at 373:2-23 (explaining that he kept a separate hard drive onto which he backed up his entire L-3 computer); Exhibit 61 (Feb. 12, 2014 Motions Hearing Tr.) at 17-19 (same), 66:1-16 (McClure explaining how Youngman got L-3 software files from him).

136.    At the preliminary injunction hearing on January 15, 2013, Mr. Youngman testified that at the time he left L-3's employ on August 18, 2009, he had a hard disk at home with some L-3 information that he later destroyed because he had no working relationship with anyone at L-3, but he had retained no copies of L-3's software. Exhibit 58 (1/15/2013 PI Hearing Tr. 170:3-9). Mr. Youngman admitted to receiving copies of L-3's software from Mr. McClure. *Id.* at 170:13-19. Mr. Youngman further asserted that he did not retain anything that belonged to L-3. *Id.* at 171:15-17. He stated that he received the L-3 software code sometime between August 18, 2009 and sometime in October 2009. *Id.* at 212:7-25.

---

[9] McClure apparently deleted all of these highly incriminating emails in which he sent Farajian the L-3 software and other materials. Indeed, once L-3 obtained and examined his computer drives, we found that none of the L-3 software or the incriminating Farajian emails remained, but the non-incriminating emails were easily discovered.

**137.**     However, on September 22, 2009, Jim Youngman reached into his L-3 "archives" [that is, his hard drive containing L-3 materials] to dig up earlier messages he had concerning an L-3 opportunity at ███████████████████; he did so in response to a current (9/2009) solicitation from ██████. Exhibit 80 (PJAX-03665648).  And on October 22, 2009, Mr. Youngman forwarded an email chain to L-3's David Kleeberg, noting he was able to "check into an old email archive." Exhibit 53 (L3-059194, Youngman Dep. Ex. 21). During his deposition, Mr. Youngman acknowledged he had kept a hard drive with L-3 materials on it so he could help out his L-3 colleagues in the future. Exhibit 77 Youngman Dep. Tr. 240:1-244:12. Indeed, Youngman actually backed up his L-3 computer to that hard drive on August 12, 2009, less than a week before he left L-3's employ. Exhibit 1 FTI Decl. (noting when Youngman backed up his L-3 computer to his external drive).

**138.**     Youngman had BADDAS data files on his computer that had been created on April 7, 2009, A2074.407; B1067.407, which he could not have received from John McClure's hard drive as Mr. McClure left L-3's employ in April 2008.  Exhibit 32 Crain Decl. ¶15 (explaining the suffix for BADDAS data files); Advanced Discovery Decl. attachment (explaining that the date on the file listing for Farajian-00215 shows the date of this file to be 4/7/2009).

**139.**     Also at the preliminary injunction hearing, Mr. Youngman confessed that it was inappropriate for Mr. McClure to have sent Farajian the L-3 software files, and inappropriate for him (Youngman) to be aware of it and not do anything about it. Exhibit 58 (1/15/2013 PI Hearing Tr. 211:10-15). And it was inappropriate for him to use BADDAS to de-bug Jaxon's software. *Id.* at 259:12-260:4.

**140.**     In early January 2010, Youngman used the BADDAS software. Exhibit 58 (1/15/2013 PI

Hearing Tr. 247:22-25); Exhibit 81 (Farajian-00719, with attached data files taken with both BADDAS and JEMDAQ). Exhibit 58 (1/15/2013 PI Hearing Tr. at 258:4-259:7) (admitting to using BADDAS to fix bug problems with JEMDAQ). The data file attached to Youngman's email, A1001.113, is a BADDAS data file taken on January 13, 2010. *Id.* at 250-251. Youngman used BADDAS while performing a PCI test for one of Jaxon's customers, ██████████. Exhibit 77 (Youngman Dep. Tr. 369:7-371:7 (referring to Dep. Ex. 47, Farajian-00719, with attached data files, "Okay, it [BADDAS] was used during a ██████████ test to acquire a piece of data because we had issues with either our JEMDAQ code or the scope, ….")).

**141.**    Jaxon used data collected through BADDAS in presentations made to customers. For example, in an April 2010 PCI Test Plan prepared for ██████, Jaxon included graphs purporting to show 1K and E2 pulser calibration shots from January 2010. Exhibit 54 (JAX-0045906 at 45929, 45930, and 45934). Each of these calibration files depicted graphically contain a .105 suffix, which is the BADDAS extension noting the data were collected on January 5.  Exhibit 77 (Youngman Dep. Tr. 370 noting that the data file with a .113 was a BADDAS data file from January 13); Exhibit 32 Crain Decl. ¶ 15 (explaining that the BADDAS/CUCO file naming construction, such that A1001.105 describes for channel A1, shot 001, taken on January 5). Jaxon claimed that it did not have a final data acquisition software until April 2010. Exhibit 101 (Jaxon Answer to Int. 15).

**142.**    Jaxon has also used L-3's CUCO software. One of Jim Youngman's hard drives, DF4-E001, contains a CUCO output file showing processed E1 and E2 pulser data from a PCI Acceptance test of a Tyco/CORCOM TECUL400B6 HEMP power filter insert. Exhibit 32 Crain Decl. ¶ 19. That output file, actually titled "CUCU test-Output.csv" identifies individual shots

collected with what appears to be Jaxon's data acquisition software, as it contains the .jdf suffix. *Id.* The file also contains a column titled "PostPulseDatTitle," which indicates Defendants also used L-3's Post-Pulsedat software. *Id.*

143.    Indeed, Jim Youngman had numerous software and data files on an external drive that he tried to delete long after this litigation started, and presumably long after his lawyers told him not to destroy evidence. The Youngman drive identified as ND1-E001 contained over 3500 files in its Recycle bin folder. That folder contained various versions of L-3's BADDAS, BUTTER software, both executable and source code; thousands of BADDAS data files, taken both before and after Youngman left L-3's employ (*e.g.*, A1001.113 [2010], B1067.407 [2009], S0021.727 [1999]); various reference folders from L-3 containing descriptions of L-3's HEMP-testing equipment and design and data reduction tutorials (*e.g.*, EM Field Attenuation of CMAS.pfd, EME HEMP TEST PACKING LISTS V2 APR09.pdf, cwms data reduction.ppt, cwms design mem1.ppt); and numerous other files that appear on L-3's servers indicating that this is the drive Youngman backed his L-3 computer to the week before he left L-3. Exhibit 32 Crain Decl. ¶ 24; Exhibit 1 FTI Decl. ¶ 14 and Exhibit 10 (listing the files from Youngman's Recycle bin on DF4-E001).

144.    Significantly, on October 16, 2011, Youngman attempted to delete the BADDAS and BUTTER software files, some of the data files showing that Youngman had used BADDAS in January 2010, the JEMDAQ PRELIM JUNK.zip file he had sent to Farajian in October 2009, and two folders titled simply "SRC CODE," which contained other versions of BADDAS source code, executable, and data files. Exhibit 1 FTI Decl. At that point, the instant litigation had been going for almost a year, all of the Defendants were under an obligation not to destroy relevant ev-

idence, and L-3 had moved to compel production of the Defendants' hard and external computer drives because Defendants had refused to produce all relevant materials responsive to L-3 first three sets of document requests.  *See* Doc. No. 89, filed Sept. 7, 2011.[10] [11]

### H. Other L-3 Documents Defendants Refused To Produce In Discovery, But Were Subsequently Found On Defendants' Computers

**145.** Jim Youngman's drive DF4-E009 contains numerous photographs detailing the construction of an L-3 5k pulser and the instruments used for CWI testing. Exhibit 32 Crain Decl. ¶ 37.

These photographs provide enough detail that the Defendants could use them to reconstruct a sim-

---

[10] Defendants opposed L-3's motion to produce the hard drives, arguing, ironically, that there was no justifying such an intrusive and drastic request. *See* Doc. No. 108 p. 13-14.

[11] As this Court is aware for the preliminary injunction hearing, Defendants hotly contested and flatly denied L-3's allegations that they (Defendants) stole and used critical HEMP-testing software that L-3 had developed and considered to be proprietary – such as BADDAS and CUCU. And as the Court is aware from the preliminary injunction proceedings, Defendants eventually changed part of their position (after L-3 obtain the Farajian emails) and Youngman testified at the Preliminary Injunction hearing that while he himself did not take any copies of L-3's software, he admitted that Defendant John McClure emailed him some copies of BADDAS, but only after he arrived at Jaxon.

In Defendants' Opposition to L-3's Motion for Preliminary Injunction, Doc. No. 413 – they took the audacious (and clearly untenable) position that:

> In addition, the evidence will show that, contrary to L3's assertions, Defendants do not have possession of BADDAS and Jaxon has not used BADDAS on any of the task orders that Jaxon has performed. Jaxon has used only its independently-developed Jaxon software, as well as commercial software. Doc. No. 413 p. 11.
>
> ***
>
> In addition, Defendants have located no copyof BADDAS within their possession and are not using it.  Doc. No. 413 p. 35

As the above evidence shows (including Jim Youngman's deposition testimony, which occurred after the Preliminary Injunction hearing) Defendants statements in their briefing to the Court were untrue, no matter how finely they parsed their language. Had Defendants been truthful and produced discovery in a timely manner, the preliminary injunction proceedings may have gone in a completely different direction.

ilar pulser. *Id.*

**146.**     Charles Rettig had on his computer a July 1, 2008 list of L-3 proprietary labor rates and

categories, which set L-3's competitive labor bid rates for the upcoming year. Exhibit 79

(JAXHD-DF4-E008-00298). Having these proprietary labor rates and categories allowed Jaxon to

use the same or similar categories and offer rates that Serco could then use (which it did) to later

justify awarding Jaxon task awards by comparing Jaxon's bids with L-3 "historical" bids rather

than actually allow L-3 to competitively bid the 2009 task orders. Indeed, Jaxon put together a

rate memorandum in August 2009 that used the same format, and almost all of the exact same la-

bor categories. *See* Exhibit 79 (JAXHD-DF4-E008-00914).

**147.**     In Defendant Scott White's hard drive, Identification No. F01949-1-CH3-E010, there are

file folders called "bird damage," "Day 1 – Site," "Soffit repairs," and "antenna" which contain

pictures at various sites, showing the configuration of the sites and repair work needed there.

With these pictures, Defendants would be aware of the extent of damages at the sites and, com-

bined with the addition of the information on the Rettig's computer, the cost and schedules re-

quired to fix them.  Having Plaintiffs' pictures gave Jaxon the understanding of the repairs needed

at certain sites so that Jaxon could prepare its proposals without having to expend their own funds

to travel to the sites themselves to uncover those repairs. Exhibit 32, Crain Decl. ¶ 38.

**148.**     Also found on Defendant Randy White's CH3-E007 drive are documents that originated

from L-3 that Jaxon modified to pose as Jaxon documents.  For example, the "███████████

███████████████████████████████████████████████" is an L-3 power point

presentation.  Exhibit 32, Crain Decl. ¶ 30. However, a modified version of this document is on

Defendant Randy White's CH3-E007 hard drive at the file called "███████████████████

██████████ ".  Id. The difference between the original L-3 briefing and Jaxon's is that Jaxon

has removed the name "Jaycor" from the top right of the presentation. *Id.*

149.    The Crain Declaration, Exhibit 32, and the FTI Declaration, Exhibit 1, contain additional

descriptions of L-3 materials found on Defendants' hard drives.\

## ARGUMENT

4. **Because the Undisputed Facts Show that the Former Employee Defendants Stole L-3's Confidential, Proprietary, and Business Information to Set Up a Turn-Key HEMP-Testing Organization and Directly Compete with L-3, L-3 Is Entitled to Summary Judgment on Its Breach of Contract Claims (Counts 8-11)**

### A.  Burden of Proof and Elements

L-3 seeks summary judgment for breach of contract against Defendants Randy White,

Scott White, Susan Rettig, James Youngman, Kelly Rice, John McClure, and Jerry Lubell, Counts

8-11 in the First Amended Complaint (Doc. No. 33), for which L-3 has the burden of proof.

*Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1057-58 (Colo. 1992).

The elements are: (1) the existence of a contract; (2) performance by the plaintiff or justi-

fication for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting

damages to the plaintiff.  *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.

1992).[12] "A motion for summary judgment is an appropriate context within which to interpret a

---

[12] The applicable agreements are subject to the laws of California (the Standard Contracts), New York (the Confidentiality Contracts), and Colorado (the Ethics Contracts).  Nonetheless, in de-termining which law to apply to the breach of contract counts, "unless there is an outcome deter-minative conflict between the potentially applicable bodies of law . . . the law of the forum is ap-plicable."  *Security Service Fed. Credit Union v. First Am. Mortgage Funding, LLC*, 861 F. Supp. 2d 1256, 1264 (D. Colo. 2012); *see also Employers Mutual Casualty Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1170 (10th Cir. 2010); *Wagner v. Discover Bank*, No. 12-cv-02786-MSK-BNB, 2014 WL 128372, at *2 n.2 (D. Colo. Jan. 13, 2014) ("[T]he Court finds that it need not resolve this question [of choice of law] because there is no outcome determinative conflict between Del-

contract as a matter of law." *Oberhamer v. Deep Rock Water Co.*, No. 06-cv-02284-JLK, 2009 WL 1193737, at *8 (D. Colo. Apr. 29, 2009).

Although, in establishing the existence of a contract, a party also must show that the contract was supported by consideration, "any benefit to a promisor or any detriment to a promisee at the time of the contract – no matter how slight – constitutes adequate consideration." *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011) (en banc).  Indeed, "[c]onsideration may take the form of forbearance by one party to refrain from doing something that it is legally entitled to do." *Id.* "Because an employer may terminate an at-will employee at any time during the employment relationship as a matter of right, its forbearance from terminating that employee is the forbearance of a legal right." *Id.* As such, the presentation of a confidentiality or other agreement to an at-will employee after his hire "is a renegotiation of the terms of employment that the employee is free to accept or reject," and the employee's continued employment constitutes adequate consideration for the agreement's terms.  *See id.* at 1063 n.2.[13]

_____

aware and Colorado law concerning the formation of contracts.").  Here, the elements of breach of contract actions are the same under Colorado, New York, and California.  *See Western Distributing Co.*, 841 P.2d at 1058; *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (Cal. 2011) ("elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff"); *Harris v Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (N.Y. App. Div. 1st Dep't 2010) ("The elements of such a claim include [1] the existence of a contract, [2] the plaintiff's performance thereunder, [3] the defendant's breach thereof, and [4] resulting damages").  Accordingly, Colorado law (the law of the forum) applies to all of L-3's breach of contract claims.

[13] Like Colorado, California and New York recognize that continued employment of an at-will employee is sufficient consideration for post-employment covenants.  *See, e.g. Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 223-24 (S.D.N.Y. 2013) ("[A]n at-will employee's continued employment can constitute sufficient consideration to support an enforceable contract.") (collecting cases); *Asmus v. Pacific Bell*, 23 Cal. 4th 1, 15 (2000) ("Just as employers must accept the employees' continued employment as consideration for the original contract terms, employees must be

**B.    The Undisputed Facts Show that the Employee Defendants Breached Their Confidentiality Obligations Under Multiple Contracts**

**Element 1**: **Each Defendant Entered into Multiple Confidentiality Contracts with L-3**

a.   L-3's Valid Contracts with the Employee Defendants

As all of the Employee Defendants were at-will employees who signed and agreed to clear and unambiguous contracts precluding them from disclosing any L-3 business or customer information to any individuals who did not need to know such information and requiring them to return all L-3 or client information upon termination, all had valid contracts containing such terms with L-3.  Indeed, Randy White, Scott White, Jim Youngman, John McClure, Jerry Lubell, and Susie Rettig all signed (1) the Standard Contract; (2) the Confidentiality Contract; (3) the Titan Ethics Agreement; (4) the L-3 Ethics Agreement; and (5) the Termination Certifications.  SOF ¶¶ 1, 3, 5, 7, 9.  Not one of the Employee Defendants disputes that these agreements exist or the terms contained therein.  *Id.* at ¶ 17.

Notably, Defendant Randy White admitted that he agreed to the terms contained in the Standard Contract, the Confidentiality Contract, the Titan Ethics Agreement, the L-3 Ethics Agreement, and to the obligations contained in the Termination Certification.  *Id.* at ¶ 13; *see also* Ex. 62 (3/25/14 Randy White Dep. Tr. 41:13-19) ("Q. So was it your understanding that these agreements bound you every day of the week, 24 hours a day, while you were an employee of JAYCOR, Titan, or L-3? . . . A. It would be my – that would be my personal opinion.").  Mr. White further testified that his obligations under the Standard Contract continued even after em-

---

bound by amendments to those terms, with the availability of continuing employment serving as adequate consideration from the employer.").  Further, under California law, "[a] written instrument is presumptive evidence of a consideration." Cal. Civ. Code § 1614 (West 2014).

ployment with L-3 ended.  SOF at ¶ 12.  Defendants John McClure and Susie Rettig also testified that they understood and agreed to the obligations contained within the various employment contracts.  *See id. at* ¶¶ 14, 15.  All of the Employee Defendants were at-will employees while at L-3 who signed the various agreements in return for continued employment.  Ex. 32 Crain Decl. ¶ 4).

Each of these contracts, by their plain and unambiguous terms, precluded the Employee Defendants from retaining, disclosing, or using any L-3 or customer confidential, proprietary, or business-related information after their employment with L-3 ended. *See* SOF at ¶¶ 2, 4, 6, 8, 10. These same contracts prevented the Employee Defendants from disclosing this information, while employed with L-3, to anyone that did not have a need to know the information.  *See id.*  Moreover, the contracts provided specific definitions and examples of exactly what types of materials fell within their ambit.  *Id.*  Indeed, the Standard Contract's definition of "Confidential Information" included "[a]ll information . . . which gives the Company or any of its Customers an advantage over competitors . . . *including, but not limited to*, trade secrets, proprietary information, customer lists and computer programs and software, and including information conceived, originated or developed by employee."  *Id.* at ¶ 2 (emphasis added). Likewise, the Confidentiality Agreement specifically noted that any "information of L-3 *relating to its services and products* (offered or to be offered), research, development, marketing, pricing, clients and prospective clients, business methods, strategies, financial condition, plans, personnel information and capabilities, policies, or prospects" were included in the definition of "Proprietary Information."  *Id.* at ¶ 4 (emphasis added).  The L-3 Ethics Agreement also included within its definition of "sensitive information" all "information whether obtained from or relating to L-3 and/or suppliers, customers or third parties."  *Id.* at ¶ 8.

Additionally, a number of the contracts explicitly required the Employee Defendants to return any L-3 materials relating to L-3's business or containing proprietary information back to L-3 at the termination of the Employee Defendants' employment. *See id.* at ¶¶ 2, 4, 6, 8, 10. Specifically, the Confidentiality Contract required the Employee Defendants to agree that, "Upon the termination of my employment for any reason, or upon the request of L-3 if sooner, I will promptly deliver to L-3 all L-3 Materials in my possession, custody or control, and shall not retain any copies of the L-3 Materials in any form or medium whatsoever.[14] *Id.* at ¶ 4. Similarly, the Titan Ethics Agreement required that "[a]ll employees are obligated to . . . not remove from their former place of employment any information that is or might be considered private or proprietary by that employer, such as books, computer printouts, notes and trade secrets, unless authorized in writing to do so by official representatives of the employer. *Id.* at ¶ 6.

In fact, each of the Employee Defendants explicitly represented at the end of their respective employment periods with L-3 that: "I do not have in my possession, nor have I failed to return, any customer lists, marketing materials, mark-up guidelines, software programs, financial information or any other documents or property that fall within the definition of "Confidential Company Information" in the Standard Confidentiality Agreement and Assignment of Inventions Agreement signed by me, or reproduction of any aforementioned items belonging to L-3." *Id.* at ¶¶ 9-10. Accordingly, the numerous confidentiality agreements described above, signed and agreed to by all of the L-3 employees, clearly and unambiguously, by their terms, required all of

---

[14] "L-3 Materials" were defined differently from "Proprietary Information" as "[a]ll files records, proposals, specifications or other documents, and all computer software, software applications, files, databases and the like relating to L-3's business or which contain Proprietary Information, whether prepared by me or otherwise coming into my possession." *Id.* at ¶ 4.

the Employee Defendants to keep confidential and not disclose any L-3 or customer business-related documents, regardless of whether such documents constitute trade secrets. *See Horne Engineering Services, Inc. v. Kaiser-Hill Co., LLC*, 72 P.3d 451, 453 (Colo. Ct. App. 2003) ("An unambiguous contract must be enforced in accordance with the plain and ordinary meaning of its terms.").

Further, numerous former L-3 employees, including some of the Employee Defendants, testified that they understood that the agreements above prevented them from disclosing or keeping L-3's proprietary business material. *See* SOF ¶¶ 14, 15, 27, 34. Indeed, Defendant Susan Rettig testified that when she signed the Confidentiality Contract, she understood it required her to recognize and respect L-3's corporate policies regarding L-3's proprietary information and that she was not to use any L-3 information for any purpose other than to carry out her duties at L-3. *Id.* at ¶ 15. Likewise, Defendant John McClure testified that he understood that when he signed the Confidentiality Agreement, he was agreeing to keeping L-3's proprietary and other business information confidential. *Id.* at ¶ 14. Former L-3 employee Bruce Anderson echoed this testimony, noting that his contractual obligations required him to return all L-3 confidential information, including the L-3 HEMP-testing data acquisition software (BADDAS) that he helped develop, upon termination. Ex. 60 (1/18 PI Hearing Tr. 81:13-86:22). Mr. Anderson retained earlier versions of the BADDAS software, and some additional L-3 files when he left L-3's employ (in direct contravention to his Termination Certification), but he returned these items to L-3's counsel immediately upon request because he knew that it was wrong for him to have retained them. Ex. 60 (1/18 PI Hearing Tr. 85:3-87:17).

In a rare and especially telling moment of candor, Defendant Jim Youngman admitted

during the PI Hearing that he knew it was wrong for his co-Defendant John McClure to send L-3's proprietary HEMP-testing software BADDAS, BUTTER, CUCO, and others, to Defendants' software consultant Tim Farajian.  Ex. 58 (1/15 PI Hearing Tr. 210:7-211:15; 333:9-334:4) (striking Youngman's coached testimony—limiting his testimony to Youngman's admission that it was inappropriate for Defendants to provide Farajian with L-3's HEMP-testing source code).  Mr. Youngman also acknowledged that it was inappropriate for him to have run L-3's proprietary software after he left L-3's employ, and that he did so to benefit Jaxon.  Ex. 58 (1/15 PI Hearing Tr. 259:12-260:4).

In short, all of the Employee Defendants signed and agreed to numerous employment contracts in return for continued employment that plainly and unambiguously precluded the Employee Defendants from disclosing any L-3 or client business information to anyone who did not need the information to perform L-3 business and required the Employee Defendants to return all such information upon termination.  These agreements in return for continued employment created valid contracts between L-3 and each of the Employee Defendants encapsulating such terms.[15]

### b.   L-3's Valid Contract with Defendant Jerry Lubell

Defendant Jerry Lubell signed an Exclusive Services Agreement ("ESA") with L-3 in November 2009, through which he agreed to perform certain HEMP-related work on an exclusive basis for L-3.  SOF ¶ 18.  Part of the work Mr. Lubell was supposed to be performing for L-3 on an exclusive basis was working with the Defense Threat Reduction Agency ("DTRA") to support its Balanced Hardening and EMP Testing and Technology Assistance Programs.  *Id.* at ¶ 19.  His

---

[15] As all of the Employee Defendants were at-will employees, continued employment was adequate consideration for the requirements contained within their employment contracts.  *See Lucht's*, 255 P.3d at 1061.

main contact with DTRA while working for L-3 was Mike Rooney. *Id.* The ESA had an initial term of 1,000 hours, but could be terminated at any time by either party upon 30-days' written notice, or by L-3 for cause (but the provisions concerning proprietary information, injunctive relief, indemnity and limitation of liability provisions would survive for one year after termination). Ex. 53 (L3-002840). The ESA also incorporated an independent and separate nondisclosure agreement, which prohibited Mr. Lubell from "cop[ying] or duplicat[ing] in any manner any portion of such proprietary information which is in tangible form." *Id.* As Mr. Lubell signed the ESA in return for beginning his employment with L-3, the ESA constitutes a valid contract between Mr. Lubell and L-3 with the clear and unambiguous terms discussed above.

**Element 2**: **L-3 Performed Its Obligations to the Employee Defendants, Including Mr. Lubell**

It is undisputed that L-3 performed its obligations under its numerous confidentiality contracts with the Employee Defendants by providing them with employment and paying their salaries until they either resigned or were terminated. Likewise, it is undisputed that L-3 performed its obligations under the ESA with Mr. Lubell by employing and paying him until his resignation. As such, it is undisputed that L-3 performed its obligations under the various contracts with the individual Defendants.

**Element 3**: **The Employee Defendants Failed to Perform by Breaching their Confidentiality Obligations and Retaining L-3 Documents After They Left L-3**

It is undisputed that each of the Employee Defendants and Defendant Jerry Lubell failed to perform under their various confidentiality agreements and the ESA by either disclosing L-3 or L-3 customer business information to others outside of L-3 who did not have a need to know such information or by retaining L-3 or L-3 customer business information after leaving their employ-

ment with L-3, in direct contravention of their various agreements (and, with respect to the latter, in direct contravention of the Termination Certifications explicitly affirming that the employees returned all such information to L-3).  As each Defendant either disclosed or retained L-3 or L-3 customer business information in direct contravention of their various contracts, it is undisputed that each Defendant failed to perform their obligations under those agreements.  *See McKinney v. Gannett Co., Inc.*, 817 F.2d 659, 669 (10th Cir. 1987) ("The agreement is unambiguous.  The plaintiff McKinney had been delegated the contractual right to hire and fire.  Gannett's refusal to consult with the plaintiff in these circumstances was a breach of contract."); *Am. Express Financial Advisors, Inc. v. Topel*, 38 F. Supp. 2d 1233, 1244 (D. Colo. 1999) (granting summary judgment on claim of breach of noncompetition covenant where it was "undisputed that during the one-year period following the date Mr. Topel left AMEX . . . he provided financial planning services for former AMEX customers" in direct contravention of the noncompetition agreement at issue); *Galvin v. McCarthy*, No. 07-cv-00885-PAB-BNB, 2009 U.S. Dist. LEXIS 30041, at *19 (D. Colo. Mar. 31, 2009) (granting summary judgment on the plaintiff's breach of contract claim where it was "undisputed that [the defendant] has failed to perform his obligations under the note").   A description of the L-3 or L-3 customer business, proprietary or confidential information that each defendant undisputedly took or disclosed follows.

a.  Defendant James Youngman

Defendant Youngman's retention, use, and disclosure of L-3 business, confidential, and proprietary materials was as brazen as it was broad.  At the hearing on L-3's Motion for a Preliminary Injunction, Mr. Youngman *admitted* that Defendant McClure provided him with L-3's proprietary BADDAS and BUTTER source codes and program files (which McClure had improperly

retained before leaving L-3) some time before October 29, 2009.  Ex. 59 (1/16 PI Hearing Tr. 91).

Youngman further *admitted* that he provided that code to Jaxon's software consultant, Tim Faraj-

ian, along with a document titled "General Description of Jaxon Engineering and Maintenance

(JEM) Data Acquisition Code JEMDAQ" (the "JEMDAQ Document"), which directed Mr. Faraj-

ian to run BADDAS in creating Jaxon's own software and then "remove all Evidence of [L-3]

pedigree."  *See* Ex. 58 (1/15 PI Hearing Tr. 193-194; 216-17, 227);[16] Ex. 54 (JAX-0056192-202).

Youngman then *admitted* that he used BADDAS to help fix problems that he, Farajian, Randy

White, and Scott White were having with their new JEMDAQ software.  Ex. 58 (1/15 PI Hearing

Tr. 242-259) ("Q. Okay. So you were running the two codes [BADDAS and JEMDAQ] next to

each other and generating output files and then comparing the files, right?  A. In this case, yes.").

Mr. Youngman then confirmed what, given the confidentiality agreements Defendants

signed, should have been self-evident: (a) it was inappropriate for McClure to have given

Youngman BADDAS and BUTTER; (b) inappropriate for Youngman to have done nothing about

it; (c) inappropriate for Youngman to have had the codes and sent them to Farajian; and (d) inap-

propriate for Youngman and Jaxon to be using BADDAS to create output files to help him fix

problems with JEMDAQ.  *See* Ex. 58 (1/15 PI Hearing Tr. 211-12; 259-60) ("Q. Did you think it

---

[16] Q. So you were giving [Farajian] permission to use L-3's BADDAS code and L-3's BUTTER
code to see if he could help write JEMDAQ, right?

MR. YOUNGMAN: I gave them as an example. Yes.

***

Q. Okay.  Now, not only did you provide code to him you also wrote up a preliminary specs doc-
ument, right?

MR. YOUNGMAN: I did.  Yes sir.

Q. Okay. And that's attached to this e-mail, right?

MR. YOUNGMAN: That's [Pl. Exh.] 48B, I believe.

was appropriate to be using BADDAS to be running output files? A. Probably not at that time sir, no. Q. Excuse me? A. No, sir.").  Mr. Youngman's *own admissions* show that he breached all of his contractual obligations by accepting, using, and disclosing L-3's proprietary software for the benefit of Jaxon after he left L-3's employ.  Youngman knew it was wrong and he did it anyway, all in an attempt to get Jaxon off of the ground so that it could compete *against* L-3.  His admissions show clear breach of his contractual duties.

Although Youngman's undisputed admissions are sufficient to show the breach of his contractual duties, the forensic evidence in this case reveals that his retention and use of L-3 proprietary and business documents (in direct contravention of his contractual duties) goes much deeper. Mr. Youngman's personal hard drive (produced only upon Court Order)  reveals that he backed up his L-3 computer files onto his hard drive on August 12, 2009, less than a week before he left L-3.  Ex. 32 (Crain Decl. ¶ 24).  The review confirms that Mr. Youngman's personal hard drive contained thousands of L-3 proprietary files, from source code to technical documents to project data, that had been collected over many years at L-3 and that would represent a massive "leg up" to anyone starting a competing business.  *Id.* at ¶ 16; *see also* SOF ¶ 118 (JAX-0060349) (Oct. 21, 2009 email from Youngman to other Jaxon employees, including Randy and Scott White, citing a "wealth of information" from "our old employer" and warning the recipients to "please hold the later close and do not distribute further").

As if Youngman's retention of thousands of L-3 technical and proprietary documents (in direct contravention to both his contractual duties and his Termination Certification) was not enough, on September 26, 2010, only a single month before L-3 filed its Complaint, he attempted (but failed) to delete the majority of the L-3 technical documents on his hard drive by moving the-

se files into his "Recycle Bin." Ex. 32 (Crain Decl. ¶ 16). On October 26, 2011, in an astonishing display of defiance to this Court's authority, Mr. Youngman attempted to finish the job by moving all documents related to BADDAS to his "Recycle Bin" (which he had previously retained). *Id.* at ¶ 15. This attempted spoliation of evidence occurred *after* discovery had been issued and, presumably, *after* Mr. Youngman's attorneys had instructed him to preserve all relevant files in his possession. Mr. Youngman's failed attempt to remove the evidence of his contractual breaches both proves his nonperformance of his contractual duties and demonstrates just how far he was willing to go to "remove all evidence of [L-3] pedigree" from existence.[17]

b. Defendant John McClure

Like Youngman, Defendant John McClure breached his contractual duties by backing up his L-3 laptop onto his external hard drive before he left L-3 and by using and providing L-3 proprietary software to Tim Farajian in an effort to create Jaxon source code. Indeed, at a hearing before the Court on February 12, 2014 regarding McClure's spoliation of the contents of his hard drive, McClure testified that he had copied the entire contents of his L-3 laptop onto his external hard drive. Ex. 61 (2/12 Hearing Tr. 19:17-19 ("Q. At your deposition you testified you used this hard drive to backup your laptop at L-3, correct? A. That's correct."); 66:1-16 ("Q. Well, there must have been a lot of things on that external hard drive because it was your entire time at L-3

---

[17] Presumably, it was Mr. Youngman's misplaced belief that he had removed all traces of the BADDAS software from his hard drive that led him to testify at the PI Hearing, that he did not have BADDAS in his possession

right, you used that hard drive? A. There's probably test reports, yes, test plans and – yes.").[18]

McClure further testified that he had retained a copy of L-3's software, specifically, on his hard drive, and that he believed that he gave a copy of that hardware to Mr. Youngman. *See id.*[19] Like Youngman, McClure sent Farajian multiple versions of L-3 source code, including BAD-DAS, CUCO, and L-3's PCI data reduction source code on multiple dates in October and November of 2009. SOF ¶¶ 126, 127, 128, 134 (Farajian-002; Farajian 003-04; Farajian 0052-54; Farajian 212-213; Farajian 00298; Farajian 00300; Farajian 00304-06). McClure's retention of his entire L-3 computer on his personal hard drive, which included numerous L-3 proprietary documents and source code (despite his Termination Certification to the contrary), as well as his use and disclosure of L-3 proprietary software to Farajian, undisputedly shows that McClure breached his contractual duties to L-3.

### c. Defendant Randy White

Defendant Randy White breached his contractual duties to L-3, both by retaining certain documents after he left L-3 and by receiving and using additional L-3 proprietary documents from his son, Scott White, so as to be able to make Jaxon a viable HEMP-testing company and compete on numerous task orders against L-3. Indeed, when Randy White left L-3, he retained numerous L-3 documents, including L-3 funding information for Air Force sites and a collection of site surveys with estimated costs, which provided specific information as to what work would need to be

---

[18] Unlike Mr. Youngman, Mr. McClure must have actually succeeded in deleting the proprietary L-3 documents he took upon leaving L-3 because, despite his testimony, Mr. McClure was unable to produce any of these documents in discovery.

[19] Of course, it is now clear that Mr. Youngman did not need the copy of BADDAS he received from Mr. McClure, as he already possessed a more recent copy of the software from his own backup of his L-3 computer. *See* Ex. 32 (Crain Decl. ¶ 24).

completed at the sites, as well as valuable lessons learned. SOF ¶ 86; *see also* Ex. 32 (Crain Decl. ¶ 26 (noting that a forensic review of Randy White's hard drive revealed "files that would be helpful to Jaxon's bids on numerous task orders). Notably, in his deposition, Randy White admitted that he took technical information with him when he left L-3 regarding L-3 projects that he created while at L-3. *See, e.g.*, Ex. 62 (3/26/14 Randy White Dep. Tr. 539:13-540:7 ("Q. So where did you get the information about all of these cabinets from? A. These sheets came from government tech manuals that I extracted and gave to ████. Q. When you say extracted them . . . when do you extract them? A. Probably in the early 2000s."); 541:9-20 ("Q. You had a document in which you listed the hardness critical assemblies? A. Yes. . . . Q. Okay. And you created that document while you were at L-3, correct? . . . A. Yes. Q. Okay. And then when you left L-3, you took it with you, correct? A. I did."); 547:6-23 ("Q. Okay. So you remembered all of these cabinets [that he listed in his proposal]? A. No. I had the extracts of these tables . . . . Q. And the extracts of the tables were tables that you prepared while at L-3; is that correct? . . . A. Yes, for ESD."). Mr. White then used these technical documents (retained in direct contravention of his contractual duties and his Termination Certification) to prepare proposals for and bid on projects in direct competition against L-3. *See id.* at 539:13-540:7; 541:9-20; 545:3-25; 547:6-23; *see also* SOF ¶ 116 (3/26/2014 R. White dep. Tr. 627:24-629:17) (noting that Randy White sent various Jaxon personnel a number of L-3 corporate plans, which were simply renamed as "JEM" plans and which he kept from L-3 without ever asking permission to either retain them or use them for any purpose).

     In addition to retaining certain L-3 technical documents for use on future Jaxon bids, Randy White accepted numerous L-3 proprietary documents sent to him by his son Scott White

while Scott was still working for L-3, which Randy White used in preparing bids for Jaxon.  For example, Scott White sent his father proprietary L-3 pricing data for inclusion in Jaxon RFP responses to Serco, SOF ¶ 109 (JAX-0045439) and multiple proprietary L-3 technical proposals on past Serco RFPs, SOF ¶ 95 (JAX-0029778).  Randy White then used this information in preparing bids for Jaxon and disclosed it to others outside of L-3 to benefit Jaxon.  *See e.g.*, SOF ¶ 109; *see also* SOF ¶ 70 (non-defendant Corey White confessing that he received multiple L-3 spreadsheets and other documents from his father, Randy, sometime in 2008).  In fact, Mr. White even forwarded an email containing confidential L-3 vendor pricing information to Michael Stella at Serco, and then asked Mr. Stella to "[p]lease burn this message once you download the PDFs.  It's from my son."  SOF ¶ 109 (JAX-0045439-41).  Randy White's instruction to Serco to "burn" the email not only shows that Mr. White was fully aware of the proprietary nature of the documents contained within, but also that he and his son breached their contractual duties to L-3 by disclosing its information and using it to compete against L-3.

#### d.  Defendant Scott White

Defendant Scott White's retention of hundreds of L-3 proprietary documents was instrumental in allowing Jaxon to compete against L-3 for task orders, for which, without the L-3 documentation, Jaxon would not have had the capacity, connections, or know-how to bid.  Indeed, from December 2009 to May 2009, while Jaxon was bidding on several Serco RFPs, Scott White emailed to his personal email account several hundred scanned L-3 proprietary business documents, including vendor quotes, L-3 purchase orders, and invoices for use in Jaxon's proposals to Serco.  SOF ¶ 105.  On numerous occasions, Mr. White emailed either himself or other individuals outside of L-3 (including Randy White) proprietary L-3 information for Jaxon to use in its

proposals to Serco, including third-party and other L-3 pricing information, Ex. 76 (10/9/13 Scott White Dep. Tr. 332:16-17; 333:14-16; 338:2-3; 338:10; 338:15-16); Ex. 54 (JAX-0045439); Ex. 54 (JAX-0057345); proprietary L-3 information and drawings on L-3's rubber keeper seal on its RF doors, Ex. 54 (JAX-0000332); several L-3 technical proposals on past Serco RFPs; Ex. 54 (JAX-0029778); several purchase orders regarding L-3 equipment, Ex. 53 (L3-036495, L3-036473, L3-036468, L3-036463); vendor invoices, Ex. 53 (L3-035156); parts numbers and drawings, Ex. 53 (L3-034422), photographs, Ex. 53 (L3-044064), Department of State forms, Ex. 53 (L3-041921); site information, Ex. 53 (L3-002933); and pictures of work being done at various government facilities. SOF ¶ 106. Despite Scott White's signature on his Termination Certification, he never returned any of these materials to L-3.

In essence, Scott White provided Jaxon all of the L-3 information it needed (which was the product of years of L-3 research and experience) to instantaneously become a viable competitor in the HEMP-testing industry. Through usurpation of L-3's hard-won knowledge and experience, Scott White essentially put Jaxon in the perfect position to compete against his then-current employer. Through this disclosure and retention of L-3 proprietary information (and false Termination Certification), Scott White breached his contractual obligations to L-3.

e.   Defendant Susan Rettig

Like Scott White, Defendant Susan Rettig emailed numerous L-3 proprietary documents to her personal email address for use in Jaxon's business. Notably, on April 6, 2009, Susie Rettig emailed herself a myriad of L-3 materials that would be beneficial to Jaxon, including an exempt performance appraisal, Ex. 53 (L3-1310594); ROM (rough order of magnitude) for ▮▮▮, Ex. 53 (L3-1310633); an ▮▮▮▮▮▮ and spreadsheet, Ex. 53 (L3-1310617); a letter with approved L-3

provisional billing rates for FY 2009, Ex. 53 (L3-1310624); an NDA with ██████████ ████████ and Jaycor, Ex. 53 (L3-1310649); a Subcontractor Funding (Task Summary), Ex. 53 (L3-1314346); an L-3 Services Inc. Project Setup Report, Ex. 53 (L3-1310637); a Project Author-ization Summary (PAS), Ex. 53 (L3-1310656); an L-3 response to an RFP (██████████ █ ), Ex. 53 (L3-1310641); a modification from ████ to extend project 450351, Ex. 53 (L3-1310627); a Revised PAS, Ex. 53 (L3-1310662); a proposal, spreadsheet and RFQ from ██ , Ex. 53 (L3-1314334); and proposed T&M rates for 3/28/09 – 3/27/10.  Ex. 53 (L3-1310597).  When Ms. Rettig signed her Termination Certification on December 30, 2009, she had not returned any of these documents to L-3.

Further, a forensic review of the personal hard drive Ms. Rettig shared with her husband (performed after Ms. Rettig signed her Termination Certification) yielded almost one thousand documents undisputedly authored by L-3 employees .  *See* Ex. 2 (compiled by FTI listing (1) 100 documents authored by Charles Crain; (2) 689 documents authored by Brandon Merewether; (3) 41 documents authored by "Jaycor;" and (4) 146 documents authored by Sandi Quintero).  These documents included an "enormous amount of L-3 information" that would give any competitor "a significant head start in preparing proposals to bid on task orders," such as (a) L-3's cost pro-posals submitted in prior years of the sites for which Jaxon bid and won its initial task orders in 2009 and (b) L-3's 2008 provisional billings rates (to go into effect in 2009) for work for specific customers such as ██████████████████████ to which Jaxon was awarded contracts during its first couple years in business.  Ex. 32 (Crain Decl.  ¶35).  Ms. Rettig either shared this information with other Jaxon employees or used it herself for her work with Jaxon.   Yet, even had she not misused L-3's information for Jaxon, Rettig's retention of this in-

formation, alone, would establish breach of her employment contracts and contradict her Termination Certification.

f.   Defendant Kelly Rice

A forensic review of Defendant Kelly Rice's personal hard drive reveals that, at the time the hard drive was collected (per Court Order), Mr. Rice was in possession of L-3 proprietary documents, including a Tyco Electronics Factory Test Plan for Corcom HEMP Filters, specifically supplied to L-3 for L-3's Purchase Order 45D0000596, an L-3 HEMP test presentation to  an L-3 Technical Manual for ████████████████████████████, both specifically prepared for ██████████ by L-3. Ex. 1 (FTI Decl., ¶ 14(e)) (providing a bulleted list of documents).  Mr. Rice's drive also contained documents that purported to be Jaxon technical documents related to Jaxon's HEMP upgrade plans, and test plans and procedures for companies such as ██████████ *See id.*  Although each of these documents appears at first blush to be a Jaxon document, their metadata undisputedly shows that they were created and modified from similar documents created at L-3 for L-3.  *Id.*  The undisputed evidence therefore reveals that Mr. Rice modified these L-3 documents in order to create similar documents for Jaxon, and, upon saving his modifications, the new "Jaxon" documents replaced the additional L-3 documents that had formerly resided on his hard drive.  Thus, Rice failed to perform his contractual duties both by being in possession of proprietary L-3 technical documents after he left L-3's employ (and in direct contravention of his Termination Certification) and by using such documents to create similar documents for Jaxon.

g.   Defendant Jerry Lubell

Unbeknownst to L-3, Defendant Lubell was performing similar services for Jaxon at the

same time he was providing such services to L-3, in direct violation of the ESA.  SOF ¶ 20 (L3-947633-34 (Lubell November 2009 invoice for Jaxon with native file printout)).  On December 11, 2009, in direct violation of the ESA, Mr. Lubell sent a copy of an email from his L-3 email account to his home address that attached an L-3 proprietary proposal.  Ex. 53 (L3-935528-30, with native filed attached).  In December 2009, L-3 discovered that Lubell was also performing services for Jaxon and demanded an explanation as to why he did not inform L-3 and why he did not believe his work with Jaxon was an impermissible conflict of interest.  Ex. 53 (L3-098973-74).  Lubell denied any conflict of interest, failed to explain what he was actually doing for Jaxon, and reiterated that his work under the ESA was limited to include DTRA support.  *Id.*  ("I have not, and will not pursue or accept any tasking that is in any way related to or in conflict with the L-3 Scope of Work, as long as the L-3 agreement [ESA] is in force.").

Mr. Lubell submitted his resignation, citing health reasons, to L-3 on December 31, 2009, providing 30-days' notice under the ESA.  SOF ¶ 21 (L3-099487).  His consultancy therefore ended on January 30, 2010.  Despite still working for L-3 under the ESA in early January 2010, Defendants set up a meeting with Mike Rooney at DTRA to discuss Jaxon's approach to HEMP-hardening and testing projects for DTRA, accompanied by Defendant Lubell, who was at the time "████████████████████████████████████████████████████████."  SOF ¶ 21 (JAX-0043493).  Because Lubell improperly copied L-3 proprietary information, and maintained it through his personal email address, and provided consulting work on Jaxon's behalf for DTRA during the pendency of the ESA, the Court should find that he breached the ESA.

**Element 4**: L-3 Suffered Damages as a Result of Defendants' Breaches

It is undisputed that, as a direct result of the Employee Defendants' and Mr. Lubell's con-

tractual breaches, Jaxon was able to compete directly against L-3 for a number of task orders and win bids that otherwise would have gone to L-3, and that L-3 therefore suffered damages in an amount to be determined at trial. *See Am. Express*, 38 F. Supp. 2d at 2248 (granting summary judgment on plaintiff's breach of contract, tortious interference with prospective contract, and breach of fiduciary duty claims on liability only and setting the determination of damages on those claims for trial). Applying this authority, the Court should grant summary judgment as to liability and reserve the issue of damages for trial.

**2. The Court Should Grant Summary Judgment in Favor of L-3 Against the Employee Defendants for Breach of Their Duty of Loyalty (Count 15)**

**A. Burden of Proof and Elements**

L-3 has the burden of proof as to its breach of fiduciary duty claim, which it asserts against the Employee Defendants. No issue of fact exists as to the elements: (1) a fiduciary duty existed between the Employee Defendants and L-3; (2) each of the Employee Defendants breached that duty; and (3) L-3 suffered resulting damages. *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F.Supp.2d 1066, 1087 (D. Colo. 2012) (internal citations omitted). "Under Colorado law, a variety of relationships can create fiduciary responsibilities among the parties, even when the relationships themselves are not *per se* fiduciary in nature." *Id.* "A fiduciary duty arises when 'one person is under a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with the undertaking.'" *Id.*

**B. The Undisputed Facts Show that the Employee Defendants Breached their Fiduciary Duties to L-3 by Retaining Confidential L-3 Documents and Forming Jaxon (Count 15)**

**Element 1: As an employee, each of the Employee Defendants owed a duty of loyalty to L-3**

One such fiduciary duty that arises out of the employer-employee relationship is the duty of loyalty an employee owes his or her employer when he or she has the authority to act for the employer or has access to the employer's confidential information. *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 492 n. 10 (Colo. 1989). This duty arises independently from any contractual agreement between the parties and prevents employees from making certain types of preparations to compete against their employer while remaining in that employ. *L-3 Commc'ns Corp.*, 863 F.Supp.2d at 1087; *see also Am. Express Financial Advisors, Inc. v. Topel*, 38 F. Supp. 2d 1233, 1247 (D. Colo. 1999) ("While an agent is entitled to make some preparations to compete with his principal after the termination of their relationship, an agent violates his duty of loyalty if he engages in pre-termination solicitation of customers for a new competing business.").

This common-law duty also prohibits an employee from "(1) us[ing] the property of the principal for the [employee's] own purposes or those of a third party; and (2) [using] or communicat[ing] confidential information of the principal for the [employee's] own purposes or those of a third party," both during and after the end of the agency relationship. Restatement (Third) of Agency § 8.05 (2006) and comment c ("[a]n agent is not free to use or disclose a principal's trade secrets or other confidential information whether the agent retains a physical record of them or retains them in the agent's memory"); *see also Koontz v. Rosener*, 787 P.2d 192, 195-96 (Colo. App. 1989) (by working to set up competing business while still engaged by plaintiff, defendants violated their duty of loyalty).

Here, it is undisputed that each of the Employee defendants worked for L-3 and had access to L-3 confidential and proprietary information (including trade secret information).  SOF ¶ 16.  Moreover, as described above, each of them signed numerous confidentiality and nondisclo-

sure agreements, as well as Termination Certifications swearing that they had returned all confidential, proprietary, or business documents to L-3. *See* discussion *supra* Part (1)(B)(Ele.1)(a). As the Employee Defendants were employed by L-3 and as each entered into numerous confidentiality contracts with L-3, a fiduciary duty existed between L-3 and each of them, both during and after their employment. This duty precluded the Employee Defendants from competing against L-3 while still employed by L-3 and it prohibited them from either using or disclosing L-3's confidential or business information either before or after they left L-3.

**Element 2: Each of the Employee Defendants breached the fiduciary duty of loyalty owed to L-3**

The undisputed facts show that each of the Employee Defendants breached their fiduciary duties owed to L-3 either by retaining, disclosing, and using L-3 proprietary or business information after they left L-3's employ or by taking various actions to compete against L-3 for Jaxon while still employed by L-3. Each Employee Defendant's individual breaches are discussed below.

a.   Defendant Randy White

As described above, Defendant Randy White retained certain L-3 technical information after leaving L-3's employ and used that and other L-3 proprietary documents received from his son, Scott White, in preparing bid proposals for Jaxon. *See* discussion *supra* Part (1)(B)(Ele. 3)(c).[20] This retention and use of L-3 proprietary and business documents for his and Jaxon's

---

[20] For example, in the beginning of June 2009, Randy White sent Mike Stella at Serco an email from Scott White at L-3 containing L-3 pricing information and asked Mr. Stella to "Please burn this message once you download the PDFs. It's from my son to me." Ex. 54 (JAX-0045439 at 440). This emails shows not only Randy White's and Scott White's breaches of their fiduciary duties, but also that these Defendants recognized the impropriety of their actions and tried to cov-

benefit after White left L-3 (in direct contravention of his contractual duties and Termination Certification), alone, shows a breach of his fiduciary duties.  *See* Restatement (Third) of Agency § 8.05 (2006) and comment c.

Moreover, Randy White began working to form Jaxon and to compete against L-3 months before he left L-3.  Indeed, Mr. White did not leave L-3 until January of 2009.  Ex. 53 (L3-002902).  Nonetheless, Mr. White and his wife incorporated Jaxon in June 2008, approximately seven months before Mr. White left L-3.  SOF ¶ 71.  During that time, White recruited others at L-3 to join him, including his son (Scott White), Jim Youngman, and Kelly Rice.  *See, e.g.*, SOF ¶ 72, 75.  Randy White also began sending himself and other future Jaxon employees L-3 documents and other information that they would need to bid on projects.  *See, e.g.*, SOF ¶ 78 (Oct. 19, 2008, email from Randy White to Robert Smith enclosing a list of bid rates and estimated overhead in L-3 spreadsheets that he modified for use in Jaxon proposals).

Finally in October of 2008, months before he left L-3, Randy White retained the services of CLR Associates, the company owned by Charles and Susan Rettig, and directed and assisted Charles Rettig in actually negotiating an IDIQ contract with Serco on behalf of Jaxon.  SOF ¶¶ 74, 79, 81; *see also* Ex. 79 (JAXHD-DF4-E008-00336) (noting that Randy and Scott White would

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ ).  Then, in November of 2008, on a Saturday, Randy conducted a meeting of future Jaxon employees, at an L-3 facility no less (at the north lab),

---

er their tracks.  Although L-3 eventually discovered their actions, it was not until after the Whites had misappropriated enough L-3 material to create their own HEMP-testing operation.

to discuss future Jaxon business.  *See* Ex. 53 (L3-002866).

In short, Randy White worked to (and in large part succeeded) to have a fully functional HEMP-testing operation up and running before he even left L-3.  This operation would operate using former L-3 employees and service former L-3 customers.  Randy White's breach of fiduciary duty could not be more clear.  *See Am. Express*, 38 F. Supp. 2d at 1247-48 (granting summary judgment to plaintiff on breach of fiduciary duty claims where it was undisputed that the defendant "solicited customers for his new venture while still affiliated with AMEX"); *Koontz*, 787 P.2d at 195-96 (finding that plaintiff's efforts to form a competing business while acting to conceal their plan from their previous employer was a breach of their fiduciary duties).

### b.  Defendant Scott White

As described above, Scott White retained and disclosed hundreds of L-3 proprietary documents by emailing them to either himself or other Jaxon employees, including vendor quotes, L-3 purchase orders, and invoices, for use in Jaxon's proposals to Serco, while Mr. White was still employed by L-3.  *See* discussion, *supra* Part (1)(B)(Ele. 3)(d).  This retention and disclosure of L-3 proprietary and business documents for his and Jaxon's benefit (in direct contravention of his contractual duties and Termination Certification), alone, shows a breach of Scott White's fiduciary duties.  *See* Restatement (Third) of Agency § 8.05 (2006) and comment c.

Additionally, although Scott White did not leave L-3 until the end of July 2009, he began working as early as August 10, 2008 to appropriate L-3 materials and employees in order to turn Jaxon into a viable competitor against L-3.  *See* SOF ¶ 72 (L3-910822) (discussing Jaxon with John McClure, informing him that they anticipated getting Jim Youngman and Kelly Rice to join them, and noting that "we are still working on [the company] next to have these damn real jobs to

76

maintain.  We are tracking along just fine with continued motivation to leave from the bastards at

L-3"); ¶ 100 (JAX-0000493-529) (March 11, 2009 Jaxon proposal listing Scott White as Jaxon

VP of Maintenance).  Notably, on October 3, 2008, Scott White created a list of "Start Up Peo-

ple" for Jaxon, the majority of which were current L-3 employees that Scott and Randy believed

they could get to leave L-3 and come work for Jaxon.  SOF ¶ 75 (L3-036954).  This attempted

solicitation shows Scott White's breach of his fiduciary duties to L-3.  *See Jet Courier*, 771 P.2d

at 497 (efforts to solicit coworkers need not be successful to be breaches of fiduciary duty, as it is

the misconduct itself that is wrongful).

Scott White also breached his fiduciary duties to L-3 by ordering parts on various L-3 con-

tracts that Mr. White and others would later try to appropriate as "Government Furnished Equip-

ment" for Jaxon.  *See* SOF ¶ 77.  Mr. White compiled lists of materials needed to build complete

sets of L-3 HEMP-testing equipment, including itemized descriptions of L-3 custom parts, for his

use at Jaxon, SOF ¶ 91, and forwarded Randy White, Corey White, and others hundreds of

scanned L-3 proprietary business documents for Jaxon's use, all of which saved Jaxon enormous

time and effort in having to research all of this information to include in proposals for the initial

task orders.  SOF ¶ 105.

Along the same vein, Scott White, while still an L-3 employee, went on "job walks" for

Jaxon, in which he investigated sites that would be the subject of future task orders that Jaxon was

"awarded."  Ex.  62 (Randy White Dep. Tr. 311:8-24; 316:7-317:25). He also attended Randy

White's Saturday "north lab" meeting of future Jaxon employees, despite his employ with L-3.

*See* Ex. 53 (L3-002866).  In short, Scott White acted as Jaxon's agent behind enemy lines until

the first task orders were awarded, feeding Jaxon anything and everything it might need to pre-

pare bids and compete against L-3.  Like Randy White, his breaches of fiduciary duty could not be more clear.  *See Am. Express*, 38 F. Supp. 2d at 1247-48; *Koontz*, 787 P.2d at 195-96.

### c.  Defendant James Youngman

As described above, Defendant Youngman retained thousands of L-3 technical and proprietary documents and L-3 proprietary and confidential source code and software after leaving L-3 in direct contravention of both is contractual duties and Termination Certification.  *See* discussion *supra* Part (1)(B)(Ele. 3)(a).  He then used and disclosed that source code in an attempt to help create and trouble shoot Jaxon's own testing software.  *Id.*  This retention, disclosure, and use of L-3 proprietary and business documents and source code for his and Jaxon's benefit after Mr. Youngman left L-3, alone, shows a breach of his fiduciary duties.  *See* Restatement (Third) of Agency § 8.05 (2006) and comment c.

Additionally, even though Youngman did not leave L-3 until the middle of August 2009, *see* Ex. 53 (L3-002898) (Termination Certification), Youngman agreed to help Randy White in June of 2009 with a Jaxon proposal for a test of the ██████████████████████████████.  SOF ¶ 112.  In spite of his fiduciary duties to L-3, Youngman provided L-3's competitor with over 11 pages of detail interpreting Jaxon's proposal, including the statement of work, and what should be included in the proposal.  *Id.* (JAX-0020625, with attachments, Youngman dep. Ex. 33).[21]  By assisting Jaxon in competing against L-3 (as well as by retaining and using L-3 proprietary documents and software), Youngman unmistakably breached his fiduciary duties to L-3.  *See Am. Express*, 38 F. Supp. 2d at 1247-48; *Koontz*, 787 P.2d at 195-96.

---

[21] Additionally, since Randy White, by his own admission, could not do HEMP testing, the proposals that Jaxon submitted in 2009, virtually all of which required testing, had to have been prepared, at least in part, by Youngman.

d.   Defendant Susan Rettig

Like Randy and Scott White, Susan Rettig's assistance to Jaxon while still an L-3 employ-ee was instrumental in allowing Jaxon to successfully compete against L-3 on the initial task or-ders.  First, as described above, Rettig emailed to herself numerous L-3 proprietary documents and retained them after being fired from L-3, including L-3's cost proposals and provisional bill-ing rates that would give any competitor "a significant head start in the proposal information nec-essary to bid on task orders," in direct contravention of both her contractual duties and the Termi-nation Certification.  *See* discussion *supra* Part (1)(B)(Ele. 3)(e).  This, alone, shows a breach of Ms. Rettig's fiduciary duties.  *See* Restatement (Third) of Agency § 8.05 (2006) and comment c.

Second, despite remaining at L-3 until the end of December 2009, *see* Ex. 53 (L3-002904) (Termination Certification), Ms. Rettig began disclosing L-3 proprietary documentation and as-sisting others to provide Jaxon with the capabilities to compete against L-3 as early as December of 2008.  *See, e.g.*, SOF ¶ 80 (JAX-0057774, with attachments, Charles Rettig custodian) (Dec. 11, 2008 email from Susan Rettig to Charles Rettig containing then-current and pending L-3 pro-posals, which included detailed and proprietary labor rates and categories with calculations and formulas for doing and calculating profit, various direct costs, materials and other costs, and which were specifically marked as containing L-3 proprietary data submitted to Serco in strict confidence.); *see also* SOF ¶ 94 (JAX-0014091-2, with attachment) (Feb. 13, 2009 Susan Rettig to Corey White email containing cost proposal for Jaxon's proposal 09-001 and an attached spreadsheet still bearing "L-3 Services, Inc." in the top left cell).

Even worse, Ms. Rettig began actively assisting Jaxon with its proposals while still work-ing for L-3.  SOF ¶¶ 94, 104, 113.  Notably, Randy White, despite initially trying to justify her

79

actions, admitted that Ms. Rettig worked on a number of Jaxon proposals throughout 2009 while still an L-3 employee when her husband, Charles Rettig, was "laid up on his back:"



Ex. 62 (3/15/14 Randy White Dep. Tr. 345:23-346:17); *see also id.* at 349:5-18 (discussing Susan Rettig's assistance to Randy White on a proposal in February 2009).

In fact, Mr. White even wished Ms. Rettig ▮▮▮▮▮▮▮▮," after her assistance on one such proposal. *See* Ex. 54 (JAX-0013980-14005 with native file attachment) (2/6/09 email from Randy White to Susan Rettig enclosing Jaxon proposal information and seeking Ms. Rettig's assistance); *see also* Ex. 79 (JAXHD-DF4-E008-00055) (2/11/09 email from Susan Rettig to Randy White offering to "▮▮▮▮▮▮▮▮" with White and responding to Randy White's email thanking Susan and Charles Rettig for their help with the "▮▮▮▮▮▮▮▮").

Eventually, Ms. Rettig became so involved with Jaxon that she began actively assisting both Jaxon and L-3 in competing for the *same* proposals at the *same* time. *See* SOF ¶¶ 104, 113; *see also* Ex. 63 (3/28/14 Susan Rettig Dep. Tr. 318:4-9 ("Q. So [you were] continuing to work for two companies doing the same work, and you were doing proposals for both of them at the same time, right? . . . A. It would appear that way.").  Indeed, Ms. Rettig testified that she received a letter from Serco, sent to her as an L-3 employee, but, instead of notifying anyone at L-3, she sent the letter to Randy White and told him to send Jaxon's information to Serco as soon as possible. *See id.* at 286:6-291:24.  Finally, over an hour later (and after Jaxon had time to react), Ms. Rettig sent the same letter to her supervisors at L-3.  *See id.* at 295:4-22.  Compounding Ms. Rettig's breach of her fiduciary duty, Randy White and Charles Rettig attempted to delete any evidence of Ms. Rettig's notification to Jaxon.  *Id.* at 300:1-15.  Ms. Rettig admitted that their actions upset her because it "wasn't the right thing to do:"

> Q.  Are you concerned about the fact that not only did you make what you call is this mistake, Randy and Chuck compounded it by deleting documents?
> MS. ROBERTS:  Oh, object to the form of the question.
>
> Q.  Does it upset you that they did that?
> A.  Yes, it upsets me they did that.
>
> Q.  Because it wasn't the right thing to do, was it?
> MS. ROBERTS:  Object to the form of this question.
> A.  In hindsight probably it was, yes."

*Id.*  Ms. Rettig then testified that her husband purchased a new computer, at least in part, to avoid sending any further Jaxon-related emails from her L-3 computer.  *See* Ex. 63 (3/28/14 Susan Rettig Dep. Tr. 306:10-15 ("Q. Well isn't it true that the reason you were buying the new computer was not because were concerned about ethics, but because you were concerned about getting caught? . . . A. I believe that's true.").

81

Ms. Rettig's undisputed assistance in preparing Jaxon bids and her assistance in enabling Jaxon to become a turn-key HEMP-testing operation, all while still at L-3, shows that she breached her fiduciary duties to her former employer.  *See Am. Express*, 38 F. Supp. 2d at 1247-48; *Koontz*, 787 P.2d at 195-96.

### e.   Defendant John McClure

As described above, Defendant McClure backed up his entire L-3 laptop onto his external hard drive before he left L-3, retained those documents, and disclosed L-3's proprietary HEMP-testing software to Tim Farajian an effort to assist him in creating Jaxon's own source code.  *See* discussion *supra* Part (1)(B)(Ele. 3)(b).  Although McClure left L-3 to go to a competitor before he became involved with Jaxon, McClure's retention, use, and disclosure of proprietary L-3 documents and software after he left L-3 for his and Jaxon's benefit (and in direct contravention to his Termination Certification) shows that he breached his fiduciary duties to L-3.  *See* Restatement (Third) of Agency § 8.05 (2006) and comment c.

### f.   Defendant Kelly Rice

As described above, Mr. Rice retained L-3 proprietary documents in his hard drive, including L-3 test plans and technical manuals.  *See* discussion, *supra* Part (1)(B)(Ele. 3)(f).  He also modified certain other L-3 proprietary documents to create similar documents for use by Jaxon.  *Id.*  This retention and use of L-3 documents for Jaxon's benefit after Rice left L-3 (and in direct contravention of his Termination Certification), alone, shows that he breached his fiduciary duties to L-3.  *See* Restatement (Third) of Agency § 8.05 (2006) and comment c.

Additionally, as described more fully below, based on Rice's extensive knowledge of L-3's portable SE testing "ABITE" system, as well as the incredible similarity between that system

82

and Jaxon's portable SE test system, the KR2, it cannot be disputed that Rice built Jaxon's system, at least in part, based on L-3's.  *See* discussion *infra* Part 3(B)(Ele. 2)(j); *see also* Ex. 55 (Crain Expert Report at 23) (noting that "the KR2 system is at least a derivative of an L-3 developed and proprietary product").  This use of L-3's trade secrets in creating products for Jaxon also constitutes a breach of Rice's fiduciary duties to L-3.

       g.  Defendant Jerry Lubell

As described above, Defendant Lubell was performing similar services for Jaxon at the same time he was providing such services to L-3, including services related to DTRA, in direct violation of the ESA.  *See* discussion *supra* Part (1)(B)(Ele. 3)(g).  Mr. Lubell also improperly copied L-3 proprietary information and retained that information through his email address in violation of the ESA and his other contractual duties.  *See id.*  Not only are these actions breaches of Lubell's contracts with L-3, they also violate his separate and distinct fiduciary duties to L-3.  *See L-3 Commc'ns Corp.*, 863 F.Supp.2d at 1087; *see also Am. Express*, 38 F. Supp. 2d at 1247 (awarding summary judgment to plaintiff for both breach of contract and breach of fiduciary duty claims based on the same operative facts).

**Element 3: L-3 Suffered Damages as a Result of Defendants' Breaches**

As a direct result of the Employee Defendants' breaches of their fiduciary duties, Jaxon was able to compete directly against L-3 for a number of task orders and win bids that otherwise would have gone to L-3.  As with its breach of contract claims, L-3 does not deny that the amount of damages suffered by L-3 is still in dispute.  However, L-3 only seeks summary judgment with respect to liability and agrees that the determination of damages to be awarded to L-3 should be determined at trial.  *See Am. Express*, 38 F. Supp. 2d at 2248 (granting summary judgment on

plaintiff's breach of contract, tortious interference with prospective contract, and breach of fiduciary duty claims on liability only and setting the determination of damages on those claims for trial).

### 3. **L-3 Is Entitled to Summary Judgment on Its Claim that by Stealing L-3's Confidential and Proprietary Information, All Defendants Violated the Colorado Uniform Trade Secrets Act (Count 7)**

#### A. **Burden of Proof and Elements**

L-3 has the burden of proof by a preponderance of the evidence on its misappropriation of trade secrets claim under the CUTSA. "To prove misappropriation of a trade secret, a plaintiff must show: (i) that [the plaintiff] possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and (iii) that the defendant knew, or should have known, that the trade secret was acquired by improper means." *Shell v. Am. Family Rights Ass'n*, 899 F. Supp. 2d 1035, 1055 (D. Colo. 2012) (citing *Gates Rubber Co. v. Bando Chemical Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993)).

Importantly, "'[m]isappropriation' is defined broadly to include the [1] 'acquisition' of a trade secret by anyone who has reason to know it was acquired by improper means, as well as [2] 'disclosure' or 'use' of a trade secret without consent by anyone who acquired it improperly or had reason to know that his knowledge of it came from someone who got it improperly or under circumstances giving rise to a duty to either keep it secret or limit its use." *Gognat v. Ellsworth*, 259 P.3d 497, 500-01 (Colo. 2011) (en banc). As such, "[t]here is no requirement in Colorado's Uniform Trade Secrets Act that there be actual use or commercial implementation of the misappropriated trade secret for damages to accrue." *Hertz v. The Luzenac Group*, 576 F.3d 1103, 1115 (10th Cir. 2009) (internal citations omitted). Rather, "[m]isappropriation consists *only* of the im-

proper disclosure *or* acquisition of the trade secret." *Id.* (emphasis added); *see also Bolsa Resources, Inc. v. AGC Resource, Inc.*, No. 11-cv-01293-MSK-KMT, 2011 WL 6370409, at *6 (D. Colo. Dec. 20, 2011) (Krieger, J.) ("There is no requirement that the trade secret be used by the defendant, only that the trade secret be improperly disclosed or acquired.") (citing Sonoco Prods. Co. v. Johnson, 23 P.3d 1287, 1290 (Colo. App. 2001)).

Notably, an employee may "acquire" trade secrets through improper means even if he still had a right to access them at the time of acquisition, so long as he intended to bring them to his new employment. *See SBM Site Services, LLC v. Garrett*, No. 10-cv-00385-WJM-BNB, 2011 WL 7563785, at *10 (D. Colo. June 13, 2011) ("I find further that [the defendant] used improper means to acquire these trade secrets. Although as an SBM employee [the defendant] had the right to access the trade secrets, at a time when he was contemplating resigning from SBM, and sometimes after he had already met with [the new employer] to discuss employment, [the defendant] had his secretary gather SBM's trade secrets surreptitiously and with the intention of taking them with him to his new employment.").

As to the improper "use" of a trade secret, if a "product embodies a person's trade secrets, or relies on the trade secrets to another party's enrichment, such action constitutes 'use' under the [CUTSA]." *See Paradigm Alliance, Inc. v. Celeritas Techs., LLC*, 659 F. Supp. 2d 1167, 1186 (D. Kan. 2009);[22] *see also Innovatier, Inc. v. CardXX, Inc.*, No. 08-cv-00273-PAB-KLM, 2011 U.S. Dist. LEXIS 8385, at *11-12 (D. Colo. Aug. 1, 2011) (finding that the defendant knowingly misappropriated the plaintiff's trade secrets where the defendant incorporated those trade secrets

---

[22] Although the court in *Paradigm* construed Kansas's version of the Uniform Trade Secrets Act, Kansas's definition of "use" is functionally identical to that provided in the CUTSA. See Kan. Stat. Ann. § 60-3320(2).

into its patent applications).  Indeed, as the United States Court of Appeals for the Fifth Circuit

aptly explained:

> [A]ny exploitation of the trade secret that is likely to result in injury to the trade
> secret owner or enrichment to the defendant is a "use" . . . . Thus, marketing
> goods that embody the trade secret, employing the trade secret in manufacturing
> or production, relying on the trade secret to assist or accelerate research or devel-
> opment, or soliciting customers through the use of information that is a trade se-
> cret . . . all constitute "use."

 *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 451 (5th Cir. 2007) (quoting Restatement

3d of Unfair Competition, § 40);[23]  *see also Aspen Tech., Inc. v. M3 Tech., Inc.*, Nos. 12-20388,

13-20268, 2014 U.S. App. LEXIS 9916, at *15 (5th Cir. May 29, 2014) (per curiam) (noting that

the plaintiff had presented evidence of the defendant's "use" of its trade secrets because the trade

secrets "(1) permit[ed] M3 to create a competing product, (2) show[ed] M3 where it need not

waste its time and resources, and (3) reveal[ed] the needs that would not be met by [the plain-

tiff's] anticipated design").

   "[C]ourts generally allow use of circumstantial evidence to prove misappropriation of

trade secrets because 'requiring direct evidence would foreclose most trade-secret claims from

reaching the jury [as] corporations rarely keep direct evidence of their use ready for another party

to discover.'"  *Hammerton, Inc. v. Heisterman*, No. 2:06-CV-00806 TS, 2008 U.S. Dist. LEXIS

---

[23] Courts within Colorado and the Tenth Circuit also rely on the Restatement 3d of Unfair Com-
petition in construing the applicable trade secrets statutes.  *See, e.g.*, *Storagecraft Tech. Corp. v.
Kirby*, 744 F.3d 1183, 1186 (10th Cir. 2014) (relying on Section 45 of the Restatement 3d of Un-
fair Competition in determining appropriate remedies for a violation of Utah's (functionally iden-
tical) trade secrets act); *Cartel Asset Mgm't v. Ocwen Financial Corp.*, 249 F. App'x 63, 79 (10th
Cir. 2007) (same in determining the burden of proof for damages under the CUTSA); *see also
NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1132 (D. Colo. 2007) (using the Restatement 3d of
Unfair Competition §§ 2-6, 38-45 in determining the scope of unfair competition claims under
Colorado law).

38036, at *32 (D. Ut. May 9, 2008) (internal citations omitted).[24]   Consequently, "a plaintiff may prove use of its trade secrets by showing (1) access by the defendant to the trade secret and (2) similarity in the respective designs or products of the defendant and the trade secret owner." *Id.*; *see also Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361 (Fed. Cir. 2002) (holding that "showings [of] access and similarity . . . may support a trade secret misappropriation claim"); *Sokol Crystal Prods. v. DSC Comm. Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) ("[O]nce the jury concluded that (1) DSC had access to Sokol's trade secrets, and (2) DSC's product was similar to Sokol's, it was entirely reasonable for it to infer that DSC used Sokol's trade secret."); *Rivendell Forest Prods. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1046 (10th Cir. 1994) ("The company decision to integrate its many offices led to the hiring of Cornwell for the purpose of developing a new system; from the fact that the G.P. system was almost identical, the conclusion could well be reached at a trial that G.P. appropriated Rivendell's system.").

Moreover, "superficial" differences between two products do not negate the inference of "use" provided by their substantial similarity.  *See Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 839-40 (5th Cir. 2004) ("[E]xpert testimony revealed that the differences between the Dresser-Rand and Apix control products were only superficial.  As such, there was sufficient evidence presented at trial supporting the jury's conclusion that Apix used technology features associated with the Trax product in its own control system products.").

Next, in order to determine whether the plaintiff possessed a valid trade secret, the CUT-

---

[24] Although the court in *Hammerton* construed Utah's version of the Uniform Trade Secrets Act, Utah's definition of "use" is functionally identical to that provided in the CUTSA.  See Utah Code Ann. § 13-24-2(2); *see also Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1186 (10th Cir. 2014) (noting that Colorado's trade secrets statute was "materially identical" to Utah's) (citing *Hertz*, 576 F.3d at 1115).

SA defines "trade secret" as:

> The whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.

Colo. Rev. Stat. § 7-74-102(4).  "Information can be a trade secret notwithstanding the fact that some of its components are well-known or publicly available."  *SBM Site Serv., LLC v. Garrett*, No. 10-cv-00385-WJM-BNB, 2011 WL 7563785, at *9 (D. Colo. June 13, 2011); *see also Hertz*, 576 F.3d at 1109 (same).  Moreover, "a trade secret can exist in a combination of characteristics, each of which, considered separately, is in the public domain, but taken together, may yield a competitive advantage that results in a protectable trade secret."  *Harvey Barnett Inc. v. Shidler*, 338 F.3d 1125, 1130 (10th Cir. 2003); *see also Rivendell Forest Prods v. Georgia-Pacific Corp.*, 28 F.3d 1042, (10th Cir. 1994) ("[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.").  "In short, a trade secret 'may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives [the possessor] an opportunity to obtain an advantage over competitors who do not know or use it.'"  *DoubleClick, Inc. v. Paikin*, 492 F. Supp. 2d 1251, 1257-58 (D. Colo. 2005) (quoting *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 911 (Colo. Ct. App. 1997)).

In determining whether a plaintiff possesses a trade secret, courts may consider the following factors:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the infor-

mation; (4) the savings effected and the value to the holder in having the infor-
mation as against competitors; (5) the amount of effort or money expended in ob-
taining and developing the information; and (6) the amount of time and expense it
would take for others to acquire and duplicate the information.

*Hertz*, 576 F.3d at 1108 (quoting *Harvey Barnett*, 338 F.3d at 1129). Notably, this list of factors

is not exhaustive and is intended simply to provide guidance to the Court. *See, e.g.*, *Gold Mes-*

*senger*, 937 P.2d at 911 (factors to consider "include" the above); *Network Telecom, Inc. v. Boor-*

*Crepeau*, 790 P.2d 901, 902-03 (Colo. Ct. App. 1990) ("several factors may be considered," and

the listed factors above may "provide guidance"). "Novelty and invention are not requisite for a

trade secret as they are for patentability . . . . The protection is merely against the breach of faith

and reprehensible means of learning another['']s secret." *Rivendell Forest Prods. v. Georgia-*

*Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994) (quoting *Kodekey Electronics, Inc. v.*

*Mechanex Corp.*, 486 F.2d 449 (10th Cir. 1973).

"A customer list can be a trade secret when it is the end result of a long process of culling

the relevant information from lengthy and diverse sources, even if the original sources are public-

ly available." *Hertz*, 576 F.3d at 1114. Likewise, "knowledge of what a former employer plans

to bid on an future contract can be a trade secret." *DoubleClick*, 402 F. Supp. 2d at 1258; *see also*

*Ovation Plumbing, Inc. v. Furton*, 33 P.3d 1221, 1224-25 (Colo. Ct. App. 2001) (holding that a

contractor's confidential contract pricing and bid information was a trade secret and that "having

access to [the plaintiff's] bid information gave [the defendant] a competitive advantage because

he did not have to spend the time or money to generate or gather the documentation to develop his

own bid on a similar project"), as can "confidential business . . . [or] confidential financial infor-

mation." *See SBM Site Services, LLC v. Garrett*, No. 10-cv-00385-WJM-BNB, 2011 WL

7563785, at *9-10 (D. Colo. June 13, 2011) (holding that internal pricing information, confiden-

tial sales history reports, product information, internal senior management reports, and images from the plaintiff's propriety software program, as well as "the information contained within them," constituted trade secrets).

Computer software, hardware, processes, and other systems also may constitute trade secrets, even if they combine elements that are found in the public domain in creating the new product. *See Rivendell Forest Prods. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1046 (10th Cir. 1994); *Paradigm Alliance, Inc. v. Celeritas Techs., LLC*, 659 F. Supp. 2d 1167,1185 (D. Kan. 2009) (finding that computer processes related to web-based public awareness product could be trade secrets).  Similarly, modifications to existing equipment necessary for a specialized version of that equipment may constitute trade secrets.  *See Sokol Crystal Prods. v. DSC Comm. Corp.*, 15 F.3d 1427, 1429 (7th Cir. 1994) (affirming misappropriation of trade secrets verdict based on the modification of an oscillator, which itself was a common component, for use in a specific type of telecommunications switching device).  Additionally, drawings and specifications disclosing a party's designs constitute trade secrets.  *See Port-a-Pour, Inc. v. Peak Innovations*, No. 13-cv-01511-WYD-BNB, 2014 U.S. Dist. LEXIS 82918, at *62 (D. Colo. June 17, 2014) (holding that the plaintiff's propriety designs, drawings, and specifications for equipment, including a portable low-profile concrete batch plant, constituted protectable trade secrets, as they included proprietary modifications beyond their individual components, which were widely used in the industry); *see also Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 411 (6th Cir. 2007) (holding that design drawings or manuals were "properly considered trade secrets even though they contain[ed] a mixture of secret information (e.g., dimensions, tolerances, and data-reference points) and non-secret information").

In order to retain its trade secret status, the owner of trade secret information "must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." Colo. Rev. Stat. § 7-74-102(4).  However, the owner must only "take steps that are 'reasonable under the circumstances' to preserve the information's secrecy . . . 'extreme and unduly expensive procedures need not be taken.'"  *L-3 Communs. Corp. v. Jaxon Eng'g & Maint., Inc.*, No. 10-cv-02868-MSK-KMT, 2013 U.S. Dist. LEXIS 139219, at *8 (D. Colo. Sept. 27, 2013) (Krieger, C. J.) (quoting *Saturn Systems, Inc. v. Militare*, 252 P.3d 516, 521-22 (Colo. Ct. App. 2011)).  Indeed, "there are always more security precautions that can be taken."  *Hertz*, 576 F.3d at 1113.  "Just because there is something else that [the plaintiff] could have done does not mean that their efforts were unreasonable under the circumstances."  *Id.*

Thus, "Courts have found that sufficiently reasonable measures to secure the secrecy of confidential information include 'advising employees of the existence of a trade secret, limiting access to a trade secret on a 'need to know' basis, and controlling plant access.'"  *L-3 Communs. Corp.*, 2013 U.S. Dist. LEXIS 139219, at *9-10 (quoting *Saturn Sys.*, 252 P.3d at 522).  Moreover, "steps such as limiting the dissemination of the information to selected employees or requiring confidentiality agreements [can] be sufficient to show reasonable protection of the secret information."  *Id.* at *14 (internal citations omitted).[25]

---

[25] Tellingly, Colorado case law is replete with examples of courts recognizing that entering into agreements preventing disclosure of confidential information constitutes a reasonable effort to maintain secrecy sufficient to protect trade secret status.  *See, e.g.*, *Energex Enters., Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1282 (D. Colo. 2003) (non-disclosure portion of non-compete agreement prohibited disclosure of confidential information, defined to include trade secrets and product marketing and business strategies, in conjunction with restricting disclosure to

In fact, requiring a confidentiality agreement is the "primary and essential precaution" to be taken before disclosing any trade secrets. *See KodeKey Electronics, Inc. v. Mechanex Corp.*, 486 F.2d 449, 455 (10th Cir. 1973). This is because "[a]n employee's express agreement 'not to disclose any of the processes and methods' of his employer is a positive acknowledgment of the fact that some of such processes and methods are secret; the stipulation would otherwise be meaningless." *Id.* (internal citations omitted); *see also Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 911 (Colo. Ct. App. 1997) (noting that "the terms of the [parties'] agreement declare[d] that the confidential information constitute[d] the 'trade secrets' of [the plaintiff] and that the confidentiality of this information [would] not be subject to contest" and that such an agreement "was an acknowledgement of fact that the information was a trade secret") (citing *KodeKey*, 486 F.2d at 455).

Finally, a trade secret is acquired by "improper means" when it is acquired by "theft, brib-

those having a "need to know," evidenced the parties intent to protect plaintiff's trade secrets and other confidential information from unauthorized disclosure); *SBM Site Services, LLC v. Garrett*, No. 10-cv-00385-WJM-BNB, 2011 WL 7563785, at *10 (D. Colo. June 13, 2011) (finding that plaintiff took reasonable measures to protect the secrecy of its information by limiting the number of people who had access and requiring those with access to sign confidentiality agreements, non-compete and non-disclosure agreements, and similar contracts); I*nnovatier, Inc. v. CardXX, Inc.*, No. 08-cv-00273-PAB-KLM, 2011 U.S. Dist. LEXIS 8385, at *3 (D. Colo. Aug. 1, 2011) (mutual non-disclosure agreements found to be reasonable measures to protect confidential information); *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 911 (Colo. Ct. App. 1997) (provision in franchise agreement that stated that the "information, knowledge, and 'know-how' contained in the [operations and procedures] manual are deemed confidential" was sufficient to find the Operations and Procedures Manual a trade secret under CUTSA); *see also Xantrex Tech., Inc. v. Advanced Energy Indus., Inc.*, No. 07-cv-02324-WYD-MEH, 2008 WL 2185882, at *18 (D. Colo. May 23, 2008) (recognizing that a common factor considered in whether the employer took reasonable measures to protect its information is the existence of a confidentiality or nondisclosure agreement between the employer and former employee – the existence of such an agreement puts the employee on notice that certain materials belonging to the employer are considered trade secrets).

ery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Colo. Rev. Stat. § 7-74-102(1).  "While reverse engineering may sometimes be an appropriate way to discover a competitor's trade secrets, Colorado law prohibits reverse engineering by a party who has a duty of nondisclosure or nonuse," such as a duty assumed by entering into a confidentiality agreement.  *Port-a-Pour, Inc. v. Peak Innovations*, No. 13-cv-01511-WYD-BNB, 2014 U.S. Dist. LEXIS 82918, at *46 (D. Colo. June 17, 2014) (internal citations omitted).

**B.    The Undisputed Facts Show that Defendants Misappropriated L-3's Trade Secrets**

**Element 1: The Undisputed Facts Show that L-3 Possessed Valid Trade Secrets**

L-3's valid trade secrets include L-3's trade secret technology related to L-3's SE testing, PCI testing, and CWI testing.  SOF ¶¶ 39-66; Ex. 84 at 5 (Trade Secrets List).  For each of these areas of testing, L-3's trade secrets include (1) L-3's proprietary selection of parts (including its selection of vendors) from which test equipment is assembled, (2) L-3's methods of assembling, arranging and using the proprietary equipment to generate raw data, and (3) the software used to generate and assimilate raw date and to generate results and put them in the desired form.  *Id.*  L-3 also possesses trade secrets in its customer lists, pricing and labor rate templates, vendor lists, design drawings, labor categories, profit margins, technical and cost bidding templates, its contract bids and proposals, marketing strategy, technical documents and other data.  SOF ¶¶ 67-70; Ex. 84 at 24-25 (Trade Secrets List).

**I.    Having Taken Years and Millions of Dollars to Develop, L-3's Trade Secrets are Incredibly Valuable to L-3 and Could Not be Duplicated or Acquired by Others without Tremendous Expense**

Over the course of a decade, L-3 spent millions of dollars developing and perfecting its

HEMP-testing technology.  Through its creation and compilation of unique equipment, methodol-ogies, software, and attendant documentation, L-3 became the preeminent provider of HEMP-testing in the United States.  Accordingly, as the undisputed facts demonstrate that L-3's hard-won technology provides it with an irreplaceable value and significant competitive advantage, all of that technology must be considered valid trade secrets.

L-3 developed its trade secret technology related to SE, PCI, and CWI testing beginning in approximately 1998.  Ex. 67 ((1-28-14 Crain Dep. 53:22-54:4) (SE testing equipment); 67:21-68:14 (PCI testing); 69:2-19 (5K pulser); 69:11-14 (1K pulser began in 2000); 69:15-17 (E2 puls-er was developed in 2003).  From 1997 through 2008, L-3 spent millions of dollars, continuing to develop, modify, and perfect its testing technology, so as to ensure that L-3 remained at the fore-front of the HEMP-testing field.  *Id.* (noting that the technology evolved through 2007-08); Ex. 94 (Ex. 10 to Zachary Nye's Expert Report) (calculating that L-3 spent approximately $14,164,026 in research and development costs from 1997 through 2008); Ex. 53 (L3-1429804) (Crain Spread-sheet from Expenditure Run) (detailing millions of dollars in research and development expens-es).  This includes development of L-3's data acquisition and data processing software and its methodologies for conducting the SE, PCI, and CWI testing; the development and construction of the 1k, 5k, and E2 pulsers and the controllers for said pulsers;  and the optimum selection of parts, materials, and assemblies of such parts and materials into functioning test equipment.  Ex. 90 (2013 Crain Dec. ¶ 36).

The development of L-3's HEMP-testing equipment, methodology, software, and other trade secret information did not come easily.  In addition to spending millions of dollars in devel-oping its technology, L-3 spent years creating the HEMP-testing technology that it uses today.

Ex. 90 (2013 Crain Decl. ¶ 42).  For example, the BADDAS data acquisition software took approximately five to six years to develop.  *Id.* ¶ 37.  As such, Mr. Crain estimates that it would take a competitor at least several years to devise its own HEMP-testing technology.  *Id.* ¶ 42.  In fact, even Defendants' own software consultant testified that it took him approximately one to three years to write data acquisition software for one of L-3's competitors, SARA. Ex. 93 (1/22 PI Hearing Tr. 64:23-65:19 (Farajian)).

Nevertheless, through L-3's expenditure of significant time and resources, L-3 created a set of unique equipment and testing methodologies that have enabled L-3 to become the preeminent provider of HEMP-testing services in the U.S.  SOF ¶ 67; Ex. 32 (Crain Decl. ¶¶ 7-12); (Ex. 90 (2013 Crain Decl. ¶¶ 30, 33) (noting the unique nature of L-3's equipment and methodologies).  Indeed, the quality, efficiency, and efficacy of L-3's HEMP-testing services are dependent on L-3's unique HEMP-testing equipment, methodology, software, and other trade secrets.  Ex. 90 (2013 Crain Decl. ¶ 39).  Moreover, that same quality, efficiency, and efficacy provide L-3 with a competitive advantage over other providers of HEMP-testing services, who do not have L-3's HEMP-testing equipment, methodology, software, or other trade secrets.  *Id.* at ¶ 40.

Turning specifically to L-3's SE, PCI, and CWI testing equipment, L-3 arrived at an optimal selection of parts and equipment, from specific vendors that it had learned could be used to efficiently generate raw testing data.  SOF ¶¶ 39-60; Ex. 84 (Trade Secrets List).  Over the years, L-3 cultivated and selected specific vendors to supply its parts (and created lists of those vendors), based on a determination of which parts worked best for specific applications, and which vendors provided highest quality/lowest price for such parts.  *Id.*; *see also* Ex. 90 (2013 Crain Decl. ¶ 21).  L-3 then used that proprietary selection of parts to design, fabricate, and build its

own unique equipment, including a variety of unique pulsers to use in PCI testing and specialized equipment for the collection of SE and CWI data.[26]  SOF ¶¶ 39-60; Ex. 84 (Trade Secrets List); Ex. 90 (2013 Crain Decl. ¶ 33).  This selection and combination of parts, along with the creation of unique equipment, has been cultivated over many years, is not generally known, was developed at private expense, and provides L-3 with better capability at lower prices than any of its competitors.  *See* SOF ¶ 66 (Trade Secrets List); Ex. 90 (2013 Crain Decl. ¶¶ 39-40).  Notably, as Mr. Crain testified, the value and proprietary nature of this equipment is not in its individual components, many of which are commercially available, but is instead in the combination of those components to create L-3's unique and superior testing equipment.  *See* Ex. 67 (1-28-14 Crain Dep. Tr. 83:17-84:9) ("Those are commercially available equipments, yes . . . . The use of these in this manner is the trade [secret]—how you use them; when you use them; and for what purpose you use them is the trade secret, not the actual thing that belongs to Agilent."); *see also Harvey Barnett*, 338 F.3d at 1130; *Sokol*, 15 F.3d at 1429 (finding that the modification of an oscillator, which itself was a common component, for use in a specific type of telecommunications switching device was a trade secret); *Mike's Train House*, 472 F.3d at 411 (holding that design drawings or manuals were "properly considered trade secrets even though they contain[ed] a mixture of secret information (e.g., dimensions, tolerances, and data-reference points) and non-secret information").

     L-3's methods of assembling and using its test equipment are also proprietary and unique

---

[26] At times, L-3 also had certain vendors make custom parts used in its HEMP-testing equipment, pursuant to L-3's proprietary certification.  *See, e.g.*, Ex. 82 (CSI 16-17) (Defendant John McClure attempting to order, on behalf of Jaxon, a capacitor that he had ordered when he worked for L-3 and for which the vendor had custom made specifically for L-3).

information upon which L-3 depends for a competitive advantage.  SOF ¶¶ 39-60; Ex. 90 (2013

Crain Decl. ¶¶30; 39-40).  New equipment is built using existing equipment as a template.  *Id.*;

84 (Trade Secrets List).  Further, employees undergo extensive, months-long training in order to

assemble L-3's equipment properly, involving both on-the-job training by a senior technician or

engineer and written training documents.  Ex. 67 (1-28-14 Crain Dep. Tr. 89:24-90:14).  L-3 also

keeps proprietary assembly drawings, parts lists, and instructions for use in building its equip-

ment.  Ex. 67 (1-28-14 Crain Dep. Tr. 87:2-9) (for PCI testing); 89:6-14 (SE and CWI test suites).

Without such training and proprietary documentation, it would not be possible to reverse engineer

L-3's proprietary test equipment, even with that equipment in hand.  *See* Ex. 67 (1-28-14 Crain

Dep. Tr. 85:4-87:1) ("Q. Okay.  What else would they need in order to reverse engineer it if they

had the pulser in hand already? . . . A. To be able to reverse engineer our pulsers, you need the

how and the why and the what.  You need a detailed set of drawings, a detailed set of equipments

and procedures to use them; otherwise, this thing is going to pieces very rapidly."); 88:4-13 ("Q.

Okay.  The same question for an SE test suite or CWI test suite . . . . A. Even if they had our test

suite disassembled, they probably couldn't put it back together again and get it to work and func-

tion correctly without a detailed set of drawings and procedures.").

Similarly, L-3's equipment must be used in a certain way – known only to those who have

worked for L-3 – to generate the optimal acceptable raw data.  SOF ¶¶ 39-60; Ex. 84 (Trade Se-

crets List).  The proprietary and unique use of this equipment is learned by L-3 employees

through training under strict confidentiality agreements.  *Id.*  Moreover, L-3's PCI testing equip-

ment operates at extreme voltages and must be used following a strict and confidential protocol to

avoid explosions, damage, and injury to the equipment and anyone with the misfortune to be

nearby.  *Id.*; *see also* Ex. 67 (1-28-14 Crain Dep. Tr. 85:8-15) ("Well, this is—and we have to be—this is a 300,000-volt pulser.  It generates 5,000 amps, 1.5 gigawatts.  One mistake, it goes to pieces and people may die.  That's why.").  Such protocols are complex and cannot be learned merely by watching the testing that occurred.  *See* Ex. 69 (Eich Dep. Tr. 642:13-17) ("Q. Other than generally watching what they did, is it fair to say that your observation did not allow you to replicate in detail any of [L-3's] testing methods? A. Correct.").  L-3 has spent years perfecting its methodologies for assembly and use of its testing equipment, and they provide L-3 with a power-ful advantage in the HEMP-testing field.  SOF ¶ 67; Ex. 32 (Crain Decl. ¶¶ 7-12).  As such, L-3's methodologies for assembly and use, along with its test equipment, are valid trade secrets.  *See DoubleClick*, 492 F. Supp. 2d at 1257-58.

L-3 also created and uses proprietary, secret software to control, capture and compile the raw data acquired by the skilled, proprietary use of its proprietary testing equipment, as well as to analyze and generate the display of the results of that testing.  SOF ¶¶ 61-67; Ex. 84 (Trade Secret List).  These programs and code, including BADDAS, CUCO, STATE, AmpOFF, Butterfly, But-ter, Pulsedat, Reductionator, and Appendix Builder, were privately written through L-3's own funding, are not generally know, and provide L-3 with a significant advantage in performing HEMP-testing.[27]  *Id.*  Indeed, the reports (including tables and graphs) generated by these proprie-

---

[27] Although some of the software programs listed in the Statement of Facts were not internally developed by L-3 (such as Easyplot, Microsoft Excel, and PowerPoint), L-3 uses such programs in conjunction with its own developed software (such as BADDAS, Butter, CUCO, DataViewer, PulseStat, PrePulseStat, Butterfly, and Reductionator) when conducting HEMP-testing.  Ex. 90 (2013 Crain Decl. ¶ 16).  Including such commercial products as trade secrets is entirely appro-priate because it is the combination of software and the ways in which the programs are used and modified that give L-3 a competitive advantage, is proprietary, and consequently, a trade secret. *See Harvey-Barnett, Inc.*, 338 F.3d at 1129; *Rivendell*, 28 F.3d at 1046.

tary software codes are the deliverables submitted to L-3's customers and are part of what makes L-3 one of the preeminent HEMP-testers in the field.  *See id.*

As described above, Defendants, in the process of conducting their enterprise and establishing Jaxon, also stole thousands of pages of trade secret information, including L-3's customer lists, pricing and labor rate templates, vendor lists, design drawings, labor categories, profit margins, technical and cost bidding documents and templates, its contract bids, proposals, and test plans, marketing strategy, technical documents and other data.  These documents (all of which were confidential and proprietary to L-3) contain the technical information necessary to create a turn-key HEMP-testing enterprise with little-to-no research or drafting costs.  SOF ¶¶ 67-70.  The pricing, vendor lists, and design drawings allow the user to learn exactly which parts are needed (and from where) to create L-3's proprietary testing equipment.  The labor rates and categories and profit margins allow the user to determine who needs to build the equipment and how much can be paid for labor and equipment while still being successful.  L-3's customer lists, contract bids, templates, and proposals allow the user to almost instantly put forward bids for work in the HEMP-testing field without any of the time and energy that usually comes with creating such bids (and matching templates that been previously accepted in the industry).  The value of these diverse documents, all of which have been developed over years of perfecting L-3's testing methodologies and equipment, comes from their ability to short-circuit that same decades-long process for a newcomer to the field.  Their ability to give the user a head-start in the field, combined with their proprietary nature, renders them trade secrets.  *See Ovation Plumbing, Inc. v. Furton*, 33 P.3d 1221, 1224-25 (Colo. Ct. App. 2001) (holding that a contractor's confidential contract pricing and bid information was a trade secret and that "having access to [the plaintiff's] bid infor-

mation gave [the defendant] a competitive advantage because he did not have to spend the time or money to generate or gather the documentation to develop his own bid on a similar project").

In sum, L-3 spent millions of dollars over a decade to develop its unique testing equipment, methodologies, software, and accompanying documents, all of which have allowed L-3 to win bid after bid over its competition and become the preeminent company in the HEMP-testing field.  Given the value of L-3's equipment, its unique nature, and the resources spent developing it (and, as described below that L-3 keeps its equipment secret), L-3's HEMP-testing technology all constitutes valid trade secrets.  *See SBM Site Services*, 2011 WL 7563785, at *9-10 (holding that internal pricing information, confidential sales history reports, product information, internal senior management reports, and images from the plaintiff's propriety software program, as well as "the information contained within them," constituted trade secrets); *Port-a-Pour*, 2014 U.S. Dist. LEXIS 82918, at *62 (holding that the plaintiff's propriety designs, drawings, and specifications for equipment, including a portable low-profile concrete batch plant, constituted protectable trade secrets, as they included proprietary modifications beyond their individual components, which were widely used in the industry).

## II.    L-3's Precautions To Guard the Secrecy of Its Information and the Containment of its Trade Secrets to Only Those Who Need to Know

The undisputed evidence in this case demonstrates both that L-3 took reasonable precautions to protect its trade secrets and that its trade secrets were only known by those with a need to know.  Indeed, all employees in L-3 Communications Applied Technologies, Inc. ("ATI") (formerly known as Applied Technologies Group ("ATG")), including those in the Colorado Springs

Office,[28] were bound by multiple confidentiality and nondisclosure agreements prohibiting the disclosure of trade secret and proprietary information at the time Jaxon stole L-3's trade secrets. *See* Ex. 96 (Appleby Decl. ¶¶ 21-22). For example, as described above, each of the Employee Defendants were required to (and did) sign (1) the Standard Contract, (2) the Confidentiality Contract, (3) the Ethics Contract, and (4) the Termination Certification, all of which required the Employee Defendants to keep L-3's proprietary and trade secret information confidential, both during and subsequent to any periods of employment. *See* SOF ¶¶ 1-10.[29] Such confidentiality agreements are the "primary and essential precautions" to be taken before disclosing any trade secrets. *See KodeKey*, 486 F.2d at 455. They serve as "an acknowledgement of fact that the information [described therein] was a trade secret," and therefore serve as powerful evidence that L-3 took the appropriate measures to safeguard its trade secrets. *See Gold Messenger*, 937 P.2d at 911; *KodeKey*, 486 F.2d at 455; *see also L-3 Communs. Corp.*, 2013 U.S. Dist. LEXIS 139219, at *14 ("[S]teps such as limiting the dissemination of the information to selected employees or requiring confidentiality agreements [can] be sufficient to show reasonable protection of the secret

---

[28] L-3's HEMP-testing technology is primarily utilized out of the Colorado Springs Office and only individuals in the Colorado Springs Office and those who are acquiring parts for and/or building, repairing or need to use the HEMP-testing equipment are permitted to have access to that equipment. SOF ¶¶ 30-33; Ex. 90 (2013 Crain Decl. ¶¶ 13-14).

[29] Although not every employee in ATI had signed the Confidentiality Contract at the time in question, it is undisputed that *every employee* in the Colorado Springs Office signed the Agreement. *See* Ex. 96 (Appleby Decl. ¶¶ 22). Moreover, it is undisputed that *every employee* in ATI was bound by "multiple other confidentiality and nondisclosure agreements containing substantially similar provisions prohibiting the disclosure of L-3 proprietary and/or trade secret information." Ex. 96 (Appleby Decl. ¶¶ 21-22). Given their previous acceptance of numerous confidentiality agreements, ATI's Vice President of Finance, Steve Appleby, described the subsequent ATI requirement to sign the Confidentiality Agreement as a simple "belt and suspenders" approach. *See id.*

information." ).

Moreover, these "primary and essential" safety precautions L-3 took in requiring its employees to sign confidentiality agreements only begin to describe the numerous ways in which L-3 sought to keep its information safe.  First, L-3 required its employees to undergo online computer-based training several times a year regarding information security, including ongoing alerts regarding security awareness.  Ex. 59 (1/16 PI Hearing Tr. 148:24-150:18 Crain)).  L-3 employees are reminded throughout this training that L-3 takes a broad view of the information it considers to be proprietary.  *Id.*  This repeated training was buttressed by L-3's Employee Handbook, which specifically noted that "an employee may not use or disclose to an outside party Confidential or Proprietary information," which included "contract and rate information, salary and benefit data, and ATD's intellectual property."  SOF ¶ 22.  Likewise, L-3's Information Protection Desktop Guidebook identified "Proprietary Information" as "Information having business, technical, or trade secret value."  SOF ¶¶ 23-24.

As a result, numerous L-3 employees testified that the general consensus amongst employees (and the repeated instruction from management) was to treat all company information as proprietary.  *See* Ex. 65 (Coakley Dep. Tr. 33-37; 48-49) (Former L-3 employee noting (1) that his division did not deal with public information as it was mostly classified or subject to ITAR restrictions and, thus, that the general consensus among employees was to treat all company information as confidential, and (2) that employees were instructed (at least annually) to err on the side of caution and treat everything as proprietary); Ex. 67 (Crain Dep. Tr. 12:5-16) (noting that "management" and "all of the certificate trainings, essentially, tells us to treat everything as classified or as proprietary unless otherwise designated and permission given to release"); Ex. 67

(Barr Dep. Tr. 211:17-20) ("We assume everything's proprietary.  So we treat it as if it is, regardless of whether it's marked proprietary.").

Second, L-3 enacted numerous physical measures to protect its trade secrets.  Indeed, L-3's HEMP-testing technology (equipment, software, and methodology) is kept tightly controlled in the Colorado Springs Office (which employs approximately 20 people).  SOF ¶¶ 28-34.  Specifically, L-3's equipment and spare parts are stored within a laboratory that is kept locked and secure at all times, under alarm.  *Id.*  The only L-3 employees who are able to access the equipment are those who are acquiring parts for the equipment and/or who are building, repairing, or need to use the equipment.  *Id.*  Further, the Colorado Springs Office, itself, is only accessible to authorized personnel through the use of keyed locks and keypads.  *Id.*  All visitors to the office are required to be signed in and escorted, or are allowed limited unescorted access with prior approval.  *Id.*  When L-3's equipment is used for testing away from the office, this testing is performed at secure government facilities, and, when left overnight, the equipment is stored in secure areas that cannot be accessed by anyone other than those with need.  Ex. 72 (Kleeberg Dep. Tr. 106:6-8; 180:15-19); *see also* Ex. 90 (2013 Crain Decl. ¶ 27); Ex. 71 (Linn Dep. Tr. 160:12-15; 157:4-16) (observing that on jobs that took multiple days, pulsers were locked up in large rental trucks overnight, or stored in secured government facilities with round-the-clock guards).  Thus, L-3 took pains to keep its trade secret equipment secure, regardless of whether that equipment was being used by L-3 personnel at various client sites.[30]

---

[30] Although some individuals may have observed L-3's HEMP-testing at government sites, merely being able to observe such testing does not reveal trade secret information.  As described above, Mr. Crain testified that L-3's testing equipment could not be constructed without "a detailed set of drawings, a detailed set of equipments and procedures to use them."  Ex. 67 (1-28-14

Likewise, L-3's methodologies for constructing, testing, and using its HEMP-testing equipment are taught only to those individuals at L-3 who will be involved in the assembly, repair, and construction of the testing equipment and who will be conducting the actual testing.  Ex. 90 (2013 Crain Decl. ¶ 19).  L-3's test plans are marked as confidential and proprietary and are considered as such by the technicians who work with them.  *See* Ex. 70 (Kizner Dep. Tr. 29:21-30:15).  Additionally, when L-3's HEMP testing occurs at government sites, any nonessential individuals are kept far enough back from the testing to make it difficult for them to see what was actually happening.  *See id.* at 47:19-48:3.  As Donald Eich's own observations made clear, from a practical standpoint, it would be impossible for anyone simply "observing" L-3 personnel conducting a HEMP-test from afar to divine L-3's specific testing methodologies.  *See* Ex. 90 (2013 Crain Decl. ¶ 31); Ex. 69 (Eich. Dep. Tr. Vol. III at 640:22-641:7; 642:13-17).

---

Crain Dep. Tr. 85:4-87:1; 88:4-13).  In fact, even with his specialized knowledge as SERCO program manager in charge of evaluating HEMP subcontractors, Donald Eich testified that his review of L-3's equipment and testing did not reveal any of L-3's trade secrets:

> Q.  Okay.  When you looked inside the box, were you able to see, simply by looking in the box, who the manufacture was of any of the components?
>
> A.  No.
>
> Q.  Were you able to see any of the performance criteria of any of the components simply by looking in the box?
>
> A.  No.
>
> ***
>
> Q.  Other than generally watching what they did, is it fair to say that your observation did not allow you to replicate in detail any of their testing methods?
>
> A.  Correct.

Ex. 69 (Eich. Depo. Tr. Vol. III at 640:22-641:7; 642:13-17).  Likewise, Kenny Moore, a former SERCO employee, after observing L-3's HEMP testing, could only determine that the pulser was "basically on a work cart, big tank, and some electronic equipment next to it."  Ex. 95 (Moore Dep. Tr. 237:5-11).  Mr. Moore did not know what the electronic equipment was.  *Id.* at 237:12-14.  And, while he knew there was oil in the "big tank," "[a]s far as [he] knew, they were putting cooking oil in it[;] I don't know how it operated."  *Id.* at 238:15-16.

L-3's HEMP-testing software, including source code, are similarly kept under the prover-bial "lock-and-key."  The software is kept only on the Colorado Springs Office's servers, on indi-vidual computers within that office, and on encrypted laptops for employees' use outside of the office.  Ex. 90 (2013 Crain Decl. ¶ 15).  The computer systems are firewalled, and the computers themselves are password-protected with passwords that must be changed every sixty days.  *Id.*  Passwords are not disseminated beyond the Colorado Springs Office.  SOF ¶ 33; Ex. 60 (1/18 PI Hearing Tr. 76:5-7 (Anderson)).  People outside of the Colorado Springs Office do not receive access to L-3's HEMP-testing software.  SOF ¶ 33; Ex. 59 (1/16 PI Hearing Tr. 151:25-152:2 (Crain)).

Moreover, L-3 not only considered all of its HEMP testing software to be proprietary, Ex. 59 (1/16 PI Hearing Tr. 135:2-10), but it also consistently identified L-3's software as such (both internally and when discussing the software with customers).  *See* Ex. 60 (1/18 PI Hearing Tr. 94:10-97:9 (Anderson)) (testifying that former L-3 employee Bruce Anderson drafted test plans that identified the HEMP-testing software system as including three specifically-designed coded software packages written internally by L-3); Ex. 53 (L3-1344045-122, at 046 and 060) (docu-ments provided to customers and drafted by Defendant Kelly Rice specifically identified L-3's HEMP-testing software programs BADDAS and BUTTER as L-3 proprietary); *see also* Ex. 53 (L3-081546-89 at 47) (noting former L-3 employee Defendant Kelly Rice as the Division Manag-er); *id.* at 811568 (identifying L-3's BADDAS and CUCO as proprietary software code).

In fact, Defendant Jim Youngman testified that while he was at L-3, he never gave the BADDAS, BUTTER or CUCO source code to anyone, nor did he have any personal knowledge of anyone at L-3 ever distributing this software outside of L-3.  Ex. 59 (1/16 PI Hearing Tr. 48:9-

49:16 (Youngman)). Mr. Youngman further acknowledged that L-3's HEMP-testing software used for data acquisition was "proprietary," meaning that "these SW codes have been developed internally for our use." Ex. 53 (L3-001025-30 at 26); Ex. 59 (1/16 PI Hearing Tr. 52:23-57:14 (Youngman)) (discussing the same document). Mr. Youngman made it clear that:

> We do not market or sell this SW, it is purely for our use in data acquisition, processing, formatting and display purposes. These are: BadAss (Data acquisition) Butter (Data processing) Reductionator (Data processing) Data Viewer (Data Processing) CuCo (Data Processing[.] . . . All of this SW was also generated, modified and maintained without consideration of 'restrictive rights' (or I believe). None of it was deliverable on a previous contract. And none of it will be a deliverable here on this current contract, unless we develop new software for these purposes—which I am anticipating.

Ex. 53 (L3-001026-07); *see also* Ex. 60 (1/18 PI Hearing Tr. 61:9-15 (Youngman)).[31] L-3 not only considered its software codes to be proprietary, but protected it completely from anyone who should not have had access. *See* Ex. 59 (1/16 PI Hearing Tr. 48:9-49:16 (Youngman)); *see also id.* (1/16 PI Hearing Tr. 76:8-77:8 (Anderson)) ("Q. But my question was, you can't tell her Honor the name of a single person who had access to BADDAS code who should not have had access to BADDAS code? A. No, that is correct.").

Finally, with respect to L-3's other trade secret information, while L-3 made its vendor lists available to those employees who were responsible for ordering specific parts, L-3 did not make these lists publicly available. Ex. 90 (2013 Crain Decl. ¶ 22). Notably, since 2006, L-3 re-

---

[31] As none of the HEMP-testing software at issue was ever considered a deliverable under any government or commercial contract as part of a development effort, Ex. 59 (1/16 PI Hearing Tr. 146:16-19 (Crain)), that software does not fall within the Rights in Software Clause of the DFARS. *See* DFARS 252.227-7014(a) (noting that computer software consists of "computer programs, source code, source code listings, object code listings, design details, algorithms, processes, flow charts, formulae, and related material *that would enable the software to be reproduced, recreated or recompiled*.") (emphasis added).

quires each of its vendors to execute nondisclosure agreements keeping L-3's requested quotes confidential, prior to requesting those quotes from the vendors.  Ex. 67 (1/28/14 Crain Dep. Tr. 135:19-136:20; 138:16-19).  Moreover, as described above, even Defendants, themselves, understood that L-3 considered its lists of preferred vendors and suppliers to be proprietary.  SOF ¶¶ 13-15.

In short, L-3 kept all of its trade secret information behind password-protected files, confidentiality agreements, lock-and-key, and repeated admonitions to keep its material secret.  The undisputed testimony in the record shows both that L-3 limited knowledge of its trade secrets to only those individuals inside and outside the company who needed access to them (and if outside, under appropriate nondisclosure agreements), and that no one had access to L-3's trade secrets other than those to whom access was granted (at least until Defendants stole those trade secrets).  As described above, Defendants, themselves, all signed confidentiality agreements acknowledging the trade secret nature of the information they took, and they cannot now argue (in contravention of all the evidence) that such information was publicly available or that L-3's security measures were anything other than reasonable.  *See L-3 Communs. Corp.*, 2013 U.S. Dist. LEXIS 139219, at *9-10, 14 (noting that "[c]ourts have found that sufficiently reasonable measures to secure the secrecy of confidential information include 'advising employees of the existence of a trade secret, limiting access to a trade secret on a 'need to know' basis, and controlling plant access'" and that "steps such as limiting the dissemination of the information to selected employees or requiring confidentiality agreements [can] be sufficient to show reasonable protection of the secret information").  Accordingly, given the uniqueness and value of L-3's HEMP-testing technology and attendant materials described above, all of those materials are valid trade secrets.

107

**Element 2**: **The Undisputed Facts Show that Defendants Acquired, Disclosed, or Used L-3's Trade Secrets**

The undisputed facts show that each Defendant (a) acquired, (b) disclosed, *or* (c) used L-3's trade secrets without consent, each one of which *independently* satisfies this element of trade secret misappropriation under the CUTSA.  *See, e.g.*, *Hertz*, 576 F.3d at 1115 ("There is no requirement in Colorado's Uniform Trade Secrets Act that there be actual use or commercial implementation of the misappropriated trade secret for damages to accrue.  Misappropriation consists only of the improper disclosure or acquisition of the trade secret."); *Bolsa Resources*, 2011 WL 6370409, at *6 (Krieger, J.) ("There is no requirement that the trade secret be used by the defendant, only that the trade secret be improperly disclosed or acquired.").  A description of each Defendant's undisputed acquisition, disclosure, or use follows.

  a. Defendant Jaxon

Defendant Jaxon stands as the focal point for each and every Defendant's theft of L-3's trade secrets, from L-3's HEMP-testing equipment and methodologies to its testing software to its proprietary trade secret documentation.  "Because a corporation can act only through its agents, the rule is that the actions of corporate officers and directors are attributable to the corporate entity."  *In re Stat-Tech Securities Litig.*, 905 F. Supp. 1416, 1422 (D. Colo. 1995).  Indeed, as long as a corporation, through its officers or members, "knew or should have known that the trade secret was acquired by improper means," the acts of trade secret misappropriation by the corporation's members, co-founders, or officers may be imputed to the corporation.  *See Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1076-77 (D. Colo. 2012) (finding that a complaint for trade secret misappropriation stated a claim against a corporation where the plaintiff alleged that the corporation's co-founder and officer "misappropriated and used plaintiffs' trade secrets").

108

Here, all of L-3's trade secrets were misappropriated in order to transform Jaxon from an empty shell of a company—incapable of bidding on or servicing any of the HEMP contracts it sought—into an elite turn-key HEMP-testing machine, all without any of the research, preparation, or elbow-grease that would otherwise have been necessary, and practically overnight. Through Jim Youngman's, Scott McClure's, and Kelly Rice's backing-up of their L-3 computers on their hard drive and Scott White's emails of proprietary information to himself, Jaxon acquired complete parts lists and descriptions of L-3 test equipment, photographs, test plans, test data and other documents sufficient to allow Jaxon's technicians (all of whom are former L-3 employees familiar with L-3's equipment and methodologies) to recreate L-3's testing equipment and methodologies. Jaxon's acquisition of these items without L-3's consent, alone, is sufficient to show that Jaxon violated the second element of L-3's CUTSA claim. *See Hertz*, 576 F.3d at 1115; *Bolsa Resources*, 2011 WL 6370409, at *6.

Yet there is so much more. Jaxon not only acquired L-3's trade secret equipment and methodologies through its gain of proprietary documents disclosing that equipment and methodologies, but also Jaxon, through its access to that equipment and methodologies and its creation of its own substantially similar models, SOF ¶¶ 42, 43, 51, 52, 58, 59, 119, used L-3's trade secrets in all of its own HEMP-testing equipment. *See Hammerton*, 2008 U.S. Dist. LEXIS 38036, at *32; *Sokol*, 15 F.3d at 1432; *Rivendell*, 28 F.3d at 1046. Indeed, Jaxon had access to L-3's equipment and methodologies through its acquisition of L-3 test plans, photographs, and test data, combined with its hiring of L-3 technicians who had worked with and built this equipment throughout their careers. *See, e.g.*, SOF ¶ 69. These former L-3 technicians built HEMP-testing equipment for Jaxon that is substantially similar to L-3's and which operates using testing meth-

odologies that are nearly identical to those of L-3.  *See* SOF ¶¶ 42, 43, 51, 52, 58, 59, 119 (noting the substantial similarity of Jaxon's and L-3's equipment in both appearance, form, and function and the near identical methodologies used for Jaxon's substantially similar equipment).  Notably, even those alleged "differences" between Jaxon's equipment and L-3's were mostly thought up by the Employee Defendants while they were still working for L-3.  SOF ¶ 51.  Thus, Jaxon's access to L-3's trade secret HEMP-testing equipment, combined with the substantial similarity between that equipment and Jaxon's, makes it clear that Jaxon used L-3's trade secrets in creating its own equipment.  This is a separate violation of the CUTSA.  *See Hammerton*, 2008 U.S. Dist. LEXIS 38036, at *32; *Sokol*, 15 F.3d at 1432; *Rivendell*, 28 F.3d at 1046.

Finally, through Jim Youngman's and John McClure's admitted acquisition, disclosure, and use of BADDAS, BUTTER, CUCO, and other L-3 proprietary testing software (as described below), all for the expressly stated purpose of creating Jaxon's own JEMDAQ software, *See, e.g.*, SOF ¶¶ 126-144, Jaxon, itself, acquired, disclosed and used that software.  *See Stat-Tech*, 905 F. Supp. at 1422; *Christou*, 849 F. Supp. 2d at 1076-77.  Likewise, through Scott White's, Randy White's, Jim Youngman's, John McClure's, Susie Rettig's, and Jerry Lubell's improper acquisition, retention, and use of L-3 proprietary trade secrets (as described further below), Jaxon gained the knowledge and materials required to bid on every aspect of a HEMP-testing task order without the capital investment and time such an endeavor would otherwise have required.  Such actions also show Jaxon's acquisition, disclosure and use of L-3's trade secrets.

In short, all of the individual Defendants either acquired, disclosed, or used L-3's trade secret testing equipment, methodologies, software, or documentation in order to create Jaxon and allow it to become a turn-key HEMP-testing operation (as described individually below), and all

of that acquisition, disclosure, and use is directly attributable to Jaxon.  Further, Jaxon's testing equipment was created using L-3's trade secrets, and its possession of that substantially similar equipment constitutes a separate basis for trade secret misappropriation under the CUTSA.

### b. Defendant Randy White

Randy White not only acquired, used, and disclosed L-3's trade secrets by retaining and accepting, L-3 trade secret and proprietary information, which he then incorporated into bids sent to potential customers for HEMP-testing contracts in direct competition against L-3, but he also directed Jaxon's use of L-3's trade secret information to build Jaxon's own HEMP-testing equipment.  First, as described above, White admitted that he took technical L-3 trade secret information with him when he left L-3 regarding L-3 projects that he created while at L-3.  *See* discussion *supra* Part (1)(B)(Ele. 3)(c).  White then used these technical documents to prepare proposals for and bid on projects in direct competition against L-3.  *See id.*  This constitutes both improper acquisition and use of L-3 trade secret materials.  *See SBM*, 2011 WL 7563785, at *9-10 (finding that defendant's gathering of trade secrets, including internal pricing information, confidential sales history reports, product information, and internal senior management reports, while still at his old company to use at his new employment was "us[ing] improper means to acquire these trade secrets").

Second, Randy White accepted numerous L-3 proprietary documents sent to him by his son Scott White while Scott was still working for L-3, which Randy used in preparing bids for Jaxon.  *See id.*  For example, Scott White sent his father proprietary L-3 pricing data for inclusion in Jaxon RFP responses to Serco and multiple proprietary L-3 technical proposals on past Serco.  *See id.*  Randy White then used this information in preparing bids for Jaxon and disclosed it to

others outside of L-3 to benefit Jaxon (including in Jaxon's bids provided to potential customers). *See id.* In fact, as described above, Mr. White even forwarded an email containing confidential L-3 vendor pricing information to Michael Stella at Serco, and then asked Mr. Stella to "[p]lease burn this message once you download the PDFs. It's from my son." SOF ¶ 109 (JAX-0045439-41). Randy White's instruction to Serco to "burn" the email shows that he was fully aware of the proprietary and trade secret nature of the documents contained within his email and sought to cover his tracks. But the damage had already been done—White used and disclosed L-3's trade secrets in violation of the CUTSA.

Third, Mr. White, the co-founder and mastermind behind Jaxon, directed Jaxon's efforts to replicate L-3's HEMP-testing technology. Indeed, prior to July 2009, when Jaxon received its first award from Serco, Jaxon had only two or three employees: Randy White, Corey White, and possibly Joni White. SOF ¶ 115 (C. White Dep. Tr. 110:18-111:8). Yet, by the end of November 2009, Jaxon had put together two full sets of PCI testing equipment, which included 1K, 5K, and E2 pulsers, and corresponding controllers. SOF ¶ 119. Each of these pulsers was substantially similar to L-3's designs, using ███████████████████████████████████ ███████████████████████████ *Id.* Notably, the only differences between L-3's and Jaxon's testing equipment are superficial and many of those purported differences were actually envisioned by L-3 before Jaxon created its equipment. *See* SOF ¶ 51; *see also* Ex. 32 (Crain Decl. ¶¶ 51-65). "[A] corporate officer can be liable for the torts of the corporation if he actively participated or wrongfully cooperated in their commission." *Powell Products, Inc. v. Marks*, 948 F. Supp. 1469, 1483 (D. Colo. 1996). Given Mr. White's knowledge of L-3 trade secrets and his status of co-founder of Jaxon and one of only a few employees during the time in which Jaxon's

pulsers were created, Mr. White cannot now argue that he did not sanction to use of L-3's trade secrets in creating that equipment.  Mr. White acquired, disclosed, and used L-3's trade secrets in founding Jaxon and turning it into a turn-key HEMP-testing facility practically overnight.  Now he must pay the price for those actions.

c.  Defendant James Youngman

Defendant Youngman acquired, disclosed and used L-3's trade secrets by retaining thousands of L-3 proprietary trade secret documents for his use at Jaxon and by specifically using and disclosing L-3's trade secret HEMP-testing software during the creation of Jaxon's own software. As described above, Youngman admitted that Defendant McClure provided Youngman L-3's proprietary HEMP-testing software and that Mr. Youngman provided that software to Tim Farajian with instructions to "run" the software, to "steal" a part of the code, and to use the software as "examples on how to communicate with the instruments and some of the other functions, like plotting data."  SOF ¶ 132.  Youngman further admitted that he used L-3's software to help fix problems that he, Farajian, Randy White, and Scott White were having with their new JEMDAQ software.  Ex. 58 (1/15 PI Hearing Tr. 242-259) ("Q. Okay. So you were running the two codes [BADDAS and JEMDAQ] next to each other and generating output files and then comparing the files, right?  A. In this case, yes.").  Finally, Youngman admitted that it was inappropriate for Mr. McClure to have sent Farajian the L-3 software files, inappropriate for him (Youngman) to be aware of it and not do anything, and inappropriate for him to use BADDAS to de-bug Jaxon's software.  SOF ¶ 139; *see also* Ex. 58 (1/15 PI Hearing Tr. 211:10-15).  This all constitutes acquisition, disclosure, and use of L-3's trade secret HEMP-testing software.

Moreover, as described above, these admissions are backed up by the physical evidence.

113

That evidence reveals that Youngman sent Farajian a zip file on October 23, 2009 with a plethora of L-3 software and executable codes, instructions, and data files acquired using L-3 software. SOF ¶ 129 (Farajian-00215 with zipfile list)). It also reveals that Youngman backed up his L-3 computer to his personal hard drive on August 12, 2009, less than a week before he left L-3's employ. SOF ¶ 137; *see also* Ex. 32 (Crain Decl. ¶ 24). Not only did this hard drive contain various versions of L-3's BADDAS and BUTTER software (both executable and source code), but also it contained hundreds of BADDAS data files from both before and after Youngman left L-3's employ. SOF ¶ 143; Ex. 32 (Crain Decl. ¶ 15). This shows further use of L-3's proprietary trade secret software by Youngman. Indeed, the evidence reveals that Youngman used L-3's CUCO software in conjunction with Jaxon's data acquisition software and L-3's Post-Pulsdat software while conducting PCI testing. SOF ¶ 142. The evidence also shows that Mr. Youngman used the BADDAS software again in January 2010 while performing a PCI test for one of Jaxon's customers, Rockwell Collins. SOF ¶ 140; Ex. 77 (Youngman Dep. Tr. 369:7-371:7 (referring to Dep. Ex. 47, Farajian-00719, with attached data files, "Okay, it [BADDAS] was used during a ███████ ███████ test to acquire a piece of data because we had issues with either our JEMDAQ code or the scope, ....")).

Additionally, the hard drive held various reference folders from L-3 containing photographs, descriptions of L-3's HEMP-testing equipment, and design and data reduction tutorials, as well as numerous other files, all of which would represent a massive "leg up" to anyone starting a competing business. SOF ¶ 143; Ex. 32 (Crain Decl. ¶ 16). Youngman's possession of these files in direct contravention of his Termination Certification shows his acquisition of L-3's trade secret materials without its consent, as does his attempts to destroy those files in September 2010 and

October 2011 (the latter while L-3's motion to compel the production of Youngman's hard drives was pending).  *See* Ex. 32 (Crain Decl. ¶¶ 15-16); *see also SBM*, 2011 WL 7563785, at *9-10. Youngman acquired, disclosed, and used L-3's proprietary software and other trade secrets again and again in 2009 and 2010 for the benefit of Jaxon, and when L-3 began to realize what he had done, he tried (but failed) to destroy the evidence of his trade secret misappropriation.  He undisputedly acquired, disclosed, or used L-3's trade secrets without L-3's consent (any one of which, alone, would be sufficient to show misappropriation).

### d.  Defendant John McClure

Like Defendant Youngman, Defendant McClure acquired and disclosed L-3's trade secrets by backing up his L-3 laptop to his external hard drive before leaving L-3 and by providing L-3's trade secret HEMP-testing software to Farajian in an effort to create Jaxon source code.  As described above, McClure admitted to taking L-3's software and multiple other files by backing up his L-3 laptop before he left L-3 in April 2008, to moving those files over to his Jaxon laptop over a year and a half later, and then to giving L-3 software files to Mr. Youngman.  Ex. 64 (McClure Dep. Tr. at 373:2-23) (explaining that he kept a separate hard drive onto which he backed up his entire L-3 computer); Exhibit 61 (Feb. 12, 2014 Motions Hearing Tr.) at 17-19 (same), 66:1-16 (McClure explaining how Youngman got L-3 software files from him).

Moreover, the evidence reveals that McClure sent Farajian numerous versions of L-3 proprietary software on multiple dates in October and November 2009, with instructions on how to use them.  SOF ¶ 126 (Farajian-00003, with attached zip file) ("Here is the BADDAS source code in VB, check it out this is similar to how I want the code to function.   I will send the data reduction next week for PCI and some requirements."); ¶ 127 (Farajian-0052, with attachments) ("Here

is the PCI data reduction source code and CUCU executable with explanation how to set up."); ¶ 128 (Farajian-000210, with attachments, and Farajian-00212, with attachments) (additional McClure emails sending various versions of BADDAS to Farajian).  McClure's copying of his entire L-3 computer for his use at Jaxon in direct contravention to his Termination Certification shows his acquisition of L-3 trade secret information without L-3's consent.  *See SBM*, 2011 WL 7563785, at \*9-10.  Likewise, his provision of L-3's proprietary software to Farajian and Young-man shows his disclosure of those trade secrets.  Each, alone, is sufficient to show that McClure misappropriated L-3's trade secrets.  *See Hertz*, 576 F.3d at 1115; *Bolsa Resources*, 2011 WL 6370409, at \*6.

### e.  Defendant Scott White

Defendant Scott White acquired and disclosed L-3 trade secrets by retaining hundreds, if not thousands, of L-3 proprietary documents, which were then disclosed to others and used by Jaxon in creating its bids to Serco.  As described above,  from December 2009 to May 2009, while Jaxon was bidding on several Serco RFPs, Scott White emailed to his personal email ac-count several hundred scanned L-3 proprietary business documents, including vendor quotes, L-3 purchase orders, and invoices, for use in Jaxon's proposals to Serco.  SOF ¶ 105.  Moreover, as described above, on numerous occasions, White emailed either himself or other individuals out-side of L-3 (including Randy White) proprietary L-3 information for Jaxon to use in its proposals to Serco, including third-party and other L-3 pricing information.  *See* discussion *supra* Part (1)(B)(Ele. 3)(d).

In essence, Scott White provided Jaxon all of the L-3 information it needed (which was the product of years of L-3 research and experience) to instantaneously become a viable competi-

tor in the HEMP-testing industry.  Through usurpation of L-3's hard-won knowledge and experience, Scott White essentially put Jaxon in the perfect position to compete against his then-current employer.  Through this disclosure and retention of L-3 proprietary trade secrets, Scott White acquired and disclosed L-3's trade secrets in violation of the CUTSA.

### f.   Defendant Joni White

Defendant Joni White acquired and disclosed L-3's trade secrets by submitting technical bid proposals to Serco which incorporated those trade secrets.  Indeed, as described above, both Randy White and Scott White acknowledged that at least some of the L-3 proprietary information they retained from their time at L-3 was incorporated into Jaxon's bid proposals.  *See* Ex. 62 (3/26/14 Randy White Dep. Tr. at 539:13-540:7 (noting that Mr. White provided a description of 58 different shielded cabinets in a bid proposal based on extracts in his possession prepared while he was at L-3); 547:6-23 (noting that Mr. White prepared a proposal based on extracts from a technical order that Mr. White prepared while at L-3)); SOF ¶ 105 (noting that Scott White emailed himself hundreds of pages of L-3 proprietary documents, including vendor quotes, L-3 purchase orders, and invoices, for use in Jaxon's proposals to Serco).

Mrs. White, as President of Jaxon, submitted those proposals to Serco, which contained L-3's trade secret, proprietary information.  *See* Ex. 58 (1/15 Hearing Tr. 66:17-24 ("Q. This—this—this was a cover letter that you attached to a proposal that Jaxon made to Serco on March 11th, 2009, correct, [Mrs.] White? A. I believe so.  Q. All right.  And in the letter you say if they have any questions about the proposal that they should contact you, correct? A. Yes."); 97:9-12 ("Q. Okay.  That's also a proposal to Serco that went out under your signature, correct?  A. Correct.").  This submission of technical bid proposals to Serco that incorporated L-3's trade secrets

constitutes a disclosure under the CUTSA.  *See Innovatier*, 2011 U.S. Dist. LEXIS 8385, at *11-12 (finding that the defendant knowingly misappropriated the plaintiff's trade secrets by incorporating those trade secrets into its patent applications).

Joni White has been the president of Jaxon since its inception and is a 55 to 60 percent shareholder in the company.  Ex. 58 (1/15 PI Hearing Tr. 65:2-11).  In fact, Jaxon is classified as a small woman-owned business because of Mrs. White's status as President and majority owner of the company.  *Id.* at 66:1-7.  Her husband, Randy, reports to Mrs. White, as do all of the other Jaxon defendants.  Ex. 58 (1/15 PI Hearing Tr. 66:11-16.).  Moreover, at the time these bids were prepared and submitted to the Serco, Jaxon only had three employees – Ms. White, Randy White, and Scott White (Ms. White's husband and son).  SOF ¶ 115.  Given these facts, Ms. White cannot dispute that she was aware of and consented to the use of L-3's trade secrets in her proposals to Serco.  *See Powell Prods.*, 948 F. Supp. at 1483 ("[A] corporate officer can be liable for the torts of the corporation if he actively participated or wrongfully cooperated in their commission.").

### g.   Defendant Susan Rettig

Like Scott White, Defendant Susan Rettig acquired numerous L-3 proprietary trade secret documents that would give any other company a competitive advantage in the industry. Notably, on April 6, 2009, Susie Rettig emailed herself a myriad of L-3 trade secret materials, including an exempt performance appraisal, Ex. 53 (L3-1310594); ROM (rough order of magnitude) for ▮▮▮, Ex. 53 (L3-1310633); an ▮▮▮▮▮ and spreadsheet, Ex. 53 (L3-1310617); a letter with approved L-3 provisional billing rates for FY 2009, Ex. 53 (L3-1310624); an NDA with ▮▮▮▮ ▮▮▮▮▮▮ and Jaycor, Ex. 53 (L3-1310649); a Subcontractor Funding (Task

Summary), Ex. 53 (L3-1314346); an L-3 Services Inc. Project Setup Report, Ex. 53 (L3-1310637); a Project Authorization Summary (PAS), Ex. 53 (L3-1310656); an L-3 response to an RFP (███████████), Ex. 53 (L3-1310641); a modification from █████ to extend project 450351, Ex. 53 (L3-1310627); a Revised PAS, Ex. 53 (L3-1310662); a proposal, spreadsheet and RFQ from █████ Ex. 53 (L3-1314334); and proposed T&M rates for 3/28/09 – 3/27/10.  Ex. 53 (L3-1310597).  Ms. Rettig's acquisition of these trade secrets for use after her the cessation of her employment with L-3 (and in direct contravention of her Termination Certification) shows that she acquired these documents without L-3's consent, in violation of the CUTSA.  *See SBM*, 2011 WL 7563785, at *9-10 (finding that defendant's gathering of trade secrets, including internal pricing information, confidential sales history reports, product information, and internal senior management reports, while still at his old company to use at his new employment was "us[ing] improper means to acquire these trade secrets").

h.  Defendants Charles and Susan Rettig

Defendants Charles and Susan Rettig acquired numerous L-3 proprietary trade secret documents without L-3's permission in July of 2009 when they transferred a copy of all of the documents on Susie Rettig's L-3 work computer to their own personal computer.  Charles is Susan Rettig's husband, and both he and she now work for Jaxon.  Yet, in July of 2009, Ms. Rettig still worked for L-3, while Charles Rettig had been working for Jaxon since approximately the end of 2008.  Indeed, at that time, Charles Rettig was preparing bid proposals for Jaxon while Susie Rettig was doing the same for L-3. *See e.g.*, Ex. 62 (3/15/14 Randy White Dep. Tr. 345:23-346:17). Mr. Rettig never worked for L-3 and never had permission to possess any proprietary L-3 materials.  Ex. 32 (Crain Decl. ¶ 5).  Despite the couple's work for rival companies, Mr. Rettig testified

that until July of 2009, he shared Susie Rettig's L-3 issued work computer with her.  Ex. 74 (3/17 Charles Rettig Dep. Tr. 6:7-15).

In July of 2009, Mr. Rettig bought his own, personal computer.  *Id.* at 7:13-20.  After Mr. Rettig bought this computer, he hired an IT professional, who copied *all* of the information on Susan Rettig's L-3-issued work computer onto the personal computer, regardless of whether that information, belonged to Susan Rettig, Charles Rettig, or L-3.  *Id.* at 7:21-8:18 ("Q. What did you transfer over? A. Both—both Susie's and mine, so that she was working exclusively then of[ ] the key fob . . . . I hired a fellow to come over, and he just moved everything over . . . ."); 17:16-24 ("Q. Okay.  Did you tell your computer guy that you used to transfer over documents, Hey, only transfer over personal documents, Chuck Rettig documents.  Don't transfer over any L-3 docu-ments . . . . A. No.  He transferred everything over.").  Mr. Rettig admitted that he never had L-3's permission to transfer its documents onto his personal computer.  *Id.* at 17:9-15 ("Q. But I'm not asking you for the context or the history.  I'm asking when you transferred over the documents in July of 2009 to your Dell desktop, did you get permission from L-3 to transfer over L-3 docu-ments to your Dell desktop? . . . . A. No.").

Although Mr. Rettig purchased the computer, he testified that both he and Susan Rettig used it for their respective work after he bought it.  *Id.* at 8:1-10:19.  Mr. Rettig testified that Ms. Rettig had been instructed by her superiors that all of her work had to be done using a security, "key fob," but that Ms. Rettig became frustrated by the "key fob" and by her inability to print from her L-3 computer, and therefore, wanted all of her files transferred to Mr. Rettig's computer. *See id.* at 8:9-18.  Mr. Rettig testified that "[w]e just moved everything over so that the device that then belonged to L-3 was naked of all that."  *Id.*  That way, Ms. Rettig could do her work for L-3

120

independently of the "key fob" (and in violation of her supervisor's instructions).  Thus, both Mr. and Mrs. Rettig gained access to the L-3 data contained in Ms. Rettig's L-3 computer.[32]  Ms. Rettig was fired from L-3 in December of 2009 and signed her Termination Certification, swearing that she did not have any L-3 confidential information, on December 30, 2009.  Ex. 53 (L3-002904).

As described above, after Mr. Rettig's computer's hard drive was submitted to FTI for an analysis of the documents contained therein, FTI found almost one thousand documents undisputedly authored by L-3 employees on his computer.  *See* Ex. 2 (compiled by FTI listing (1) 100 documents authored by Charles Crain; (2) 689 documents authored by Brandon Merewether; (3) 41 documents authored by "Jaycor;" and (4) 146 documents authored by Sandi Quintero).  Tellingly, these documents contained an "enormous amount of L-3 information" that would give any competitor "a significant head start in preparing proposals to bid on task orders."  Ex. 32 (Crain Decl.  ¶ 35).  This information included (a) L-3's cost proposals submitted in prior years of the sites for which Jaxon bid and won its initial task orders in 2009 and (b) L-3's 2008 provisional billings rates (to go into effect in 2009) for work for specific customers such as ███████████ ███████████████████████ to which Jaxon was awarded contracts during its first couple years in business.  *Id.*  This information could be used to derive program and site specific cost estimates and would give the owner an understanding of what work would need to be done on those work sites, the number of labor hours and quantity of material needed to do it, and other in-

---

[32] Although Mr. Rettig testified that the computers were "bifurcated," i.e., that a folder existed for him and that a separate folder existed for Ms. Rettig, *see id.* at 8:9-18, both Rettigs now had access to each other's folders.  Moreover, by removing the mandatory security protection of L-3's "key fob," it was no longer possible to determine who was accessing the computer.

formation that would allow the user to project future costs for those same sites.  *Id.*

Mr. Rettig's acquisition of this proprietary L-3 trade secret information in July of 2009 without authorization and Ms. Rettig's retention of this information after signing her Termination Certification constitutes acquisition without permission under the CUTSA.  Additionally, Ms. Rettig disclosed some of the L-3 trade secret documents found on their computer to other individuals, including Charles Rettig.  SOF ¶ 80.  For example, on August 27, 2009 (while still working for L-3), Ms. Retting sent her husband an email attaching a memorandum purportedly containing 2009 Jaxon labor rates.  Ex. 79 (JAXHD-DF4-E008-00298).  Incredibly, this Memorandum matched, exactly, the labor rates contained in the L-3 2008 Provisional Billing Rates found on her and Mr. Rettig's computer.  *See id.*; *see also* SOF ¶ 146.  This example shows Ms. Rettig's disclosure and use of L-3's trade secret information and Mr. Rettig's acquisition of the same under the CUTSA.

### i.   Defendant Jerry Lubell

Defendant Lubell acquired L-3 trade secrets without permission by improperly copying L-3 trade secret information from his L-3 email to his own personal email without L-3's permission. For example, on December 11, 2009, in direct violation of the ESA, Lubell sent a copy of an email from his L-3 email account to his home address that attached an L-3 proprietary proposal. Ex. 53 (L3-935528-30, with native filed attached).  Lubell did not have permission to send this email to himself and his actions constitute acquisition without permission under the CUTSA.

### j.   Defendant Kelly Rice

Defendant Rice acquired L-3's trade secrets without permission by retaining such trade secrets after signing his Termination Certification, and he used L-3's trade secrets to modify those

documents for use by Jaxon and to build Jaxon testing equipment based on L-3's.  First, as described above, a forensic review of Mr. Rice's personal hard drive reveals that, at the time the hard drive was collected (per Court Order), Mr. Rice was in possession of L-3 proprietary documents, including a Tyco Electronics Factory Test Plan for Corcom HEMP Filters, specifically supplied to L-3 for L-3's Purchase Order 45D0000596, an L-3 HEMP test presentation to ████ an L-3 Technical Manual ████████████████████████████████████████ ████████████████████████, both specifically prepared for ████████████ by L-3.  Ex. 1 (FTI Decl., ¶ 14(e)) (providing a bulleted list of documents).  Mr. Rice's possession of these L-3 trade secret documents after he signed his Termination Certification shows acquisition of L-3's trade secrets under the CUTSA.  *See SBM*, 2011 WL 7563785, at *9-10.

Second, Rice's drive contained documents that purported to be Jaxon technical documents related to Jaxon's HEMP upgrade plans and Jaxon's test plans and procedures for companies such as Boeing and Serco. *See*  Ex. 1 (FTI Decl., ¶ 14(e)).  Although each of these documents appears at first blush to be a Jaxon document, their metadata undisputedly shows that they were created and modified from similar documents created at L-3 for L-3.  *Id.*.  The undisputed evidence reveals that Rice could not have come to possess these "Jaxon" documents without using L-3's documents to create them.  This constitutes use of L-3's trade secrets under the CUTSA.

Third, Rice created Jaxon's portable SE test system, the KR2, using the technology from one of L-3's own SE test systems, the ABITE system.  The KR2's parts also mirror a portable SE test system Kelly Rice designed while at L-3.  SOF ¶ 46.  Mr. Rice testified that he worked "extensively" with the ABITE system while at L-3, Ex. 66 (Rice Dep. Tr. 45:11-16).  Indeed, Mr. Rice testified that he developed the prototype for the ABITE, *id.* at 48:19-49:4, and, along with

Jim Youngman, Mr. Rice was one of the four inventors of the system. *Id.* at 47:11-15. Mr. Rice also conceded that he "put together [Jaxon's] portable SE system," the KR2. *Id.* at 147:13-18. The KR2 system is a "productized version of a system that Kelly Rice designed for L-3" in the ABITE system. Ex. 55 (Crain Expert Report at 19). In fact, the KR2 system contains code for controlling L-3's spectrum analyzers and signal generators and possesses the same "form, fit and function" as L-3's system. *Id.* at 20. For the most part, the equipment for Jaxon's and L-3's portable SE test systems are "interchangeable with each other and only require software changes to make them functional." *Id.* at 23. Thus, "the KR2 system is at least a derivative of an L-3 developed and proprietary product," *id.* at 23, and therefore its creation by Rice constitutes a use under the CUTSA. *See Hammerton*, 2008 U.S. Dist. LEXIS 38036, at *32; *Sokol*, 15 F.3d at 1432; *Rivendell*, 28 F.3d at 1046.

### <u>Element 3</u>: Defendants All Knew or Should Have Known that L-3's Trade Secrets Were Acquired by Improper Means

As described above, all of the Employee Defendants had both contractual and fiduciary duties to keep L-3's trade secrets confidential and refrain from retaining, using, or disclosing them after leaving L-3. Thus, each of the Employee Defendants acquired, disclosed, or used L-3's trade secrets in breach of their duty to maintain their secrecy (and in direct contravention of their Termination Certifications), and therefore, did so by improper means. Colo. Rev. Stat. § 7-74-102(1); *Port-a-Pour*, 2014 U.S. Dist. LEXIS 82918, at *46. Moreover, each of the other individual Defendants (Joni White and Charles Rettig) are both related to and worked hand-in-hand with one or more of the Employee Defendants and either knew or should have known of their contractual obligations. As such, they, too, acquired, used, or disclosed L-3's trade secrets by improper means. Finally, as Jaxon's officers and founders acquired L-3's trade secrets by improper

means, Jaxon did so as well.  *See Stat-Tech*, 905 F. Supp. at 1422; *Christou*, 849 F. Supp. 2d at

1076-77.  Accordingly, summary judgment should be granted on L-3's misappropriation of trade

secrets claims against all Defendants.

### 4.    Unjust Enrichment (Count 17)

#### A.    Burden of Proof and Elements

L-3 admits it has the burden of proof on this claim. The elements of this claim are (1) the

Defendant received a benefit, (2) at Plaintiffs' expense, (3) under circumstances that would make

it unjust for the Defendants to retain the benefit without commensurate compensation. *Bolsa Re-*

*sources, Inc. v. AGC Resource, Inc.*, Case No. 11-cv-01293-MSK-KMT, 2011 WL 6370409, at

*4 (D. Colo. Dec. 20, 2011) (internal citations omitted) "The claim of unjust enrichment is a judi-

cially-created remedy designed to undo the benefit to one party that comes at the unfair detriment

of another. Unjust enrichment is based on principles commonly associated with restitution." *Id.*

"Unjust enrichment may be appropriate when '[t]he defendant's wrongful act may be a common-

law tort, such as conversion of personal property or trespass to land, or it may be an equitable

wrong such as breach of trust or other fiduciary obligation.'" *Id.* (citations omitted).

Here, L-3 asserts its claim for unjust enrichment against each of the named Defendants.

The facts supporting L-3's claims for breach of contract, breach of fiduciary duty, and trade secret

misappropriation, also support L-3's unjust enrichment claim. L-3 understands that to the extent

any of the materials and information Defendants stole or wrongfully retained or obtained from L-

3 are determined to be L-3's trade secrets and subject to L-3's misappropriation of trade secrets

claim, such materials and information are not *also* subject to this unjust enrichment claim. *See,*

*e.g., Animal Care Systems, Inc. v. Hydropac/Lab Products, Inc.*, No. 13-cv-143-MSK-BNB, 2014

WL 103812, at *4 (D. Colo. Jan. 10, 2014) (recognizing that the CUTSA preempts other civil remedies for misappropriation of a trade secret).

But to the extent any of the L-3 items or information Defendants stole or wrongfully retained or obtained does not amount to a trade secret under the CUTSA, and the Defendants were unjustly enriched by their misappropriation of such items or information, there is no CUTSA preemption and unjust enrichment provides the proper remedy. *Id*; *see also Virtual Cloud Services, Inc. v. CH2M Hill, Inc.*, Case No. 02-cv-1004, 2006 WL 446077, at *2 (D. Colo. Feb. 21, 2006) ("[T]he salient question in addressing the question of trade secret act preemption is whether the challenged common law claim depends *solely* on a finding of trade secret status to be actionable. Where it does not, the claim is not preempted.") (emphasis added); *University of Colorado Foundation, Inc. v. American Cyanamid Co.*, 342 F.3d 1298 (10th Cir. 2003) (affirming unjust enrichment damages for theft of technology developed by plaintiff, which not subject to a trade secret or patent claim).

**B.      By using L-3's materials to set up a turn-key competitive operation to obtain HEMP-testing task Orders, the Defendants have been unjustly enriched at L-3's expense.**

**Element 1**: Defendants all obtained a benefit from their efforts to misappropriate L-3 materials to create Jaxon

As described above in tremendous detail, at varying points in 2008 and 2009, Defendants acquired, retained, used, and disclosed a comprehensive set of L-3 proprietary documents, materials, and software related to every aspect of the HEMP-testing industry and sufficient to transform a start-up, would-be HEMP-tester into a turn-key operation, without any of the ordinarily attendant costs or time. This metamorphosis of Jaxon from an empty shell of a company with only three employees into a full service HEMP-testing operation, alone, provided a huge benefit to

Jaxon.  Indeed, L-3 spent millions of dollars over the past decade developing and perfecting the technology, resources, and compilations of information that the Defendants improperly obtained from L-3.  *See* discussion *supra* Part (3)(B)(Ele. 1)(I) (noting that L-3 spent approximately $14,164,026 in research and development costs from 1997 through 2008).  And by taking this information from L-3, Jaxon was able to avoid spending the same time and money in developing its own technology and resources.

Moreover, Defendants used their new-found and improperly won skills in the HEMP-testing field to compete for, win, and perform task orders that they never would have received, but for their theft of L-3 materials, resources, and equipment.  As Jaxon could not have performed on these task orders without its theft from L-3, all of its profits on these task orders constitutes a benefit to Jaxon.  Additionally, each of the individual Defendants obtained a benefit as a result of the theft in the form of their salaries from Jaxon, because Jaxon was only able pay the Defendants due to the work it gained as a result of its acquisition of L-3's materials, equipment, and resources.

> **Elements 2 and 3**: Defendants obtained these benefits at L-3's expense under circumstances that would make it unjust for Defendants to retain the benefit without commensurate compensation

Again, as described above in tremendous detail, Defendants obtained L-3's proprietary materials, equipment, and resources (and the turn-key HEMP-testing operation that resulted therefrom) as a result of their breaches of their contractual and fiduciary duties and by underhanded and deceitful means.  Indeed, while ostensibly working for L-3 (and as described above with respect to each individual Defendant), the Employee Defendants took reams of L-3 proprietary documents, materials and resources and used them to compete directly against L-3, in spite of their

numerous contractual and fiduciary obligations to refrain from doing exactly that.  *See, e.g.*, discussion *supra* Part (1)(B)(Ele. 3); SOF ¶ 113 (noting that Susie Rettig assisted both Jaxon and L-3 on their bids for HEMP-testing at ███████████).  The Employee Defendants then retained L-3's proprietary information, equipment, resources, and software and used them for their own and Jaxon's benefit, despite expressly and unequivocally swearing that they had returned all such information to L-3.  *See, e.g.*, discussion *supra* Part (1)(B)(Ele. 3).  The other, remaining Defendants (all close family members to one or more of the Employee Defendants) knew exactly where this information was coming from and chose to use it nonetheless.

Moreover, through the use of Defendants' malfeasance, Jaxon was able to win HEMP-testing task orders with which Jaxon was directly competing with L-3 and which, but for Jaxon's use of L-3 materials and resources, L-2 would have won.  In short, Defendants effectively stole all of the materials necessary to replicate L-3's turn-key HEMP-testing operation and then used that nearly identical operation to win task orders and contracts that otherwise would have gone to L-3.  It is hard to imagine benefits that could be obtained at greater expense to a plaintiff or by more unjust means.  Accordingly, L-3 is entitled to summary judgment on its unjust enrichment claims.[33]

**5.      L-3 Is Entitled to Summary Judgment on its Conversion Claim Against Jaxon (Count 12)**

      **A.      Burden of Proof and Elements**

L-3 is moving for summary judgment only with respect to its conversion claims against

---

[33] As with L-3's claims for breach of contract, breach of fiduciary duty, and misappropriation of trade secrets, L-3 moves for summary judgment only with respect the issue of liability and agrees that the measure of damages to be awarded to L-3 should be determined at trial.

Jaxon.  L-3 admits that it has the burden of proof as to its claim for conversion.  The elements of a claim for conversion under Colorado law are (1) a defendant exercised dominion or control over property; (2) that property belonged to L-3; (3) the defendant's exercise of control was unauthorized; (4) L-3 demanded return of the property; and (5) the defendant refused to return it. *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F.Supp.2d 1066, 1081 (D. Colo. 2012) (internal citations omitted). As to elements four and five, however, "[w]here there is a wrongful taking, the tort of conversion is complete upon that taking; the victim does not have to demand return of the goods nor does the wrongdoer have to refuse such a demand." *Montgomery Ward & Co., Inc. v. Andrews*, 736 P.2d 40, 46 (Colo. App. 1987) (citing *Colorado Kenworth Corp. v. Whitworth*, 357 P.2d 626 (Colo. 1960)).

### B.    The Undisputed Evidence Shows that Defendant Jaxon Converted L-3's Capacitors for its 5K and 1K Pulsers

<u>Elements 1 and 2</u>: Jaxon exercised dominion or control over capacitors belonging to L-3

The undisputed facts show that Jaxon, through one or more of its employees, stole from L-3 the ███████ used as part of Jaxon's 1K and 5K pulsers.  Indeed, as of the end of November 2009, Jaxon had assembled two full sets of PCI testing equipment, which included 1K, 5K, and E2 pulsers, and corresponding controllers.  SOF ¶ 119.  Jaxon's 5K pulser ████████████ ██████████████████████████—the exact same ████████ used in L-3's own 5K pulser.  Ex. 32 (Crain Decl. ¶¶ 43, 47).  These ████████ are generally made to order by ████  SOF ¶ 122 (CSI 000017) (noting that the particular part number was "especially made for our customer [L-3]").  Jaxon's 1K ██████████████████████████, also just like L-3's 1K pulser.  *Id.*  Therefore, Jaxon required a total of ████████████ in making its two sets of 1K

and 5K pulsers.

Nonetheless, despite the fact that Jaxon built this testing equipment in November 2009 with parts that are generally made to order, ███ has no record of making or delivering the model ████████████████ to Jaxon (for Jaxon's use in the 5K pulser). SOF ¶ 122 (CSI 000001) (noting that ███ sold Jaxon only a single ████████████). Likewise, Jaxon has no record or financial entry corresponding to the purchase of any of its 5K or 1K ████████ in the relevant time period. *Id.* (Jaxon financials from 8/09 through 11/09, showing no entry for purchasing ████████ for the 1K or 5K). Indeed, on December 8, 2009, John McClure passed on to Scott White an update on what Jaxon had spent thus far on building HEMP-testing equipment. SOF ¶ 123. The attached "Test Purchases Matrix" contained no entries indicating that Jaxon was using *any* ███ ████████ in its 5K pulser (even though it was using four in each). *Id.*

As to Jaxon's two 1K pulsers, the Matrix contained only a single entry for a single ███ ████████, which would not even be delivered until the end of January 2010. *Id.* ████ own records confirm that it only provided Jaxon with a single ████████████ for its 1K pulsers. SOF ¶ 122 (CSI 000001) (noting that ████████████████████████). Thus, the undisputed evidence shows that Jaxon did not purchase any of the 10 5K ████████ and 2 1K ████████ it required to build its two 5K and 1K pulsers in November 2009. *See id.*[34]

The undisputed evidence also reveals photographs of a Jaxon 1K pulser, which contained a ████████████████████ that was built and shipped in January 2002. SOF ¶ 122 (2009 JAXON Photos DSC00034.JPG to DSC00038c.JPG). These photos were taken on December 1,

---

[34] Jaxon did eventually order two 80PP00001 capacitors from CSI, but those were not shipped until December 7, 2009, after Jaxon had already built its two 1K pulsers. *Id.*



2009, before a ███████ had ever been shipped to Jaxon, *see* Ex. 98 (DSC000016.jpg), and

the ██████ manufacturing and delivery date matched an order that L-3 had placed for the

same equipment on the same date.  SOF ¶ 122.  Moreover, L-3 placed orders for additional ██

███████ while the Employee Defendants worked at L-3.  *See* Ex. 82 (CSI-000021) (████████

████████).  Given that Jaxon did not purchase any of its own ██████ before December

2009, that the Employee Defendants had access to L-3's ██████ while they worked for L-3,

and that Jaxon had in its possession at least one ██████ that was delivered to L-3 years earlier,

Jaxon cannot dispute that it took the ████████ from L-3 required to build its November 2009

5K and 1K pulsers.

> **Elements 3, 4, and 5**: Jaxon's exercise of L-3's control was unauthorized and
> **Wrongful**

Jaxon**'s** theft of L-3's ██████ for use by a rival company to create testing equipment

that would compete directly against L-3 was not authorized by L-3.  Ex. 32 (Crain Decl. ¶¶ 48-

49).  Moreover, those ██████ were purchased for use in L-3's own test equipment, and Jaxon's

theft of that equipment for use in rival HEMP-testing equipment both deprived L-3 of its use of

the same equipment and occurred in breach of the Employee Defendant's contractual and fiduci-

ary duties.  Such taking was wrongful, and therefore satisfies the fourth and fifth elements of con-

version.  *See Montgomery*, 736 P.2d at 46 ("Where there is a wrongful taking, the tort of conver-

sion is complete upon that taking; the victim does not have to demand return of the goods nor

does the wrongdoer have to refuse such a demand.").

**6.     L-3 is entitled to summary judgment as to its Lanham Act claim (Count 13)**

**A.     Burden of Proof and Elements**

L-3 is moving for summary judgment on its Lanham Claims against Jaxon, Randy White,

Joni White, and Susan Rettig.  L-3 admits that it has the burden of proof on its claim under the Lanham Act, 15 U.S.C. § 1125(a). The elements of such a claim are (1) Jaxon made a material false or misleading representation in connection with promoting its products or services; (2) the representation was made in commerce; (3) the false representation was likely to cause confusion or mistake as to the origin, association, approval of the product with or by another, or as to the characteristics of Jaxon's products or services; and (4) the false statements caused L-3 harm. *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002).

Section 1125(a) creates two bases of liability – false association and false advertising. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1384 (2014). A claim under § 1125(a) has a broad reach and "imposes liability on any person who, on or in connection with any goods or services, uses misleading representations about a product." *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F.Supp.2d 1066, 1083 (D. Colo. 2012) (internal quotations omitted).[35] Each of the individual Defendants affected by this claim participated in acts that warrant Lanham Act liability. And under an agency theory, Jaxon is also vicariously liable for the acts of the individual Defendants. *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863

---

[35] 15 U.S.C. § 1125(a) (1) provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

F.Supp.2d 1066, 1085 (D. Colo. 2012); *see also Stat-Tech*, 905 F. Supp. at 1422; *Christou*, 849 F. Supp. 2d at 1076-77.

> **B.** **The undisputed facts Show that Jaxon's False and Misleading Advertisements and Proposals Violated the Lanham Act**

> **Element 1**: **Each of the affected Defendants made materially false or misleading representations in connection with promoting Jaxon's products or services**

Jaxon's bid proposals to companies in early 2009, including Serco; its Initial Talking Papers advertising Jaxon's capabilities in January of 2009, its website as it appeared in 2010 (before Serco issued the 2010 task orders) and a Jaxon Capabilities Presentation prepared for ███████ ███████ in November of 2009 all contained false and misleading statements in violation of the Lanham Act.

The classic Lanham Act false-advertising claim involves one competitor directly injuring another by making false statements about his own goods (or the competitors' goods) and thus inducing customers to switch. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1393 (2014). Under the same logic, implied falsities also fall within the scope of the Lanham Act, "because otherwise, clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed." *NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1134 (D. Colo. 2007) (internal citations and quotations omitted). Thus, as long as a statement contains a falsehood, whether direct or implied, such a statement meets this element of the Lanham Act. *See id.*

Here, Jaxon's bid proposals to companies in early 2009, including Serco; its Initial Talking Papers advertising Jaxon's capabilities in January of 2009, its website as it appeared in 2010

(before Serco issued the 2010 task orders) and a Jaxon Capabilities Presentation prepared for

█████████████ in November of 2009 all contained false and misleading statements in violation

of the Lanham Act.[36]  First, each of Jaxon's proposals submitted to Serco in early 2009 contained

numerous false representations regarding Jaxon's capacity, personnel, and experience.  For exam-

ple, on March 11, 2009, Joni White submitted Jaxon proposal 09-001 to Serco for its Task Order

9030.  SOF ¶ 98 (JAX-0000493-529).  At that time the proposal was submitted, Jaxon had three

employees—Randy White, Joni White, and Corey White.  SOF ¶ 115.  In spite of Jaxon's lack of

other personnel, the proposal expressly (and falsely) stated that Jaxon's employees included

"managers, engineers, scientists, professionals, and technicians" who were "well known to AF-

SCP personnel."  SOF ¶ 98.  Indeed, throughout the proposal, Jaxon references various positions

such as Chief Scientific Advisor, VP Engineering, and other positions for which it had no person-

nel to fill them.  *See id.*; *see also* Ex. 54 (JAX-0000493 at 508-09 (noting that Jaxon's ██████

████████████████████████████████████████████████████

████████████████████████ even though Jaxon did not have such a position).  Moreo-

ver, the proposal specifically referenced John McClure as one of Jaxon's Senior Test Engineers

and Scott White as Jaxon's VP of Maintenance, even though McClure was working for SARA

and Scott White for L-3 at the time.  *Id.*  Each of Jaxon's initial proposals to Serco in 2009 con-

tained these same false representations.  *See* Ex. 85-88 (Compilation of Jaxon Proposals).

---

[36] Randy, Joni White, and Susan Rettig assisted in the preparation of the bid proposal to Serco, and thus are liable, along with Jaxon for the false statements contained in that proposal.  Randy White and Joni White, as co-founders of Jaxon, approved and assisted in creating the false state-ments in Jaxon's 2010 website, and thus, along with Jaxon, are liable for the false statements found therein.  *See Powell Prods.*, 948 F. Supp. at 1483 ("[A] corporate officer can be liable for the torts of the corporation if he actively participated or wrongfully cooperated in their commis-sion.").

Similarly, the proposal stated that "our staff"—meaning Jaxon's staff—" 

," despite the fact that, as of March 2009, Jaxon had never performed a task order. *See id.* Again, these false representations were repeated in all of Jaxon's initial 2009 proposals to Serco. *See* Ex. 85-88 (Compilation of Jaxon Proposals). All of these statements were either explicitly false as of March 2009 or impliedly false, as they held Jaxon out as a long-time turn-key HEMP-testing operation, even though Jaxon had neither the personnel nor the experience advertised. *See NetQuote*, 504 F. Supp. 2d at 1134 (holding that advertisements comparing the quality of a competitor's products to those of the plaintiff falsely "implied that [the plaintiff's products] generally were of poor quality").

Second, Jaxon prepared "Initial Talking Papers" in January of 2009 that advertised its capabilities. *See* Ex. 79 (JAXHD-CH3-E007-00185-208); *see also* SOF ¶ 90. Like Jaxon's March 2009 proposal, these Talking Papers touted Jaxon experience and capabilities that Jaxon simply did not have at the time. In fact, the Talking Papers state that Jaxon had been involved in the "AFSPC HEMP Hardening Program" since 1996 and that "[w]e've [Jaxon] been performing EM studies, upgrades and maintenance ever since on AFSPC's mission critical sites." Ex. 54 at 00187. Likewise, the Talking Papers state that "[s]ince 1999 we are also the only team in the world authorized to perform repairs and upgrades to the faces of the radars," and they note projects that Jaxon performed "[i]n recent years." *Id.* at 00188. Of course, Jaxon had not been in existence before June 2008, and thus, all of these statements were either directly or impliedly false.

Third, in November of 2009, Jaxon sent a Capabilities Presentation to ATEC Industries that also falsely depicted Jaxon's experience and capabilities.  Notably, this presentation advertised an "automated" SE testing capability by Jaxon identical to L-3's ABITE capability, despite the fact that Defendants have repeated argued in deposition that they possess no such "automated" testing systems. Ex. 53 (L3-509586 at 595) (advertising Jaxon's "automated EM barrier monitoring systems"); *see also* Ex. 66 (8/21/13 Rice Dep. Tr. 227:25-228:15 (arguing that Jaxon's portable SE test system was "specifically designed not to be an ABITE" system and noting that Jaxon's system "does not run in an automated mode").  The Presentation also states that "Jaxon personnel have been instrumental in accomplishing" certain HEMP-testing for the "past 10 years" and have completed "[o]ver 20 task orders direct to ESC" and "[o]ver 40 task orders under the SENSOR program," even though Jaxon had been in business for only a little over a year and performing on task orders for less than six months.  *Id.* at L3-509598.  Finally, the Presentation shows a picture of a supposed Jaxon employee performing HEMP-testing.  *See id.* at L3-509599. In reality, this individual is an L-3 employee performing HEMP-testing for L-3.  Ex. 32 (Crain Decl. ¶ 36 n.12).  All of these statements are either directly or impliedly false.

Fourth, Jaxon's website, copyrighted in 2010, also contained false statements regarding Jaxon's capabilities, technology and expertise.  For example, the website states that Jaxon's "engineers have developed state-of-the-art, special [HEMP] test equipment . . . including full Certification by Command Authorities," and that "[p]atents are pending on these new pulsers and STE components," despite the fact that Jaxon never attempted to patent any of its technology.  *See* Ex. 54 (JAX-0044589 at 92) (mock-ups of the website containing the false representations regarding

Jaxon's technology);[37] *see also* Ex. 66 (8/21/13 Rice Dep. Tr. 27:16-21) ("Q. Has Jaxon contemplated filing any patents of its own? A. It –as I recall, it was discussed fairly early on and then dismissed because all the work that we do is funded by the government and anything we patented would belong to the government."); 28:15-20 ("We made the decision not to pursue any patents.").  Like Jaxon's Capabilities presentation, Jaxon's website also includes pictures of L-3 employees performing HEMP-testing and yet passes those L-3 employees off as its own.  Ex. 32 (Crain Decl. ¶ 36 n.12).  As such, Jaxon's website, too, contained directly or impliedly false statements.

### Element 2: Jaxon made its false representations in commerce

Each of the false representations made by Jaxon identified above were made in commerce. Indeed, Jaxon's proposal was submitted to Serco for the purpose of gaining HEMP-testing work in numerous states and international locations.  *See* Ex. 54 (JAX-0000529).  Likewise, Jaxon's Initial Talking Points and Capabilities Presentations were advertisements created to attempt to gain business for Jaxon from HEMP-testing contractors throughout the United States and the world.  *See, e.g.*, Ex. 53 (L3-509586-600) (Email from John McClure to ATEC in Elkridge Maryland enclosing the November 2009 Capabilities Presentation in an attempt to solicit HEMP-testing business from ATEC).  Finally, the advertisements contained in Jaxon's website attempted to do the same over the internet.  *See NetQuote*, 504 F. Supp. 2d at 1134 (holding that the plaintiff's advertisements made on its website were sufficient to state a claim under the Lanham Act).  Thus each of these representations were made in commerce.

---

[37] Jaxon's website still contains these same misrepresentations today.  *See* Jaxon website, available at http://jaxon-em.com/engineering.html (last visited Oct. 6, 2014) (noting that Jaxon's patents are "pending").

**Element 3**: Jaxon's false representations were likely to cause confusion or mistake as to the origin or characteristics of Jaxon's products or services

The law recognizes that once a court finds an advertisement to be literally false, or that the defendant acted with the intent to deceive, that finding triggers a presumption of customer confusion that relieves the plaintiff of any obligation to present evidence of likely confusion. *NetQuote, Inc. v. Byrd*, Case No. 07-cv-630-DME-MEH, 2008 WL 5225880, at *3 (D. Colo. Dec. 15, 2008). Here, as described above, each of the Jaxon representations at issue are literally false (or at a minimum, were intended to deceive any reader into believing that Jaxon possessed capabilities and experience that it did not), and thus L-3 does not have any obligation to present evidence of likely confusion. *See id.*

Nonetheless, even assuming *arguendo* that customer confusion was not presumed, Jaxon's false representations explicitly touting Jaxon's years of experience and preeminence in the HEMP-testing field, along with its employees' numerous accomplishments, even though Jaxon did not possess any of the advertised expertise, experience, or clout would necessarily cause confusion as to Jaxon's capabilities and experience.[38] In fact, Mike Stella, a former Serco Subcontract Administrator testified that it was possible that Serco would not have awarded Jaxon the task

---

[38] Moreover, "[t]he greater the similarity between the products …, the greater the likelihood of confusion." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002). Here, as described in tremendous detail above, Jaxon held itself out as a turn-key HEMP-testing operation because it was in the process of misappropriating L-3's proprietary and trade secret documents, equipment, methodologies, software and resources, and it created testing equipment nearly identical to L-3's. Notably, Jaxon employees had to specifically warn each other to try to create superficial differences between their equipment and L-3's. See Ex. 80 (PJAX-01196927-0001) (Sept. 11, 2009 email from Youngman warning McClure to "[t]ry not to make any of the pulsers look like what is claimed in the attachment [a copy of L-3's '989 patent]). Jaxon's clients, including Serco, would of course be confused as to the origin or characteristics of Jaxon's products when faced with a company with near-identical equipment to that possessed by L-3 and with a large swath of L-3's former testing employees in its employ.

orders it did if Serco had been aware of Jaxon's deceptive statements regarding Jaxon's personnel

and capabilities:

> Q. When you would send out RFPs and get responses, would you expect that the
> information contained in the responses from the subcontractors was true and
> accurate?
> A. Yes.
>
> ***
>
> Q. And it's presumed, so that SERCO can rely on those statements, correct?
> A. That's correct.
>
> Q. And if the statements contained in a proposal were untrue, isn't it fair to say
> that might have changed SERCO's decision with respect to any given subcon-
> tract
>    MR. EVANS: Objection to form and foundation.
> A. It's possible.
>
> Q. If you found out that a subcontractor submitted false statements to SERCO,
> would you believe, as part of your job responsibility, you would have to report
> that to somebody.
> A. Yes.

Ex. 97 (4/26/12 Stella Dep. Tr. 66:22-70:15).

In short, Jaxon's false representations described above contained literally false statements

of fact that would and did cause confusion or mistake as to the origin or characteristics of Jaxon's

products or services.  This is sufficient to meet the third element of L-3's Lanham act claims.  *See*

*NetQuote*, 2008 WL 5225880, at *3.

**<u>Element 4</u>: The false statements caused L-3 harm**

As with the rest of L-3's claims, L-3 is moving for summary judgment on liability only.

L-3 does not deny that the amount of damages suffered by L-3 is still in dispute and agrees that

the determination of damages to be awarded to L-3 should be determined at trial.

## CONCLUSION

For all of the reasons stated herein, L-3 respectfully requests that this Honorable Court grant it summary judgment on Counts 7, 8, 9, 10, 11, 12, 13, 15, and 17 of its Amended Complaint.

Respectfully submitted,

Date: October 6, 2014                L-3 COMMUNICATIONS CORPORATION, and L-3 SERVICES, INC.

By: /s/ Nigel L. Wilkinson

| | |
|---|---|
| Steven L. Levitt<br>Karen L. Weiss<br>LEVITT LLP<br>129 Front Street<br>Mineola, New York 11501<br>Phone:  (516) 248-9700<br>Fax: (516) 741-9224<br>E-mail:  slevitt@levittlawllp.com<br>E-mail:  kweiss@levittlawllp.com | Benjamin G. Chew<br>Nigel L. Wilkinson<br>MANATT, PHELPS & PHILLIPS, LLP<br>One Metro Center<br>700 12th Street, N.W., Suite 1100<br>Washington, DC 20005<br>Phone: (202) 585-6500<br>Fax: (202) 585-6600<br>Email: bchew@manatt.com<br>nwilkinson@manatt.com |
| | Bryan Patrick Collins<br>Robert M. Fuhrer<br>Pillsbury Winthrop Shaw Pittman, LLP<br>1650 Tysons Boulevard<br>Suite 1400<br>McLean, VA 22102<br>703-770-7900<br>Fax: 703-770-7901<br>Email: bryan.collins@pillsburylaw.com<br>robert.fuhrer@pillsburylaw.com |

ATTORNEYS FOR PLAINTIFFS

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 7th day of October 2014, I electronically filed the foregoing

using the CM/ECF system, which will send notification of such filing to the following:

Daniel E. Johnson
Lora A. Brzezynski
Derek A. Auito
R. Tyler Goodwyn, IV
Claire M. Maddox
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
djohnson@mckennalong.com
lbrzezynski@mckennalong.com
dauito@mckennalong.com
tgoodwyn@mckennalong.com
cmaadox@mckennalong.com

Steven Michael Masiello
Jennette C. Robert
McKenna Long & Aldridge LLP
1400 Wewatta Street, Suite 700
Denver, CO 80202-5556
smasiello@mckennalong.com
jroberts@mckennalong.com

/s/ Nigel L. Wilkinson