**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 10-cv-02868-MSK-KMT

**L-3 COMMUNICATIONS CORPORATION; and**
**L-3 SERVICES, INC.,**

      **Plaintiffs,**

**v.**

**JAXON ENGINEERING & MAINTENANCE, INC.;**
**JONI ANN WHITE;**
**RANDALL K. WHITE;**
**SUSAN RETTIG;**
**CHARLES RETTIG;**
**JAMES YOUNGMAN;**
**JERRY LUBELL;**
**KELLY RICE; and**
**JOHN MCCLURE,**

      **Defendants.**

_____

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS**
**FOR SUMMARY JUDGMENT AND OTHER MOTIONS**
_____

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment (**# 1175, 1185**), the Plaintiffs' response (**# 1246, 1265**), and the Defendants'

reply (**# 1294, 1295, 1298**); the Plaintiffs' Motion for Partial Summary Judgment (**# 1176, 1186**),

the Defendants' response (**# 1252, 1260, 1261**), and the Plaintiffs' reply (**# 1292**) the Plaintiffs'

Motion to Dismiss the Civil Theft Claim (**# 1196**), the Defendants' response (**# 1199**), and the

Plaintiffs' reply (**# 1200**); the Defendants' Motion for Summary Judgment (**# 1223, 1219**), the

Plaintiffs' response (**# 1234**), and the Defendants' reply (**# 1284, 1296**); and the Defendants'

Renewed Motion to Stay (**# 1227**) consideration of the Plaintiffs' patent infringement claims, the

1

Plaintiffs' response (**# 1245**), and the Defendants' reply (**# 1286, 1297**).  Also pending are a wealth of motions by both parties seeking to restrict public access to various filings (**# 1197, 1201, 1203, 1213, 1218, 1222, 1225, 1226, 1229, 1230, 1231, 1263, 1268, 1269, 1280, 1281, 1282, 1300, 1301, 1302, 1303, 1304, 1305**), all of which are unopposed.

## FACTS

Given the breadth of motions at issue here, the Court dispenses with a general factual or procedural summary, deferring factual development to the appropriate portion of the analysis.  It is sufficient to note here that the Plaintiffs (collectively, "L-3") are engaged in the business of performing high-altitude electromagnetic pulse ("HEMP") testing of electronics, particularly for military applications, along with designing and manufacturing HEMP testing equipment.  Most of the individual Defendants were employees of L-3 until approximately 2008, at which time they left L-3 and formed Defendant Jaxon Engineering and Maintenance, Inc. ("Jaxon"), a company that competes with L-3 in HEMP testing.  Among its claims, L-3 alleges that the individual Defendants misappropriated L-3 trade secrets when they left L-3 employment and that Jaxon is infringing upon L-3's patents.  The Defendants have filed counterclaims against L-3, although those counterclaims are not at issue here.

## ANALYSIS

### A.  Standard of review

The substantive motions at issue here are motions for summary judgment.  Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are

material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Here, both sides have filed motions seeking summary judgment in their favor.  Most often such motions must be determined separately because whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact.  *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

The Court pauses at this stage to emphasize that, given the sheer volume of briefing and exhibits submitted with regard to each of the parties' motions, the Court has scrupulously limited its analysis on a motion-by-motion basis, and within each motion, to the specific arguments and evidence identified by the parties in the pertinent portions of their respective briefs.  In other words, when considering the Defendants' Motion For Summary Judgment, the Court limits its consideration to the evidence and arguments contained within that motion, L-3's response to it, and the Defendants' reply; the Court does not consider evidence or arguments contained within L-3's own summary judgment motion, even though it might be directed at the same claims.  In considering the Defendants' motion directed at, for example, L-3's false advertising claim, the Court considers only the evidence and arguments specifically discussed by the parties under that heading (and any specific portion elsewhere in the brief incorporated by a precise reference), but will not consider evidence and arguments directed at, for example, the conversion or trade secrets claims.

To the extent that a party has, purposefully or accidentally, omitted a key argument or evidence from its presentation with regard to one set of motions but presented it in another, the Court can offer no solace.  The sheer amount of submissions on the parties' primary motions alone – a combined 439 pages of briefing and at least 2,400 pages of supporting exhibits on the Defendants' primary summary judgment motion, and a combined 547 pages of briefing and approximately 10,000 pages of exhibits on L-3's summary judgment motion – makes it essential that the Court limit its inquiry to a precisely-constrained set of evidence and arguments.  The Court lacks the time and resources to attempt to derive a unified, holistic overview of the interactions among the claims or among the parties' dispositive motions or to "hunt for truffles" that may be buried in documents submitted.

## B.  Defendants' Motions

### 1.  <u>Defendants' motion for summary judgment</u> (**# 1185**)

In this motion, the Defendants seek summary judgment on: (i) Claim VII in L-3's Amended Complaint (**# 33**), which sounds in misappropriation of trade secrets in violation of Colorado's Uniform Trade Secrets Act ("CUTSA"), C.R.S. § 7-74-101; (ii) Claims VIII through X, which allege that individual former employee Defendants breached various contracts (the "Standard Contract," the "Confidentiality Contract," and the "Ethics Contract") with L-3, and Claim XI which alleges that Defendant Jerry Lubell also breached an Exclusive Services Agreement that he signed with L-3; (iii) Claim XV, which alleges that the former employee Defendants engaged in a breach of fiduciary duty to L-3 by misusing confidential data entrusted to them; (iv) Claims XII and XIX, which allege that the former employee Defendants and Jaxon

engaged in common-law conversion and in statutory civil theft[1]; (v) Claim XIII, alleging that

Defendants Jaxon, Randall White, Joni White, and Susan Retting violated the Lanham Act, 15

U.S.C. § 1125(a)(1)(B), by falsely advertising the goods or services provided by Jaxon; (vi)

Claims XX through XIV, which allege individual claims of common-law fraud against

Defendants Randall White, Scott White, Kelly Rice, Susan Rettig, and Jerry Lubell, respectively,

relating to false statements that each made on their timesheets while employed by L-3; (vii)

Claim XIV, which alleges a claim of tortious interference with prospective economic advantage

against Jaxon, Randall White, and Susan Rettig, relating to business that Jaxon solicited from an

L-3 customer called Serco; (viii)  Claim XVII, sounding in unjust enrichment; and (ix) Claim

XVIII, which alleges a common-law conspiracy claim against the Defendants.

(a) Trade secrets claim

The Court does not intend the address the Defendants' motion on the merits as it relates

to the trade secrets claim, as the Defendants have previously filed an unsuccessful summary

judgment motion directed at that claim, raising many of the same issues.  In December 2012, the

Defendants filed a Motion for Partial Summary Judgment on Plaintiffs' Trade Secret and Breach

of Contract Claims **(# 463, 468)**.  With regard to the misappropriation of trade secret claim, the

Defendants argued, among other things, that L-3 lost any trade secret protection it had in certain

technology because it sold HEMP testing equipment to Boeing and the United States

Government without constraining those entities' ability to use and distribute the technology.  *See*

*Docket #* 463 at 8-17.  This is precisely the same argument that forms the backbone of the instant

motion insofar as it is directed at the trade secrets claim.  *See Docket #* 1175 at 6-18.  (This Court

denied the earlier motion **(# 694)**, finding, among other things, that the Defendants had relied

---

[1]      L-3 has since moved to voluntarily dismiss these claims, as discussed in more detail
below.

6

almost entirely on certain written documents that were not self-explanatory and for which the parties had not offered meaningful interpretations.  Nevertheless, the Court also attempted to interpret the documents as best it could and found some evidence that might suggest that Boeing and the Government implicitly understood the need to maintain L-3's confidentiality in the technology.)

Included within a court's inherent discretion to control their own dockets is the discretion to consider (or to refuse to consider) successive motions for summary judgment raising the same arguments or directed at the same claims.  *See Hoffman v. Tonnemacher*, 593 F.3d 908, 910-11 (9th Cir. 2010) *and cases cited therein*; *see also Wagner v. American Family Insurance*, 968 F.Supp.2d 1100, 1102 n. 3 (D.Colo. 2013).  Although courts sometimes accept successive motions where the latter motion presents a different factual record than the first motion did (as is the case here), this Court finds that, at least in the circumstances presented here, the presence of a different or broader factual record does not warrant a second round of motion practice.  As explained more than 50 years ago in *Allstate Finance Corp. v. Zimmerman*, 296 F.2d 797, 799 (5th Cir. 1961), "we certainly do not approve in general of the piecemeal consideration of successive motions for summary judgment, since defendants might well normally be held to the requirement that the present their strongest case for summary judgment when the matter is first raised."  This observation is consistent with this Court's belief that judicial resources are scarce[2] and that the effective functioning of the judicial system as a whole is not served when parties present incrementally more comprehensive summary judgment motions in the hopes that one will finally succeed.  This Court expects that every time a party presents a motion to the Court

---

[2]  Particularly so in this case, which has already absorbed an extraordinary amount of judicial time and effort over its lifespan.

for adjudication, that party has completely considered all aspects of the issue being raised, has thoroughly developed the record, and has ensured that the Court is receiving the party's strongest and most comprehensive argument on that point.  A party who presents something less than that, then demands another go-around, squanders the time and resources of their opponent, the Court, and all of the other litigants in the judicial system that await their own turn to have their cases heard.  The most appropriate way to prevent such waste is the hold to a rigid rule against hearing successive summary judgment motions directed at the same issues.

This Court might be more willing to entertain a successive summary judgment motion if circumstances beyond the movant's control compelled the filing of an initial motion that was less-comprehensive than the movant would otherwise have presented.   For example, if the pendency of an imminent dispositive motion deadline prompted the filing of the initial motion before the parties had completed their discovery and subsequently-acquired evidence unexpectedly changed the factual picture, the Court might permit a second motion to be filed. Here, however, there was no urgency for the Defendants to file their initial motion when they did so.  By May 2012, more than six months before the Defendants filed their initial summary judgment motion in December 2012, the Scheduling Order in this case had extended the dispositive motions deadline to May 2013 (**# 292**).  The Magistrate Judge had also extended the discovery deadline to February 2013 (**# 256**) before the Defendants filed their motion.  Thus, there were no external circumstances compelling the Defendants to seek summary judgment when they did, and they did so knowing that there was more factual discovery to be had.[3]  The Court can only assume that the Defendants filed their initial summary judgment motion in

---

[3]     Indeed, many of the transcripts submitted in support of the Defendants' instant motion reflect depositions taken after the Defendants' initial summary judgment motion in December 2012.

December 2012 as a matter of litigation strategy, hoping for a quick knockout in order to avoid spending time and money on continued discovery.  The risk of such a strategy is that it presents the Court with a less-than-comprehensive basis for granting relief to the Defendants, increasing the possibility that the motion will be denied.  Having gambled and lost on that strategy, this Court sees no reason why the Defendants should now be relieved of the consequences of that decision.

Accordingly, the Court declines to entertain a successive summary judgment motion by the Defendants directed at the trade secrets claim.[4]

(b)  Contract claims

L-3 asserts a series of breach of contract claims against each of the former employee Defendants.  The record reflects that these Defendants each signed three separate contracts with L-3: the "Standard Contract," the "Confidentiality Contract," and the "Ethics Contract."

---

[4]    In any event, the Court has reviewed the parties' briefing and evidence on that issue and finds that, to a significant extent, the Defendants' motion for summary judgment on the trade secrets claim would be denied on the merits.

Both parties reference an extremely detailed list of all of the trade secrets L-3 has identified as being allegedly misappropriated in this case.  *Docket* # 1174.  That list includes a list of the physical components of L-3's "SE test equipment" (*id.* at 6-7); a list of certain alternative methods that L-3 uses to construct the SE test equipment (*id.* at 7); a list of techniques that it employs when conducting SE testing (*id.* at 7-8); and a list of software programs that it employs when conducting SE testing (*id.* at 8-9).  The list contains similar categories regarding PCI testing (including the components of five different types of pulsers) and CWI testing, along with a list of more general business records in which L-3 claims trade secret protection.

The Court would be inclined to find that, by delivering test equipment to Boeing and the Government with no restrictions on the clients' ability to use or disseminate the equipment, L-3 surrendered any trade secret protection it might have in the identity of the parts used in that test equipment.  Although L-3 contends (on fairly thin evidence, the Court observes) that it would be extremely difficult for another person to reverse engineer the equipment in order to build duplicates, nothing in the record suggests that Boeing or anyone else in possession of that equipment could not, at the very least, readily disassemble the equipment in order to identify each and every part contained therein.  However, there may be a triable issue of fact as to whether production of the test equipment itself necessarily disclosed L-3's secret methods used in constructing that equipment, the secret techniques it used in conducting tests, and the source code (*c.f.* the output) of the software it supplied to Boeing and the Government.

Defendant Jerry Lubell signed a fourth contract with L-3, an "Exclusive Services Agreement." L-3 alleges that these Defendants breached each of these agreements, and the Defendants seek summary judgment on those claims, arguing that L-3 cannot show that the contracts are enforceable, that the Defendants breached them, or that L-3 suffered any damages resulting from the breaches.

Turning first to the Ethics Contract, the Court agrees with the Defendants that the document in question is merely an aspirational statement, not a formal contractual agreement with sufficiently definite terms. *See e.g. Stice v. Peterson*, 355 P.2d 948, 952 (Colo. 1960) ("An offer must be so definite in its terms . . . that the promises and performances to be rendered by each party are reasonably certain"). The Ethics Contract appears to take two different forms. One document (apparently distributed by L-3's predecessor entity called Titan) is a multi-page pamphlet entitled "Code of Ethics and Standards of Conduct" and a single-page document entitled "Statement of Affirmation." The employees signed the Statement of Affirmation below a paragraph reading "I have received and read the [pamphlet] and understand the requirements and obligations contained therein as it applies to me. I will abide by the Code of Ethics and Standards of Conduct." (Apparently, these affirmations were signed annually or thereabouts by employees, and the language varies slightly from year to year.) The pamphlet itself is divided into several sections. The pertinent one, entitled "Standards of Conduct," begins with an introductory paragraph stating "Titan's Standards of Conduct prescribe specific guidelines that all employees should understand and follow. . . This Code of Ethics booklet provides general guidance applicable to all Titan employees, managers, and supervisors." Several pages later is a subsection entitled "Proprietary information, Copyrights, and Inventions," which states:

> All employees are obligated to:
>
> • Not remove from their former employer any information that is or might be considered private or proprietary . . . .[5]
>
> • Not disclose or use Titan customer private or proprietary information except as required by the normal business activity of Titan.
>
> • Not take, disclose, or use Titan or customer private or proprietary information upon terminating employment with Titan unless authorized to do so . . . .

A second version of the contract is a lengthy booklet, published by L-3, entitled "Guiding the Way: Code of Ethics and Business Conduct." (Notably, L-3's briefing does not direct the Court to any document by which the individual Defendants signed affirmations agreeing to comply with the provisions of this booklet.)   The booklet's section entitled "Purpose" states "In this guide, you will find a summary of some of our most important policies and procedures which govern the day-to-day conduct of our business.  More detailed guidance is found in our Corporate Policies."  It further states that "Our Code is designed to serve as a broad outline of our company standards and legal obligations that we are required to abide by."   Many pages later, under the subsection entitled "Safeguarding Confidential Information," the booklet states:

> At L-3, we own, create or have access to a significant amount of 'sensitive information' (e.g., confidential or proprietary information) in the course of conducting our business.  We must protect the confidentiality of all sensitive information whether obtained from or relating to L-3 and/or suppliers, customers, or other third parties.  You should not disclose (even to family) or use any sensitive information for any purpose other than on a 'need to know' basis within L-3.  This obligation lasts during your entire employment and at all times thereafter.

---

[5]     L-3 highlights this provision, among others, in its brief, but it is obvious that this prohibition refers to <u>new</u> Titan employees being prohibited from bringing trade secrets from their <u>former</u> employer with them to Titan.  There is no allegation that any of the Defendants improperly brought confidential information from their former employers to Titan/L-3.

The Court finds that these documents are not enforceable contracts.  Provisions contained in employee handbooks of this type can, in some circumstances, operate as binding contractual agreements, but to do so, it must be clear to both parties that the employer was making an offer to enter into a bargain on the terms contained in the handbook and that, by accepting or continuing employment, the employee was agreeing to be contractually bound by those terms. *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1464 (10th Cir. 1994).  Normally, the determination of whether an employee handbook created an implied contract create factual questions for a jury, but if the alleged promises are only "vague assurances," the Court may determine the issue as a matter of law.  *Id.*

Here, the pamphlet and booklet seem to disclaim any status as formal, binding agreements between the employees and L-3/Titan. They describe themselves as "guidelines" and "general guidance" and "summar[ies]."  The vast bulk of the documents' contents are generalized platitudes, statements of aspirational intent, or non-biding advice as to what employees and others "should" do.  The specific provisions that L-3 invokes appear to be express prohibitions, but they are presented in an indirect manner: rather than reflecting the crisp, unambiguous tenor of a formal contract provision, the prohibitions take on the elliptical form and passive voice of employees being "obligated" (by some unknown force) to "not disclose" confidential information.  This is compounded by the fuzzy terms by which the Defendants manifest their assent to the documents as a whole: they state that they agree to "abide by" the documents.  It is by no means clear whether this "abid[ing]" is intended to be  a promise by the employee to adopt the documents' platitudes and exhortations, an agreement to use the employee's best efforts to follow the advice, a promise not to engage in the behaviors that the employee is prohibited from (or, more accurately, "obligated" to "not [do]"), some combination

of those, or something else entirely.  Taken as a whole, the Court finds that, as a matter of law, the documents are so vague and indirect as to preclude them from having any contractual effect. There is no clear meeting of the minds as to what the employees are obligated to do, and no apparent consideration for their promise to do so.  Accordingly, the Defendants are entitled to summary judgment on L-3's claims of breach of contract relating to the so-called Ethics Contract.

The Court then turns to the claims invoking the "Standard Contract" and the "Confidentiality Contract."  The "Standard Contract" is a document entitled "Standard Confidentiality Agreement and Assignment of Inventions."  The Defendants signed these contracts at various dates between 1984 and June 2005, a time period in which L-3 was known as either Titan or Jaycor.  Taking the form of a typical contract, it recites that it is an agreement between each named employee and the company, recites definitions for certain key terms, recites the consideration given for the agreement ("hiring or continued employment of the employee"), and states its purpose: "to protect the trade secrets and other proprietary ad confidential information of the company."  It provides, in pertinent part, that "[t]he employee agrees to maintain the confidentiality of all Confidential Information," that "the employee will not . . . directly or indirectly reveal or cause to be revealed any such Confidential Information to any person other than to [Jaycor] employees," that the employee "will [not] use any such Confidential Information to the detriment of the Company," and that the employee "will not take or keep any Confidential Information" upon the termination of the employee's employment with Jaycor.  By its terms, the Standard Contract is governed by California law.

At some point after June 2005, Titan/Jaycor became L-3, and the employees were apparently asked to sign a new contract addressing confidentiality.  These new contracts,

described in the Amended Complaint as the "Confidentiality Contract," were signed by the

Defendants between August and October 2005.  The formal title of this contract is "Employee

Confidentiality and Innovation Agreement," and it provides, in pertinent part, that "I [the

employee] . . . agree to hold all Proprietary Information and L-3 Materials in strict confidence,"

that "I will not take, use, copy, disclose, publish, or summarize any Proprietary Information or L-

3 materials except to the extent necessary to carry out my duties and responsibilities as an

employee of L-3," and that "upon termination of my employment for any reasons, or upon the

request of L-3 if sooner, I will promptly deliver to L-3 all L-3 Materials in my possession,

custody, or control and shall not retain any copies of the L-3 Materials in any form or medium

whatsoever."  This agreement, by its terms, is governed by New York law.

The Defendants argue that, under either California or New York law, the terms of the

Confidentiality Contracts supersede the terms of the Standard Contracts, because they address

the same subject matter.  Thus, the Defendants argue, the Court should dismiss L-3's claims

premised on the Standard Contract.   The Court declines to address this issue, as the outcome

would not materially affect the nature of the evidence to be produced at trial. Whether the jury is

instructed on separate breach of contract claims addressing both the Standard and Confidentiality

Contracts, or on a single claim involving only the Confidentiality Contract (arguably

encompassing any breaches allegedly committed by the Defendants during the time frame of the

Standard Contract as well) is largely an administrative, not substantive, issue.[6]

---

[6]      That being said, it may be sensible for L-3 to dismiss its claims premised on the Standard
Contracts.  In all pertinent respects, the Confidentiality Contract appears to be at least as broad as
the Standard Contract, and it is difficult to conceive of a situation in which a Defendant could be
found to have breached the Standard Contract but not the Confidentiality Contract.  Even if there
is a conceivable difference, the likelihood that L-3 will prevail on a claim based on the former
buy lose on the latter seems extremely remote, particularly when balanced against the benefits
that simplification and narrowing of the claims would have for the parties and jury.

The Defendants also make an abbreviated argument that L-3 cannot show that they breached the Standard Contract (or the Confidentiality Contract) because the HEMP testing equipment and methods allegedly misappropriated by the Defendants are not confidential information or trade secrets in light of L-3's unrestricted dissemination of the HEMP testing equipment to Boeing and the Government. As previously noted, there is evidence suggesting that there is a genuine dispute of fact as to whether some of the material allegedly taken by the Defendants enjoys trade secret protection despite the production to Boeing and the Government. Accordingly, this argument is without merit.

That leaves the Exclusive Services Agreement, which L-3 entered into only with Mr. Lubell. That agreement, reached between the parties in November 2009, provides for L-3 to retain Mr. Lubell's services as a consultant to "perform work and services for, supply reports to, and act as a consultant to L-3" in exchange for stated compensation. Among other provisions, the Exclusive Services Agreement: (i) provided that L-3 was retaining Mr. Lubell "on an exclusive basis with respect to" a defined scope of work, which an attachment defined as "all activity with the Defense Threat Reduction Agency (DTRA)"; and (ii) included an addendum, entitled "Mutual Non-Disclosure Agreement," that required that, upon termination of the Agreement, Mr. Lubell "return to [L-3] any proprietary information" that L-3 had expressly marked as "proprietary" or "confidential" before delivering it to Mr. Lubell. L-3 alleges that Mr. Lubell breached both provisions, the latter by improperly retaining, at least, a "proprietary"-

---

The Court has previously observed that litigation, particularly the trial process, is unlike a law school examination. Litigants will not prevail by spotting and asserting as many issues or colorable claims as possible. Indeed, that often creates a duststorm that obscures recognition of dispositive issues and wastes both time and client resources. To prevail, counsel obviously must recognize all the issues, but then using discriminating judgment should cull out colorable-but-weak claims from strong ones, presenting only the best arguments to the Court. Put another way, using a rather homely metaphor – when one hopes to win the contest for the best steer at the stock show, one does not bring the entire herd.

marked L-3/Jaycor document entitled "Some Specifics (con't)," and the former by performing DTRA-related consulting work for Jaxon in January 2010, before the Exclusive Services Agreement with L-3 expired.  In reply, Mr. Lubell submits his own affidavit denying that these acts constitute a breach of the Exclusive Services Agreement, but the Court finds that this affidavit merely creates a genuine dispute of fact when juxtaposed with L-3's evidence, such that a trial is required on L-3's claim against Mr. Lubell for breach of the Exclusive Services Agreement.

Accordingly, the Court grants summary judgment to the Defendants on Claim X, alleging breach of the Ethics Contract, but denies summary judgment on the remaining contract claims.

### (c)  Breach of fiduciary duty

In Claim XV, L-3 alleges that each of the former employee Defendants breached a fiduciary duty they owed to L-3 by appropriating L-3's confidential data and other materials and using it to benefit Jaxon, L-3's competitor.   The Defendants' argument on this claim is exceedingly brief.  They contend merely that "with respect to L3's claim that the Former L3 Defendants misused L3 confidential data, L3 cannot show that a given Defendant misused any L3 data that was confidential" and refers the reader back to "Sections I and II above," a 40-page portion of the Defendants' motion.  It makes a similarly-abbreviated argument that L-3 cannot show damages flowing from the Defendants' alleged breach of their fiduciary duties, again referring back to arguments raised with regard to other claims.

The Court declines to entertain such a generalized and unspecific argument on these terms.  It is not clear whether the thrust of the Defendants' one-sentence argument that "no Defendant misused any L-3 data" or whether it is that "any data allegedly misused by a Defendant was not actually confidential" (or possibly some other permutation of the words in the

sentence).  The generalized reference to 40 pages of prior argument, much of which does not relate to any potential interpretation of the Defendants' single-sentence argument, offers no assistance.

The Court also declines to grant summary judgment to the Defendants on their argument that L-3 cannot adequately demonstrate an appropriate apportionment of damages among the Defendants and their alleged wrongs. The Defendants' brief appears to concede that, even if L-3 cannot demonstrate actual damages, it would still be entitled to an award of nominal damages in its favor, making the issue of damages one of proof at trial and instruction to the jury, not one that can be resolved on summary judgment.

### (d)  Civil theft and conversion

Claims XII and XIX alleged that the Defendants engaged in civil theft and conversion by taking physical property belonging to L-3.  The Defendants' summary judgment motion recites that by October 6, 2014 (the same date that the Defendants filed their summary judgment motion), L-3 had conceded in an e-mail that it no longer intended to pursue the civil theft claims in its entirety and that it would not be pursuing the conversion claim against the individual Defendants, but that it would apparently continue to press that claim as against Jaxon in some respect.  With regard to the conversion claim against Jaxon, the Defendants again offered a highly-abbreviated argument to the effect that the October 6, 2014 e-mail conceded the conversion claim against Jaxon as to every item of property that L-3 had identified in its interrogatory responses as having been converted, and thus, L-3 could not base any remaining conversion claim against Jaxon on allegedly-converted items of property that L-3 had not disclosed during discovery.  Shortly thereafter, L-3 filed a Motion to Dismiss the Civil Theft claim (**# 1196**).  The motion made no reference to the conversion claim.

Later, L-3 filed its response to the Defendants' summary judgment motion, arguing that the Defendants had failed to put forward a meaningful argument as to any deficiencies in L-3's conversion claim against Jaxon.  It further argued that the conversion claim against Jaxon was based on Jaxon "convert[ing] a number of CSI capacitors for use in Jaxon's 1k and 5k pulsers."[7] The response acknowledged that L-3 had not disclosed these capacitors when itemizing the alleged converted property in response to the Defendants' interrogatories, but L-3 argued that it did not discover the existence of the allegedly-converted capacitors until some time after it had answered the interrogatories and that it was under no obligation to supplement its interrogatory responses to include the capacitors because it subsequently "made clear to Defendants both during the discovery process and in writing that it had discovered evidence that Defendants had stolen CSI capacitors from L-3."

Fed. R. Civ. P. 26(e)(1)(A) provides that, once a party responds to discovery requests, the party is under a continuing obligation to "supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the [initial] disclosure is incomplete or incorrect."  However, that rule contains an exception: no supplementation is required "if the additional or corrective information has [ ] otherwise been made known to the other parties during the discovery process or in writing."  *Id.*  To satisfy the "made known" requirement, a party's collateral disclosure of the information that would normally be contained in a supplemental discovery response must in such a form and of such specificity as to be the functional equivalent of a supplemental discovery response; merely pointing to places in the

---

[7]   L-3's arguments incorporate by reference specific arguments and evidence that L-3 makes in its own Motion for Summary Judgment, in which it seeks judgment in its own favor on its conversion claim against Jaxon.  The Court's analysis here considers the evidence cited in that motion, as well.

discovery where the information was mentioned in passing is not sufficient.  *Jama v. City and County of Denver*, 304 F.R.D. 289, 228-29 (D.Colo. 2014).

The Court finds that although L-3 did not formally supplement its interrogatory responses to identify the capacitors as allegedly converted property, other information produced during the discovery process was sufficient to put the Defendants on notice of that fact.  Specifically, L-3 produced the report of Charles Crain, who discussed the capacitors at issue, posed the question "where did the [capacitors] come from?," and concluded that "the JAXON 1k pulser capacitor actually appears to belong to L-3."  L-3 further points out that, when deposing Mr. Crain, the Defendants clearly understood that L-3 was asserting that Jaxon had obtained the capacitor in question from L-3, as counsel repeatedly inquired of Mr. Crain as to the possibility that Jaxon could have acquired the capacitor from some other source.  Although the Defendants contend that Mr. Crain was identified only as a rebuttal expert, and thus, disclosure therein prevented the Defendants from obtaining a response from their own expert, that fact is irrelevant: the sole question being considered is whether L-3 somehow made clear to the Defendants that it was claiming the capacitor as converted property, and there can be little dispute that Mr. Crain's report did so.  The Defendants were free to seek to reopen discovery or otherwise attempt to explore L-3's new conversion facts in more detail, but it cannot be said that they were uninformed of L-3's position on the matter.

However, the Court also notes that, although Mr. Crain expressed relative certainty that the capacitor in Jaxon's 1k pulser was taken from L-3, he acknowledged that "the same cannot be said conclusively about [other capacitors]."  Thus, because L-3 did not unambiguously assert to the Defendants that it believed other capacitors were also converted, L-3's conversion claim against Jaxon is limited to a single instance of converting a single capacitor.

The Court finds that there is a genuine dispute of fact between the parties as to whether Jaxon converted the capacitor.  L-3 has produced evidence, through Mr. Crain and otherwise, that the particular capacitor in question is one that was custom-manufactured for it in 2002 and that it never gave that capacitor to Jaxon.  The Defendants have submitted evidence that the capacitor in question was obtained by Jaxon as part of a box of spare parts given to it by representatives of the Air Force.  Although each side contends that the other side's explanation is unpersuasive in various respects, it is clear that there is a genuine dispute of fact as to the means by which Jaxon came into possession of the capacitor.  Resolution of this dispute can only be had by trial.

Accordingly, the Court dismisses the civil theft claim in its entirety and the conversion claim against all individual Defendants, but the Court denies the Defendants' request for summary judgment on the conversion claim against Jaxon as it relates to the single capacitor used in Jaxon's 1k "prototype" pulser.

(e)  Lanham Act

L-3 asserts a claim under the Lanham Act, sounding in false advertising, against Jaxon, Randall White, Joni White, and Susan Rettig.  The crux of the claim is that Jaxon falsely advertised its ability to perform HEMP testing to potential customers in various ways.  To establish a false advertising claim under the Lanham Act, L-3 must show: (i) that the Defendants made a material false or misleading representation in connection with the promotion of their products or services; (ii) that the statement was made in interstate commerce; (iii) that the statement was likely to cause confusion or mistaken by customers as to the characteristics of the goods or services of the Defendants or others; and (iv) that L-3 suffered an injury as a result of

those false representations.  *L-3 Communications Corp. v. Jaxon Engineering & Maint., Inc.*, 863 F.Supp.2d 1066, 1082 (D.Colo. 2012).

The Defendants first challenge this claim on the grounds that L-3 never identified any of the alleged false representations during discovery.  The Defendants point to an interrogatory they served on L-3, requesting that it "identify each communication by a Defendant that . .  was a false representation" for purposes of the Lanham Act claim (among others).  It is undisputed that L-3's responses never identified any advertising-based communications.  In response to the Defendants' instant motion, L-3 again argues that it was not required to identify the advertising misrepresentations via interrogatories because it identified those matters through the alternate "made known" provision of Rule 26(e)(1)(A).  Careful parsing of L-3's summary judgment response is necessary, as that response makes many assertions regarding how it disclosed the allegedly misleading statements to the Defendants during discovery, but supports those assertions with only two actual citations to the record: (i) a reference to L-3 taking the deposition of Defendant Randall White, asking him "about various statements made in Jaxon's Initial Talking Papers dated January 2009 and whether those statements were false," and citing to a 15-page excerpt of Mr. White's deposition; and (ii) a reference to allegedly misleading statements in a March 2009 version of the Talking Papers, citing to a three-page excerpt from Mr. White's deposition.[8]

Turning first to the 15-page excerpt, the Court finds that it does not suffice to discharge L-3's obligations under Rule 26(e)(1)(A) for numerous reasons.  First, the Court notes that nowhere in the excerpt does L-3's counsel ever explicitly state to Mr. White or the Defendants'

---

[8]    L-3 also argues that "additional evidence of Jaxon's and other affected Defendants' false or misleading statements . . . is set forth" in L-3's own summary judgment motion.  The Court declines to consider that argument further.  Disclosure of L-3's factual position at that late stage is not a disclosure "during the discovery process" as required by Rule 26(e)(1)(A)'s exception.

counsel that L-3 is purporting to identify the particular misrepresentations that underlie L-3's Lanham Act claim. It is only logical to require that a constructive disclosure of information under the "made known" provisions of Rule 26(e)(1)(A) be at least as specific and comprehensible as the express disclosure normally required by the rule would have been. *Jama*, 304 F.R.D. at 299. Thus, to the extent that L-3 relies upon questions posited to Mr. White at his deposition to put the Defendants on notice of the particular alleged misrepresentations that underlie the Lanham Act claim, this Court would expect that such questioning would either be expressly identified as such (*e.g.* preceded by "I'd like to turn to the Lanham Act claim now . . .") or, at the very least, would be questions that unambiguously relate solely to that claim. Nothing in the 15-page excerpt suggests to Mr. White or the Defendants that the questions being presented relate to the Lanham Act claim, as opposed to a different claim by L-3; indeed, certain lines of questioning in that excerpt appear to be more germane to the trade secrets-based claims instead. For example, the lengthiest portion of the excerpt concerns a portion of the document that appears to be a cost proposal by Jaxon for a job labeled "Fix Local Sites – Proposal 1." L-3's counsel was particularly interested in how Mr. White derived the figures contained in that proposal, at one point suggesting that "this document was prepared based on information you had gotten from . . . L-3, correct?" (On another occasion in the excerpt, L-3's counsel again asked "So isn't it true you got that information from documents that you got while you were at L-3?") This line of questioning would seem to be directed at a contention that the figures themselves reflected L-3's trade secrets and that Mr. White misappropriated them, not a contention that Mr. White was using the figures to falsely advertise Jaxon's services to L-3's customers. Because the questions by L-3's counsel do not tie the inquiry to the Lanham Act claim, expressly or by unambiguous implication, the Court cannot say that those questions

operated as substitute disclosures of alleged Lanham Act misrepresentations under Rule 26(e)(1)(A).

Second,  Mr. White's deposition explains that the document in question was being submitted to "a bank."  The excerpt does not reveal the purpose for which Jaxon was communicating with the bank, but it is implausible that Jaxon was addressing the bank as a potential customer of Jaxon's HEMP testing services; more likely, Jaxon was presenting the documents in the course of seeking a loan or financing from the bank.  Because the cited examination of Mr. White did not involve misrepresentations allegedly made by Jaxon to potential <u>customers</u> of the services that it and L-3 compete to provide, nothing in the deposition excerpt would suggest to the Defendants that L-3's questioning was directed at the Lanham Act claim.

The 3-page excerpt of Mr. White's deposition cited by L-3 comes somewhat closer to supporting the contention that L-3 orally disclosed the factual basis of the Lanham Act claim to the Defendants.  In that excerpt, Mr. White is being asked about a March 2009 version of the Talking Papers document.  In a section entitled "Recent EHFASS HM/HS Work," the document states "In 2008-09, for MCSW/OSL, HM/HS test prep and HEMP testing has been accomplished on the following sites," and four sites are listed.  In Mr. White's deposition, he acknowledged that Jaxon did not perform two of those tests and that L-3 did.  (Mr. White stated "This is the contract I set up [at L-3] before I left," thus apparently taking personal credit for securing the HEMP testing contract, rather than performing the testing itself.)  Asked whether he believed that representation was misleading, Mr. White responded that it was not because the people to whom the document was directed knew who had performed the testing.

Arguably, this line of questioning could be sufficient to put the Defendants on notice that L-3 was asserting that this particular portion of the March 2009 Talking Papers contained a misrepresentation that supported the Lanham Act claim.  The questions posed to Mr. White at the deposition identified the particular text in question, established that the text was directed by Jaxon to what appears to be a potential purchaser of HEMP testing services ("the OSL office over at" a particular Air Force base), and inquired of Mr. White whether the text was "misleading."  An argument could be made that this group of questions would only be germane to the Lanham Act claim, not to the trade secret-based claims or any other claims asserted by L-3.[9]  Thus, the Court could deem L-3 to have disclosed, via Rule 26(e)(1)(A), exactly one alleged misrepresentation by the Defendants in support of L-3's Lanham Act claim -  the representation in the March 2009 Talking Papers that implied that Jaxon, not L-3, had performed the HEMP testing at the two locations.

Even so, the Court finds that L-3 has failed to come forward with evidence that such a misrepresentation was likely to cause confusion to the putative purchaser of the services.  Mr. White's deposition makes clear that Mr. White believed that the putative customer, the OSL Office at the Air Force Base, would not have been confused by the apparent false implication in the document -- that Jaxon had performed the prior testing -- because the staff at that office "knew" that L-3 had done so.  In its response to the Defendants' summary judgment motion, L-3 does not acknowledge Mr. White's testimony or attempt to refute it.  Indeed, L-3's response discusses the potential for customer confusion of other alleged misrepresentations by Jaxon,

---

[9]     However, the same set of questions might be relevant to L-3's tortious interference with prospective business advantage.  To the extent that the Defendants could not necessarily assume that the questions were disclosing the factual basis for L-3's Lanham Act claim, rather than the tortious interference claim, L-3 would not be able to rely on them to satisfy its obligations under Rule 26(e)(1)(A).  In any event, because the Court grants summary judgment to L-3 on the Lanham Act claim on other grounds as set forth herein, the Court need not reach that issue.

none of which L-3 has shown it identified in discovery.  L-3 also makes an abbreviated argument that this Court should simply presume customer confusion on the grounds that Jaxon's misrepresentations were "literally false" or done "with the intent to deceive," *citing NetQuote, Inc. v. Byrd*, 2008 WL 5225880 (D. Colo. Dec. 15, 2008), but L-3 has not demonstrated either of those factual predicates.  It has not offered any testimony that even addresses, much less refutes, Mr. White's own testimony that the recipients of the March 2009 Talking Papers documents understood that L-3, not Jaxon, had performed the prior HEMP testing, and thus, the Court will not presume confusion.

Because L-3 has not come forward with sufficient evidence to show a genuine issue of material fact with regard to the single alleged misrepresentation that it disclosed as supporting the Lanham Act claim, the Defendants are entitled to summary judgment on that claim.

### (f) Fraud

L-3 asserts that the former employee Defendants engaged in fraud when they completed time sheets at L-3, reporting to L-3 that they had worked on L-3 business during those hours when, in fact, the Defendants had been working on business to benefit Jaxon during those hours. The Defendants contend that L-3 cannot show that any particular time sheet entry is false.

L-3's response is curious.  It does not address any alleged fraud contained on the time sheets.  Instead, it attempts to shift the focus of its fraud claim from the time sheet theory (as set forth in the Amended Complaint) to a new theory of fraud it developed during discovery - that the fraudulent statements by the Defendants were those made on documents called Termination Certifications, in which the Defendants (allegedly falsely) stated that they had returned all L-3 property and would abide by the Confidentiality Agreements they had signed.  L-3 acknowledges that this theory of fraud is not the one pled in the Amended Complaint, but argues that the

Defendants cannot be surprised by this new theory, as it "was fully explored during discovery and was identified in the beginning of the case," insofar as the Amended Complaint makes mention of the Termination Certifications (albeit not in the fraud context).

Treating L-3's response as a motion for leave to amend its complaint under Rule 15(a), the Court denies it.  Although leave to amend a pleading is to be "freely granted," the Court may deny such leave when it is the result of undue delay by the movant.  *Cohen v. Longshore*, 621 F.3d 1311, 1313 (10th Cir. 2010).  Here, L-3 has offered no adequate explanation for its delay in seeking to amend the pleading of its fraud claim in the Amended Complaint to focus on the Defendants' retention of L-3 property in violation of the Termination Certification, rather than on their submission of fraudulent time sheets.  Indeed, by L-3's own acknowledgement, it was aware of all of the predicate facts of this new fraud theory at the time it filed its Amended Complaint: it knew that the various employee Defendants had signed Termination Certifications promising to return L-3 property, because it expressly referenced those Certifications; and it believed that the Defendants had improperly retained L-3 property, because it alleged as much in the conversion, civil theft claims, and trade secret misappropriation claims.  Given the length of time that this case has been pending and the vigor with which L-3 has litigated it, no reasonable explanation can be proffered to explain why L-3's current fraud theory could not have been formally pled years ago.

Accordingly, because L-3 has not come forward with evidence to support the fraud claim as it is alleged in the Amended Complaint – that is, as it relates to allegedly fraudulent timesheets -- all Defendants are entitled to summary judgment on L-3's common-law fraud claim.

(g)  <u>Tortious interference with prospective advantage</u>

L-3's tortious interference claim is asserted against Jaxon, Randall White, and Susan Rettig, and alleges that these Defendants secured 13 "Task Orders"[10] – that is, contracts -- for certain work from Serco, a company that had previously done business with L-3.

The parties disagree slightly on the precise elements that comprise this cause of action, but they generally agree that the pertinent elements require L-3 to show: (i) that it had a reasonable probability of entering into a future economic relation with Serco; (ii) that the Defendants against whom the claim is asserted resorted to improper means to prevent L-3 from securing that relation; and (iii) that L-3 suffered damages as a result.  In their motion, the Defendants argue that L-3 cannot show that it had a reasonable probability of obtaining the Serco Task Orders that are the subject of the claim – either because Serco had designated them as available only to small businesses (which L-3 is not) or because bids that L-3 actually submitted were rejected as insufficient or non-compliant – and cannot quantify the damages that it would show arising from this claim.

The first seven Task Orders at issue were offered by Serco for bidding in or about April 2009.  It is undisputed that Serco did not inform L-3 of these Task Orders, even though L-3 and its predecessor entities had previously performed the same type of HEMP testing services for Serco in the past.  The Defendants contend that Serco did not open the bidding to L-3 because it had designated the Task Orders at issue as being subject to an internally-imposed small business set-aside program for which L-3 would not have been eligible.  L-3 responds that no such set-

---

[10]     L-3's response brief contends that 25 Task Orders are actually at issue, even though it concedes that it only identified 13 of those in its Amended Complaint.  For the same reasons discussed above, the Court denies any implicit request by L-3 to amend its pleadings at this late date to raise new claims or broaden its existing claims beyond that pled in its Amended Complaint.  Thus, the Court limits the tortious interference claim to only the 13 Task Orders alleged in the Amended Complaint.

aside program actually existed at the time, and that the set-aside program is a *post hoc* justification fabricated by Jaxon and Serco (or more specifically, by Don Eich, the Serco official in charge of awarding contracts) to obscure the fact that the two entities had conspired amongst themselves to steer work away from L-3 and towards the newly-formed Jaxon.

It is not necessary to recite, in detail, the complex factual theory that supports L-3's contention; it is sufficient to observe that, taking all of the evidence in the light most favorable to L-3 and drawing reasonable inferences in its favor, L-3 has raised a genuine dispute as to the existence and applicability of the set-aside program to the key Task Order (number 9070) at issue here.  Notably, L-3 points out that the bidding documents and information made no mention of any small business-related restrictions, that the internal Serco plan for directing contracts to small businesses was not put in place until several months after the key Task Order was granted to Jaxon, that Mr. Eich had given a different explanation to a subordinate for excluding L-3 from bidding (offering the patently false assertion that L-3 "didn't have the test capability" rather than because they were not a small business), and that Serco acted surprisingly hastily in awarding the key Task Order to Jaxon.  Taken in the light most favorable to L-3, these facts could support the conclusion that Serco's "small business set-aside" explanation for why L-3 was excluded from bidding on these Task Orders is a pretext.

However, L-3 fails to supply additional evidence that would allow the factfinder to make the next necessary logical leap: that Serco either favored Jaxon or shunned L-3 because of some improper conduct by the Defendants.  The entirety of L-3's discussion of its factual theory focuses on actions taken by <u>Serco</u>.  At no point in L-3's discussion of this claim does it identify a single communication by any of the Defendants with Serco or Mr. Eich prior to or during the bidding on the Task Orders.

This is significant. L-3's apparent theory is that Jaxon, Mr. White, and/or Ms. Rettig (or their agents) conspired with Mr. Eich to ensure that Serco's business was steered to Jaxon and away from L-3. To prove this theory, L-3 must come forward with some evidence that the Defendants actually induced Mr. Eich to steer the Task Orders to Jaxon instead of L-3. Put differently, if Mr. Eich elected to favor Jaxon over L-3 for reasons entirely of his own accord – say, because of a (hypothetical) personal dislike of an L-3 principal, because of a close friendship with a Jaxon principal, or even because of a general favoritism for new startup business – his decision to do so would not suffice to render the Defendants liable in tort for a decision they did nothing to influence. And, of course, a unilateral decision by Mr. Eich to freeze L-3 out of bidding on Task Orders prevents L-3 from showing that it had a reasonable probability of obtaining contracts that Mr. Eich was determined not to award to it in the first place. The absence of any evidence of involvement by the Defendant in Serco/Mr. Eich's decisions is fatal to the tortious interference claim premised on these Task Orders.

As to the remaining Task Orders, Serco received bids from L-3 but rejected them for various reasons, again awarding the contracts to Jaxon instead. L-3 points to the opinions of its expert, Dr. Nye, for the proposition that, in a fair bidding environment, L-3 would have been awarded the contracts. However, the question is not whether L-3 would have prevailed in fair bidding, the question is whether L-3 can show that some act by the Defendants influenced Serco's decision to award the Task Orders to Jaxon instead of L-3. Once again, L-3 fails to come forward with evidence suggesting that the Defendants did anything more than submit a bid to Serco. Without evidence that would establish some complicity by the Defendants in Serco/Mr. Eich's decision to award the Task Orders to Jaxon instead of L-3, L-3 has failed to show a reasonable probability that Serco would have awarded the Task Orders to L-3 but for the

Defendants' involvement.  Accordingly, the Defendants are entitled to summary judgment on the tortious interference claim in its entirety.

(h)  Unjust enrichment

The Defendants seek summary judgment on L-3's unjust enrichment claim, but only to "to the extent that [it is] based on" the various other claims L-3 has asserted (which, the Defendants contend, each lack merit on their own).  This is not so much an argument as a truism: unjust enrichment is an equitable remedy that is not available when a remedy at law lies to address the same conduct.  *Greenway Nutrients, Inc. v. Blackburn*, 33 F.Supp.2d 1224, 1260-61 (D.Colo. 2014).  By definition, then, L-3's unjust enrichment claim cannot overlap any of its existing claims for relief.

However, Colorado law does recognize a limited situation in which a claim for unjust enrichment may piggyback on certain tort claims.  As the court in *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo.App. 2009), explained, tort claims generally offer compensatory relief, entitling the plaintiff to damages that offset "the harm done to him".  Unjust enrichment, by contrast, provides an equitable, restitution-based remedy that allows the plaintiff "to recover the gain acquired by the defendant through the wrongful act."  Thus, unjust enrichment entitles the wronged plaintiff to recover not only compensation for his own injuries, but to also strip the tortfeasor defendant of the benefits of having perpetrated the wrongful act. *Id.  Harris* is factually-identical to the instant case.  In *Harris*, employees of an engineering firm defected to form their own competing business.  The plaintiff firm brought suit against them, alleging the same types of claims asserted by L-3 here: misappropriation of trade secrets, breach of fiduciary duty, conversion, etc., along with a claim for unjust enrichment.  A jury ultimately returned a verdict in favor of the plaintiff firm and against the employees, awarding nearly $ 2

million in actual damages and an additional $ 200,000 as an advisory verdict on the unjust enrichment claim. On appeal, the Court of Appeals vacated the unjust enrichment award, finding that "the company had an adequate remedy at law." *Id.* at 1207. But review of the court's reasoning indicates that it reached that conclusion only because the trial court's jury instructions on damages on the substantive tort claims allowed the jury to award "anything of value or profit the former employees and the new business received as a result of the breach" in addition to damages for other injuries. *Id.* Thus, the trial court had already allowed the jury to award the restitution-based damages normally available under an unjust enrichment theory as part of its award on the substantive tort claims. This made a separate unjust enrichment award unnecessary.

Thus, L-3's unjust enrichment claim is cognizable to the extent that it seeks a restitution - based remedy on its tort claims against the Defendants. Accordingly, the Defendants' motion for summary judgment on that claim is denied.

### (*i*) Civil conspiracy

Finally, the Defendants seek summary judgment on L-3's claim of civil conspiracy. The Defendants' offer two primary arguments: (i) that the intra-corporate conspiracy doctrine precludes L-3 from basing a conspiracy claim against Jaxon on alleged agreements that it made with its own agents or employees, and vice versa – that the individual Defendants cannot be liable for conspiring with Jaxon itself, *citing Vinton v. Adam Aircraft Indus., Inc.*, 232 F.R.D. 650, 655 (D.Colo. 2005) *and Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1390 (Colo.App.

1986); and (ii) that L-3 cannot show sufficient evidence of conspiratorial agreements among the Defendants.  L-3 responds with a lengthy factual recitation.[11]

The Court will not engage in a lengthy recapitulation of L-3's evidence, for it is sufficient to observe that L-3 has come forward with sufficient evidence to create a genuine issue of fact as to whether individual Defendants, while employed by L-3, conveyed L-3's physical and intellectual property to each other with the intention of aiding Jaxon, and that each individual Defendant either participated in those acts or knew of and acquiesced in the others' performance of them to the point where one could reasonably infer their tacit agreement to participate in the common plan.  *See generally Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1056-57 (Colo. 1995).  Accordingly, the Court denies the Defendants' request for summary judgment on L-3's civil conspiracy claim.

Thus, the Defendants' Motion for Summary Judgment **(# 1175, 1185)** is granted in part, insofar as the Court grants summary judgment to the Defendants on L-3's claims for breach of the Ethics Contract (Claim X), on the civil theft (Claim XIX), on the conversion claim (Claim XII) as against the individual Defendants; on the Lanham Act claim (Claim XIII), on the fraud claims (Claims XX through XXIV), and on the tortious interference claim (Claim XIV). Summary judgment is denied as to the remaining claims.

2. Defendants' Motion for Summary Judgemnt **(# 1223)**

Separately, the Defendants move for summary judgment on L-3's sole remaining patent infringement claim (Claim VI),[12] which involves U.S. Patent No. 7,485,989 ("the Patent").  The

---

[11]     The Court observes that L-3's recitation often veers into irrelevancy, particularly with L-3's apparent complaint that Jaxon presented itself to contracting entities as "woman-owned," when, in fact, Joni White lacked the substantive knowledge of HEMP testing to be considered an owner of the company under federal contracting regulations.  This assertion has no bearing whatsoever on the issues in this case.  The Court also notes that many of L-3's "facts" are not supported by citations to supporting evidence.

Defendants seek summary judgment on that claim on the grounds that: (i) L-3 lost its exclusive right to practice the Patent when the Government exercised its right to appropriate title the Patent; and (ii) that pursuant to 28 U.S.C. § 1498(a), L-3 must bring suit against the U.S. Government, not the Defendants, for infringement of the Patent.

The Defendants first contend that L-3 lacks any ownership interest in the Patent because the Government acquired it in August 2011.   Generally, a government contractor who invents a product as part of a federally-funded project retains the right to that invention.  35 U.S.C. § 201(a).  However, the right to retain is conditioned upon the contractor promptly disclosing the invention to the contracting agency.  *See* 35 U.S.C. § 201(c)(1).  If the contractor fails to promptly disclose the invention, the Government obtains the right to appropriate all rights to the invention, including patent rights.  48 C.F.R. § 252.227-7038(d)(1)(ii) ("The Contractor shall assign to the agency, upon written request, title to any subject invention [i]f the Contractor fails to disclose or elect the subject invention within the time specified"); *see generally Campbell Plastics Eng. & Mfg., Inc. v. Brownlee*, 389 F.3d 1243, 1247-48 (Fed. Cir. 2004).

On August 19, 2011, Dawn Thompson, a Contracting Officer with the U.S. Army Corps of Engineers, wrote to SI International Telecom Corp., the primary contractor on the project at issue, stating as follows:

> The Government has only recently become aware of two patents issued to L-3 Communications Corporation, [including Patent No. 7,485,989]. Preliminary review of these patents indicates that they describe . .  work performed under [a federal contract].
>
> Please review this matter and be aware that L-3, as required by the above referenced contract, must report 'subject inventions' in a timely manner. . . .  A subject invention related to the work performed under the contract that is . . . not reported may have title appropriated by the Government. . . . **Please consider this letter**

---

[12]   L-3 has previously dismissed Claim V, which alleged infringement of a different patent.

**as activation of the Government's right to appropriate title to the above patents** since the Government was not made aware of the patents until 20 June 2011, long after referenced contract closeout.

(Emphasis added.)  The Defendants thus contend that the August 19, 2011 letter operated to vest title in the Patent in the U.S. Government, stripping L-3 of the right to assert patent infringement claims based on it.

L-3's response touches on a range of issues,[13] but the Court focuses on its contention that the August 19, 2011 letter was not a final agency action sufficient to strip L-3 of title to the Patent.  L-3's explanation for why the letter was ineffective to accomplish a federal appropriation of the Patent is somewhat elliptical. Via the affidavit of its contracting expert, Steven Tomanelli, L-3 cites to the Contract Disputes Act, 41 U.S.C. § 7101 *et seq.*, explaining that it "authorizes contractors to submit 'claims' against the Government for actions under Government contracts."  L-3 explains that, once a contractor makes such a 'claim,' the Government's Contracting Officer evaluates it and issues a "Final Decision" that may then be appealed to designated courts or administrative appeals boards.  L-3 argues that "the [August 19, 2011 letter] ***could*** form the basis for L-3 to initiate the claims process," but it "cannot be a 'Contracting Officer's Final Decision' because it was not preceded by a 'claim.'"  (Emphasis in original.)  L-3 does not explain why it did not initiate a claims process in response to the August 19, 2011 letter or explain what steps it contends the Government had to take to finalize an

---

[13]     Among other things, L-3 argues that it did not develop the technology encompassed by the Patent as part of the federal contract, that the technology is not subject to government appropriation under 35 U.S.C. § 201, that the Government's attempt to appropriate the Patent via the August 19, 2011 letter was untimely, and that the Government itself has not acted consonantly with an understanding that it is the actual owner of the Patent.  These are all arguments that L-3 might raise were it to challenge the Government's attempted appropriation of the Patent in the appropriate forum, but they are not cognizable here.

appropriation of a patent when a contractor like L-3 declines to file a claim in response to a letter like the August 19, 2011 one.

The Court begins with the recognition that the August 19, 2011 letter is, on its face, unambiguous: the letter informs L-3 of the "activation of the Government's right to appropriate title to the . . . patents."  The letter is does not express that "activation" conditionally or provisionally, it does not invite L-3 to respond with its own position on the matter, nor does it in any way suggest that the Government's stated intent to appropriate the patents is in any way non-final.  That the letter is a final statement of the Government's position is further demonstrated by Mr. Tomanelli's acknowledgement that L-3 *could* have initiated a claim under the Contract Disputes Act in response to it.  It can hardly be that the letter is sufficiently "final" that L-3 could file a claim in response to it, but not "final" enough to have any effect if L-3 chose not to file such a claim.  Moreover, it would appear that even if the August 19, 2011 letter did not prompt L-3 to bring a claim against the Government under the Contract Disputes Act, the letter itself was sufficient to constitute a "claim" by the Government against L-3.  The Contract Disputes Act's claim procedure primarily focuses on claims by contractors against the Government; it contains only a single provision addressing claims by the Government against contractors, and that provision merely requires that "[e]ach claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer."  41 U.S.C. § 7103(a)(3).  The August 19, 2011 letter certainly meets each of those requirements – it is in writing, it is signed by the contracting officer, and it explains the Government's decision and the reasons for it.

The Contract Disputes Act clearly gave L-3 at least two ways of challenging the Government's decision.  As Mr. Tomanelli seems to acknowledge, L-3 could have filed a claim

under the Act with the U.S. Army Corps of Engineers, challenging the determination that the invention should have been disclosed or that such disclosure was untimely.  41 U.S.C. § 7103(a) (contractor may file a claim against the Government, in writing, to the appropriate contracting officer), or L-3 could have deemed the August 19, 2011 letter to be a final determination and appealed it directly to "an agency board" or directly to the U.S. Court of Federal Claims.  41 U.S.C. § 7104(a), (b).  It did neither.  Accordingly, the Court concludes that the Government appropriated L-3's rights in the Patent in 2011, that L-3 failed to timely challenge that appropriation, and thus, that L-3 no longer possesses standing to bring the patent infringement claim herein.

Although not specifically addressed by L-3, the Court pauses here to acknowledge *Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347 (Fed. Cir. 2007).  There, a Dr. Buckberg invented a chemical solution to be used during heart surgery.  The invention was achieved while Dr. Buckberg was performing research under a grant from the National Institutes of Health ("NIH").   Consistent with 35 U.S.C. § 201, Dr. Buckberg disclosed the invention to NIH and requested that NIH release any patent rights it might have in the invention so that he could pursue a patent in his own name.  NIH agreed to do so, subject to Dr. Buckberg granting a license to NIH to use the invention.  For reasons unknown, Dr. Buckberg never formally signed the licensing paperwork. The patent issued to Dr. Buckberg at some point thereafter, he assigned it to plaintiff Central, and Central commenced a patent infringement suit against the defendant.  482 F.3d at 1351.

The defendant moved to dismiss the patent infringement claims against it on standing grounds, noting that Dr. Buckberg had never executed the license demanded by NIH.  Thus, it argued, NIH had never released its rights in the patent, preventing Dr. Buckberg or Central from

having patent rights to assert.  The trial court found the plaintiffs to have standing and, on appeal, the Federal Circuit affirmed.  The Court of Appeals explained that a violation of 35 U.S.C. § 201 "grants the government *discretionary* authority to take title" in the patent.  482 F.3d at 1352 (emphasis in original).  It explained that, in such circumstances:

> title to the patent [in the inventor] may be voidable.  However, it is not void: title remains with the named inventors or their assignees. Nothing in the statute, regulations, or our caselaw indicates that title is automatically forfeited.  The government must take an affirmative action to establish its title and invoke forfeiture.

482 F.3d at 1352-53.  The quoted passage is similar to an argument that L-3 raises here -: that the Government was under some obligation, above and beyond sending the August 19, 2011 letter, to take some action to effectuate its appropriation of L-3's patent rights.

Such an argument is without merit here.  The key fact in *Central Admixture* is that the NIH never expressed to Dr. Buckberg that it was intending to exercise its rights to appropriate the patent upon Dr. Buckberg's failure to issue the requested license.  Until NIH affirmatively acted to claim those patent rights, Dr. Buckberg's rights in the patent were merely "voidable" upon demand by NIH, but not automatically "void."  Here, however, the Army Corps of Engineers did take action to change L-3's patent rights from "voidable" to "void": it issued the August 19, 2011 letter purporting to do exactly that.  *Central Admixture* does not suggest that NIH was required to take elaborate steps to appropriate the patent rights (such as by petitioning the U.S. Patent and Trademark Office to register the transfer of the Patent to the Government, as L-3 points out did not occur here), but it was required to do something.  Because the August 19, 2011 letter sufficiently discharged the Government's obligation to take an affirmative step to

seize patent rights it was entitled to claim, the Court finds that the Defendants are entitled to summary judgment on L-3's patent infringement claim.[14]

### C. Intermission: Subject Matter Jurisdiction

The court pauses at this point to make an observation. L-3's Amended Complaint invokes this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1331, predicated on L-3 having asserted federal claims under the Lanham Act, the Patent Act, the RICO Act, and the Sherman Act. The court dismissed the latter two claims at the pleadings stage and, as discussed above, grants summary judgment to the Defendants on the former two claims. All that remain are claims under state law. In such circumstances, 28 U.S.C. § 1367(c)(3) grants discretion to the Court to decline to exercise further subject matter jurisdiction over the state law claims; indeed, the 10th Circuit states that the Court "usually should" decline to do so. *Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir. 1998).

It is not immediately apparent that any other basis exists for the exercise of federal subject matter jurisdiction over the state law claims. 28 U.S.C. § 1332 permits the Court to exercise subject matter jurisdiction founded on diversity of citizenship. Although Plaintiff L-3 Communications Corporation, as a Delaware corporation with its principal place of business in New York, is diverse in citizenship from Jaxon (a Colorado corporation with its principal place of business in Colorado) and the individual Defendants (who are identified as residents of Colorado and New Mexico), the same cannot necessarily be said of Plaintiff L-3 Services, Inc. The Amended Complaint indicates that Plaintiff L-3 Services, Inc. is incorporated in Delaware, but it gives no indication of that entity's principal place of business; it states only that L-3 Services, Inc. has "an office located [in] Colorado Springs, CO." If Colorado is L-3 Services,

---

[14] This renders moot the Defendants' motion seeking to stay proceedings (**# 1227**) on the patent infringement claim pending re-examination by the U.S. Patent and Trademark Office.

Inc.'s principal place of business, subject matter jurisdiction premised on diversity of citizenship would be unavailable.

Accordingly, within 14 days of the date of this Order, L-3 shall show cause why the remaining claims should not be dismissed for lack of federal subject matter jurisdiction. Notwithstanding the Court's concerns about a potential lack of subject-matter jurisdiction, it will proceed to briefly address the remaining motions.

### D.  L-3's motion

L-3 moves for summary judgment in its own favor on its various claims.  At this point, it is worthwhile to review the claims that remain: (i) Claim VII, misappropriation of trade secrets, against all Defendants; (ii) Claim VIII, breach of the Standard Contract, as against the former employee Defendants; (iii) Claim IX, breach of the Confidentiality Contract, as against the former employee Defendants; (iv) Claim XI, breach of the Exclusive Services Agreement, as against Mr. Lubell; (v) Claim XII, conversion, as against Jaxon only, relating to the single capacitor used in the 1k "prototype" pulser; (vi) Claim XV, breach of fiduciary duty, as against the former employee Defendants; (vii) Claim XVII, unjust enrichment against all Defendants; and (viii) Claim XVIII, civil conspiracy, as against all Defendants.

#### 1.  Misappropriation of trade secrets

Although L-3 has plead a constellation of claims, many derive from the same common premise: that the former employee Defendants took L-3's trade secret information over to Jaxon when they left, "jump-starting" Jaxon's ability to compete for HEMP testing contracts. Accordingly, although the trade secret claim is addressed later in L-3's motion, it is appropriate to begin with it here.

To establish a claim of misappropriation of trade secrets under Colorado law, L-3 must show: (i) that it possessed a "trade secret," as that term is defined in C.R.S. § 7-74-102(4) – that is, scientific, technical, business, or financial information that has value and that L-3 has taken reasonable steps to prevent dissemination of; and (ii) that the Defendants "misappropriated" the secret, as that term is defined in C.R.S. § 7-74-102(2) – that is, acquired or disclosed the secret with actual or constructive knowledge that the acquisition or disclosure was by improper means. "Improper means" include theft, misrepresentation, or breach of a duty to maintain secrecy, among other acts. C.R.S. § 7-74-102(1); *see generally Saturn Sytems, Inc. v. Militare*, 252 P.3d 516, 525 (Colo.App. 2011). Misappropriation can occur there without actual use or commercial implementation of the misappropriated trade; the act of misappropriation consists only of the improper acquisition or disclosure of the trade secret. *Saturn*, *id.*

The Court need not extensively walk through L-3's contentions regarding each Defendant and the alleged trade secrets they misappropriated. It is sufficient for purposes of addressing L-3's motion to observe that there are genuine disputes of material fact as to whether L-3 forfeited trade secret protection for most of its testing equipment, procedures, and software in the course of disclosing those matters to customers such as Boeing and the Government without reservations or requirements of confidentiality.[15]   For example, Davidson Scott, the Defendants' expert, opines that an engineer familiar with military standard specifications, coupled with access to the pulser produced by L-3 to Boeing and the detailed test reports provided by L-3 to Boeing (which recite, at some length, the test protocols followed by L-3) could easily deduce all of the

---

[15]    Notably, L-3's reply brief does not independently address the Defendants' arguments on this point; instead, it simply incorporates by reference the arguments on this point contained in its own response to the Defendants' summary judgment motion – a response whose purpose was to demonstrate the existence of genuine disputes of material fact such that the Defendants' motion for summary judgment could not be granted.

pertinent test methods and protocols claimed by L-3 to be trade secrets.  A trial will be necessary to determine what specific items L-3 claims as trade secrets were disclosed to Boeing and the Government and to the extent to which that disclosure operated to strip the items of any trade secret protection.  In such circumstances, the Court need not address the other contentions raised by L-3 – *i.e.* whether its internal controls over information were sufficient to confer trade secret protection on various items; whether a given Defendant misappropriated a given item, etc. Accordingly, L-3's motion seeking summary judgment against the Defendants on the misappropriation of trade secrets claim is denied.

### 2.  Breach of contract claims

#### a. Standard and Confidentiality Contracts

As previously discussed, the former employee Defendants entered into the Standard Contract with L-3's predecessor and the Confidentiality Contract with L-3.

As pertinent herein, the Standard Contract contained provisions designed to protect L-3's "Confidential Information."  That term was defined to include "all information . . . possessed by [L-3] . . . which gives [L-3] an advantage over competitors who do not know or use it or is otherwise not generally known in the trade."  The definition acknowledged that "Confidential Information" included, but was not limited to, "trade secrets, proprietary information, customer list and computer programs and software," and also included "information conceived, originated or developed" by the employee him- or herself.  The Standard Contract required that the employee "maintain the confidentiality of" this information both during and after employment, that the employee "not . . . directly or indirectly reveal or cause to be revealed" such information outside of L-3, that the employee "not . . . use" the information "to the detriment of" L-3, and that the employee "not take or keep" any such information upon his or her separation from L-3.

41

In or about August 2005, each of the employee Defendants signed the Confidentiality Contract with L-3.  That contract defined two separate classes of information that were affected by its terms: "L-3 Materials" and "Proprietary Information."  "L-3 Materials" were defined as "all files, records, proposals, specifications or other documents, and all computer software, software applications, files, databases and the like relating to L-3's business or which contain Proprietary Information."  "Proprietary Information" was defined as "all trade secrets, know-how, and other information that relates to the business of L-3 and is not generally available to the public or generally known in the industries in which L-3 does business" including "formulas, devices, inventions, methods, techniques [etc.] that are owned or licensed by L-3 and used in the operation of L-3's business and any other information of L-3 relating to its services and products . . . research, development, marketing, pricing, [etc.]"  The Confidentiality Contract requires that the employee "hold all Proprietary Information and L-3 Materials in strict confidence," that the employee "not take, use, copy, disclose, publish, or summarize and Proprietary Information or L-3 materials" except in the course of business for L-3, and that upon termination of employment, the employee will "promptly deliver to L-3 all L-3 Materials in [the employee's] possession, custody or control and shall not retain copies of the L-3 Materials in any form whatsoever.

L-3 has come forward with evidence demonstrating that each of the former employee Defendants obtained or retained certain specific L-3 materials following the end of their employment with L-3.  (L-3 also makes broader assertions that, for example, Mr. Youngman retained "thousands of L-3 proprietary files" but does not generally elaborate on the particular documents involved.)  For example, following his departure from L-3, Mr. Youngman obtained and distributed copies of L-3 software programs known as BADDAS and BUTTER.  Mr. McClure retained a hard drive containing a backup of his L-3 laptop that included "test reports"

and "test plans," and also distributed copies of the BADDAS software to an employee at Jaxon in October 2009. Randy White retained a document containing "funding information," "L-3 proposals for the AACE site," a test plan, and various other documents, as well as received L-3 documents from Scott White, then employed by L-3, after Randy White had ceased his employment there. There is evidence that Scott White, while employed by L-3, distributed various L-3 documents to persons employed at Jaxon.[16] After leaving L-3, Ms. Rettig retained copies of L-3 cost proposals and pricing and billing rates, among many other documents. There is evidence suggesting that documents Mr. Rice created for Jaxon were copied or derived from documents created by L-3.

The Defendants do not appear to significantly dispute that they obtained or retained L-3 software or documents after their employment with L-3 ended. Rather, they contend that the

---

[16]     The Court digresses here to remark upon how difficult it has been to consider the parties' exhibits. For example, L-3 has submitted a single exhibit in support of its motion, Exhibit 53, which consists of more than 1,000 pages spread across 10 subparts. (Another example, Exhibit 54, consists of more than 500 pages spread across 5 subparts.) The Defendants' Exhibit 11 in response consists of more than 3,500 pages, broken in more than 40 subparts.

Such presentation is unhelpful to the Court because it is too voluminous, unwieldy and largely irrelevant. First, going by citations alone (without attempting to ascertain whether the same page is cited multiple times), L-3's motion cites to no more than 125 specific pages (of 1000 ) in Exhibit 53. This suggests that more than 850 pages of that exhibit are unnecessary. The Defendants' brief cites only twice to their Exhibit 11, offering no pinpoint cites to any of the more than 2,500 pages of supporting materials. Second, L-3 refers to individual pages within its voluminous exhibits by Bates numbers, without any indication of which subpart the specific page is pertinent. Third, buried within the thousands of pages, are a few pertinent documents that are critical and therefore should and could stand alone. For example, among its more than 1,000 pages, Exhibit 53 contains both the Standard and Confidentiality contracts signed by each of the former employee Defendants. There is no apparent reason why these contracts must be presented *in situ* as part of Exhibit 53, buried within a 1,000 page collection of documents.

Presenting each document as a separate exhibit may multiply the number of separate exhibits being filed, but it makes each individual exhibit far easier for the Court to locate and access. Moreover, requiring attorneys to carefully examine each and every exhibit they cite would help to reduce the number of exhibit pages that are filed unnecessarily.

materials they retained are "generally known in the trade" or otherwise available to the public, and thus, not "Confidential Information" or "L-3 Materials" covered by the contracts.  This argument is both mostly unsupported and somewhat irrelevant.  It is unsupported in that each of the Defendants have produced their own affidavits that observe that L-3 did not generally mark the materials in question as being "proprietary," although that fact is mostly irrelevant – neither the Standard or Confidentiality Contracts require that material bear a particular marking in order to fall within the contractual definitions.  The Defendants also cite extensively to Mr. Scott's affidavit, but that affidavit primarily addresses whether the physical components or design of L-3's pulsers are generally know; Mr. Scott says nothing about whether the design of L-3's BADDAS software or its test reports or pricing data are generally known in the industry.

Moreover, the argument that the materials the Defendants retained are not "proprietary" or "confidential" or trade secrets, etc. fails to recognize that the Confidentiality Contract is broader than that.  It requires parties to not disseminate and to return "L-3 Materials."  Those materials are defined as any document or information "relating to L-3's business" <u>or</u> those which "contain Proprietary Information."  Even if the records retained by the Defendants are not proprietary in nature, they certainly "relat[e] to L-3's business" and are thus "L-3 Materials" subject to the contract.  Similarly, the Defendants' arguments that the Confidentiality Contracts prevent them from using general skills and knowledge they possess also misses the point: the Confidentiality Contract is not concerned with <u>knowledge</u>, it is concerned with <u>property</u>.  The Defendants might be free to employ any knowledge they obtained while working at L-3 (although the Court does not make findings on that point), but the Confidentiality Contract prevents them from retaining actual <u>records</u> from L-3.

Because it is apparently undisputed that each former employee Defendant disseminated records "relating to L-3's business" to persons outside the company or retained such records following their termination, it would seem that each Defendant has, at a minimum, breached the Confidentiality Contract.  However, the Court declines to enter summary judgment on this claim to L-3 at this time; there remains the uncertain question of whether the Court has subject-matter jurisdiction over any of the breach of contract claims and, in any event, it remains necessary to submit this claim to a trial to conclusively ascertain which materials each Defendant improperly retained and to assess appropriate damages.  Thus, the Court denies L-3's motion as it relates to the Standard and Confidentiality Contracts.

### b. Exclusive Services Contract

In November 2009, Mr. Lubell entered into an agreement with L-3 in which he agreed to "perform work and services for, supply reports to, and act as a consulted to L-3" in exchange for compensation.  Section 1.1 of that contract proves that "L-3 . . . hereby engages [Mr. Lubell] on an exclusive basis with respect to" certain types of work as set forth in a separate attachment. That attachment defined the scope of work as "all activity with the Defense Threat Reduction Agency ('DRTA') and with respect to all telecom business" that L-3 was involved in.  The agreement stated that Mr. Lubell would not engage in other consulting work or employment with others in these areas.  Separately, the agreement also provided that Mr. Lubell would be subject to an attached "Mutual Non-Disclosure Agreement" that obligated him to not disclosure "proprietary information" as that term was defined by the agreement.  (Notably, this agreement expressly required that "proprietary information" by "clearly identified as 'proprietary' or 'confidential' by each page being marked with a restrictive legend.")

L-3 appears to allege that Mr. Lubell breached the Exclusive Services Agreement in two ways: by simultaneously providing consulting services relating to DTRA matters to Jaxon, and by copying an L-3 proposal and sending it to himself via e-mail.  For the reasons discussed above, the Court finds that Mr. Lubell's own affidavit on these points raises a genuine dispute of fact as to whether he breached the Exclusive Services Agreement.  Accordingly, L-3's motion for summary judgment on the contract claims is denied.

### 3. Breach of fiduciary duty

L-3 alleges that each of the former employee Defendants breached a fiduciary duty of loyalty they owed to it.  In *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 492-93 (Colo. 1989), the Colorado Supreme Court grappled with two competing policies: that an employee has a duty of loyalty to act solely for the benefit of his or her employer concerning the subject matter of his employment, and that employees are privileged to "prepare or make arrangements to compete" with their employers.  Resolving the tension between the two concepts, *Jet Courier* concluded that: (i) an employee may advise customers that he or she intends to leave his or her employment, but may not solicit those customers to defect to a competing business while the employee remains with the employer; and (ii) whether an employee, during his or her employment, may solicit co-workers to quit and join a competitor is subject to a fact-intensive inquiry examining the nature of the co-worker's employment relationship with the employer (at-will or under contract), the impact of the action on the employer's operations, and the extent of promises or inducements made to the co-worker, among others.  *Id.* at 493-98.  Courts have also recognized that it may be "a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity

to hire and train replacements." *In re Professional Home Health Care, Inc.*, 159 Fed.Appx. 32, 34 (10th Cir. 2005).

L-3 points to evidence that each of the former employee Defendants retained L-3 materials when they left their employment; that several were instrumental in soliciting co-workers to leave L-3 and join Jaxon; and that several participated in varying degrees in assisting Jaxon in obtaining work while still employed by L-3.  Although some of this evidence is indeed powerful (particularly as to Randy White and Ms. Rettig), the Court declines to grant summary judgment to L-3 as to any Defendant at this time.  As *Jet Courier* and others cases recognize, determining whether an employee has breached a duty of loyalty to his or her employer is often a fact-intensive inquiry and there is some uncertainty in the record as to precisely the extent to which the work Jaxon was performing or seeking to perform was actually work that L-3 would have or could have obtained.  For example, L-3 points out that Mr. Youngman, while employed by L-3, assisted Jaxon in developing a bid for a project on the island of Kawjalein.  However, nothing in L-3's motion indicates whether L-3 was also bidding on the Kawjalein project, such that the two entities might actually be in direct competition for it.  Moreover, as discussed above, the Court is reticent to grant summary judgment to L-3 on any state-law claim when the question of this Court's subject-matter jurisdiction over such claims remains unclear.  Accordingly, the Court denies summary judgment to L-3 on this claim.

4. Remaining matters

Although L-3 also seeks summary judgment on its remaining claims – for conversion of the prototype pulser capacitor, for unjust enrichment, for civil conspiracy – the Court denies L-3's request largely for reasons previously stated herein.

Accordingly, L-3's Motion for Summary Judgment is denied in its entirety.

### E.  Motions to restrict access

The parties have filed dozens of motions seeking to restrict access to briefing and exhibits, mostly citing to concerns about disclosing trade secrets.[17]   The Court has previously addressed the general standards for such motions in prior orders and will not repeat them here.  It is sufficient for the Court to again emphasize the strong public interest in having unfettered access to materials that have been submitted to a court for consideration and upon which the court bases its decisions, and that public interest can only be secured by parties making every practical effort to provide publicly-accessible versions of documents filed with the Court.  *See generally* D.C. Colo. L. Civ. R. 7.2(c)(4).

Having reviewed each of the motions in question, the Court finds common themes that reoccur in them and thus, the Court is able to rule on most of the motions in categorical terms.  First, to the extent that parties provisionally filed documents under restriction, then later concluded that those restrictions can be lifted and the documents be publicly available in their entirety, the motion is granted.  Because it is of some burden to the Clerk of the Court to attempt to lift restrictions on individual documents contained within an otherwise-restricted filing, the Court finds it appropriate to require the movant[18] to re-file these documents without restriction.

---

[17]     The Court reminds the parties that the next stage in this process is a trial that will be open to the public.  Given the wealth of instances in which the parties contend that their summary judgment presentations warrant restricted public access, it would behoove both sides to carefully consider how they intend to present that same evidence in a trial that will be open to the public at all times.

[18]     In many instances, the "movant" for purposes of the motion to restrict access is not necessarily the party filing the documents in the first instance.  L-3 frequently moves to restrict public access to documents attached by the Defendants to their summary judgment papers and vice-versa.  For purposes of expediency, the Court will require that that "movant" requesting restricted access take some particular action, but the Court expects that the parties will confer among themselves and determine whether it is more appropriate for the party filing the documents in the first instance to take the actions required by the Court.

(Moreover, in an attempt to avoid further disruption to an already borderline-incomprehensible docket sheet, the Court encourages the party filing the documents to identify, in the docket text, the docket number of the provisionally-restricted document that is being duplicated.)

Second, on many occasions, the parties have tendered proposed redacted versions, suitable for public review, of documents that would otherwise be subject to restricted access. Except as noted below, the Court generally finds that the parties have been diligent and circumspect in ensuring that no more material than necessary has been redacted, and thus, the Court grants the motions in those respects.

Third, as specified below, in a handful of situations, the Court agrees with the movant that a given document warrants a restriction on access in its entirety, and that effective redaction of the document is impossible. These situations typically arise with regard to discovery responses that extensively itemize alleged trade secrets and expert reports and affidavits that discuss those trade secrets at length. The Court grants these motions as set forth below.

That leaves a final category that requires further discussion. In several instances, a party seeks to restrict access to a given document in its entirety, claiming that effective redaction is impossible. Often times, the Court disagrees for several reasons. First, as noted above, both parties have often filed far more pages of documentation than their briefs cite. Any portion of an exhibit that is not specifically cited in a party's brief is, by definition, beyond the scope of the Court's review and thus irrelevant.[19]  The Court appreciates parties' desires to submit the entirety of a lengthy document for purposes of completeness, even though the party might only be citing

---

[19]  The Court notes that both sides have sometimes filed entire exhibits that, for whatever reason, are never actually cited by the party in the accompanying brief. This may be due to typographical errors in citations, last-minute editing of a brief that removes a citing reference, overexuberance or errors in the collection of exhibits for filing, or any number of potential causes. Nevertheless, the same principle applies: an exhibit that is not cited in the accompanying brief is one which is irrelevant to the Court and should not be filed.

to a single sentence on a single page of the document.  But such a practice is unnecessary at best – again, the Court constrains itself to only the portions of the record specifically cited by the parties – and harmful at worst, as it is often that extraneous material that gives rise to a contention that the document should be shielded from public access.  Robust excision of uncited, unnecessary portions of these documents is necessary.  In many instances, excising these unnecessary pages from the parties' submissions could often reduce, if not outright eliminate, the need to restrict access to the remainder of the document.

Moreover, for those portions of documents that remain, the sensitive information warranting restricted access is rarely the particular reason why the document is cited.  In such circumstances, redaction of the sensitive material (or, really, everything in the document <u>except</u> the portion pertinent to the proposition for which the document is cited) can often eliminate the need for restricted access.

Once again, the touchstone is the brief itself: a brief that cites to Exhibit A for a specific proposition constrains the relevance of Exhibit A to that limited portion of it that establishes the proposition.  An exhibit that is tendered to establish that Person A sent Document B to Person C by e-mail on a given date might establish that fact in the header alone (if the header identifies Document B as being attached).  In such circumstances, the body of the e-mail and its attachments, including Document B, is beyond the scope for which the document is cited and all of that content can be excised or redacted.  Other times, the brief may cite to Document B to establish that it has certain sensitive contents, such as a cost proposal.  But rarely are the actual numerals within that document relevant to the proposition; what is relevant might simply be the labels on fields found within that table (*e.g.* that one of the columns shown is "2010 costs," thus establishing that the document indeed contains cost data) or that there is a given entry (*e.g.* for

"laptop computers").  In such circumstances, all of the remaining material might be subject to redaction, thus eliminating the need for restricted access, without diminishing the probative value of the exhibit.

Unless stated otherwise, the Court denies without prejudice all of the motions below to the extent they request that certain documents be retained under restricted access in their entirety, without a redacted version being tendered.  Consonant with the observations above, the movants shall review each of the exhibits at issue, excise any pages of them that are not specifically cited in the briefs that the exhibits accompany, carefully correlate the remaining pages to the briefs in order to ascertain the precise fact(s) the exhibits are proffered to establish, and redact any sensitive material that is not necessary to establish the precise fact for which the exhibit is cited.  In most instances, the Court anticipates that this process will produce a redacted exhibit that can be publicly-filed.[20]  In those instances where it does not, the movant may file a single,

---

[20]      Two examples sufficiently illustrate the situation:

• In one of their motions to restrict **(# 1263)**, the parties seek to restrict access to Exhibit R, a document found at Docket # 1233-2.  That exhibit is a 47-page document on the letterhead of SI International, and is entitled "Request for Proposals."  It is cited exactly once in the associated brief to which it is attached (L-3's response to the Defendants' summary judgment motion directed at the patent infringement claims), for the proposition that a certain Government contract "required only the performance of 'HEMP Protection' in compliance with MIL-STD-188-125."  Those citations refer to only two pages in the 47-page document (pages 2 and 3 an attachment to the Request for Proposals), yet the parties unnecessarily submitted the full 47 pages.  There is no reason why the purpose for which the document is proffered – to establish that the Government only required the performance of HEMP testing in compliance with the stated standard – could not have been accomplished by submitting only the two relevant pages (and, perhaps, the cover page for context), and excising the remaining pages.  To the extent that pages 2 and 3 themselves contain sensitive information, the statements that "all tasks [in a bid] shall be designed to meet MIL-STD-188-125 protection levels" and that "test requirements are in MIL-STD-188-125" are the only portions of those pages that support the proposition for which Exhibit R is cited.  Accordingly, the remainder of pages 2 and 3 could be redacted, yielding an exhibit that is suitable for public filing yet supports the proposition asserted by L-3.

supplemental motion to restrict access that describes, in detail, the reasons why this process was unavailing and why the document remains appropriate for restricted access in its entirety.  (The movant's compliance with Local Rule 7.1(A) with regard to this motion will be particularly important.)  Each movant shall complete this process within 28 days of the date of this Order.

With these principles in mind, the Court briefly addresses the pending motions to restrict access.  (All requested restrictions are at Level 1 access unless otherwise noted.)

**# 1197:**  The parties have proposed a publicly-accessible redacted version of the documents to be restricted.  Although it appears to the Court that some redactions are somewhat overbroad – the Court doubts that the components of  L-3's damage calculations would support restrictions – the proposed redacted version is sufficiently focused as to warrant granting this motion.  Accordingly, the motion is granted.

**# 1201:**  seeks a Level 3 restriction on Exhibit 36 to the Defendants' motion for summary judgment, Docket # 1175-35.  The document in question is a four-page document on Serco letterhead, entitled "2.11-1 Source Justification."  The stated grounds for restriction are primarily that Serco, a third-party, designated the document as "attorney eyes only" as part of a protective order that accompanied its production of documents in response to a subpoena.

---

• In another motion to restrict **(# 1203)**, the parties seek to restrict access to Exhibit 83 (#1183-5).  In the associated brief, that document is cited for the proposition that Mr. McClure sent several purchase orders from SARA to Scott White.  The precise contents of the purchase orders do not appear to be relevant, as the accompanying brief does not discuss them; what is asserted is simply that the purchase orders were sent.   Accordingly, the contents of those purchase orders could have been redacted in their entirety (or even omitted, as the fact of the sending is all that was asserted), thus eliminating the need for Exhibit 83 to be restricted at all. (Alternatively, L-3 could have proposed that Mr. McClure stipulate that he sent SARA purchase orders to Scott White and, presumably, Mr. McClure would have been obligated to stipulate to that fact under Fed. R. Civ. P. 11(b)(4).)

The Court denies the motion for several reasons.  The mere fact that any party – even a third-party like Serco – designated the document as sensitive for purposes of a protective order is not grounds for relief under D.C. Colo. L. Civ. R. 7.2(c)(2).  Moreover, the Court finds that further review of the exhibit by the movant, as discussed above, is likely to yield an excised, redacted exhibit suitable for public filing.

**# 1203:**  As to the documents sought to be restricted in their entirety without redacted versions supplied, further review by the movant, as discussed above, is warranted.

**# 1213:**  Exhibits 2 (Docket # 1174), 7 (1175-6), and 38 (1175-37) each make extensive reference to L-3's itemization of its alleged trade secrets.  The Court agrees that Exhibits 2 and 7 are not amenable to redaction, as nearly all of their content would be obscured, and thus, the motion to restrict access as to these documents is granted.  The Court has concerns about Exhibit 38, however.  The movant shall review this exhibit under the process discussed above.

**# 1218:**  Of the remaining items for which restricted public access is sought for the documents as a whole, the Court generally agrees that these documents are not meaningfully susceptible to redaction and thus grants the motion, with the following exceptions.

The Court believes that further review by the movant of Docket # 898-20, Docket # 942-3 and 942-4, Docket # 942-3, and Docket # 942-8 is warranted under the terms discussed above.

**# 1225, 1226**:  Seeks to restrict access to Docket # 1195-1 and 1195-7 due to incomplete redactions, and publicly-file a properly-redacted substitute version of each exhibit, attached to the motion. The motion is granted, and the Clerk of the Court shall place Docket # 1194-01 and 1195-07 under a Level 1 restriction.  (Docket # 1226 requests forthwith consideration of the motion to restrict.  That motion is denied as moot.)

**# 1229:**  Having reviewed the document, the Court is satisfied that it is not amenable to production in a redacted form, and thus, the motion is granted.

**# 1230:**  The motion offers a redacted version of the document for public access.  The Court finds the redactions sufficient and grants the motion.

**# 1231:** The four exhibits (Exhibits 5, 6, 7, and 9) for which no redacted version is proffered warrant further review and analysis as discussed above.

**#1263**:  The motion makes reference to a redacted version of the opposition brief itself (given that only one photograph on one page constitutes the sensitive material warranting restriction), but it is not immediately clear to the Court whether a redacted version has been tendered or already filed.  The motion is granted, and to the extent a redacted version of the brief has not been filed, the movant shall file one.  As to the two supporting exhibits for which no redacted version is proffered (# 1234-22 and 1233-3), further analysis by the movant is required.

**# 1268:** Identifies several exhibits that are proposed for restricted access for which no publicly-available version would exist.  All of these documents require further review and analysis by the movant as discussed above.

**#1269:** seeks restriction of certain documents relating to L-3's response to the Defendants' motion seeking a stay of patent claims pending re-examination by the USPTO.  Because the Court dismisses the remaining patent claims on other grounds, it has not reached the underlying motion, and thus, there is little public interest in having access to a document this Court did not consider.  *See Riker v. Federal Bureau of Prisons*, 315 Fed.Appx. 752, 755 (10th Cir. 2009).  This motion is granted.

**#1280:**  The motion is granted as to Exhibit 81, which consists of an expert report that discusses L-3's claims of trade secrets to a degree that effective redaction is impossible.  The

Court denies the motion with respect to the nearly 400-page Exhibit 41, and directs the movant to engage in further analysis as discussed above.

**# 1281:** The motion is denied as to Exhibits 135 (# 1274-33), 145 (1274-44), 146 (1274-45), and 169 (1276-8), as more analysis by the movant is necessary as discussed above.

**#1282**: The motion is denied as to Exhibit 174 (# 1277).  Although a third-party designated it as "attorney's eyes only," the Court sees nothing in that document that could not, with very minimal redaction, be publicly-filed.  Further analysis, as discussed above, is appropriate.  The motion is also denied as to Exhibits 127-132, 138-143, 150-160, 164, 166-67, 172-73, 175-178, 180, 182-84, 191-192, and 194, pending further review by the movant as discussed above.

**# 1300**:  The motion proposes redacted versions of the two exhibits that would be suitable for public filing.  The Court grants this motion.

**#1301**:  For reasons unclear, this motion seeks to submit a redacted version of one of the same exhibits addressed in the motion at Docket # 1300.  (One would think that the conferral process of Local Rule 7.1 would prevent such duplicative filings.)  Worse yet, the proposed redacted version submitted in conjunction with this motion is less comprehensive than the redacted version submitted above.  (*See e.g.* the absence of redactions at page 375, lines 2-3).  Accordingly, this motion is denied.

**# 1302**: It attaches a proposed redacted version for public access.  The Court grants the motion.

**# 1303**:  It proposes redacted versions of each document, suitable for public access. The Court grants the motion.

**# 1304**: As Exhibits 88 (# 1294-5) and 92 (1294-9) – and those for which the a Level 3 restriction is sought – Exhibits 94 (1295) and 95 (1295-1) – the motion is denied pending further review by the movant as discussed above.

**# 1305**: It attaches redacted versions suitable for public filing.  The motion is granted.

<u>**CONCLUSION**</u>

Accordingly, he Defendants' Motion for Summary Judgment **(# 1175, 1185)** is **GRANTED IN PART** and **DENIED IN PART** as set forth herein. L-3's Motion for Partial Summary Judgment **(# 1176, 1186)** is **DENIED**.  L-3's Motion to Dismiss the Civil Theft Claim **(# 1196)** is **GRANTED** with regard to the civil theft claim in its entirety and as to the conversion claim with the exception of a claim against Jaxon only, relating to the capacitor in the 1k prototype pulser.   The Defendants' Motion for Summary Judgment **(# 1223, 1219)** is **GRANTED**.  It appearing that there may be no basis for federal subject matter jurisdiction over the remaining claims, L-3 shall **SHOW CAUSE**, within 14 days, why the remaining claims should not be dismissed for lack of federal subject matter jurisdiction. The Defendants' Renewed Motion to Stay **(# 1227)** consideration of the Plaintiffs' patent infringement claims is **DENIED AS MOOT**.  The parties' various motions to restrict access **(# 1197, 1201, 1203, 1213, 1218, 1222, 1225, 1226, 1229, 1230, 1231, 1263, 1268, 1269, 1280, 1281, 1282, 1300, 1301, 1302, 1303, 1304, 1305)** are **GRANTED IN PART** and **DENIED IN PART** as set forth above.  The movants on those motions shall, within 28 days, file a supplemental motion addressing those matters specifically identified by the Court.

Assuming there remains a predicate for federal subject matter jurisdiction, the Court observes that the dispositive motions deadline has now passed.  Although there remain certain collateral matters to address, the Court directs that the parties begin preparation of a Proposed

Pretrial Order pursuant to Docket # 44 and that they jointly contact chambers to schedule a

Pretrial Conference.

      Dated this 1st day of September, 2015.

                                  **BY THE COURT:**

                                    Marcia S. Krieger
                                    Chief United States District Judge