1   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLORADO

2

Civil Action No. 10-cv-02868-MSK-KMT

3

L-3 COMMUNICATIONS CORP. and
4   L-3 SERVICES, INC.,

5       Plaintiffs,

6   vs.

7   JAXON ENGINEERING & MAINTENANCE, INC.,
    JONI ANN WHITE,
8   RANDALL K. WHITE,
    SCOTT WHITE,
9   SUSAN RETTIG,
    CHARLES RETTIG,
10  JAMES YOUNGMAN,
    JERRY LUBELL,
11  KELLY RICE,
    JOHN McCLURE,

12

    Defendants.
13  _____

14

                    **REPORTER'S TRANSCRIPT**
15                  FINAL PRETRIAL CONFERENCE

16  _____

17          Proceedings before the HONORABLE MARCIA S. KRIEGER,

18  Judge, United States District Court for the District of

19  Colorado, commencing at 1:35 p.m., on the 21st day of December,

20  2015, in Courtroom A901, United States Courthouse, Denver,

21  Colorado.

22

23

24          THERESE LINDBLOM, Official Reporter
            901 19th Street, Denver, Colorado 80294
25      Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

1 **APPEARANCES**

2          STEVEN LEON LEVITT, Attorney at Law, Steven L. Levitt

3 & Associates, P.C., 2 Hillside Avenue, Building F, Williston

4 Park, New York, 11596, appearing for the Plaintiffs.

5          BENJAMIN G. CHEW, Attorney at Law, Manatt, Phelps &

6 Phillips, LLP, 1050 Connecticut Avenue, N.W., Suite 600,

7 Washington, DC, 20036, appearing for the Plaintiffs.

8          KAREN LISA WEISS, Attorney at Law, Steven L. Levitt &

9 Associates, P.C., 129 Front Street, Mineola, New York, 11501,

10 appearing for the Plaintiffs.

11          LORA ANN BRZEZYNSKI, Attorney at Law, Dentons US LLP,

12 1900 K Street NW, Washington, DC, 20006, appearing for the

13 Defendants.

14          DANIEL E. JOHNSON, Attorney at Law, Covington &

15 Burling, LLP, 850 10th Street NW, Washington, DC, 20001,

16 appearing for the Defendants.

17          ABIGAIL L. BROWN, Attorney at Law, Dentons US LLP,

18 1900 K Street NW, Washington, DC, 20006, appearing for the

19 Defendants.

20                    *   *   *   *   *

21               **P R O C E E D I N G S**

22          *THE COURT:*  Court is convened today in

23 Case No. 10-cv-2868.  This is encaptioned L-3 Communications

24 Corporation and L-3 Services, Inc. v. Jaxon Engineering &

25 Maintenance, Inc., Joni Ann White, Randall K. White, Susan

1    Rettig, Charles Rettig, James Youngman, Kelly Rice, and John

2    McClure.  The matter is set down for a pretrial conference.

3              Could I have entries of appearance, please.

4              MR. LEVITT:  Good afternoon, Your Honor.  For the

5    plaintiff --

6              THE COURT:  I can't hear you, sir.

7              MR. LEVITT:  I apologize.

8              Good afternoon, Your Honor.  My name is Steve Levitt.

9    With me is, in order, Ben Chew and Karen Weiss.  And Steve Wahl

10   is the company representative on behalf of the plaintiffs.

11             THE COURT:  And what role does Mr. Wahl play in the

12   company?

13             MR. LEVITT:  Mr. Wahl is counsel for the division that

14   is part of the plaintiffs' --

15             THE COURT:  Does he have decision-making authority

16   today?

17             MR. LEVITT:  He does, Your Honor.

18             THE COURT:  Thank you.

19             MS. BRZEZYNSKI:  Good afternoon, Your Honor.  Lora

20   Brzezynski from the law firm of Dentons.  With me today is my

21   colleague, Abigail Brown, also with Dentons on behalf of the

22   defendants.  Also with us today is Dan Johnson, with the law

23   firm of Covington & Burling, on behalf of defendants as well.

24             MR. JOHNSON:  Good afternoon, Your Honor.

25             THE COURT:  Good afternoon.  Who do you have as a

1    client representative?

2          *MS. BRZEZYNSKI:*  Joni White is here, Your Honor.

3          *THE COURT:*  Thank you.

4          *MS. BRZEZYNSKI:*  Actually, Your Honor, each individual

5    defendant is here, as well.

6          *THE COURT:*  Does Ms. White have decision-making

7    authority on behalf of Jaxon?

8          *MS. BRZEZYNSKI:*  Yes, she does.

9          *THE COURT:*  Thank you very much.

10          All right.  This is a pretrial conference.  And I've

11   had the opportunity to consider your almost 150-page proposed

12   final pretrial order; I've also had the opportunity to look at

13   your revised joint motion under Rule 702; I've considered

14   pending motions, which I'll address here in a minute.

15          And I want you to know that this is not like a final

16   pretrial conference that you may have gone through with

17   magistrate judges elsewhere, nor is it the kind of final

18   pretrial conference that you may have experienced in the state

19   court.  My job here is not to sign off on your final pretrial

20   order.  It is, instead, to be sure that this matter is ready to

21   go to trial, to set it for an appropriate length of trial, to

22   resolve the pending motions.

23          And the reason that the parties are here today and

24   required to be here today is because this is their lawsuit.

25   It's not the attorneys' lawsuit; it's the parties' lawsuit.

1    And I want them to have a good, clear, and reasonable set of

2    expectations as to what trial is going to look like.

3            The first step in this process is to address the

4    pending motions, and there are a number of these.

5            The first is, actually, an order to show cause that

6    was issued at Docket No. 1316, requesting that the parties show

7    cause why the plaintiffs' claim should not be dismissed for

8    lack of subject matter jurisdiction.  The plaintiffs responded

9    at Docket No. 1318.

10           Is there any further argument with regard to that?

11           MR. CHEW:  No, Your Honor.

12           THE COURT:  Thank you.

13           Let me caution you -- I know we've got lots of

14   attorneys sitting at counsel table.  If you don't speak into a

15   microphone, our court reporter will not be able to hear you.

16   This courtroom, like so many in this building, tends to operate

17   like a sound damp, so it absorbs the sound.  So it is

18   critically important to pick up those microphones and hold them

19   up to your mouths when you speak or go to the lectern where you

20   don't have to do that.

21           MR. JOHNSON:  For the defendant, Your Honor, we have

22   no further argument on the order to show cause.  We did, as

23   Your Honor knows, file a motion with respect to standing.  To

24   the extent that relates to subject matter --

25           THE COURT:  I have that on my list.  Thank you.

1          This order was issued after the Court granted summary

2    judgment to the defendants on all of the plaintiffs' federal

3    claims, leaving only claims sounding in state law.  Noting that

4    the only stated basis for federal subject matter jurisdiction

5    today was federal question jurisdiction under 28 U.S.C. Section

6    1331, the Court directed the plaintiffs to show cause why the

7    Court should retain any further subject matter jurisdiction

8    with regard to state law claims.

9          The plaintiffs responded that the Court should

10   continue to exercise subject matter jurisdiction premised upon

11   diversity of citizenship under 28 U.S.C. Section 1332.

12   Plaintiffs indicated that plaintiff L-3 Communications is a

13   citizen of Delaware and New York and further states that

14   plaintiff L-3 Services, Inc. is a citizen of Delaware and

15   Virginia, but notes that in 2012, L-3 Services, Inc. underwent

16   a corporate transformation.  The entity asserting the claims

17   here, and the claims themselves, were transferred to a new

18   company, known as L-3 Applied Technologies, Inc., and that

19   entity is a citizen of Delaware and California.  The remainder

20   of L-3 Services, Inc. became a new independently owned and

21   publicly traded company called Engility.

22          The Court finds that it continues to possess subject

23   matter jurisdiction over the action pursuant to 28 U.S.C. 1332.

24   L-3 Communications and L-3 Applied Technology are citizens of

25   Delaware, New York, and California.  The defendants are all

```
 1    citizens of either Colorado or New Mexico.  Thus, the diversity
 2    that is required under Section 1332 is satisfied.  The
 3    requisite amount in controversy is similarly satisfied.
 4    However, to avoid confusion over the proper parties here, L-3
 5    Applied Technologies should be substituted for plaintiff L-3
 6    Services, Inc. in the caption and in all further pleadings.
 7                 Any need for further clarification or further
 8    explanation on that?
 9                 MR. LEVITT:  No, Your Honor.
10                 MR. JOHNSON:  No, Your Honor.
11                 THE COURT:  Thank you.
12                 Then we'll turn to plaintiffs' motion for
13    reconsideration, filed at Docket No. 1319 and 1320.  Response
14    by the defendants was filed at 1327, and a reply at 1331.
15                 Any further argument with regard to this?
16                 MR. LEVITT:  No, Your Honor.
17                 MS. BRZEZYNSKI:  No, Your Honor.
18                 THE COURT:  Thank you.
19                 On September 1, 2015, when the Court granted summary
20    judgment to the defendants on an array of the plaintiffs'
21    claims, including the plaintiffs' claim that the defendants
22    tortiously interfered with -- that the defendants tortiously
23    interfered with the plaintiffs' prospective business relations
24    with an entity called Serco, Inc., the Court found that the
25    plaintiffs could not show that they had a reasonable
```

probability of entering into a business relationship with Serco

because the record indicated that the Serco representative, Don

Eich, deliberately chose to steer Serco's business to the

defendants rather than to the plaintiffs.

I noted that the plaintiffs did not come forward with

any evidence of the pertinent defendants, Jaxon, Mr. White, and

Ms. Rettig, to indicate that they communicated with or

otherwise induced Mr. Eich to do so.

In the instant motion, the plaintiffs assert that,

one, the Court exceeded the scope of the issues raised by the

defendants' motion; and, two, as a result, the plaintiffs were

not previously informed of the obligation to come forward with

evidence showing personal participation of the defendants in

Serco's decision making.

In the instant motion, the plaintiffs point to

evidence that indicates that the defendants and Mr. Eich

jointly worked to get Serco to award contracts to Jaxon that

might otherwise have gone to the plaintiffs.

I decline to address this motion in great detail.  As

I will discuss momentarily, the tortious interference claim is

so inextricably intertwined with the plaintiffs' other claims

that it seems to matter little whether the claim is described

as a separate claim or is merely used to define the contours of

some other claim, primarily, the misappropriation of trade

secrets or breach of contract.

 1           For purposes of the completeness of the record,

 2    however, I'll grant the motion and allow the tortious

 3    interference claim to proceed, as the plaintiffs have pointed

 4    now to evidence to demonstrate a triable issue as to whether

 5    the defendants themselves improperly induced Serco to divert

 6    contracts to Jaxon that otherwise would have gone to L-3.  But

 7    as I will explain momentarily, there is some question as to

 8    whether it is necessary to describe that claim as one for

 9    tortious interference with prospective advantage.

10           Any need for clarification or further explanation?

11           *MR. LEVITT:*  No, Your Honor.

12           *MS. BRZEZYNSKI:*  No, Your Honor.

13           *THE COURT:*  Thank you.  The next motion is a motion by

14    defendants, this is at Docket No. 1337, and it is a motion for

15    leave to file a motion to dismiss challenging the plaintiffs'

16    standing, the plaintiffs responded, and the defendants replied.

17           Any further argument with regard to this?

18           *MR. LEVITT:*  We'd like to be heard on the argument,

19    Your Honor.

20           *THE COURT:*  All right.  Then let's hear from the

21    defendants first.  It's their motion.

22           *MR. LEVITT:*  Thank you, Your Honor.

23           *MR. JOHNSON:*  Thank you, Your Honor.  May it please

24    the Court, Dan Johnson for the defendants.

25           The actual motion before the Court, as you recognized,

1  Your Honor, is a motion for leave to file the motion to dismiss

2  rather than the motion to dismiss itself.

3          *THE COURT:*  Correct.

4          *MR. JOHNSON:*  Although, in the course of this,

5  plaintiffs took the opportunity to brief the merits in a

6  32-page brief.  That was their principal argument in opposition

7  to the motion for leave.

8          I do believe the motion has been fully briefed on the

9  merits, and I'm prepared to address the motion to dismiss on

10  the merits, in addition to addressing the motion for leave,

11  whichever would please the Court.

12          *THE COURT:*  Please proceed.

13          *MR. JOHNSON:*  Thank you.

14          With respect to the motion to dismiss, Your Honor,

15  this is a motion to dismiss all of the plaintiffs' requests for

16  relief that arise out of the loss of Serco task orders.

17  Collateral estoppel applies under the Tenth Circuit test

18  because each of the four elements of collateral estoppel are

19  met.

20          The factual background, as Your Honor knows, is that

21  in 2014, while this case was pending, the plaintiffs in this

22  case, L-3 Communications and ATI, filed a suit against Serco in

23  Virginia alleging loss of the Serco task orders, the same

24  issues that were presented in the pleadings here.  Ultimately,

25  the case found its way to federal court, where Judge Lee on

1  November 3 entered an order dismissing that case for lack of

2  standing.

3      The Court's finding specifically was that neither L-3

4  Communications nor ATI have standing, have a personal stake in

5  the loss of the Serco task orders.  And that arises from the

6  fact, according to Judge Lee in his finding, that the

7  apparently attempted assignment from L-3 Services of their

8  Serco subcontract to ATI never occurred.  Whether they

9  attempted or not, I don't know.  But what Judge Lee concluded

10  is, it never happened, and so ATI never had a personal stake.

11  Neither did L-3 Communications.

12      And the Court rejected each of the alternative grounds

13  that the plaintiffs had asserted for standing, either that, by

14  virtue of the fact that they engineers who had done the work

15  over the years, there was standing; by virtue of the fact that

16  they had performed work under the subcontract in the past, they

17  had standing; by virtue of the fact that the assignment

18  allegedly occurred, they had standing.

19      But the point for collateral estoppel here is not to

20  relitigate Judge Lee's findings, but just to give you as

21  background.  The important finding of the Court was that those

22  two plaintiffs, which you have the same two plaintiffs in this

23  case, did not have standing to seek any relief for the loss of

24  the Serco task orders.  That's the identical issue that is

25  presented before the Court here.  In this case, as you see from

1   the Complaint and as you see from the pretrial order,

2   plaintiffs allege a large amount of damages, and there is a

3   great deal of evidence devoted in this case to the notion that

4   these plaintiffs can assert claims for loss of the Serco task

5   orders.  So that issue is the identical issue presented in this

6   motion as what was resolved in the case in Virginia.

7         Second, there is a final judgment on the merits.

8   Federal law is clear, and plaintiffs do not challenge in their

9   response, in their oppositions, that under federal common law,

10   an appeal does not upset the finality of the judgment.  L-3 has

11   appealed the Serco judgment.  That's on appeal to the Fourth

12   Circuit.  Under federal law, it's very clear that the appeal is

13   of no moment.  They argue that under the *Semtek* case, the

14   Supreme Court is telling lower courts that they should apply

15   Virginia state collateral estoppel law because the first action

16   was a diversity action.  But as we explained in our brief,

17   actually, what *Semtek* says, the Court should do that if the

18   first judgment was a judgment on the merits.  And the Tenth

19   Circuit tells us very clearly that a dismissal for lack of

20   standing is not a judgment on the merits.  In any event, if we

21   look to Virginia law, the binding Virginia precedent says, we

22   look -- if it's a question of collateral estoppel effect of a

23   federal court decision, we look to the federal rule.  So,

24   again, final judgment on the merits.

25         We now have the same parties prosecuting both cases.

1    Your Honor has resolved that.  Finally, this issue of standing,

2    as you can see from Judge Lee's decision, there was a full and

3    fair opportunity to litigate by L-3.  They had a full, fair

4    opportunity there.  The opinion itself is clear.  The same 13

5    task orders that are at issue in this case were at issue in the

6    Serco case, and there were others at issue in the Serco case,

7    but there is a common set of 13 in the two cases.  Here, there

8    are only 13 at issue.  The burden of proof is the same.  And we

9    request that the Court decide this at the first opportunity,

10   because it will have a huge impact on the scope of this trial

11   and preparation of parties as they move forward preparing this

12   case for trial.

13            THE COURT:  Thank you.

14            MR. JOHNSON:  Thank you, Your Honor.

15            MR. CHEW:  Good afternoon, Your Honor.  May it please

16   the Court, Ben Chew for L-3.

17            I would like to start with an issue Mr. Johnson

18   raised, because we respectfully disagree with his

19   interpretation of *Semtek* and the other cases he cited.

20            We addressed the merits to some extent because, as

21   Your Honor is aware, futility is a ground for opposing a motion

22   for leave in this case to file a motion to dismiss out of time.

23            As a threshold matter, under Virginia law, collateral

24   estoppel -- collateral estoppel cannot apply where, as here,

25   the appeal is pending.  And, Your Honor, despite Mr. Johnson's

1   heroic attempts to take this case out of the majority rule of

2   *Semtek*, it's right on point.  What *Semtek* has said --

3   Mr. Johnson got part of it right -- was that the Supreme Court

4   of the United States says that a court sitting in Your Honor's

5   shoes should apply the law of the state, especially where, as

6   here, the issue resolved more closely related to a traditional

7   merits matter.  And, clearly, the issue before Judge Lee was a

8   merits issue.

9          He examined whether the contribution agreement, which

10  clearly transferred the causes of action from Services to L-3

11  ATI, that much, everybody agrees on.  What Judge Lee looked at

12  was, did it effectively convey the subcontract?  And what Judge

13  Lee determined -- we respectfully submit, and correctly -- was,

14  A, that a party can have an interest in this business

15  expectancy only if it were a party to the subcontract.  And

16  because that subcontract had an assignment clause -- in other

17  words, Judge Lee determined that the subcontract required

18  Serco's approval for -- for it to be transferred from Services

19  to ATI.  Because that never happened, ATI did not get standing

20  with respect to the subcontract, though it did with respect to

21  the causes of action.

22         So the majority -- that clearly is a merits-based

23  decision that Judge Lee resolved.

24         Now, it was a very narrow one, and it certainly didn't

25  go to the whole panoply of issues that are at issue in this

1    case, but it was a merits decision on that particular issue.

2              And in Virginia, it's black letter law that the

3    judgment -- and I'm quoting now from the *Faison* case -- and the

4    reason I wanted to be heard, Your Honor, is, we put this at the

5    back of our argument, and it actually should have been the

6    threshold point.  Quoting from the *Faison* case, "A judgment is

7    not final for the purposes of *res judicata* or collateral

8    estoppel when it is being appealed or when the time limits

9    fixed for perfecting an appeal have not expired."  *Faison v.*

10   *Hudson*, 243 Va. 413, 1992.  That is the Supreme Court in

11   Virginia, which is the highest authority in the federal court

12   in the Eastern District, and they always look to those cases

13   for resolution.  There are a number of affirming string cites

14   on page 27 to the same effect.

15             It's clear, Your Honor, as a threshold matter, the

16   Court cannot -- or should not apply collateral estoppel to this

17   matter.  The good news being that the Fourth Circuit's

18   procedures for appeal are quite expeditious, and we expect a

19   result in the next three or four months, perhaps -- depending

20   on what Your Honor decides, perhaps before the trial in this

21   case.

22             So for that reason alone, Your Honor, I think it's

23   clearly futile for this motion for leave, and the motion for

24   leave should be denied without prejudice on that basis alone.

25   And that's why we addressed futility.

```
 1              If I could just address a couple of the other

 2   arguments, Your Honor.  Some of them have changed in light of

 3   Your Honor's ruling that L-3 ATI is now effectively substituted

 4   for L-3 Services, if I'm understanding the Court correctly.

 5   When we briefed this, that was not the case.  L-3 Services was

 6   still one of the two party plaintiffs.  So that, we would

 7   respectfully submit, would be reason, if the Court were

 8   inclined to grant leave -- which we don't think it should.  But

 9   if it does, we believe we should have an opportunity to brief

10   in opposition to the motion to dismiss because we're now

11   operating in a slightly different paradigm.  Because coming

12   into today, we clearly had a threshold issue for collateral

13   estoppel, that these were all different parties and different

14   interests, different plaintiffs, different defendants,

15   different cause of action, different claims seeking different

16   relief, relating to different time periods.

17              And that is crucial, Your Honor, because the case that

18   L-3 filed in Virginia was filed in May of 2014, and the issue

19   that Judge Lee addressed was whether those two plaintiffs

20   had -- at the time the complaint was filed, whether they had

21   standing.

22              This case, as Your Honor knows, was filed in November

23   of 2010.  And no one disputes, not even Judge Lee, that as of

24   that time, L-3 Services clearly was the appropriate party

25   plaintiff.  And it wasn't until December of 2011, when we had
```

17

1    the contribution agreement, when L-3 Services conveyed the

2    causes of action at issue in this case to L-3 ATI.  Your Honor

3    has correctly said that as of -- as of the first day of 2012,

4    that these causes of action that we are asserting against Jaxon

5    and the individual defendants are now part of L-3 ATI.  That's

6    not at all what Judge Lee was differing.

7           And I think with respect, one of the issues that we're

8    raising on appeal is that Judge Lee conflated the subcontract

9    issue with the causes of action issue, that even under Judge

10   Lee's logic, assuming that he's correct, all of our claims

11   against Serco prior to December 31, 2011, remain with L-3

12   Services.  But that is, again, Your Honor, why none of the

13   elements of collateral estoppel have been met here.  The

14   Virginia court did not address any of the issues that Your

15   Honor is dealing with now.

16          Finally, Your Honor -- so we believe that the Court

17   should not grant leave.  If it does, we should have a full and

18   fair opportunity to brief it on the merits with the parties now

19   substituted.

20          And at the most, Your Honor, with respect,

21   Mr. Johnson's statement as to the impact of this is overstated.

22   At most, defendants' arguments, even if viable, would affect

23   only L-3's claims for tortious interference with prospective

24   business advantage.  They have nothing to do with our claims

25   for breach of contract, for trade secrets misappropriation,

1     breach of fiduciary duty, conversion, conspiracy, et cetera.

2             So for all of those reasons, Your Honor, we ask the

3     Court deny motion for leave without prejudice pending the

4     Fourth Circuit's ruling on our appeal of the Serco case.

5             Thank you, Your Honor.

6             THE COURT:  Thank you.

7             MR. JOHNSON:  May I respond, Your Honor?

8             THE COURT:  You may.

9             MR. JOHNSON:  Thank you.

10            Let me try to take Mr. -- plaintiffs' counsel's

11    arguments in order.

12            The first argument was that the decision in Virginia

13    was really a traditional merits matter.  The Tenth Circuit

14    answered that question very clearly in the *Brereton* case, which

15    stated that a judgment -- dismissing on subject matter

16    jurisdiction grounds is not a judgment on the merits.  And

17    therefore, *Semtek* would not require that the reading -- I think

18    the best reading of *Brereton* is -- comes -- does not come --

19    comes right out and says this, is under *Semtek*, we still apply

20    federal common law.  The Court said very clearly that *Semtek*

21    did not address dismissal on jurisdictional grounds*.  So Semtek*

22    really doesn't address this issue at all, except where the

23    Court said, even where -- the Supreme Court said, even where

24    there is a decision on the merits, there may be circumstances

25    where the federal courts need to respect its own processes,

1    require -- even where the state law would otherwise apply,

2    require the application of federal law.  Certainly when we're

3    talking about Article III case or controversy, that's right at

4    the heart of federal interest.

5           Second, Mr. Chew referred to the *Faison* case, which

6    followed the *Nottingham* case, which we cited.  *Nottingham*

7    addressed the preclusive effect of the federal diversity

8    judgment.  *Faison* did not.  *Faison* was a case that was looking

9    at the collateral estoppel effect of another state court

10   decision.  So *Faison* does not address the issue before the

11   Court at all.  *Nottingham* does.  *Nottingham* has never been

12   questioned or disputed or never been any suggestion that has

13   been superseded by the Supreme Court in Virginia or any other

14   court, for that matter.

15          With respect to the timing, Your Honor, in the Fourth

16   Circuit -- last time I checked was about a week or so ago, the

17   Fourth Circuit has not scheduled this matter for argument.  I'm

18   not sure it's fully briefed.  I'm not sure the appellants in

19   this case, the same parties in this case, have even filed their

20   appellate brief.  I know the appellees have not.  So when the

21   Fourth Circuit is going to decide that, Your Honor's guess is

22   as good as mine.  To say that one expects it to be decided in

23   the next few months is overly optimistic, since it has not been

24   scheduled on any of the court's calendars for argument.

25          Second -- or next, counsel argues that their brief

1    really didn't address the issue before the Court now, which is,

2    well, what if ATI is the plaintiff?  But our motion for leave

3    and our motion to dismiss assume that ATI would be substituted,

4    and that's certainly the way that plaintiffs argued the motion,

5    although they also argue that you should look at L-3's

6    standing, which is really the next point, L-3 Service's

7    standing is really the next point.

8          It doesn't make any sense to look at L-3 Service's

9    standing, whether they lost standing or not, because the fact

10   is, according to -- as Your Honor found, as plaintiffs conceded

11   in their response to the order to show cause, in December of

12   2012, L-3 Services became a stranger.  They're now Engility

13   Corporation, a stranger to this lawsuit.  And even in their

14   response brief, in their opposition, you never see L-3 Services

15   ever claiming that they continue to have an interest in this

16   case.

17         The question is, do the current plaintiffs in this

18   case have a personal stake in the loss of the Serco task

19   orders?  And that issue was clearly resolved by Judge Lee in

20   the Eastern District of Virginia, and it's entitled the

21   collateral estoppel effect here, regardless of whether L-3

22   Services transferred its interest in this litigation.  That's

23   wholly apart from the ability -- the right to assert a personal

24   stake in the loss of the Serco task orders.  That's what was

25   resolved in Virginia against the plaintiffs in this case.

1          Finally, with respect to the impact on the case,

2     plaintiffs stated a few moments ago that the loss of the Serco

3     task orders have nothing to do with the other claims.  And one

4     of the claims that was cited was the breach of contract claim.

5     But in the opposition itself plaintiff said, L-3 alleges --

6     quote, L-3 alleges lost profits in its breach of contract

7     claims against defendants in this action, but only because such

8     damages represent the expectancy that L-3 would have received

9     but for defendants' contractual breaches.

10          The expectancy, of course, is the Serco task orders.

11     When we look at the pretrial order under each claim, plaintiffs

12     have alleged, contend, that they're entitled to damages for the

13     loss of the Serco task orders under each claim.  So it's going

14     to have a very large impact on the case.

15          That, of course, is not a reason, Your Honor, to get

16     rid of the claim.  I'm not suggesting that.  But in terms of

17     timing for Your Honor to resolve that at this point would, I

18     believe, have a huge impact on the trial preparation and

19     potentially the length of the trial, as we talked earlier

20     today.

21          Thank you, Your Honor.

22          *THE COURT:*  Thank you.

23          *MR. CHEW:*  Your Honor, may I bring one case quickly to

24     the Court's attention?

25          *THE COURT:*  No, you may not.  You had plenty of time

1    for argument.

2          *MR. CHEW:*   Thank you.

3          *THE COURT:*   I appreciate your oral argument.   I

4    appreciate your written argument with regard to this.   And

5    although the motion is somewhat procedurally complex, and I've

6    had an opportunity to examine it in detail for purposes of

7    today's ruling, it is not particularly difficult to unravel.

8          In a parallel action in the United States District

9    Court for the Eastern District of Virginia, the plaintiff sued

10   Serco, asserting claims of conspiracy, tortious interference

11   with contract, breach of fiduciary duty, among others, arising

12   from allegations of Serco's decision to steer certain HEMP

13   testing work to Jaxon rather than to L-3.

14         The Virginia court granted a motion by Serco to

15   dismiss the claims for lack of standing, finding that, one, the

16   now extinct entity known as L-3 Services, Inc. was the party

17   that was eligible to receive the work from Serco pursuant to a

18   subcontract.   Two, the subcontract required another entity, SI

19   International, to grant approval before that subcontract could

20   be assigned to some other entity.   And, three, when L-3

21   Services, Inc. ceased to exist as a result of its

22   reorganization in 2012, SI International was neither asked to

23   approve nor did it approve the assignment of Serco's

24   subcontract from L-3 Services, Inc. to L-3 Applied

25   Technologies, Inc.   And, thus, four, neither of the current

1   plaintiffs could claim a contractual right to receive work from

2   Serco after the 2011 reorganization of -- I'm sorry, 2012

3   reorganization of L-3.

4        The defendants here invoke the doctrine of collateral

5   estoppel.  They request, first, to file a motion to dismiss all

6   the plaintiffs' claims, and then -- out of time.  And then as

7   the argument has developed, developed -- assert the grounds on

8   which they would seek to dismiss those claims.

9        Let me start first with the question of ripeness.  And

10  that's ripeness of the judgment to have a collateral estoppel

11  or *res judicata* effect on this litigation.  Because it is

12  currently on appeal in the Fourth Circuit, it does not have a

13  preclusive effect in this litigation.  And, therefore, on that

14  ground alone, I deny the motion, with leave to renew.

15       But let me also explain some of the differences that I

16  see between what has been argued here and what happened in

17  Virginia, because it's helpful, I think, in understanding where

18  this litigation might go.

19       As we all know, there is a difference between the

20  doctrines of *res judicata* and collateral estoppel.  *Res*

21  *judicata* affects claims; collateral estoppel affects issues.

22       And, here, the factual issue that was resolved, as I

23  see it, in Virginia is whether L-3 -- or L-3 ATI had a right to

24  receive business from Serco after the reorganization.  That's a

25  factual issue.  If that is determined on a conclusory basis --

1    meaning that it's affirmed on appeal in the Fourth Circuit, or

2    if the appeal is dismissed and it becomes final that way --

3    then the question is, what effect does that factual

4    determination have?

5           In the Virginia action, it impacted standing.  But a

6    determination of standing is not something that has a

7    preclusive effect here.  It is the factual determination that

8    could have collateral estoppel effect.  And, here, it doesn't

9    affect standing; here, it affects recovery of damages.  So it

10   does not have a jurisdictional effect, arguably.  What it

11   affects is whether or not the plaintiffs could recover for a

12   loss of business from Serco.

13          Now, it's not altogether clear to me whether a

14   collateral estoppel effect will translate into any significant

15   change in the presentation of evidence or the preparation for

16   trial.  But once we know whether the opinion that was issued in

17   Virginia is final, we can assess how the factual determination

18   affects the determinations to be made in this litigation.

19          Any need for clarification or further explanation?

20          *MR. LEVITT:*  No, Your Honor.

21          *MR. JOHNSON:*  No, Your Honor.

22          *THE COURT:*  Thank you.

23          That, then, takes us to a number of supplemental

24   motions to restrict access, Dockets No. 1321, 1323, 1324, 1325.

25   These motions were directed by the Court -- as part of its

consideration of the parties' prior motions to restrict, the

Court directed that the parties publicly file certain documents

or to more fully explain why certain public filings could not

be accomplished.  To the extent that these motions reflect that

the parties have submitted redacted versions of exhibits that

are suitable for public filing, they are granted.

        In certain instances, the plaintiffs have asserted

that it is untenable to effectively redact a given document,

where, because of sheer volume -- it would pose an undue burden

of allocating multiple attorneys' days, if not weeks, to

unnecessary work.  Alternatively, the plaintiffs have offered

only perfunctory explanations that public dissemination of a

document would be harmful to national security.

        This court has repeatedly and extensively explained in

multiple orders the strong public interest in access to

judicial records and the thoughtful, extensive, and, indeed,

often time-consuming process that a party must undertake in

order to make an adequate showing that a particular document

should be shielded from public examination.

        Put in a rather homely analogy, you all chose the

public bus to ride on, not limousines.  And as a consequence,

using the free public system, you're subject to the public

interest.  And the public interest increases as the litigation

proceeds.  The reason has nothing to do with your dispute; it

has to do with the fact that the public interest is in making

1    sure I do my job.  So the more job I have to do, the more the

2    public has an interest in monitoring what I do, do.  So all the

3    time that we spend getting close to trial, the public interest

4    is increasing, and your interest in keeping information from

5    the public is decreasing.

6          In those instances in which the plaintiffs have

7    requested that certain documents remain under public

8    restriction without a corresponding tender of an adequately

9    redacted version, I find that the plaintiffs have failed to

10   carry their burden of showing an entitlement to a continued

11   restriction on public access.

12         I am not inclined to continue to waste judicial

13   resources attempting to guide parties toward a set of access

14   restrictions that will satisfy both the public and the parties.

15   I am simply going to adjudicate all future motions to restrict

16   access on their facial merits, either granting or denying them

17   without leave for further modification.  And finding that the

18   plaintiffs' request to continue access restrictions in full for

19   certain documents fails to satisfy the plaintiffs' burdens, I

20   will direct that public access to the following documents be

21   restored in their entirety:

22         Docket Nos. 1177-2 through 6, 1177-8, 1177-9, 1180-1,

23   1180-4 through 1180-11, 1181-1 through 1181-13, 1181-15 through

24   1181-16, 1182-1 through 1182-5, 1188-1, 1184-7 through 1184-8,

25   1248-2 and 1248-3, 1274-33.

1              In addition, the parties have agreed that the

2    following documents may have their public access restored:

3    Docket Nos. 1182-5 and 1247-18.

4              Any need for clarification or further explanation as

5    to that?

6              *MR. LEVITT:*  No, Your Honor.

7              *MR. JOHNSON:*  No, Your Honor.

8              *THE COURT:*  Thank you.

9              Then let's go to Docket No. 1326, the plaintiffs'

10   motion to restrict access to certain exhibits attached to its

11   motion for reconsideration.  That's -- and that's Docket No.

12   1319.  And the defendants filed a response at Docket No. 1330.

13             Any further argument?

14             *MR. LEVITT:*  No, Your Honor.

15             *MR. JOHNSON:*  No, Your Honor.

16             *THE COURT:*  In this motion, L-3 seeks to restrict

17   public access to Exhibits B and C to its motion, claiming that

18   those exhibits contain a list of parts that constitute trade

19   secret information.  Plaintiffs insist that the listing of the

20   particular parts is essential to establishing the facts

21   asserted in the motion.  The confidential parts list in Exhibit

22   B is duplicated by a request by Mr. Eich in Exhibit C.  And

23   although it tenders a redacted version of the exhibit allegedly

24   suitable for public filing, the redacted version clearly

25   redacts more than just the plaintiffs' claimed trade secrets.

1          Among other things, it redacts entries for such

2     ordinary items as canvas bag; battery charger; two training

3     videos; listings for equipment cases and extension cords;

4     ordinary bits of hardware, such as washers and gaskets; first

5     aid kits; caulk guns; various tools, such as drills and saws.

6     It is apparent that the plaintiffs' proposed redacted versions

7     entail wholesale rather than selective redactions.  As such, I

8     find that L-3 has failed to carry its burden of showing that

9     Exhibits B and C should be restricted from public access; and,

10    thus, the motion is denied.

11         The motion identifies certain other exhibits that the

12    plaintiffs do not seek access to, but -- seek to restrict

13    access to, but posits that the defendants might.  The

14    defendants do not move separately to restrict access to those

15    documents, but discuss them as part of their response to the

16    plaintiffs' brief.

17         Pursuant to Local Rule 7.1(d), a request for relief

18    may not be included in a response or a reply.  And, thus, the

19    defendants' efforts to broaden the relief requested by the

20    plaintiffs' motion is inappropriate and therefore denied.

21    Public access to Docket No. 1319 shall be restored in its

22    entirety.

23         Now, that takes us to Docket Nos. 1340 and 1341, the

24    parties' joint Rule 702 motion.

25         I have been over this motion in some detail.  And

1   because of what we're going to talk about with regard to your

2   proposed final pretrial order, I'm not going to set a hearing

3   at this time.  I am going to make several observations,

4   however.

5          First of all, at the time that we have the Rule 702

6   hearing, because the hearing will be in open court, the motion

7   will be restored for public access.  Right now, it's under

8   restriction.

9          Secondly, let me ask counsel, in preparing this

10  motion, how did you come up with the opinions that were going

11  to be offered by the various experts?  What was the process

12  here that you used to identify the opinions that were going to

13  be offered?

14         *MR. LEVITT:*  I'm sorry if I'm being dense, but I'm not

15  sure I understand the question.  For the purpose -- the

16  opinions offered for the purpose of the 702 hearing?

17         *THE COURT:*  Yes.

18         *MR. LEVITT:*  Or for the trial itself?

19         *THE COURT:*  They should have been identical.  And

20  that's the reason I'm asking.

21         *MR. LEVITT:*  I guess --

22         *THE COURT:*  You intuit exactly what I was asking.

23         *MR. LEVITT:*  I agree with you, but I guess I'm missing

24  the perspective in terms of how you chose to challenge the --

25         *THE COURT:*  Okay.

1          MR. LEVITT:   -- the opinions as opposed to how you

2    chose them.  I don't mean to be argumentative.

3          THE COURT:  The purpose -- you're not being

4    argumentative, don't worry.

5          MR. LEVITT:  Okay.

6          THE COURT:  The purpose of this process is for the

7    party who is going to call an expert witness and tender an

8    opinion to identify the opinions that you're going to use at

9    trial.  Not everything that is in the report; what you're going

10   to use at trial.  And then the party who is going to be

11   cross-examining that witness or submitting rebuttal expert

12   testimony looks at those particular opinions and says, do -- is

13   there sufficient foundation under Rule 702 for those opinions?

14         Now, I have to tell you, having gone through a little

15   over 100 pages here, we've got a lot of opinions, so-called

16   opinions, that are nothing more than a recitation of what is in

17   someone's expert report.  And I have no idea whether you really

18   intend to call a witness to testify to that at trial.  And

19   we're not going to have a 702 hearing testing sufficiency of

20   foundation for statements in reports.  We only test the

21   sufficiency of the testimony that is going to be submitted at

22   trial.

23         The other thing that I note as an overview is that in

24   looking at these opinions, some of the responsive experts are

25   responding to reports.  And in fact, their opinions will start

1    out with, "as stated in so and so's report, blah, blah, blah,

2    and I disagree."  Again, that's not a helpful thing to test,

3    because reports will not be offered at trial.  It will be the

4    witnesses who are testifying.  And so we need to get out of the

5    paper business and focus in on what is going to be offered at

6    trial and what the problems are as far as foundation.

7         The third observation I make is, a 702 hearing does

8    not determine admissibility; it determines inadmissibility.

9    Simply because there is sufficient foundation does not

10   necessarily mean that testimony will ultimately be admitted.

11   But, clearly, if there is insufficient foundation, the

12   testimony cannot be proffered.  So this is not an opportunity

13   to try to weaken someone's testimony.  It's not an opportunity

14   to present all of the arguments against someone's testimony.

15   It's only the opportunity to test the foundational basis.  And

16   that takes me to the grounds.

17        You have two witnesses who are obviously legal

18   witnesses, Mr. Tomanelli and Mr. Anderson.  There are *Specht*

19   issues, arguably, with both of those, and you need to grapple

20   with those.

21        For those in the courtroom who don't know what I'm

22   talking about when I say *"Specht,"* there is a case called

23   *Specht v. Jensen*, which is the Tenth Circuit standard on

24   whether or not lawyers can opine as expert witnesses at trial.

25        In addition, there are a number of objections to

1   insufficiency of facts and data.  In the Tenth Circuit, the

2   standard is numerical.  It is a quantum, not a quality.  And so

3   if you are going to challenge an opinion for insufficient facts

4   and data, you're going to need to be able to say how many

5   things -- data points, issues, papers, whatever -- are

6   necessary to be reviewed in order to express the opinion.  It's

7   not really a catchall for "I sure wish you would have looked at

8   something else."

9        And rarely -- actually, I think some of the other

10  circuits have a little different standard; but the Tenth

11  Circuit has adopted the standard that follows Rule 702.

12       Finally, looks like a number of these witnesses are

13  testifying based upon experience, that there is no standard

14  methodology by which they are formulating their opinions.

15  Instead, they are doing it based on their skill, expertise,

16  training, and experience.

17       Rule 702, in the comments after it, address that.

18  There really looks like to me, two avenues for a basis for an

19  expert opinion under Rule 702.  One is a methodology or

20  analytical pattern or principle that is being applied, and the

21  other is experience.

22       And it's interesting to me that they did not

23  incorporate experience into the rule itself.  But after the

24  rule, the commentary explains that there are lots of opinions

25  that can be based solely on experience.  And the question is,

1   what is the person's experience, and how closely does it tie to

2   the opinion that is being proffered?

3            The example I frequently use for that is, we all have

4   people come into our homes and lay tile or do drywall work.

5   Now, probably there is no book that they have studied that

6   tells them the process for laying tile or doing drywall work.

7   But a real experienced drywaller, a really experienced mason,

8   can look at someone else's work and based on their experience

9   tell you exactly what they did.  And so that's an

10  experience-based decision or opinion.

11           And I think that some of your witnesses are going to

12  fall into that category.  And therefore, if that's the case,

13  then just be straightforward with each other about it, this is

14  based on experience, and focus in on whether that experience

15  closely ties to the opinion.

16           My thought with regard to the 702 challenges is that,

17  one, they're going to be narrower.  And I think you need to

18  revise this again and get them narrower, once we get through

19  the final pretrial conference and you've had a chance to narrow

20  in on your case.  And, secondly, that probably these are best

21  handled in a pairing of the opinion and then the rebuttal

22  opinion on the same day, so that we can address all of that in

23  the appropriate framework.  And it looks like you've got

24  several pairs of witnesses that we can do that with.

25           Okay.  Let's turn to the final -- proposed final

1   pretrial order.

2          Notwithstanding the fact that this is close to 150

3   pages long, it doesn't indicate that you're ready for trial.

4   And that's because it reflects we're about six or seven steps

5   away from trial, still at the stage of trying to incorporate

6   all of the information that has been gathered during the

7   pretrial phases.

8          And quite frankly, folks, you don't want a ten-week

9   trial, you don't need a ten-week trial, and I don't think you

10  could get a jury to sit for ten weeks to listen to this.

11         In fact, let me ask you:  How many here in the

12  courtroom have been jurors?  I've got some hands back there.

13  How many have sat for a ten-week trial?  Not a hand.  That's

14  right.  So we need to practically narrow this case for purposes

15  of trial.

16         Your statement of claims in the final pretrial order

17  is filled with argument.  It states facts only in conclusory

18  terms.  And, actually, you've only stipulated to a very few

19  number of facts.

20         There are a lot of things that you need to stipulate

21  to.  You probably will have no difficulty stipulating to the

22  dates of employment at L-3 for each of the defendants,

23  especially the date that each defendant left L-3's employ.  You

24  can probably stipulate as to particular items, documents, or

25  information belonging to L-3 that the defendants admit taking.

1    You can identify the particular contracts that both L-3 and

2    Jaxon bid on.  You can identify who ultimately received those

3    contracts.  You can probably stipulate on the value of those

4    contracts.

5         The claims, it looks like to me, are overlapping,

6    which contributes significantly to your request for a ten-week

7    trial.  In reality, I think that the substantive claims turn on

8    some fairly straightforward factual and legal arguments, which

9    if we focus on those, will allow a narrowing of this case.

10        At the core of all of these claims is the allegation

11   that the defendants took certain information belonging to the

12   plaintiffs.  It's the basis of the breach of contract claim,

13   the misappropriation of trade secrets claim, the breach of

14   fiduciary duty claim, the tortious interference claim, and the

15   civil conspiracy.

16        And with regard to this, it's helpful, I think, to

17   think about the basis of all of these claims from a factual

18   perspective.  What information did the defendants take from

19   L-3?  What do they admit they took?  What does L-3 contend they

20   took that they deny they took?  And of that information,

21   looking at the things that the defendants admit they took, were

22   any of them trade secrets?

23        And that requires asking a number of questions.  If

24   they agree they were trade secrets, then those fall into one

25   basket.  But if not, we have to ask whether the information had

1    already become public, whether it had been disseminated to

2    others, whether it once had been a trade secret but it lost its

3    character due to operation of law, or anything that might be a

4    trade secret originally but ceased to be a trade secret for

5    other reasons.  When we can boil down these particulars, we

6    will have a number of baskets of information.

7              As to information that is not a trade secret, then we

8    are looking at the breach of contract claim and the breach of

9    fiduciary duty claim, arguably.  For the property that is a

10   trade secret, then we are looking at misappropriation of trade

11   secrets.  But the truth of the matter is, for all the variety

12   of claims that are being asserted here, there is only going to

13   be, if the plaintiffs prevail, one award of damages.  We don't

14   have a separate award for every claim.

15             And so if you can break this information into the

16   appropriate categories, you could maybe figure out what claim

17   is the best claim to proceed on.  Because I'll tell you, what I

18   want to see in a final pretrial order is not all of the photos

19   that you've gathered in your picture album during five years of

20   pretrial preparation in this case.  I want to know, what is

21   your best claim that you're going to go to trial on?  What is

22   the evidence that you're going to put on for that claim?  Where

23   do you have disputes?  Who are the witnesses you're going to

24   call?

25             The purpose of the final pretrial order is not to

37

1   comprehensively reflect the case; it is to give predictability

2   and reliability as to the trial.  And that's why I say we're

3   about six steps out from the trial, because we're still at the

4   total of the case being reflected in the proposed final

5   pretrial order, and we need to get it narrowed down to what

6   you're really going to put on at trial.

7        Now, I will tell you, I noticed in your proposed final

8   pretrial order there is some boilerplate language that

9   repeatedly refers to "and there may be other information that

10  we're going to present at trial."  No, there is no other

11  information to present at trial.  When we get to the final

12  pretrial order, that's it; that's what we're going to do; no

13  reservation, no adding stuff, no surprises.  Everybody should

14  know what the issues are, factually and legally, because,

15  frankly, we're asking twelve citizens to come in here and spend

16  their time resolving your dispute.  And they're not going to

17  much like it if you waste their time or you insult their

18  intelligence.  So our job is to get this narrowed down so they

19  can know what issues you need them to determine, and they

20  will -- they will undoubtedly do that.

21        Now, with regard to the breach of fiduciary duties,

22  you've got a focus on Mr. White and Ms. Rettig; and then you've

23  got unspecified instances in which you contend that -- the

24  plaintiffs contend that the defendants allegedly performed work

25  for Jaxon while actually on the clock at L-3.  That means -- if

                                                                              38

1    you're going to proceed on that, we need to nail that down.  As

2    to conversion, you're down to a single capacitor, and that's

3    it.

4            Now, the defenses are kind of interesting here, too.

5    Waiver is alleged here, but I don't think this is the classic

6    sense of waiver.  Waiver is the knowing -- is the voluntary

7    relinquishment of a known right.  But I think what we're

8    talking about here in waiver is not a right, but an interest.

9    And I think it is an interest because I think your waiver claim

10   pertains to that information which once was a trade secret and

11   lost its trade secret character.

12           Do I understand that right?  Is that what we're

13   talking about when we're talking about waiver?

14           *MS. BRZEZYNSKI:*  In part, Your Honor.  It's not only

15   those alleged trade secrets that lost their trade secret rights

16   because the information became public, but it's also those

17   alleged items that never were trade secrets for one reason or

18   another.

19           *THE COURT:*  Well, what's the waiver there?  What's the

20   intentional relinquishment of a known right as to those?

21           *MS. BRZEZYNSKI:*  L-3 affirmatively waived its right to

22   maintain that those items were trade secrets when they

23   submitted certifications to the government, among other things,

24   certifying that they had no trade secrets.

25           *THE COURT:*  Well, I thought that -- maybe I

1  misunderstood what you said.  I thought what you said is your

2  waiver argument applies to those things that lost their trade

3  secret status.

4       *MS. BRZEZYNSKI:*  Yes.

5       *THE COURT:*  And to items that never had any trade

6  secret status, and that's what I'm asking about.

7       *MS. BRZEZYNSKI:*  They never had that trade secret

8  status, Your Honor, certain items, because L-3 affirmatively

9  chose to not certify to the government that they had trade

10  secret rights in certain items.

11       *THE COURT:*  Well, if they never had it, and they still

12  don't have it, then there wasn't any waiver.

13       *MS. BRZEZYNSKI:*  Okay.  Thank you.

14       *THE COURT:*  Gotcha.

15       Okay.  You have a defense here of unclean hands.

16  Unclean hands in the equitable sense usually pertains to

17  pre-litigation conduct.  What I'm reading is you're asserting

18  unclean hands as a defense based upon litigation behavior.  I'm

19  wondering on what basis that is.

20       *MS. BRZEZYNSKI:*  Most it, Your Honor, is

21  pre-litigation conduct that we are asserting as part of our

22  unclean hands affirmative defense.

23       *THE COURT:*  And unclean hands, of course, is an

24  equitable defense.  What equitable claim is it being asserted

25  against?

1          *MS. BRZEZYNSKI:* Unjust enrichment, Your Honor.

2          *THE COURT:* I'm not sure in this case whether there is

3    really a claim of unjust enrichment or if that is an alternate

4    measure of loss.

5          *MR. JOHNSON:* Your Honor, we struggled with that

6    ourselves. And I think the better rule probably is that it's a

7    potential measure of recovery for certain of the causes of

8    action where unjust enrichment is recoverable, but it should

9    not be viewed as a separate cause of action.

10         And with respect to whether it's an equitable or a

11   legal recovery or a doctrine, as Your Honor knows, I'm sure,

12   there are cases on both sides of that issue.

13         *THE COURT:* Well, it becomes important at trial, and

14   it's something you need to talk about, because equitable

15   decisions, equitable issues are resolved by the Court.

16         *MR. JOHNSON:* I understand, Your Honor, yes.

17         *THE COURT:* Not by the jury. So the question is, what

18   are we going to put in the equitable basket, as compared to the

19   legal basket, and how do you want to handle that at trial?

20         *MR. JOHNSON:* I understand, Your Honor. Yes, we -- on

21   our side, we've given quite a bit of thought to that question.

22   And in the pretrial, we raised an issue that, we don't think

23   all of the claims are -- requests for relief are properly tried

24   by the jury.

25         But, frankly, maybe this goes to your point of, we're

1    a step or two away from trial.  We haven't resolved that in our

2    own minds.

3           *THE COURT:*  Well, you need to resolve it with each

4    other.  You may have different theories as to what the outcome

5    of this trial should be; but, frankly, there is only going to

6    be one trial.  And we all know, as good lawyers, certain things

7    are going to happen and certain things have to be handled in a

8    particular way.  And we've got to talk about these things so

9    that we have a good trial, so that those folks that are going

10   to sit over there in the jury box can do what you ask them to

11   do.

12          *MR. JOHNSON:*  We understand, Your Honor.  And I know

13   Ms. Brzezynski's –– she was on the front line for this.  We

14   made several efforts, particularly in response to the last

15   conference we had with Your Honor, which was by telephone, to

16   try to narrow the claims.  And we approached the plaintiff and

17   asked them to drop claims.  The conversion claim was the only

18   one that was dropped, and then it bounced back in.  So we have

19   tried on our side.  We are the defendants; we can only do so

20   much to get the plaintiffs to narrow their case.

21          And I understand your comments go to both sides, both

22   the defenses and the affirmative claims; but it really has to

23   start with the plaintiffs recognizing that this case can't be

24   tried for ten weeks.  We agree 100 percent.  I mean, it's ––

25   I've never been in a ten-week trial.

42

1          THE COURT:  I have, but --

2          MR. JOHNSON:  And sitting there listening to it, I'm

3    sure Your Honor probably hopes to never have to do another one.

4          MS. BRZEZYNSKI:  Along those lines, Your Honor, we

5    broached with the plaintiffs' counsel before the conference

6    today whether we can agree on a shorter amount of time for

7    trial.  We took the liberty of going through and reassessing

8    all of the witnesses to reduce the time and tried to have that

9    conversation with plaintiffs, to agree on no more than a

10   one-month or four-week trial.

11         In addition, Your Honor, I don't want to give you the

12   impression that we did not make every effort to try to obtain

13   stipulations to narrow the case.  In fact, we sent over 230

14   separate stipulations to plaintiffs' counsel, single

15   statements, very similar to a request for admission,

16   one-thought statements, clean, taken from testimony or

17   documents in the case.

18         THE COURT:  I'm going to interrupt you counsel.  And I

19   appreciate the good efforts that you've made, and likely the

20   plaintiff would tell me the same thing.

21         MS. BRZEZYNSKI:  Thank you.

22         THE COURT:  I'm going to be real blunt here, though.

23   This case has gone on for five years.  You're still not ready

24   for trial.  I'm not going to let you go to trial until you're

25   ready.  And if you aren't able to creatively look at the volume

1   of information you've got and whittle it down, then I'm going

2   to appoint a special master to help you do that. And I'm going

3   to instruct the special master to recommend a form of final

4   pretrial order that allows me to conduct a trial of reasonable

5   degree. I would not at all be surprised if a special master

6   says somewhere between probably two and three weeks. And I

7   would empower the special master to make a recommendation that

8   the costs associated with the process be apportioned between

9   the parties based upon their willingness and ability to narrow

10  issues for purposes of trial.

11       The parties in the case are entitled to get this

12  matter to trial and have it resolved. And when I teach law

13  students, I often tell them, when they want to give me every

14  argument that they have, like they're taking a law school exam,

15  they think of those arguments like a herd of cattle, and you're

16  going to take something to the National Western Stock Show to

17  have it judged in competition with other animals. And when you

18  do that, you take your very best animal. You don't take the

19  whole herd. And that's the way it is with claims and arguments

20  and evidence. If the best doesn't work, the rest won't either.

21       So it's time to get this narrowed down, and I'm going

22  to give you a very short window in which to do it. If you

23  can't do it yourselves, as I said, I'll appoint a special

24  master to assist you. But then to some degree, you'll be off

25  the public transportation system, and you'll be paying for

1   someone to help you out.

2          Given the fact that it's the holiday season, I'll give

3   you until January 15 to reframe and redact your proposed final

4   pretrial order and your motion under Rule 702.

5          If at the end -- and I will also request that by that

6   date you also submit a name or names of folks who you would

7   like to have be a special master to assist you in the process

8   of getting this matter ready for trial.

9          Any questions at this juncture?

10          *MS. BRZEZYNSKI:*  No, Your Honor.

11          *MR. LEVITT:*  Your Honor, I know you said I wasn't

12   being argumentative before, so I'm going to push my luck and

13   ask if we could have slightly more time to do both, since

14   you're talking about both.

15          *THE COURT:*  Can you speak into the microphone.

16          *MR. LEVITT:*  I'm sorry.

17          *THE COURT:*  Thank you.

18          *MR. LEVITT:*  Since you're asking us to redo, and

19   rightly so.  I think both sides, we don't want to get into a

20   tit for tat, and appreciate Your Honor doesn't want to hear it.

21   If we can have a little more time, since it's both the 702 and

22   pretrial, before we use a special master.  Because I'm hoping

23   on both sides that we have taken in what you said seriously.

24   I'm sorry you've had to do this a second time, but I think a

25   little more time might be helpful, so --

45

1          *THE COURT:*  All right.  I'll give you until

2     January 29.  You get another couple of weeks.

3          *MR. LEVITT:*  Thank you, Your Honor.

4          *THE COURT:*  You're welcome.

5          I want everybody in the courtroom to understand that I

6     appreciate that a lot of this special business information

7     which is the subject of this litigation you would like to keep

8     private.  We can call it trade secrets, we can just call it

9     important business information, and it's all the same for

10    purposes of what I'm going to say right now.

11         You want to keep this private because it's the essence

12    of the business.  The moment our trial starts, it's all going

13    to be public.  And there is a certain irony here.  I've never

14    seen so many motions to restrict; I've never had to deal with

15    so many.  And I recognize that that's -- that's the

16    undercurrent of the entire litigation.  But when you go to this

17    very public trial, your competitors may be sitting out there in

18    the gallery.  They'll have the right to listen to everything

19    that is said.  They'll have the right to look at every exhibit

20    that comes in.  If we have the 702 hearing, that's going to be

21    public.

22         And to some degree, this looks a little bit like a

23    cold war.  I would hate to see it result in an assured mutual

24    destruction, so I urge you to think about that.

25         Now, let me move on to the last topic that we usually

1   deal with at a final pretrial conference.

2        Parties, the reason you're here is because this is

3   your litigation.  Sometimes we lawyers forget that, we forget

4   that the people who are going to live with this outcome are the

5   parties and that they get to the make the choice as to how

6   they're going to deal with this.

7        In this case, you've got a commercial dispute; and

8   every dollar you spend fighting is a dollar you can't use for

9   something else.  And every hour you spend, you can't use for

10  anything else.  You understand that, and I have great

11  confidence in the business sense of the people involved here.

12  I know, having been before I was a district judge, a bankruptcy

13  judge, that at some point the line will get crossed where the

14  benefits will diminish because the costs get too great.  And

15  good business people don't let that happen.

16        So I know you're aware of that.  But what you may not

17  be aware about is what happens here in the courtroom during a

18  trial.

19        Now, I know we have a former juror, there is some

20  former jurors back there, you have seen a trial, and you know

21  that a trial is not the same as what you see on TV or in the

22  movies.  And if you've been a juror in a commercial case, you

23  know that the real danger is that jurors will become mind numb,

24  occasionally drift off to sleep because it is so boring,

25  because they're not business people in the same way that you

1    are.

2            What I want to do is touch base on a couple of

3    realistic limitations in the trial process.  I'm sure your

4    attorneys have mentioned these; but sometimes when I say them,

5    they have a little different flavor.

6            We believe that trial is the very best mechanism to

7    resolve disputes other than "shoot them up in the O.K. Corral,"

8    and we prefer to have people come here to the courthouse to

9    resolve their disputes, but a jury trial is not without its

10   problems.

11           First and foremost, we're going to ask twelve people

12   to serve as jurors here.  And if you were to read the little

13   black book that Ms. Glover maintains -- it is black, but it's

14   not really little, just euphemistically referred to that way --

15   it has comments from jurors in hundreds of trials in this

16   courtroom.  And those comments, you're free to look at any time

17   you want, but they will say to you something that is not

18   terribly remarkable.  People really want to do a good job as

19   jurors, but they don't like to have their time wasted or their

20   intelligence insulted, because we're taking them away from the

21   rest of their lives, and they want to be efficient and

22   productive in what they're asked to do.

23           So we invite them in here, put them in the box, and we

24   ask whether they can be fair and impartial.  Now, I'll conduct

25   the *voir dire* here; and that's because I really am looking for

1    a fair and impartial jury.  I'm not looking for strategic

2    advantage.  And what it means to be fair and impartial is to be

3    a bit detached.  The instructions that are given to these

4    jurors tell them, you cannot base a verdict on sympathy or

5    prejudice or emotion.  You base it on common sense and the

6    evidence that's presented here in the courtroom and the law as

7    I describe it.

8             And if you were to look at the jury verdict and the

9    jury packet of instructions, you'll see they really resemble a

10   decision tree.  It is a logical, sensible process that the

11   jurors go through.  But in being detached, they don't identify

12   with what it is that you went through on an emotional level.

13            And just to give you an example of that, if you can

14   just think back to the last set of vacation pictures that

15   someone showed to you, maybe they were on a Facebook page,

16   Instagram, or, at my house, in little books.  And you saw a

17   picture of somebody's tropical vacation, and they just raved

18   about it.  And you could tell when they were talking that they

19   were thinking about the margarita and the sunshine and the salt

20   air.  And you looked at the picture, and you saw a tree and a

21   beach.  And you smiled very nicely, and you were warm and

22   friendly about it, but it looked like any other beach that

23   you've ever seen.  It just didn't have a resonance because you

24   didn't have an experience associated with it.

25            That's what we have with the jurors.  You will know

1    this case so well, and they will not.  And they take a solemn

2    oath promising to listen to the evidence as presented by the

3    witnesses and the exhibits that come in and evaluate only that

4    to determine the facts.  And that's why it's so important for

5    the parties to stipulate to the facts that they can agree on.

6         The second piece in a jury trial that is difficult

7    is -- those of you who have been jurors will recall -- you hear

8    a witness testify, and maybe there are two or three witnesses

9    that all saw the same thing or participated in the same event,

10   and they recount it differently.  And the attorneys argue to

11   you that one of them is lying.  In my experience, that's not

12   usually the case.  What is more the case is something that the

13   neuroscientists now explain to us, but we've known based on our

14   common sense for a long time.

15        Some of you are probably close to the age that I am,

16   and you probably played as children the game of telephone, or

17   gossip, where one -- the children line up in a line, and one

18   child whispers a secret message in the ear of the next child,

19   and it gets passed down the line.  When you get to the end of

20   the line, the message is never the same as the message as it

21   started out.  And that's not because somebody was lying or had

22   bad intent; it's because, as neuroscientists will tell us, our

23   brains all work differently.  We perceive, we process, we

24   store, and we recall information differently.

25        And as a consequence, the information that the jury is

1    going to use to make their decision is going to be a little bit

2    distorted by the very human nature of the witness's testimony.

3           So then you think about documents.  We all read

4    documents all the time.  We even like documents.  Most jurors

5    look at documents about the same way that they look at the

6    documents that are presented at their closing when they bought

7    their house or the documents when they sign to buy a new car.

8    It all looks like legalese to them.  Now, that's not to say

9    that they aren't going to pay close attention, and it's not to

10   say that they aren't intent on doing a good job, but to some

11   degree, it is a bit of a foreign language for them.

12          And we assume, particularly in commercial cases, that

13   the jurors are going to be facile with all the terms that we

14   customarily use.  And you can add another layer to that on top

15   of it, and those are the technical terms that you use in your

16   business.

17          So we have a jury that doesn't know a lot about your

18   business or this controversy relying just on the evidence that

19   is presented.  And meanwhile, you're going to spend a lot of

20   time getting ready for trial and a lot of time in trial.  And

21   every bit of time you spend in trial and getting ready for

22   trial, you can't spend on something else.  Some of you may have

23   headaches, some of you may have nervous stomachs, some of you

24   may not be able to sleep.  That comes with the territory.  The

25   people who enjoy being here, well, they're the lawyers and the

 1    court staff and me.  It's not compensable, all that wear and

 2    tear.

 3          And once we get a verdict, one side will probably be

 4    somewhat satisfied, the other somewhat unsatisfied.  And

 5    whoever it is that's unsatisfied will have the right to appeal.

 6    So that verdict will not end the controversy, likely.  Whoever

 7    is unhappy will file post-trial motions with me.  I will push

 8    them to the back of my pile, because there are lots of other

 9    people like you who need to get to trial.  And when I have a

10    spare day, I'll pull them out and rule on them, and then you

11    can take the matter over to the Tenth Circuit Court of Appeals.

12          Now, what you'll be appealing from is not what the

13    jury did.  You'll be appealing from mistakes that you believe I

14    made.  And I'll be doing my best during the trial not to make

15    any mistakes, but you may nevertheless believe I have and want

16    to appeal on that.  If, indeed, I did make a mistake, and it

17    was so serious as to render the decision that the jury made

18    infirm, they'll reverse and remand, and we'll get to do this

19    all over again.  So it's not necessarily final.

20          Rarely is there a case where there is an external

21    justification for considering an alternative method of

22    resolution.  This case is one of those.  Usually at this

23    juncture I would say to the parties, you know, if you don't

24    want to risk what is going on in the trial, giving your dispute

25    to twelve unknown people to resolve for you, giving away your

1    control, based on evidence you can't control, with all the wear

2    and tear that goes with it, and you don't necessarily have a

3    final decision, you don't want to do that, there is an

4    alternative, and that's settlement.  You can do that knowing

5    that you're in control, the people who know the most about the

6    issue are making the decisions, they're the ones that are going

7    to live with the outcome, you avoid the wear and tear of the

8    trial process and the costs associated with it, and you end up

9    with a final decision.

10        In this case, you have an added reason to think about

11   this, and that is, you have worked assiduously to keep your

12   trade -- your private business information private.  And if you

13   go to trial, it won't be.

14        I hope you will think while the attorneys are busy

15   putting this trial package together about what you want to do

16   to resolve this controversy.  If you want to go to trial, I

17   love a commercial trial, and we can do that.  But in good

18   business judgment, if a need to keep this private information

19   private, and the uncertainties of trial, as well as the cost

20   and expense, dictate another outcome, I get that, too.  And,

21   ultimately, this is your lawsuit to decide what it is you want

22   to do with it.

23        Okay.  We've got a deadline set for our trial -- final

24   pretrial order to be resubmitted.  I think you probably will

25   either end up having a special master or end up having another

53

```
 1    final pretrial conference.

 2              Parties, you don't need to come back for that if we

 3    need to do that.  You came here today, you heard what I had to

 4    say, I know you'll think on it.  And what I would anticipate is

 5    that we will have another hearing probably in February or so to

 6    determine matters as they go along.

 7              Is there anything else you want to address today?

 8         MR. JOHNSON:  If I may, Your Honor.

 9              I believe this was covered by your subsequent

10    comments, but early on in today's session you said you were

11    going to comment more about the tortious interference count and

12    how it may be superfluous.  I didn't know if Your Honor meant

13    to say more about that.

14              Secondly, just a moment ago your Honor said you

15    thought this was a case where a different procedure is called

16    for.  And I thought perhaps Your Honor was leaning towards what

17    we've requested and that in the past know, which is a mediation

18    or court-supervised settlement conference.  We think that would

19    be helpful --

20         THE COURT:  I am not willing to make court resources

21    available to these parties for settlement purposes.

22         MR. JOHNSON:  May I ask alternatively, Your Honor,

23    that you order the parties engage in private mediation?

24         THE COURT:  I'm not going to order parties to go to

25    the settlement table.  It would be wise for them to do that,
```

54

```
 1   but they're good business people.
 2            MR. JOHNSON:  Thank you, Your Honor.
 3            THE COURT:  Thank you.
 4            MR. LEVITT:  Two things I want to say.  First, to
 5   thank you very much for how patient you've been both today and
 6   throughout the whole case.  And having lived with our
 7   adversaries as well as our co-counsel for the five-year period,
 8   I think I get the sense you got through the bulk of us.  I'm
 9   not going to speak on their behalf, but we know each other
10   pretty well.
11            THE COURT:  I was going to say, you probably know each
12   other very well.
13            MR. LEVITT:  Yes.  The other thing is just a technical
14   issue.  On our motion for reconsideration, it does sound like
15   we overdesignated, and I apologize for that.  There is some
16   information there, if we could be given a short time to try to
17   do --
18            THE COURT:  Nope.
19            MR. LEVITT:  I wish you a very happy holiday, Your
20   Honor.
21            THE COURT:  Thank you.
22            Let me clarify, just at the request of counsel.  The
23   improper means element of the tortious interference claim seems
24   to be the same as the misappropriation of trade secrets or
25   confidential information claim.  And so what I think is, you've
```

55

1    got just an alternate theory that overlaps.  It's really not a

2    different claim altogether.  Does that answer your question?

3              MR. JOHNSON:  I think so.  Thank you, Your Honor.

4              MR. LEVITT:  Thank you, Your Honor.

5              THE COURT:  Thank you.  I wish you all happy holidays.

6    That will conclude our hearing, and we'll stand in recess.

7              MR. LEVITT:  Thank you, Your Honor.

8              (Recess at 3:11 p.m.)

9                        REPORTER'S CERTIFICATE

10

11        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

12

13        Dated at Denver, Colorado, this 31st day of December,

14    2015.

15                                  s/Therese Lindblom

16                        _____

17                        Therese Lindblom,CSR,RMR,CRR

18

19

20

21

22

23

24

25